No. 25-2087
(1:25-cv-01432-RDA-LRV)

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

### FAIRFAX COUNTY SCHOOL BOARD

*Plaintiff – Appellant,*

v.

### LINDA MCMAHON, in her official capacity as Secretary of Education of the United States; UNITED STATES DEPARTMENT OF EDUCATION

*Defendants – Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Honorable Rossie D. Alston, District Judge

---

### ALEXANDRIA CITY SCHOOL BOARD'S
### MOTION FOR LEAVE TO INTERVENE AS PLAINTIFF-APPELLANT

John F. Cafferky, VSB No. 26179
Michael K. Kim, VSB No. 82922
Jakob T. Stalnaker, VSB No. 95010
BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)
jcafferky@bklawva.com
mkim@bklawva.com
jstalnaker@bklawva.com

*Counsel for Movant Alexandria City School Board*

**Table of Contents**

Introduction ................................................................................................1

Background Relevant to Consideration of this Motion ............................4

Argument....................................................................................................8

I.     Standard for Permissive Intervention in the Court of Appeals. ........................9

II.   All of the *AEF* factors support granting the School Board's request for
intervention. ............................................................................................10

   A.   The School Board's request is timely and the prudential guardrails identified
by this Court in AEF are not a bar to the ACSB's intervention, especially given
the *sua sponte* dismissal by the District Court. ...................................................10

   B.   The School Board's intervention is necessary to protect its interest in its
allocated federal funds. ........................................................................................13

     1.   The School Board cannot bring suit in the District Court. ........................13

     2.   The School Board cannot bring suit in the Court of Federal Claims to
obtain the injunctive relief it needs..............................................................13

   C.   ACSB's interests cannot be protected by the Appellants without intervention
by the School Board, and denial of intervention would preclude ACSB from
receiving any relief from this Court....................................................................14

Conclusion ...............................................................................................17

## Table of Authorities

**Page(s)**

**Cases:**

*Alt v. EPA*,
    758 F.3d 588 (4th Cir. 2014) ....................................................10, 11

*Arlington County School Board v. McMahon, et al.*,
    Case No. 1:25-cv-01432, ECF Nos. 1-3 ...................................... 2-3

*Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*,
    88 F.4th 495 (4th Cir. 2023) ...............................................*passim*

*Berger v. N.C. State Conference of the NAACP*,
    597 U.S. 179, 142 S. Ct. 2191 (2022) ...........................................15

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)....................................................................13

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022)..............................................................1, 8, 9

*Doe v. South Carolina*,
    No. 25-1787,
    2025 U.S. App. LEXIS 20849 (4th Cir. Aug. 15, 2025)............................6, 7

*Doran v. Salem Inn, Inc.*,
    422 U. S. 922, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975) ........................ 16-17

*Fairfax County School Board v. McMahon, et al.*,
    Case No. 1:25-cv-01432, ECF Nos. 1-3 .........................................2

*Goose Creek Physical Med., LLC v. Kennedy*,
    No. 2:22-cv-03932-DCN, 2025 U.S. Dist. LEXIS 141792
    (D.S.C. July 24, 2025) ..............................................................13

*Gould v. Alleco, Inc.*,
    883 F.2d 281 (4th Cir. 1989) ........................................................10

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 (4th Cir. 2020) .....................................................2, 5, 7

*Hill v. Western Electric Company, Inc.*,
    672 F.2d 381 (4th Cir. 1982) .......................................................11

*JLS, Inc. v. PSC of W. Va.*,
  321 F. App'x 286 (4th Cir. 2009).................................................15

*Lummi Tribe of the Lummi Reservation v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) ....................................................14

*Scott v. Bond*,
  734 F. App'x 188 (4th Cir. 2018)..................................................10

*Todd v. United States*,
  386 F.3d 1091 (Fed. Cir. 2004) ....................................................13

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025)............................................................4, 16

*United States v. Testan*,
  424 U.S. 392 (1976)....................................................................13

**Statutes & Other Authorities:**

2 C.F.R. § 200.208 ...........................................................................6

2 C.F.R. § 3474.1 .............................................................................6

5 U.S.C. § 706(2)(A)-(B) .................................................................7

20 U.S.C. §1681 *et seq*...................................................................4-5

28 U.S.C. § 2201 ..............................................................................7

28 U.S.C.A. § 1491(a)(1)................................................................14

4th Cir. Local Rule 12(e) .................................................................1

4th Cir. Local Rule 27(a) .................................................................4

Fed. R. App. P. 15(d) .....................................................................11

Fed. R. Civ. P. 24 ...........................................................................15

Va. Code § 22.1-71 ...........................................................................1

Va. Const. Art. VIII, § 7 ...................................................................1

The Alexandria City School Board[1] ("ACSB" or the "School Board") moves to intervene as an appellant in this appeal, pursuant to this Court's authority to grant permissive intervention. *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 278-79 (2022); *Ass'n for Educ. Fairness v. Montgomery Cty. Bd. of Educ.*, 88 F.4th 495, 498 (4th Cir. 2023) ("*AEF*"); 4th Cir. R. 12(e). ACSB seeks to protect its immediate interests – distinct from those of Appellant – and to ensure the availability of relief in this Court from the arbitrary and unlawful acts of the Appellees by moving to intervene and filing its own Emergency Motion for Injunction Pending Appeal, which is attached hereto as Exhibit A. ACSB respectfully requests that the Court grant ACSB's Motion to Intervene and deem its Emergency Motion for Injunction Pending Appeal filed as of the date the Court grants the Motion to Intervene.

## Introduction

The United States Department of Education ("Department") and its Secretary Linda McMahon (collectively, "Appellees") have – via the administrative complaint process operated by the Department's Office for Civil Rights ("OCR") – attempted and continue in their effort to coerce ACSB and four other school divisions in

---

[1] ACSB operates, maintains, and supervises Alexandria City Public Schools ("ACPS") pursuant to the Virginia Constitution and Virginia law. Va. Const. Art. VIII, § 7; Va. Code § 22.1-71. ACSB, through ACPS, administers the public schools within the City of Alexandria, Virginia.

northern Virginia into violating Title IX and this Court's binding precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 619 (4th Cir. 2020), upon pain of loss of tens of millions of dollars in federal grant funds administered by the Department. Those funds include programs that provide special education and therapy for students with disabilities; transportation for students who are homeless; reading and other support for students in underprivileged schools; career and technical education; assistance for student support and academic enrichment and funds for English language learner students. Those funds also represent a significant proportion of ACSB's budget, the loss of which will result in significant cutbacks on services and programs that will result in immediate harm to the student population ACSB serves. Importantly, as outlined in the Declaration of ACSB Chief Financial Officer Dominic Turner, Ex. C, threatened loss of these federal funds is uniquely harmful to a diverse, largely urban district such as ACSB, with a large percentage of economically disadvantaged and English Language Learner students.

On August 29, 2025, two of those divisions, the Fairfax County School Board ("FCSB") and the Arlington County School Board ("ASB"), filed an emergency motion to enjoin Appellees from their unlawful actions. *Fairfax County School Board v. McMahon, et al.*, Case No. 1:25-cv-01432, ECF Nos. 1-3; *Arlington County*

*School Board v. McMahon, et al.*, Case No. 1:25-cv-01432, ECF Nos. 1-3.[2] Just a few days later, the U.S. District Court for the Eastern District of Virginia denied those divisions' motions for emergency relief and dismissed their complaints *sua sponte* for lack of subject matter jurisdiction. Ex. B ("Order") at 10-12; FCSB Dist. Ct. ECF No. 28 at 10-12; ASB Dist. Ct. ECF No. 27 at 10-12. In doing so, the District Court held that the Appellants are required to pursue their claims in the Court of Federal Claims. *Id.* But the Court of Federal Claims does not have jurisdiction over these claims and cannot provide the relief required. The District Court's decision was error, and leaves school divisions, including ACSB, without recourse to challenge Appellee's legally impermissible threat to withhold essential federal grant funds that will significantly harm ACSB and the students it serves unless ACSB accedes to Appellees' demand that ACSB violate Title IX as applied in *Grimm* by changing its facility access policies for transgender students.

ACSB must intervene in this appeal in order to protect its own interests, and the interests of the many thousands of students it serves. While ACSB faces similar legal issues that FCSB and ASB face, it receives different funds, in different amounts from the other divisions, and faces harm distinct from FCSB and ASB. ACSB's federal funding amounts to approximately 5.2% of its annual budget of $392.27

---

[2] In the absence of an Appendix, the School Board will cite to the District Court records as "FCSB Dist. Ct. ECF" and "ASB Dist. Ct. ECF", and the dockets in this Court as "FCSB 4th Cir. ECF" and "ASB 4th Cir. ECF".

million, and given the makeup of its student population – 47% of whom are eligible for free/reduced price meals – it is highly reliant on those funds to ensure that adequate services are provided to its students. Ex. C.

Furthermore, as the U.S. Supreme Court has recently made clear, ACSB must be a *party* to the litigation in order to gain the benefit of any relief provided by this Court. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 (2025). This Court can, and should, permit ACSB to intervene in this appeal, and award ACSB and the Appellant relief.

Pursuant to 4th Cir. Local Rule 27(a), Appellant consent to this motion, and Appellees oppose it and intend to file a reply.

## **Background Relevant to Consideration of this Motion**

In February of 2025, OCR launched an investigation into five school divisions[3] in northern Virginia, including ACSB. FCSB Dist. Ct. ECF No. 1 at ¶ 41; ASB Dist. Ct. ECF No. 1 at ¶ 41. That investigation was undertaken in response to a complaint by America First Legal (founded by White House Deputy Chief of Staff Stephen Miller) which sought to compel the five school divisions to change their facility access policies for transgender students in a manner that would directly violate Title IX of the Education Amendments of 1972, 20 U.S.C.

---

[3] Those school divisions were FCSB, ASB, ACSB, the Loudoun County School Board, and the Prince William County School Board.

§1681 *et seq.*, as applied in this Court's decision in *Grimm*. FCSB Dist. Ct. ECF No. 1 at ¶ 41-42; ASB Dist. Ct. ECF No. 1 at ¶ 41-42. OCR then sought information from ACSB concerning its non-discrimination policy. ACSB's Policy JB is attached hereto as Exhibit D.

ACSB promptly responded to OCR's inquiries, noting that its Policy JB was squarely in compliance with Court's decision in *Grimm* and with Title IX. Moreover, ACSB confirmed that it had received no complaints regarding Policy JB during the time period at issue.

On July 25, 2025, OCR issued a Findings Letter directed to ACSB and the other four school divisions, asserting that Policy JB (and similar facilities-access policies) violates Title IX as applied in other circuits. FCSB Dist. Ct. ECF No. 1-8; ASB Dist. Ct. ECF No. 1-7. With the Findings Letter, OCR delivered a draft Resolution Agreement which requires that each division (1) modify its policy to ensure that access to restroom and locker room facilities will be limited by students' sex assigned at birth; and (2) ensure that all policies adopt OCR's definition of the terms "sex, female, male, girls, women, boys [and] men." OCR's definitions of these terms treat individuals exclusively according to the sex assigned them at birth. Ex. E; FCSB Dist. Ct. ECF No. 1-9; ASB Dist. Ct. ECF No. 1-8.

5

In response to the Findings Letter, ACSB informed OCR that it could not modify its policies as demanded by the Department without violating Title IX and this Court's precedent, and that the legal and factual analysis in the Findings Letter was fundamentally flawed. Ex. F. ACSB's position was confirmed the same day, when this Court granted a stay pending appeal in *Doe v. South Carolina*, expressly holding that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." No. 25-1787, 2025 U.S. App. LEXIS 20849 *19 (4th Cir. Aug. 15, 2025). On September 10, 2025, the U.S. Supreme Court denied South Carolina's application for a stay of this Court's injunction pending appeal. *South Carolina v. Doe*, No. 25A234, 2025 U.S. LEXIS 2784, at *1 (Sep. 10, 2025). *Grimm* remains precedent in the Fourth Circuit and continues to bind ACSB.

Nevertheless, on August 19, 2025, the Department designated ACSB as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.1 ("Designation Letter"). Ex. G. *Inter alia*, the Designation Letter required ACSB to submit plans for compliance with "all federal laws" and "submit a corrective action plan." *Id.* The Department's August 19, 2025 letter makes clear that ACSB will not receive reimbursement unless it accedes to the Department's interpretation of Title IX, which is not consistent with this Court's precedent. Accordingly, the Department's demand that ACSB agree to the terms of a "Resolution Agreement" and enter into a "corrective action plan" that is directly contrary to this Court's

6

Title IX holding in *Grimm*, and ruling in *Doe*, constitutes an attempt to coerce ACSB into violating federal law by threatening the immediate loss of tens of millions of dollars in federal funds that ACSB relies on to operate its schools and serve its students.

On August 29, 2025, FCSB and ASB brought suit in the District Court, and sought emergency relief from the Appellees' actions. FCSB Dist. Ct. ECF Nos. 2-3; ASB Dist. Ct. ECF Nos. 2-3. FCSB and ASB brought claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(B), and the Declaratory Judgment Act, 28 U.S.C. § 2201. FCSB Dist. Ct. ECF No. 1; ASB Dist. Ct. ECF No. 1. The District Court set a hearing for Wednesday, September 3, 2025, shortly after the Labor Day holiday. Order at 2. That day, the District Court heard arguments on the Motions and took the matter under advisement. *Id.* at 3. At the end of the hearing, counsel for ASB and FCSB informed the Court that litigation by ACSB would be forthcoming. *See* FCSB Dist. Ct. ECF No. 33.[4]

Just two days later, however, the District Court denied FCSB and ASB's emergency motions, concluding that only the Court of Federal Claims had jurisdiction over the complaints. Order at 10-11. The District Court dismissed both complaints *sua sponte*, for the same reason. *Id.* at 11-12. In its opinion, the District

---

[4] While the transcript of the hearing is not presently publicly available, the undersigned counsel was present in Court when the representation was made.

Court did state that "This Court unconditionally recognizes that *Grimm* 'remains the law of this Circuit' and thus binds both this Court and parties within the Fourth Circuit." *Id.* at 4. Both FCSB and ASB timely noted their appeals, FCSB Dist. Ct. ECF No. 30; ASB Dist. Ct. ECF No. 29, and both moved this Court for injunctive relief pending appeal on September 15, 2025 and September 17, 2025, respectively. FCSB 4th Cir. ECF No. 10; ASB 4th Cir. ECF No. 6. On September 16, 2025, the Department announced that it was "seeking suspension of federal financial assistance to the Divisions," including ACSB. Ex. H.

Asserting its own substantial and unique interest in the important subject matter of this appeal, ACSB timely moves to intervene as a party to this appeal. Not only does ACSB have significant interest in its federal funds and the recission of its own high-risk designation, but without intervention, ACSB will not obtain the benefit of any injunctive relief available in this Court.

## **Argument**

The United States Supreme Court and this Court have recognized the availability of permissive intervention in federal appellate courts in appropriate cases. *Cameron*, 595 U.S. at 278-79; *AEF*, 88 F.4th at 498. This appeal is exactly such a case for permissive appellate intervention – intervention is timely sought and necessary to protect the interests of ACSB and the students it serves.

I.    **Standard for Permissive Intervention in the Court of Appeals.**

"No statute or rule provides a general standard to apply in deciding whether intervention on appeal should be allowed." *AEF*, 88 F.4th at 498 (quoting *Cameron*, 595 U.S. at 276). *See also Faulkner v. Martin*, 2023 U.S. App. LEXIS 26004 (5th Cir. Sep. 29, 2023) (granting leave for permissive intervention under Cameron, where the movant's interest "may not be adequately represented by the defendant . . . or the plaintiffs"); *Friends of George's, Inc. v. Mulroy*, 2023 U.S. App. LEXIS 24666 (6th Cir. Sep. 15, 2023) (granting permissive intervention on appeal where the movant "has a claim or defense that shares with the main action a common question of law or fact." (internal quotation omitted)). As a result, permissive intervention in an appeal is committed to this Court's discretion. *AEF*, 88 F.4th at 498. In *AEF*, this Court provided the analytical framework for intervention on appeal in the Fourth Circuit.

In considering intervention, this Court looked to the *Cameron* decision, for "a non-exhaustive list of factors— including the timeliness of the organizations' request, the interests the organizations seek to represent, the extent to which the existing parties adequately represent those interests, and the effect on the organizations and the current parties of granting or denying intervention." *AEF*, 88 F.4th at 499 (citing *Cameron*, 595 U.S. 276-82). The Court also identified two additional concerns for appellate intervention: a party seeking intervention

9

*generally* must do so while the case is pending before a trial court instead of on appeal and appellate intervention cannot be used as an end-run around the discretion of the trial court. *Id*.

ACSB satisfies each of the requirements for intervention in this appeal, and neither prudential consideration is triggered in this case.

## II.   All of the *AEF* factors support granting the School Board's request for intervention.

Each of the factors identified by the Court in *AEF* supports ACSB's intervention in this appeal: the request is timely, and necessary to protect ACSB's interests, which cannot be protected without intervention.

### A. The School Board's request is timely and the prudential guardrails identified by this Court in *AEF* are not a bar to ACSB's intervention, especially given the *sua sponte* dismissals by the District Court.

The truncated proceedings in the District Court practically prevented ACSB from intervening below, and intervention now is timely. ACSB recognizes that "[t]imeliness is a central consideration when deciding a motion to intervene, and a movant's failure to seek intervention in a timely manner is sufficient to justify denial of such motion." *Scott v. Bond*, 734 F. App'x 188, 191 (4th Cir. 2018) (addressing intervention at the district court level). Timeliness considerations include "(1) how far the case has progressed, (2) the prejudice to other parties caused by any tardiness in filing the motion, and (3) the reason for any tardiness. *Id.* (citing *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014); *Gould v. Alleco, Inc.*, 883

10

F.2d 281, 286 (4th Cir. 1989)). "The most important consideration in reviewing a motion to intervene is whether the existing parties will suffer prejudice if the motion is granted." *Hill*, 672 F.2d at 386. The timeliness requirement "is intended to prevent an intervenor from 'derailing a lawsuit within sight of the terminal.'" *Id.* (quoting *Alt*, 758 F.3d at 591).

Here, ACSB's motion to intervene cannot in any respect fairly be said to be tardy. In the District Court, the Complaints were dismissed only two days after an initial hearing, and only a week after the Complaints were filed. *See* Order at 1-3. The lawsuit had not progressed past a motion for emergency relief and Appellees had not even filed responsive pleadings. *Id.*

Likewise in this Court, this motion is filed within a few days of the Notice of Appeal, and the emergency motions for an injunction. That period is significantly shorter than the analogous 30 days allowed by Rule 15(d) of the Federal Rules of Appellate Procedure. By any reasonable standard, ACSB's intervention is timely.

Furthermore, there is no prejudice to the other parties caused by the few days since the filing of this appeal, or the few weeks since filing of the original actions in the district court. Appellees have been treating FCSB, ASB, and ACSB in a similar fashion in regard to the initiating OCR complaint since February 2025. FCSB Dist. Ct. ECF Nos. 1-8, 1-9; ASB Dist. Ct. ECF Nos. 1-7, 1-8; Ex. D. And,

the District Court and Appellees were informed at oral argument of forthcoming litigation from ACSB. *See*, FCSB ECF No. 33.

Importantly, the prudential concerns relating to filing in the District Court are not present in this case. The purpose of the "guardrails" identified in *AEF* are to protect against circumvention of the District Court, by not presenting it with the opportunity to decide intervention, or by sidestepping its discretionary decision-making. 88 F.4th at 499. Neither consideration is implicated here. Within less than two days of their filing, the District Court *sua sponte* set a hearing on the emergency motions. Within two more business days the Court had heard those motions, and less than two days later had dismissed the Complaint altogether. *See* Order at 1-3. This is not at all a case where ACSB waited through protracted litigation before seeking to intervene on appeal; nor is ACSB seeking a rerun on appeal, having been denied intervention below. Moreover, given that the District Court dismissed the complaints without further briefing, if ACSB had attempted to intervene the Court would almost certainly have determined, just as did the district court in *AEF*, that "the intervention question had been rendered academic by its decision to enter a final judgment" albeit against FCSB and ASB. *AEF*, 88 F.4th at 499. ACSB would then be in the same position as it is today.

In short, ACSB's intervention in this appeal is timely, and does not offend the prudential concerns identified in *AEF*.

**B. The School Board must intervene to protect its interest in its allocated federal funds.**

The School Board's intervention in this appeal is necessary, as the two jurisdictions for seeking relief are futile and unavailable.

**1. The School Board cannot bring suit in the District Court.**

ACSB cannot practically bring suit in the District Court, because such an effort would be subject to a stay pending this appeal. *See, e.g.*, *Goose Creek Physical Med., LLC v. Kennedy*, No. 2:22-cv-03932-DCN, 2025 U.S. Dist. LEXIS 141792, at *10 (D.S.C. July 24, 2025) (stay granted pending outcome of appeals on similar issues). ACSB cannot seek relief in the District Court at this stage.

**2. The School Board cannot bring suit in the Court of Federal Claims to obtain the injunctive relief it needs.**

Similarly, ACSB is unable to obtain the relief it needs from the Court of Federal Claims. The Court of Federal Claims' "jurisdiction is statutorily granted and is to be strictly construed." *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988). "The jurisdiction of the Court of Federal Claims under the Tucker Act is 'limited to actual, presently due money damages from the United States.'" *Todd v. United States*, 386 F.3d 1091, 1093 (Fed. Cir. 2004) (quoting *United States v. Testan*, 424 U.S. 392, 398 (1976)).

Additionally, the Court of Federal Claims lacks jurisdiction over constitutional and statutory claims unless they involve money-mandating statutes.

13

*Lummi Tribe of the Lummi Reservation v. United States*, 870 F.3d 1313, 1317

(Fed. Cir. 2017). A statute is money mandating for purposes of the Tucker Act if:

(1) it can fairly be interpreted as mandating compensation by the Federal

Government for damages sustained, or (2) it grants the claimant a right to recover

damages either expressly or by implication. 28 U.S.C.A. § 1491(a)(1). And, the

Federal Circuit has held that statutes providing for formula grants are not money-

mandating, even if they require specific awards to specific entities, if the grants are

awarded pursuant to "string-attached" agreements rather than a "free and clear

transfer of money." *Lummi Tribe*, 870 F.3d at 1319.

  Here, by virtue of the District Court's decision below, ACSB is in limbo,

stuck between a District Court that has held it does not have subject matter

jurisdiction, and the Court of Federal Claims which does not have subject matter

jurisdiction, under binding precedent. ACSB's only present remedy lies in this

Court and intervening in this appeal.

### C. **ACSB's unique interests cannot be fully protected by the Appellant, and denial of intervention would preclude ACSB from receiving any relief from this Court.**

  ACSB's interests, which are unique and distinct from that of Appellant,

cannot be protected by Appellant without intervention here, because it receives

different funds, and would not be a party to any injunctive relief this Court grants

Appellant.

14

First, ACSB's interests are in its own high-risk designation, and that designation's impact on its funds and financial reputation. Those interests are unique to ACSB and cannot be protected by Appellant. To demonstrate inadequacy, ACSB "need not show that the representation by existing parties will *definitely* be inadequate in this regard." *JLS, Inc. v. PSC of W. Va.*, 321 F. App'x 286, 289 (4th Cir. 2009) (addressing intervention under Fed. R. Civ. P. 24). That burden is "minimal." *Id.* And, "[w]here the absentee's interest is similar to, but not identical with, that of one of the parties, that normally is not enough to trigger a presumption of adequate representation." *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 197, 142 S. Ct. 2191, 2204 (2022) (addressing intervention under Fed. R. Civ. P. 24).

ACSB's interests in this case are similar, but not identical to those of FCSB and ASB. ACSB serves more than 16,000 students, attending 18 schools. Ex. C. Of those, 47% are eligible for free/reduced price meals, 38 % require English Language Learner services, and 12% receive special education. *Id.*, ¶ 2. For fiscal year 2026, ACSB expects to receive over $20 million in federal funding, supporting 194 positions, most of which are school-based positions benefitting students. *Id.*, ¶ 3. At this point, ACSB does not have the practical ability to replace these sources of funding.

Additionally, ACSB relies on federal funds to a greater degree than its neighboring jurisdictions in Arlington and Fairfax. For example, more than half of ACSB's schools are Title I schools, nearly double that of Arlington or Fairfax. *Id.* And, ACSB's Title I funding as a share of its budget is almost triple its neighboring jurisdictions. *Id.* ACSB's Title II funding is more than twice that of Arlington and 70% higher than that of Fairfax. *Id.* ACSB's IDEA funding is likewise as high or higher than the other jurisdictions. *Id.* ACSB's federal nutrition funding as a percentage of the overall school nutrition fund is between 15% and 30% higher for ACSB than either Fairfax and Arlington, respectively. *Id.* The immediate impact on ACSB, with a smaller overall budget than the other Appellants, is significant. Should the Appellees succeed in suspending ACSB's federal funds, there will be significant impacts on student services, staffing assignments, and everyday expenditures that will cause real harm to the students served by ACSB.

Second, the U.S. Supreme Court made clear that because the "universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump*, 145 S. Ct. at 2554. Instead, the Court reiterated that "'[n]either declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.'" *Id.* at 2552 (quoting *Doran* v. *Salem Inn, Inc.*,

422 U. S. 922, 931, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975)) (alteration added).

That is the case here: ACSB has similar, but not identical, interests to the

Appellants, but cannot partake of any remedy without intervening in this appeal,

and bringing its own Emergency Motion. Ex. A.

     For the same reasons, denial of ACSB's motion for leave to intervene would

preclude ACSB from partaking in any relief this Court awards. That would place

the ACSB with a valid legal claim, but with no venue in which to bring it. This

Court would be unavailable; the District Court would direct ACSB to the Court of

Federal Claims; and the Court of Federal Claims would direct ACSB right back to

the District Court. That outcome is untenable.

<strong><u>Conclusion</u></strong>

     The Appellees have placed ACSB in an impossible position. And

intervention by the School Board in this appeal is necessary to protect ACSB's

separate and significant interest in its federal funding and designation. For the

foregoing reasons, the Alexandria City School Board respectfully requests that the

Court grant it leave to intervene in this appeal as an appellant, and deem its

Emergency Motion for Injunction Pending Appeal filed.

By Counsel

Date: September 22, 2025

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)

By:        /s/ Michael K. Kim
       John F. Cafferky, VSB No. 26179
       jcafferky@bklawva.com
       Michael K. Kim, VSB No. 82922
       mkim@bklawva.com
       Jakob T. Stalnaker, VSB No. 95010
       jstalnaker@bklawva.com

*Counsel for Movant Alexandria City
School Board*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the

parts of the document exempted by Fed. R. App. P. 32(f):

      this document contains 4,050 words.

2.    This document complies with the typeface requirements because:

this document has been prepared in a proportional spaced typeface using

Microsoft Word in 14 point Times New Roman.

/s/ Michael K. Kim
Michael K. Kim, VSB No. 82922
mkim@bklawva.com
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (Telephone)
(703) 691-3913 (Facsimile)
*Counsel for Movant Alexandria City School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2025, I electronically

filed a copy of the foregoing with the Clerk of the Court using the CM/ECF

system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Michael K. Kim

Michael K. Kim, VSB No. 82922
mkim@bklawva.com
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (Telephone)
(703) 691-3913 (Facsimile)

*Counsel for Movant Alexandria City School Board*

# Exhibit A

**No. 25-2087**
**(1:25-cv-01432-RDA-LRV)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**FAIRFAX COUNTY SCHOOL BOARD**

*Plaintiff – Appellant,*

v.

**LINDA MCMAHON, in her official capacity as Secretary of Education of the United States; UNITED STATES DEPARTMENT OF EDUCATION**

*Defendants – Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Honorable Rossie D. Alston, District Judge

---

**PROPOSED INTERVENOR ALEXANDRIA CITY SCHOOL BOARD'S**
**EMERGENCY MOTION FOR TEMPORARY INJUNCTION**
**PENDING APPEAL**

John F. Cafferky, VSB No. 26179
Michael K. Kim, VSB No. 82922
Jakob T. Stalnaker, VSB No. 95010
BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)
jcafferky@bklawva.com
mkim@bklawva.com
jstalnaker@bklawva.com

*Counsel for Movant Alexandria City School Board*

**Table of Contents**

Introduction .................................................................................................1

Relevant Factual Background ......................................................................4

    A.    The Parties. ....................................................................................4

    B.    OCR's complaint investigation, Findings Letter and
        "voluntary" resolution demand to ACSB ..............................5

    C.    Despite legal developments reaffirming that *Grimm* remains
        the law for ACSB, the Department threatens cutoff of
        ACSB's federal funds unless ACSB capitulates to a contrary
        position. ..........................................................................................7

    D.    ACSB's federal grant funds are essential to serve its neediest
        students. ..........................................................................................8

    E.    The lawsuit below and the district court decision. ...................10

    F.    The Department's renewed threat to cut off ACSB's federal
        funds ..............................................................................................11

Argument......................................................................................................11

    I.    An emergency injunction should be granted in this Court
       pending consideration of the appeal of the District Court's
       jurisdictional ruling ....................................................................11

        A.    Plaintiff-Appellant, and ACSB, are likely to succeed on
            the merits of the appeal, and the underlying substantive
            claim. ......................................................................................12

        1.    The District Court's dismissal on jurisdictional grounds
            was in error, since Plaintiff-Appellant's claims lie
            exclusively within Article III Courts' jurisdiction...................12

            a.    The Court of Federal Claims lacks jurisdiction
                because neither Title IX nor the grants at issue
                involve money-mandating statutes. ...............................12

            b.    The APA, on which Plaintiff-Appellant's claims
                are in part based, contains its own avenue of
                judicial review. .............................................................13

c.    Claims for funds improperly denied in violation of Title IX are "relief other than money damages" and subject to the APA. ................................14

d.    Where Congress has expressly designated jurisdiction, emergency-docket decisions are unnecessary to consider. ................................17

2.    Plaintiff-Appellant's substantive claims as to Title IX are correct. ................................................................18

B.    ACSB will suffer irreparable harm absent an injunction, and McMahon and the Department certainly will not ................................................................20

C.    The public interest favors the granting of an injunction ..........22

Conclusion ................................................................22

# Table of Authorities

*Arlington County School Board v. McMahon, et al.*,
  Case No. 1:25-cv-01432, ECF Nos. 1-3 .........................................2

*Bennett v. Spear,*
  520 U.S. 154 (1997)......................................................................16

*Bowen v. Massachusetts*,
  487 U.S. 879, 908 n.46 (1988) ...................................................13

*C.G. ex rel. P.G. v. Saucon Valley Sch. Dist.*,
  571 F.Supp.3d 430 (E.D. Pa. 2021).............................................21

*Dep't of Educ. v. California*,
  14 S. Ct. 966 (2025)......................................................................15

*Doe v. South Carolina*,
  No. 25-1787,
  2025 U.S. App. LEXIS 20849 (4th Cir. Aug. 15, 2025).........7, 19

*Fairfax County School Board v. McMahon, et al.*,
   Case No. 1:25-cv-01432, ECF Nos. 1-3 ......................................2

*Freeman v. Quicken Loans, Inc.*,
  566 U.S. 624 (2012)......................................................................17

*Frozen Food Express v. United States*,
  351 U.S. 40 (1956)........................................................................17

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020) .................................................*passim*

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020), *cert. denied*
  114 S. Ct. 2878 (2021).................................................................18

*Grimmett v. Freeman*,
  No. 22-1844, 2022 WL 3696689 (4th Cir. Aug. 25, 2022)..........12

*Harris v. Wood*,
  888 F. Supp. 747 (W.D. Va. 1995)..............................................22

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ....................................................20, 22

*Lipsett v. Univ. of P.R.*,
   864 F.2d 881 (1st Cir. 1988) ........................................................15

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024).....................................................................16

*Lummi Tribe of the Lummi Reservation, WA v. United States*,
   870 F.3d 1313 (Fed. Circ. 2017) ................................................13

*Maine v. United States Dep't of Agric.*,
   778 F. Supp. 3d 200 (D. Me. 2025) .................................15, 16, 17

*Me. Cmty. Health Options v. United States*,
   590 U.S. 296 (2020)......................................................................14

*Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
   918 F.3d 353 (4th Cir. 2019) .......................................................21

*Multi-Channel TV Cable Co. v.*
   *Charlottesville Quality Cable Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) .........................................................20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)......................................................................19

*New York v. United States*,
   505 U.S. 144 (1992).....................................................................20

*Palmore v. United States*,
   411 U.S. 389 (1973)......................................................................14

*Pappas v. FCC*,
   807 F.2d 1019 (D.C. Cir. 1986).....................................................18

*President and Fellows of Harvard College, et. al. v. United States*
   *Department of Health and Human Servs. et. al.*,
   No. 25-cv-11048-ADB (D. Mass. Sept. 3, 2024).........................15

*S. Dakota v. Dole*,
   483 U.S. 203 (1987)......................................................................20

*South Carolina v. Doe*,
   No. 25A234, 2025 U.S. LEXIS 2784 (Sep. 10, 2025) ...................7

*Sustainability Institute v. Trump*,
   2025 U.S. App. LEXIS 14121 (4th Cir. June 5, 2025) .................17

iv

*Tandon v. Newsom*,
    593 U.S. 61 (2021)........................................................................12

*Tenn. v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ....................................................14

*Todd v. United States*,
    386 F.3d 1091 (Fed. Cir. 2004) ..................................................13

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)..................................................................4

*United States v. Testan*,
    424 U.S. 392 (1976)....................................................................13

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
    386 F.3d 581 (4th Cir. 2004) ......................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................11

**Statutes & Other Authorities:**

5 U.S.C. § 551 ....................................................................................16

5 U.S.C. § 702 ..............................................................................13, 16

5 U.S.C. § 706(2)(A)....................................................................16, 18

5 U.S.C. § 706(2)(A)-(B)....................................................................10

20 U.S.C. § 1681 *et seq*......................................................................5

20 U.S.C. § 1683 ..........................................................................14, 16

28 U.S.C. § 2201 ........................................................................10, 18

APA § 1683 ........................................................................................17

4ᵗʰ Cir. Local Rule 12(a) ....................................................................4

4ᵗʰ Cir. Local Rule 12(e) ....................................................................1

U.S. CONST. Amend. X........................................................................20

U.S. CONST. art. III, § 1 ....................................................................14

Va. Code § 22.1-71 ..............................................................................4

Va. Const. Art. VIII § 7 ......................................................................4

## PROPOSED INTERVENOR ALEXANDRIA CITY SCHOOL BOARD'S EMERGENCY MOTION FOR TEMPORARY INJUNCTION PENDING APPEAL

Proposed Intervenor Alexandria City School Board ("ACSB"), pursuant to Fourth Circuit Local Rule 12(e), together with its Motion to Intervene filed concurrently herewith, moves this Court to grant its Emergency Motion for Temporary Injunction Pending Appeal.

## Introduction

The United States Department of Education ("Department") and its Secretary Linda McMahon ("Appellees") continue – via the complaint process operated by the Department's Office for Civil Rights ("OCR") – in their effort to strongarm ACSB and four other northern Virginia school divisions into violating Title IX and this Court's binding precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 619 (4th Cir. 2020), by threatening ACSB with the immediate loss of tens of millions of dollars in federal grant funds administered by the Department, if ACSB does not: (1) rescind its current nondiscrimination policy, which follows *Grimm*, and instead limit access to restroom and locker room facilities solely on the basis of students' sex assigned at birth; and (2) ensure that all ACSB policies adopt OCR's definition of "sex, female, male, girls, women, boys [and] men," which treat students exclusively according to the sex assigned them at birth. Those funds that Appellees have threatened to withhold – which have nothing to do with ACSB's policies

1

relating to transgender students – are earmarked for programs providing essential assistance for thousands of ACSB's neediest students, including special education and therapy for disabled children; transportation for students experiencing homelessness; reading and other support for economically underprivileged; career and technical education; and funds for students struggling to learn English. Contrary to the Department's representations to the district court below that it was seeking only to exercise some "additional scrutiny" over these school divisions' federal grant applications, a September 16, 2025 Department press release tells the real story: "After the Divisions' rejection of OCR's proposed Resolution Agreement to voluntarily resolve its Title IX violations, *the Department is seeking suspension of federal financial assistance to the Divisions*." Ex. H (emphasis added).[1]

On August 29, 2025, two school divisions, Fairfax County School Board ("FCSB") and Arlington County School Board ("ASB"), filed emergency motions to enjoin Defendants-Appellees from maintaining this unlawful course of action. *Fairfax County School Board v. McMahon, et al.*, Case No. 1:25-cv-01432, ECF Nos. 1-3; *Arlington County School Board v. McMahon, et al.*, Case No. 1:25-cv-01432, ECF Nos. 1-3.[2] Just a few days later, the District Court denied those

---

[1] Exhibits referred to herein are attached to ACSB's Motion to Intervene filed concurrently herewith.

[2] Absent an Appendix, the School Board will cite to the District Court records as "FCSB Dist. Ct. ECF" and "ASB Dist. Ct. ECF", and the dockets in this Court as "FCSB 4th Cir. ECF" and "FCSB 4th Cir. ECF".

divisions' motions for emergency relief and dismissed their complaints *sua sponte* for lack of subject matter jurisdiction, without reaching the merits of those claims, or the harms threatened by Defendants-Appellants' actions. FCSB Dist. Ct. ECF No. 28 at 10-12; ASB Dist. Ct. ECF No. 27 at 10-12 ("Order"). Instead, the District Court held that Plaintiffs-Appellant had to litigate these issues in the Court of Federal Claims ("CFC"), even though that Court lacks jurisdiction over APA and Title IX claims seeking equitable relief. The District Court's decision was error, and leaves ACSB without recourse to challenge Appellees' attempt to force school divisions to comply with a legally invalid position by threatening the loss of essential and properly awarded federal grant funds.

The loss of such federal funds imposes significant and uniquely harmful consequences on ACSB. As a largely urban district with a highly diverse community and student population, it depends even more heavily than most upon federal funding for services such Title I instruction for disadvantaged students; assistance for many students striving to learn English; meals for children who might otherwise go hungry; and special education for infants, toddlers and school-aged disabled children. Overall, ACSB's federal funding amounts to approximately $20.2 million dollars, or over 5.2% of its annual budget approved last spring. ACSB has no practical ability at this point to replace those funds. Ex. C, ¶¶ 2-5, 8-9.

Furthermore, as the U.S. Supreme Court has recently made clear, ACSB must be a *party* to the litigation in order to gain the benefit of any relief provided by this Court. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 (2025). There is no reason, and insufficient time, for ACSB to pursue alone a separate lawsuit on the same issues.

While the District Court erred in its jurisdictional ruling, it correctly recognized a core substantive principle directly material here, stating, "**[t]his Court unconditionally recognizes that *Grimm* 'remains the law of this Circuit' and thus binds both this Court and parties within the Fourth Circuit**." C.A. No. 1:25-cv-1432, Dkt. 28 at 4 (September 5, 2025) (emphasis added). ACSB asks that this Court restore that law of this Circuit, by which ACSB has for years operated its schools without incident, during the pendency of this appeal.

Per Fourth Circuit Local Rule 12(a), Appellants consent to this motion, while Appellees oppose it and intend to file a reply.

## **Relevant Factual Background**

### A. **The Parties.**

ACSB operates, maintains, and supervises the Alexandria City Public Schools pursuant to the Virginia Constitution and Virginia law. Va. Const. Art. VIII, § 7; Va. Code § 22.1-71. ACSB serves more than 16,300 students who attend 18 schools. Approximately 47% of those students are eligible for free/reduced-price meals, 38% require English Language Learner services, and 12% have

4

educational disabilities and receive special education and related therapy services. Ex. C, ¶ 2.

McMahon is Secretary of the Department. She authored the Department's letter threatening to terminate ACSB's federal funds unless it capitulates to the Department's view of Title IX, which this Court has repeatedly held erroneous, and which the U.S. Supreme Court has left in place.

**B. OCR's complaint investigation, Findings Letter and "voluntary" resolution demand to ACSB.**

In February 2025, OCR launched an administrative complaint investigation into five northern Virginia school districts[3]. FCSB Dist. Ct. ECF No. 1 at ¶ 41; ASB Dist. Ct. ECF No. 1 at ¶ 41. That complaint sought to compel the school divisions to change their facility access policies for transgender students in a manner that would directly violate Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*, as applied in this Court's decision in *Grimm*. FCSB Dist. Ct. ECF No. 1 at ¶ 41-42. For ACSB, that is Policy JB. Ex. D. OCR then sought information from ACSB concerning that policy. Ex. F. OCR sought no information about ACSB's financial controls concerning grant funds.

ACSB responded in March 2025, noting that Policy JB was squarely in compliance with this Court's decision in *Grimm* and with Title IX. Furthermore,

---

[3] Those school divisions were FCSB, ASB, ACSB, the Loudoun County School Board, and the Prince William County School Board.

ACSB confirmed that it had received no complaints regarding the operation of Policy JB during the period at issue. Ex. F.

On July 25, 2025, OCR nonetheless issued a Findings Letter directed at ACSB (and the other school divisions), asserting that *Grimm* somehow did not apply, and concluding that ACSB's Policy JB violated Title IX. FCSB Dist. Ct. ECF No. 1-8. The Findings Letter also claimed that there were problems with ACSB's financial controls, even though OCR had never sought information on that issue during its "investigation," and the Findings Letter made no actual "findings" at all in that regard. This was simply pretext, since had OCR actually sought and examined evidence, it would have learned that ACSB has in place a robust, multi-tiered and exemplary system of financial controls. Ex. C, ¶¶ 10-11.

With its Findings Letter OCR delivered a "Voluntary Resolution Agreement" which would have required ACSB to change its policies contrary to applicable law, including: (1) rescinding Policy JB such that restroom and locker room facilities would be barred to gender-identifying students, and instead limited exclusively to students' sex assigned at birth; and (2) adopting across all ACSB policies OCR's definition of the terms "sex, female, male, girls, women, boys [and] men" as applying exclusively to the sex assigned at birth. Ex. E.

**C.** **Despite legal developments reaffirming that *Grimm* remains the law for ACSB, the Department threatens cutoff of ACSB's federal funds unless ACSB capitulates to a contrary position.**

In response to the Findings Letter, ACSB informed OCR that it could not modify its policies as demanded by the Department without violating Title IX and this Court's precedent, and that the legal and factual analysis in the Findings Letter was fundamentally flawed. ACSB's position was soon confirmed when this Court granted a stay pending appeal in *Doe v. South Carolina*, holding that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." No. 25-1787, 2025 U.S. App. LEXIS 20849 *19 (4th Cir. Aug. 15, 2025).[4]

Nevertheless, on August 19, 2025, the Department issued correspondence designating ACSB as a "high-risk' entity in accordance with 2 C.F.R. §§ 200.208 and 3474.1 ("Designation Letter"). Ex. G. *Inter alia*, that Letter required ACSB to "submit a corrective action plan". *Id.* It also made clear that ACSB would not receive federal grant funding reimbursement unless it acceded to the Department's interpretation of Title IX, which is directly contrary to this Court's precedent. This includes the Department's demand that ACSB execute a "Voluntary Resolution Agreement" which, it turns out, was not "voluntary" at all.

---

[4] On September 10, 2025, the U.S. Supreme Court denied South Carolina's application for a stay of this Court's injunction pending appeal. *South Carolina v. Doe*, No. 25A234, 2025 U.S. LEXIS 2784, at *1 (Sep. 10, 2025).

D. **ACSB's federal grant funds are essential to serve its neediest students.**

The Department's immediate threat to cut off federal grant funding to ACSB in an effort to force ACSB to adopt the Department's erroneous view of Title IX's requirements means losing tens of millions of dollars that support education, therapy, nutrition and other services for many of ACSB's neediest students. As further described in the Declaration of ACSB's Chief Financial Officer Dominic Turner, Ex. C, the $20,182,070 in federal grant funding included within ACSB's budget represents approximately 5.2% of its operating budget, which ACSB cannot practically replace. *Id.*, ¶ 4. That funding directly supports at least 194 positions, most of whom are school-based employees directly serving students , *Id.* ¶ 3, including:

- $3,682,791 in Individuals with Disabilities Education Act ("IDEA") funding for special education and related services for school-aged students, and early childhood and infant and toddler early intervention services, for students with disabilities.

- $4,105,065 in Title I Part A aid, $594,726 in Title II Part A aid, and $1,250,460 in Title IV aid, supporting instruction of children from low-income families;

- $722,841 in Title III aid, which helps ELL students become proficient in English;

- $324,209 in Perkins Act funding supporting career and technical education programs, including teacher training, work-based learning opportunities, and career guidance;

- $29,823 for assistance for educational services to the Juvenile Detention Center; and,

- $40,000 in McKinney-Vento aid, which supports students experiencing homelessness;

*Id*. ¶ 8. In addition, funding from other federal agencies includes:

- $9,153,000 in National School Lunch aid from the Department of Agriculture ("USDA"), providing free and low-cost meals to low income students.
- $1,900,000 in Medicaid funding from the U.S. Department of Health and Human Services for costs associated with providing therapy to children enrolled in Medicaid or Virginia's Family Access to Medical Insurance Security Plan.

*Id*. ¶ 9.

Importantly, even compared to its neighboring districts, these threatened losses of federal funds hit ACSB particularly hard. As a largely urban school division with a highly diverse student and community constituency, ACSB relies to a greater degree upon federal grants than ACSB's neighboring jurisdictions of Arlington and Fairfax County Public Schools. *Id*. ¶ 5. For example, it has double or more the percentage Title I schools, and significantly higher percentages of students eligible for free/reduced-price meals (a measure of economic disadvantage). *Id*. Accordingly, ACSB's budget necessarily includes a higher percentage of federal funding for things like Title I, special education, and school nutrition, among others. *Id*. With no practical ability to replace these funds, thousands of ACSB students face the loss of these essential services thereby causing irreparable harm to ACSB's most vulnerable.

**E. <u>The lawsuit below and the district court decision.</u>**

On August 29, 2025, FCSB and ASB filed suit in the District Court, seeking emergency relief from Appellees' actions, including claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(B), and the Declaratory Judgment Act, 28 U.S.C. § 2201. FCSB Dist. Ct. ECF No. 1; ASB Dist. Ct. ECF No. 1. The District Court set a hearing for September 3, 2025 shortly after the Labor Day holiday. That day, the District Court heard arguments on the Motions and took the matter under advisement. *Id.* at 3. At the close of the hearing, counsel for ASB and FCSB informed the Court that litigation by ACSB would be forthcoming. *See* FCSB Dist. Ct. ECF No. 33.[5]

Just two days later, however, the Court denied FCSB and ASB's emergency motions, concluding that only the Court of Federal Claims had jurisdiction over the complaints. Ex. B, Order at 10-11. The Court dismissed both complaints *sua sponte*, for the same reason. *Id.* at 11-12. In its opinion, the District Court did state that "This Court unconditionally recognizes that *Grimm* 'remains the law of this Circuit' and thus binds both this Court and parties within the Fourth Circuit." *Id.* at 4.

---

[5] While the transcript of the hearing is not presently publicly available, the undersigned counsel was present in Court when the representation was made.

Both FCSB and ASB timely noted appeals, and both moved this Court for injunctive relief pending appeal earlier this week, on September 15 and 17, 2025 respectively. FCSB 4th Cir. ECF No. 10; ASB 4th Cir. ECF No. 6.

Asserting its own substantial and unique interest in the important subject matter of this appeal, ACSB has moved to intervene as a party to these appeals. Not only does ACSB have a significant interest in its federal funds and the vulnerable students it serves, but without intervention, ACSB will not obtain the benefit of any injunctive relief available in this Court.

**F. The Department's renewed threat to cut off ACSB's federal funds**

To the extent there was doubt as to the Department's true intentions, its press release a few days ago (September 16, 2025), Ex. H, announcing an imminent cutoff of federal funding, eliminates any such doubt. ACSB thus faces the immediate, and very real, prospect of losing tens of millions of dollars in needed federal assistance, a loss it does not have the ability to absorb without tangible impact to the students it serves.

## Argument

**I. An emergency injunction should be granted in this Court pending consideration of the appeal of the District Court's jurisdictional ruling.**

Though an extraordinary remedy, and similar to the test for a preliminary injunction in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), a plaintiff is entitled to an injunction pending appeal if it is "likely to succeed on the

merits," would be "irreparably harmed" absent an injunction, and the balance of

equities and public interest favor an injunction. *Tandon v. Newsom*, 593 U.S. 61,

64 (2021); *accord Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *1-2

(4th Cir. Aug. 25, 2022). Certainty of irreparable injury or success on the merits is

not required, only likelihood. Under these standards, ACSB should be granted an

emergency injunction pending consideration of the appeal of the District Court's

dismissal here.

**A.** **Plaintiff-Appellant, and ACSB, are likely to succeed on the merits of the appeal, and the underlying substantive claim.**

Both as to the jurisdictional issue, and the underlying substantive merits,

Plaintiff-Appellant and ACSB are likely to succeed on their claims.

**1.** **The District Court's dismissal on jurisdictional grounds was in error, since Plaintiff-Appellant's claims lie exclusively within Article III Courts' jurisdiction.**

The District Court's jurisdictional ruling is erroneous for two reasons. First,

the Court of Federal Claims ("CFC") lacks jurisdiction. Second, Title IX itself

clearly places jurisdiction within Article III courts such as the district court.

**a.** **The Court of Federal Claims lacks jurisdiction because neither Title IX nor the grants at issue involve money-mandating statutes.**

The CFC's jurisdiction is limited to disputes over statutes that are "money-

mandating." Title IX - and for that matter Title I, IDEA, and other formula-grant

programs at risk for ACSB – are not the type of money-mandating statutes within

the CFC's jurisdiction.

The CFC's "jurisdiction is statutorily granted and is to be strictly construed." *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988). "The jurisdiction of the Court of Federal Claims under the Tucker Act is 'limited to actual, presently due money damages from the United States.'" *Todd v. United States*, 386 F.3d 1091, 1093 (Fed. Cir. 2004) (quoting *United States v. Testan*, 424 U.S. 392, 398 (1976)). As a result, the CFC lacks jurisdiction over APA claims because those claims *cannot* be claims for money damages. 5 U.S.C. § 702.

Specifically, the CFC lacks jurisdiction over constitutional and statutory claims unless those claims are made under "money-mandating" statutes. The Federal Circuit has held that statutes providing for formula grants are not money-mandating, even if they require specific awards to specific entities, if the grants are awarded pursuant to "strings-attached" agreements rather than a "free and clear transfer of money." *Lummi Tribe of the Lummi Reservation, WA v. United States*, 870 F.3d 1313, 1319 (Fed. Circ. 2017). Here, the funds under threat for ACSB are in the form of funding received under formula grant programs that do not authorize an unencumbered transfer of money to recipients. Thus, they are not "money-mandating" and therefore not within the CFC's jurisdiction.

**b.** **The APA, on which Plaintiff-Appellant's claims are in part based, contains its own avenue of judicial review.**

The Supreme Court has clarified that "[t]he Tucker Act yields when the obligation-creating statute provides its own detailed remedies, or when the

Administrative Procedure Act … provides an avenue for relief." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323–24 (2020).

Here, Congress indicated that the APA provides such an avenue for relief. See id.; 20 U.S.C. § 1683 ("any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5"); *Tenn. v. Dep't of Educ.*, 104 F.4th 577, 604 (6th Cir. 2024) ("The second sentence of § 1683 [] … provides one avenue to judicial review[.]") (emphasis added). That is precisely what has been sought in the lawsuits of FCSB and ASB.

### c. Claims for funds improperly denied in violation of Title IX are "relief other than money damages" and subject to the APA.

Congress sets the jurisdiction of all federal courts below the Supreme Court. *See* U.S. CONST. art. III, § 1; *Palmore v. United States*, 411 U.S. 389, 401 (1973). Through 20 U.S.C. § 1683, Congress decided that the APA is an appropriate vehicle for judicial review of agency actions terminating or refusing to grant or continue funding based on an agency determination "of a failure to comply" with the requirements of Title IX or its implementing regulations.

Here, Plaintiff-Appellant and ACSB are not asking the Court to award money damages, but rather to enjoin the Department from attempting to use grant awards as a mechanism to coerce ACSB into adopting a policy that is violative of the law in the Fourth Circuit. Their APA claim relates directly to an "action

14

…terminating or refusing to grant or to continue financial assistance" and, therefore, is not a claim for money damages. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 885 n.6 (1st Cir. 1988) ("there is in Title IX … no express congressional authorization of private damages actions"). Plaintiff-Appellant's claims, and that of ACSB, are for injunctive relief under APA. While ACSB of course seeks a result under which the government releases the funds, the essence of what it seeks is vacatur of the Department's threats to punish ACSB, including cutting off funding, on an impermissible basis. ACSB seeks a declaration that it is not in violation of Title IX because of the law as it currently exists, through *Grimm* and *Doe,* in the Fourth Circuit. Such a result would necessarily render the Designation Letter arbitrary and capricious. *See Maine v. United States Dep't of Agric.,* 778 F. Supp. 3d 200 (D. Me. 2025); *cf. President and Fellows of Harvard College, et. al. v. United States Department of Health and Human Servs. et. al.*, No. 25-cv-11048-ADB (D. Mass. Sept. 3, 2024) ECF No. 238 at 29 ("guidance and the [grant] terminations did not need to rise or fall together"). Such a result – injunctive relief declaring Plaintiff-Appellant and ACSB to be compliant with Title IX – is outside the bailiwick of the CFC and clearly within this Court's authority. It is not a request to enforce a contractual obligation to pay money, but rather a request to set aside an agency action, which *vacatur* may result in the disbursement of funds. See *Dep't of Educ. v. California*, 14 S. Ct. 966, 968 (2025).

Therefore, ACSB's claims, like those of Plaintiff-Appellant, are within the

jurisdiction of "court[s] of the United States" empowered to review agency actions

under 5 U.S.C. § 702—including the district court. *Tennessee*, 104 F.4th at 604

("The second sentence of § 1683 … says that after an administrative enforcement

proceeding strips the recipient of its funding, the recipient can sue under the

APA."); *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 226–27 (D. Me. 2025)

(enjoining "freezing … funds" under Title IX: "Consistent with the plain language

of 20 U.S.C. § 1683 … the Court agrees with the Plaintiff that it has jurisdiction to

review the disputed agency action").

Finally, the APA provides a mechanism to set aside agency action by

injunction or order which is "arbitrary, capricious, an abuse of discretion, or

otherwise contrary to law by suit in the District Court." 5 U.S.C. § 706(2)(A); *see*

*Loper Bright Enters. v. Raimondo*, 603, U.S. 369, 407 (2024) (quoting § 706 in

stating that the "express responsibility [is] vested in the reviewing court to decide

all relevant questions of law and interpret statutory provisions") (cleaned up).

There can be no question that the Department's action here constitutes "final

agency action" for the purposes of review under the APA, 5 U.S.C. § 551, since on

the basis of the Finding Letter and Determination Letter, the Department has

announced that it "*is seeking suspension of federal financial assistance.*" See

*Bennett v. Spear,* 520 U.S. 154, 177–78 (1997). This has an immediate and

practical impact," on ACSB and the many students it serves. See *Frozen Food Express v. United States*, 351 U.S. 40, 43–44 (1956).

The District Court's decision that jurisdiction falls to the CFC requires either disregarding APA § 1683, or expanding APA's waiver of sovereign immunity to incorporate claims money damage claims. *See, e.g.*, *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012); *Kirtz*, 601 U.S. at 48. Because neither of these are appropriate, the district court's decision should be reversed.

### d. <u>Where Congress has expressly designated jurisdiction, emergency-docket decisions are unnecessary to consider.</u>

The District Court unnecessarily relied (*see* R.28 at 4-8) on cases from the U.S. Supreme Court's emergency-docket and this Court's decision following those cases (*Sustainability Institute v. Trump*, 2025 U.S. App. LEXIS 14121 (4th Cir. June 5, 2025)) in ruling that jurisdiction lay at the CFC. However, the precedent – such as it is given the lack of detailed reasoning that necessarily accompanies rulings from the emergency docket – does not abrogate the clearer jurisdictional intent developed by Congress in § 1683 for addressing Title IX disputes, in particular those involving the termination of federal funding. *See, e.g.*, *Maine*, 778 F. Supp. 3d at 226–27 (rejecting jurisdiction of the CFC because § 1683 "makes clear that any person aggrieved by an agency action terminating … funding upon a finding of Title IX noncompliance" may obtain APA review).

2.  **Plaintiff-Appellant's substantive claims as to Title IX are correct.**

The Department's position on Title IX is unquestionably arbitrary, capricious, an abuse of discretion, and contrary to law within the meaning of APA. 5 U.S.C. § 706(2)(A). An agency abuses its discretion when its "decision is based on an improper understanding of the law." *Pappas v. FCC*, 807 F.2d 1019, 1023 (D.C. Cir. 1986) (cleaned up).

The district court likewise had jurisdiction to issue a declaratory judgment. See *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004); 28 U.S.C. § 2201. Indeed, this is precisely the kind of situation – involving an actual, immediate controversy concerning an important matter of federal law – in which a declaratory judgment was appropriate.

Here, as recent developments confirm, ACSB is correct in its substantive understanding that the decision of this Court in *Grimm v. Gloucester County School Board*, 972 F.3d 586, 619 (4th Cir. 2020), *cert. denied* 114 S. Ct. 2878 (2021), continues to represent directly-applicable binding legal precedent applying Title IX on the matters at issue here. As the district court itself recognized, **"*Grimm* 'remains the law of this Circuit' and thus binds both this Court and parties within the Fourth Circuit."** Ex. B, Order at 4 (September 5, 2025) (emphasis added).

18

In addition, in *Doe v. South Carolina*, No. 25-1787 (4th Cir. Aug. 15, 2025), this Court issued an injunction pending appeal, prohibiting South Carolina from enforcing a state law directly contrary to the holding of *Grimm*. That Order expressly states that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." Order at 17. As Judge Agee (who dissented in *B.P.J.*) stated in a concurrence:

> *Grimm* binds all judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal.

Order at 29. South Carolina filed an "emergency" stay application to the U.S. Supreme Court, which denied it on September 10, 2025 – leaving in place this Court's injunction prohibiting precisely the position the Department is insisting ACSB adopt here.

Furthermore, the Department's actions here constitute precisely the kind of improper coercion that neither the legislative nor executive branches may exercise. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575 (2012). Defendants-Appellees are engaged in exactly the kind of "economic dragooning" the Supreme Court has forbidden, leaving ACSB "with no real option but to acquiesce" in Defendants-Appellees' regulatory interpretation of Title IX. *See Sebelius*, 567 U.S. at 582. By effectively cutting off future access to federal funding, Defendants-

19

Appellees seek not to "mild[ly] encourage[]," *S. Dakota v. Dole*, 483 U.S. 203, 211 (1987), but to *compel* those divisions to "administer" Defendants-Appellees' position barring transgender individuals from accessing facilities that correspond with their gender identities, *see New York v. United States*, 505 U.S. 144, 188 (1992). This constitutes an *ultra vires* invasion of the powers retained by the States and the people. U.S. CONST. Amend. X.

In sum, the Department's contrary position is plainly arbitrary, capricious and contrary to law, and Plaintiff-Appellant, and ACSB, are likely to succeed in establishing that.

**B. <u>ACSB will suffer irreparable harm absent an injunction, and McMahon and the Department certainly will not.</u>**

A plaintiff suffers "irreparable harm" when injuries are hard to quantify or a later award of monetary damages cannot fully cure them. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994); see also *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("irreparable harm factor is satisfied" when "there is a likely constitutional violation."). Without such an injunction here, ACSB is immediately threatened with loss of numerous sources of federal grant funding by the Department's action. That funding provides direct support to, among other things, help special education students and underprivileged students participate in school and learn, help homeless students get to school at all, and help students with

language needs learn English in order to participate in school. And as further set forth in Ex. C, these funds are particularly and uniquely critical for ACSB. The school year, and fiscal year, are well underway, and ACSB lacks the ability to replace these long-received sources of funds. Even otherwise "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Ultimately those who are harmed here without an injunction pending appeal, likely in a permanent fashion, include those students who will not receive those services when they need them, the benefit of which cannot later be made up. *See*, *e.g.*, *C.G. ex rel. P.G. v. Saucon Valley Sch. Dist.*, 571 F.Supp.3d 430, 444 (E.D. Pa. 2021) ("[C]ompensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time.").

There is no argument that the Department will suffer any, let alone irreparable, harm from the continuation of ACSB's Policy JB in its current form pending appeal. The relevant provisions of that policy has been supported by the Alexandria community, and there have been no complaints filed concerning its application.

C. **The public interest favors the granting of an injunction.**

It cannot seriously be contended that the public interest is best served by the peremptory cutoff of federal funds – provided and relied on continuously for many years -- that support special education, homeless, underprivileged and language-minority students. The public interest strongly favors an injunction.

A government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Leaders*, 2 F.4th at 346. The proposed injunction here does not require the government affirmatively to do anything. Rather, it maintains the status quo which, as to ACSB, has existed for years. Moreover, upholding civil rights is always in the public interest. *See, e.g.*, *id.* at 346. Specifically, "[c]ompliance with Title IX," an important and well-established federal civil rights statute, is in the public interest. *Harris v. Wood*, 888 F. Supp. 747, 778 (W.D. Va. 1995). Here, ACSB's policy JB squarely reflects this Court's binding pronouncements on Title IX.

## Conclusion

The issuance of a temporary emergency injunction preventing cutoff of federal education funds during the pendency of these appeals is necessary to protect ACSB's separate and significant interests in funding that serves thousands of students with disabilities, those who are economically and educationally

22

disadvantaged, students with limited English proficiency, those who are homeless, and many others. For these reasons, the Alexandria City School Board respectfully requests that the Court grant an emergency temporary injunction, and for such other relief as the Court deems appropriate.

By Counsel

Date: September 22, 2025

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)


By:        /s/ Michael K. Kim        
        John F. Cafferky, VSB No. 26179
        jcafferky@bklawva.com
        Michael K. Kim, VSB No. 82922
        mkim@bklawva.com
        Jakob T. Stalnaker, VSB No. 95010
        jstalnaker@bklawva.com

*Counsel for Proposed Intervenor and
Movant Alexandria City School Board*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiff Alexandria City School Board certifies, pursuant to Local Rule 27(d)(2), that the foregoing motion contains 5195 words, excluding the parts of the motion exempted by Local Rule 27(d)(2), according to the word count feature of Microsoft Word.

/s/ *Michael K. Kim*
Michael K. Kim

## <u>Certificate of Service</u>

I hereby certify that on this 22nd day of September, 2025, I electronically

filed a copy of the foregoing with the Clerk of the Court using the CM/ECF

system, which will send a notification of such filing (NEF) to all counsel of record.

<u>        /s/ Michael K. Kim        </u>

Michael K. Kim, VSB No. 82922
jstalnaker@bklawva.com
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (Telephone)
(703) 691-3913 (Facsimile)

*Counsel for Proposed Intervenor and
Movant Alexandria City School Board*

25

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD,<br><br>    Plaintiff,<br><br>    v.<br><br>LINDA MCMAHON, *et al.*,<br><br>    Defendants. | Civil Action No. 1:25-cv-1432 (RDA/LRV) |
| ARLINGTON SCHOOL BOARD,<br><br>    Plaintiff,<br><br>    v.<br><br>LINDA MCMAHON, *et al.*,<br><br>    Defendants. | Civil Action No. 1:25-cv-1434 (RDA/LRV) |

## **ORDER**

This matter comes before the Court in the above-captioned actions on Plaintiff Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order, Civil Action No. 1:25-cv-1432 ("*FCSB*"), Dkt. 2, Plaintiff Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order, Civil Action No. 1:25-cv-1434 ("*ASB*"), Dkt. 2, (collectively, the "Motions"), and the respective Complaints, *FCSB*, Dkt. 1; *ASB*, Dkt. 1.[1]  Considering the Complaints, the Motions, Plaintiffs' Memoranda in Support, *FCSB*,

---

[1] In the Complaints, Plaintiffs noted the similar nature of the above-captioned actions and Motions and requested that the actions be consolidated.  *FCSB*, Dkt. 1 at 1 n.2; *ASB*, Dkt. 1 at 1 n.2.  Defendants have consented to this consolidation.  Accordingly, for good cause shown and by the express agreement of the parties to the litigation, the Court exercises its discretion pursuant to Federal Rule of Civil Procedure 42(a)(2) to consolidate these actions and will address the Motions together.

Dkt. 3; *ASB*, Dkt. 3, Plaintiffs' Declarations, *FCSB*, Dkt. 16; *ASB*, Dkt. 17, Defendants'[2] Oppositions, *FCSB*, Dkt. 19; *ASB*, Dkt. 19, the parties' arguments at the hearing held by the Court on September 3, 2025, Defendants' Notices Regarding Factual Background, *FCSB*, Dkt. 26; *ASB*, Dkt. 25, and Plaintiffs' Replies, *FCSB*, Dkt. 27; *ASB*, Dkt. 26, the Court DENIES Plaintiffs' Motions and DISMISSES the Complaints for lack of subject matter jurisdiction because, pursuant to the Tucker Act, jurisdiction appropriately lies with the Court of Federal Claims for the reasons that follow.

## I. BACKGROUND

This case arises out of Defendant United States Department of Education's (the "Department") August 19, 2025 placement of Fairfax County Public Schools ("FCPS") and Arlington Public Schools ("APS") "on high-risk status[] with the result that all Department funds . . . will be done by reimbursement only." *FCSB*, Dkt. 1 ¶ 1; *ASB*, Dkt. 1 ¶ 1. According to Plaintiffs, to support this "high-risk status," "Defendants assert that [FCPS and APS] violate[] Title IX by maintaining a policy that permits students to access restrooms and locker rooms . . . that align with their gender identity." *FCSB*, Dkt. 1 ¶ 2; *ASB*, Dkt. 1 ¶ 2.

On Friday, August 29, 2025, Plaintiffs, who operate, maintain, and supervise FCPS and APS, filed suit in this Court, alleging six claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(B), and the Declaratory Judgment Act, 28 U.S.C. § 2201. *FCSB*, Dkt. 1; *ASB*, Dkt. 1. At the same time, Plaintiffs also filed Emergency Motions for Preliminary Injunctions and/or Temporary Restraining Orders. *FCSB*, Dkt. 2; *ASB*, Dkt. 2. Both cases were assigned to this judge at approximately 4:30 p.m. on Friday, August 29, 2025, and the Court, despite the intervening national Labor Day Holiday, promptly set a hearing on the Motions for the following Wednesday, September 3, at 9:00 a.m. given the emergency nature of the Motions.

---

[2] Defendants are Linda McMahon, in her official capacity as Secretary of Education of the United States, and the United States Department of Education.

On Tuesday, September 2, at approximately 4:30 p.m., Defendants filed Notices indicating that, due to the Labor Day weekend, necessary federal personnel were unavailable and that Oppositions to the Motions would be forthcoming. *FCSB*, Dkt. 15; *ASB*, Dkt. 16. That same day, Plaintiffs filed Declarations in support of the Motions. *FCSB*, Dkt. 16; *ASB*, Dkt. 17. At approximately 11:30 p.m. on the same day, Defendants filed their Oppositions. *FCSB*, Dkt. 19; *ASB*, Dkt. 19.

On Wednesday, September 3, at 9:00 a.m., the Court held the hearing on the Motions, the parties presented argument, and the Court took the matter under advisement. *FCSB*, Dkt. 22; *ASB*, Dkt. 21. Later that day, at approximately 5:00 p.m., Defendants filed a Notice to correct a factual inaccuracy asserted in their Oppositions and at the hearing.[3] *FCSB*, Dkt. 26; *ASB*, Dkt. 25.

On Thursday, September 4, at approximately 12:00 p.m., Plaintiffs filed Replies in support of their Motions. *FCSB*, Dkt. 27; *ASB*, Dkt. 26.

## II. LEGAL STANDARD

In their Motions, Plaintiffs seek preliminary injunctions or temporary restraining orders—each "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). To be eligible for a preliminary injunction or temporary restraining order, Plaintiffs must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22. As particularly relevant to the Court's analysis here, the requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement

---

[3] During the hearing, Defendants had asserted that Plaintiffs had failed to file a request for reconsideration. After the hearing, Defendants reported that they discovered that Plaintiffs' request for the Department's reconsideration had been "caught by a spam filter." *FCSB*, Dkt. 26 at 1; *ASB*, Dkt. 25 at 1.

that the [moving party] demonstrate only a grave or serious question for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (cleaned up).  Fundamentally, as is the case with any action filed in a federal district court, a federal court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (internal citation omitted).

## III. ANALYSIS

The parties' briefing and oral argument raised a number of legal issues.  In their Motions, Plaintiffs address the merits of their requests for injunctive relief and rely primarily on the Fourth Circuit's precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020).  This Court unconditionally recognizes that *Grimm* "remains the law of this Circuit" and thus binds both this Court and parties within the Fourth Circuit.  *Doe v. South Carolina*, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025).  In their Oppositions, however, Defendants raise the threshold question of this Court's subject matter jurisdiction.  Under controlling Supreme Court and Fourth Circuit precedent, this Court lacks subject matter jurisdiction.  Thus, this Court "may not rule on the merits" of the questions raised by Plaintiffs.  *Sinochem Int'l*, 549 U.S. at 430.

**A.    Whether the Court Has Jurisdiction to Provide the Relief Requested in the Motions**

Earlier this year, in *Department of Education v. California*, the Supreme Court of the United States granted a stay of a federal district court order[4] which had (1) enjoined the Department from terminating various education-related grants and (2) required the Department to pay out past-due grant obligations and continue paying obligations as they accrued.  145 S. Ct. 966, 968 (2025).  In so doing, the Supreme Court held that the Department was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA" because "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or

---

[4] The order was styled as a temporary restraining order; however, the Court construed the order as an appealable preliminary injunction. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025).

impliedly forbids the relief which is sought.'" *Id.* (quoting 5 U.S.C. § 702). While the Supreme Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)), "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the district court ordered." *Id.* Rather, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

Despite the recency of the *California* decision, the Fourth Circuit has already applied *California* in other cases. In *Sustainability Institute v. Trump*, the Fourth Circuit granted a stay of a district court order requiring the Government "to restore [the plaintiffs'] access to grant funds immediately" and prohibiting the Government from "freezing, terminating or otherwise interfering with the funding of [the grants] . . . without written authorization from the Court." 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (quoting *Sustainability Inst. v. Trump*, 2025 WL 1486979, at *4, *10 (D.S.C. May 20, 2025)). Following the Supreme Court's specific direction in *California*, the Fourth Circuit held that the Government was likely to succeed in showing that the district court lacked subject matter jurisdiction over the plaintiffs' claims. *Id.* The Fourth Circuit noted that, "like the grants in *California*, the grants [in *Sustainability*] were awarded by federal executive agencies to specific grantees from a generalized fund . . . and it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* at *2. While the district court had relied on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), in exercising jurisdiction, the Fourth Circuit rejected this approach, noting that "the Supreme Court distinguished *Bowen* in *California*, highlighting the meaningful difference between the relief in that case and an order 'to enforce a contractual obligation to pay money' along the lines of what the district court entered." *Id.* And the Fourth Circuit held that it was "unlikely that [the plaintiffs'] ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended [the plaintiffs'] grants, would provide a detour around

the Tucker Act." *Id.* (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to . . . implied statutory limitations," and "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001))); *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991); *Widakuswara v. Lake*, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025) (staying injunction in a similar case raising APA claims and "mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers, and *ultra vires* claims")).[5]

Just two weeks ago, on August 21, 2025, in *National Institutes of Health v. American Public Health Association*, the Supreme Court stayed a district court's order vacating the Government's termination of various research grants pursuant to *California* but denied the application for a stay as to the district court's order vacating various related internal guidance documents describing the National Institutes of Health's ("NIH") new priorities as arbitrary and capricious and unlawful in violation of the APA.  2025 WL 2415669, *1 (U.S. August 21, 2025).  The Supreme Court divided 4-1-4, and Justice Amy Coney Barrett provided the critical, and what may ultimately be the decisive, analytical perspective for assisting lower courts in their efforts to navigate an ever-evolving federal jurisprudence. *Id.*  In her concurrence, Justice Barrett emphasized that, in the case before the Supreme Court, both the district court and court of appeals had treated NIH's termination of grants and its issuance of guidance as distinct agency actions.  *Id.* at *2 (Barrett, J., concurring).  Relying on this fact, Justice Barrett found that just because "the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear."  *Id.*

---

[5] The Fourth Circuit has also cited *California* as support for staying other district court injunctions.  *See Maryland v. U.S. Dep't of Agric.*, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (staying injunction related to the Department's termination of grants awarded for teachers).

at *2. Justice Barrett also emphasized the lack of a causal connection between the two actions, noting that vacating the agency guidance did not reinstate the terminated grants. *Id.*; *see also id.* at *3 (noting that she was "not sure" that the challenges to the guidance and the grant terminations arise from substantially the same operative facts).

Turning to the instant case, in their Motions, Plaintiffs request that this Court "preliminarily enjoin and/or temporarily restrain Defendants, including their officers, employees, agents, attorneys, and any person working in concert or participation with any Defendant or under any Defendant's supervision, direction or control, from designating [FCPS/APS] as 'high-risk' and requiring that [FCPS/APS] receive federal funds by reimbursement." *FCSB*, Dkt. 2 at 1-2; *ASB*, Dkt. 2 at 1-2. Because the relief that Plaintiffs seek ultimately requires this Court "to order the payment of money," this Court lacks subject matter jurisdiction under controlling Supreme Court and Fourth Circuit precedent as discussed *supra*. *See California*, 145 S. Ct. at 968 (holding a district court likely lacked jurisdiction to enjoin the Department from terminating grants); *Sustainability*, 2025 WL 1587100, at *1 (holding a district court likely lacked jurisdiction to require the Government to restore access to grant funds immediately and prohibit the Government from freezing, terminating, or otherwise interfering with the funding of the grants without court authorization); *NIH*, 2025 WL 2415669, *1 (holding a district court likely lacked jurisdiction to vacate the Government's termination of grants).

Because this Court is bound by controlling authority, Plaintiffs' arguments to the contrary are unavailing. As a preliminary matter, Plaintiffs focus on the argument that they did not explicitly request "money damages," and thus cannot be subject to the Tucker Act. This argument cannot endure as it is not only contrary to the Supreme Court's recent decisions in *California* and *NIH* and the Fourth Circuit's admonition in *Sustainability* but also is contrary to an established line of authority from the Fourth Circuit and other courts holding that plaintiffs may not artfully plead around Tucker Act jurisdiction. *See Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("This is because plaintiffs can bypass Tucker Act jurisdiction by converting complaints which

7

'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions. Because this forum shopping circumvents a primary purpose of the Act—to ensure that a central body adjudicates most claims against the United States Treasury, we have stated that 'jurisdiction under the Tucker Act cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief.'" (internal citations omitted)); *see also Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 474 (4th Cir. 1983) ("Although the [plaintiff's] amended complaint phrases its request for money as a request for equitable relief, Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms."). Thus, even if Plaintiffs had avoided pleading an explicit request for money damages (which they did not, as their Complaints seek to compel Defendants to "immediately pay"), their avoidance of those words would not overcome the direct connection that their Motions and Complaints draw between the relief sought here and the disbursement of federal funds. This connection compels the Court to find that, under the Tucker Act, jurisdiction is lacking here.

Moreover, Plaintiffs' reliance on 20 U.S.C. § 1683 is unavailing.[6] That provision states that, "[i]n the case of action, ***not otherwise subject to judicial review***, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5 . . . ." 20 U.S.C. § 1683 (emphasis added). But here the action is subject to judicial review in the Court of Federal Claims. *California*, 145 S. Ct. at 968 ("[T]he Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" (quoting 28 U.S.C. § 1491(a)(1))). Accordingly, that provision does not apply here.

---

[6] Plaintiffs made a singular reference to 20 U.S.C. § 1683 in their Memoranda in Support of their Motions. *FCSB*, Dkt. 3 at 16; *ASB*, Dkt. 3 at 16. It was not until their Reply Briefs that Plaintiffs devoted any analysis to Section 1683. *FCSB*, Dkt. 27 at 6; *ASB*, Dkt. 26 at 6. Thus, Defendants did not have an opportunity to respond.

Plaintiffs also attempt to place their claims within the realm of those that Justice Barrett found distinguishable in *NIH*, arguing that the Court of Federal Claims is unable to afford them relief given that they "seek[] prospective equitable relief demanding . . . that Defendants comply with Title IX's procedural requirements." *FCSB*, Dkt. 27 at 9; *ASB*, Dkt. 26 at 9. But, respectfully, that is not relief that Plaintiffs seek in their Motions or Complaints, and Plaintiffs do not identify any count or relief sought that relates to Title IX's procedural requirements.

Moreover, in Justice Barrett's concurrence, she explained that "vacating the guidance" at issue there "does not reinstate the terminated grants" and that such claims, although perhaps topically related, were "legally distinct." *NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring); *see also id.* at *3 (noting that she was "not sure" that the challenges to the guidance and the grant terminations arise from substantially the same operative facts). Although Plaintiffs here have exercised a degree of ingenuity, it is Plaintiffs who have blurred the line in this case and expressly linked their claims to the disbursement of money. Indeed, the Motions specifically condition the need for "immediate action" justifying injunctive relief on "the federal funds that Defendants have effectively frozen." *FCSB*, Dkt. 3 at 16; *APS*, Dkt. 3 at 16; *see also FCSB*, Dkt. 1 at 28 ¶ (j); *ASB*, Dkt. 1 at 27 ¶ (j). Plaintiffs' proposed orders in support of injunctive relief refer to no specific count, no specific claim, and seek, as a singular relief, to enjoin Defendants "from designating [FCPS/APS] as 'high-risk' and requiring that [FCPS/APS] receive federal funds by reimbursement." *FCSB*, Dkt. 2-1 at 2; *ASB*, Dkt. 2-1 at 2. Indeed, throughout their briefing, almost every time Plaintiffs mention the "high-risk" designation, it is in conjunction with the effect that this determination has had or will have on the disbursement of federal funds. Moreover, despite the discussion at the September 3, 2025 hearing and the Court's questions regarding how the Tucker Act applies to specific counts, Plaintiffs continue to refer broadly to the Complaints in their entirety. Thus, the Court is left without a principled basis on which it could carve out any particular count from the overarching reinstatement-of-grants framework and craft a non-

causally or legally related relief. Again, this compels the conclusion that this Court lacks subject matter jurisdiction.

Finally, with respect to the recently issued case *President & Fellows of Harvard College v. United States Department of Justice*, No. 25-cv-11048, Dkt. 238 (D. Mass. Sept. 3, 2025) ("*Harvard*") (addressing allegations relating to antisemitism and the First Amendment),[7] this Court agrees with the very contemplative statement of U.S. District Judge Allison D. Burroughs opining that the boundary between the APA and the Tucker Act remains, at least somewhat, "elusive" given the procedural posture of the cases in which these lines are being drawn. *See id.* at 24. But, to be sure, based on the record before the Court, the relief sought, and more importantly the Fourth Circuit law binding this Court (which are not precedents binding the District of Massachusetts), this Court finds that the case here falls on the other side of the line. *See Sustainability*, 2025 WL 1587100, at *2 (holding it was "unlikely that [the plaintiffs'] ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended [the plaintiffs'] grants, would provide a detour around the Tucker Act"). And, in the *Harvard* case, Judge Burroughs specifically held that, "[r]egardless of how these claims are resolved, the government will not necessarily be obligated to disburse any additional funds . . . ." *Id.* at 31. Again, Plaintiffs here provide this Court with no sustainable basis on which to make a similar finding, especially when the very first paragraph of the Complaints alleges that Defendants' placement of FCPS and APS on high-risk status had "the result that" federal funding would be done by reimbursement only, where the emergency nature of the relief sought is premised on "freezing federal funds," and where Plaintiffs specifically seek immediate payment of federal funds in their Complaints. *FCSB*, Dkt. 1 ¶ 1 ("On August 19, 2025, the Department of Education . . . issued a press release announcing that it was 'placing . . . [FCPS] . . . in Northern Virginia on high-risk status' with

---

[7] The *Harvard* decision was issued on September 3, 2025, the same day that this Court held argument in these cases. Thus, the parties did not have an opportunity to raise this decision at oral argument, and it has only been discussed in Plaintiffs' Reply Briefs.

the result that 'all Department funds including formula funding, discretionary grants, and impact aid grants' will be 'done by reimbursement only.'"); *ASB*, Dkt. 1 ¶ 1 (same for APS); *FCSB*, Dkt. 1 at 28 ¶ (j) (asking this Court to "[r]equire that Defendants immediately pay to FCBS . . . funds"); *ASB*, Dkt. 1 at 27 ¶ (j) (same for ASB); *FCSB*, Dkt. 3 at 16 ("Because the federal funds that Defendants have effectively frozen are essential . . . , immediate action is needed."); *ASB*, Dkt. 3 at 16 (same). Accordingly, this Court lacks jurisdiction, and Plaintiffs' Motions will be denied.

**B.      Whether the Complaints Will Be Dismissed for Lack of Subject Matter Jurisdiction**

The lack of subject matter jurisdiction to provide the relief requested in the Motions also compels the Court to examine the Complaints.  As noted *supra*, at oral argument, the Court asked questions of all parties to determine whether any of the specific counts alleged here should be treated differently from one another—no party argued they should.  Accordingly, the Court, like the parties, will address the Complaint as a whole.[8]

For much the same reason that the Court lacks subject matter jurisdiction over the Motions, the Court also lacks subject matter jurisdiction over the Complaints.  The Court notes that almost every count in the Complaint contains specific references to grants, funds, or reimbursements.  *See, e.g.*, *FCSB*, Dkt. 1 ¶¶ 66 ("constructive termination or refusal to continue federal funds owed to FCPS"), 69 ("Defendants' actions constructively terminating or refusing to continue funds owed to FCPS"), 88 ("Defendants have nonetheless conditioned FCPS's receipt of federal funds . . . ."), 89 ("conditioning the Department funding"), 97 ("FCPS receives federal education funds under several federal statutes . . . . These funds are critical to FCPS's ability to provide state and federally mandated education-related services . . . ."), 99 ("Defendants are conditioning essential federal funding . . . ."), 101 ("[t]his

---

[8] Judge Burroughs found in the *Harvard* case that "splitting [those] claims between two forums [was] procedurally unworkable." No. 25-cv-11048, Dkt. 238, at 29. Here, too, Plaintiffs' claims are inextricably intertwined and must "rise [and] fall together" unlike the guidance and terminations in *NIH*. *Id.*  Thus, Plaintiffs' claims, which ultimately and fundamentally seek immediate disbursement of funds, fall within the Tucker Act and the instruction and precedents of the Supreme Court and Fourth Circuit.

funding threat"), 107 ("Defendants have no authority . . . to demand FCPS rescind Regulation 2603.2 . . . in order for FCPS to receive federal funding."), 108 ("FCSB is entitled to a declaration that Defendants acted *ultra vires* by demanding that FCSB rescind its policy in order for FCPS to receive federal funding."), 112 ("FCSB and Defendant have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" where the issue requiring immediacy is the disbursement of funds); *ASB*, Dkt. 1 ¶¶ 66, 69, 88, 89, 97, 99, 101, 107, 108, 112 (same allegations by ASB).  As noted above, the Complaints also specifically seek to have Defendants "immediately pay" Plaintiffs funds.  *FCSB*, Dkt. 1 at 28 ¶ (j); *ASB*, Dkt. 1 at 27 ¶ (j).  Thus, under binding Supreme Court and Fourth Circuit precedent, because Plaintiffs base their Complaints around requests "to order the payment of money," this Court lacks subject matter jurisdiction over the actions.  *See California*, 145 S. Ct. at 968 (holding a district court likely lacked jurisdiction to enjoin the Department from terminating grants); *Sustainability*, 2025 WL 1587100, at *1 (holding a district court likely lacked jurisdiction to require the Government to restore access to grant funds immediately and prohibit the Government from freezing, terminating, or otherwise interfering with the funding of the grants without court authorization); *NIH*, 2025 WL 2415669, *1 (holding a district court likely lacked jurisdiction to vacate the Government's termination of grants).  Accordingly, the Complaints will be dismissed.

\*       \*       \*

Accordingly, for the foregoing reasons, it is hereby ORDERED that Plaintiffs' Emergency Motions for Preliminary Injunction and/or Temporary Restraining Order (*FCSB*, Dkt. 2; *ASB*, Dkt. 2) are **DENIED**; and it is

FURTHER ORDERED that the Complaints (*FCSB*, Dkt. 1; *ASB*, Dkt. 1) are **DISMISSED WITHOUT PREJUDICE**; and it is

FURTHER ORDERED that the Motion for Leave to File Brief of *Amicus Curiae* (*FCSB*, Dkt. 17) is **DENIED**.[9]

The Clerk of the Court is directed to provide copies of this Order to all counsel of record and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
September 5, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge

---

[9] A federal district court has "broad discretion in deciding whether to allow a non-party to participate as *amicus curiae*." *F.E.R.C. v. Powhatan Energy Fund, LLC*, 2017 WL 11682615, at *1 (E.D. Va. Mar. 15, 2017). Further, a court should only grant leave to file an *amicus curiae* brief if the court "deems the proffered information timely and useful." *Id.* Counsel for both the Plaintiffs and the Government have zealously, professionally, and most competently assisted the Court in reaching its decision. Here, while the Court appreciates the time and energy exercised by the *amicus* in support of its perspective, the proffered *amicus* brief does not aid the Court in analyzing the issues presented to it. Accordingly, the Court exercises its discretion to deny the motion.

Exhibit C

## DECLARATION OF DOMINIC B. TURNER

I, Dominic B. Turner, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Dominic B. Turner, and I am Chief Financial Officer of Alexandria City Public Schools ("ACPS"). I have served in that position for 7 years, and have over 17 years of experience in the field of public finance. Unless otherwise indicated, I have personal knowledge of the matters set forth herein and would be competent to testify to those matters if called upon to do so.

2.      Alexandria City Public Schools serves more than 16,300 students who attend 18 schools. Approximately 47% of ACPS' students are eligible for free/reduced-price meals, 38% require English Language Learner ("ELL") services, and 12% receive special education.

3.      For the fiscal year 2026, ACPS expects to receive approximately $20,182,070 in federal funding from various government agencies, including the Department of Education ("DOE"). That funding directly supports at least 194 positions, most of which are school-based positions that directly benefit students.

4.      ACPS' fiscal year 2026 budget was approved by the Alexandria City School Board in June 2025. The $20,182,070 in federal grant funding included within that budget represents approximately 5.2% of its approved operating budget of $392.27 million. At this point, ACPS does not have the practical ability to replace

these sources of funding.

5.    As a largely urban school division with a highly diverse student and community constituency, ACPS relies to a greater degree upon federal grants than ACPS' neighboring jurisdictions of Arlington Public Schools and Fairfax County Public Schools. For example, based upon my knowledge of ACPS' data, and review of publicly-available information for those other school divisions, half (9 of 18, or 50%) of ACPS's schools are Title I schools, which is nearly double or more the percentage of Arlington (23%) and Fairfax (26%). ACPS' Title I funding as a percentage of its overall budget (1.18%) is almost triple that of Arlington (0.43%) and a third higher than Fairfax (0.86%). ACPS' IDEA funding as a percentage of overall budget is as high or higher than these other two divisions. ACPS' Title II funding as a percentage of overall budget (0.17%) is more than twice what it is in Arlington (0.08%), and 70% higher than for Fairfax (0.10%). ACPS' federal nutrition funding as a percentage of the overall school nutrition fund is between 15% and 30% higher for ACPS (where it is 72.57%) than in Arlington or Fairfax (57.16% and 43.85%, respectively). And ACPS' percentage of students eligible for free or reduced-price meals (47%), a measure of economic disadvantage, is appreciably higher than either Fairfax (35%) or Arlington (24%).

6.    ACPS receives most of this federal aid by submitting grant applications to the relevant government agencies. Those grant applications require

compliance with the Elementary and Secondary Education Act ("ESEA") and General Education Provisions Act ("GEPA"). To my knowledge, none of ACPS' existing grant applications required ACPS to comply with DOE's newfound interpretation of Title IX in order to receive grant funding.

7.     Almost all of the funds that ACPS receives from federal agencies are already provided on a reimbursement basis. Once ACPS's grant application is approved, ACPS submits for reimbursement on a period basis or pursuant to a particular schedule.

8.     In fiscal year 2026, ACPS expects to receive the following in federal funds from DOE:

a. $ 3,682,791 in Individuals with Disabilities Education Act ("IDEA") aid, which funds special education and related services as ACPS is required to provide by federal and Virginia law for school-aged students, as well as early childhood and infant and toddler early intervention services, for students with disabilities.

b. $ 4,105,065 in Title I Part A aid, which provides financial assistance to local educational agencies and schools with high numbers and/or percentages of children from low-income families to help support their ability to meet state academic standards.

c. $ 722,841 in Title III aid, which supports ELL  students to become proficient in English and meet state academic standards.

d. $594,726 in Title II Part A aid, which provides funding to increase student achievement consistent with state academic standards, improve the quality and effectiveness of teachers, principals, and other school leaders, increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement in schools, and provide low-income and minority students greater access to effective teachers, principals, and other school leaders.

e. $1,250,460 in Title IV aid, which provides financial assistance to local educational agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet state academic standards.

f. $ 324,209 in Perkins Act aid, which is a federal grant program providing funding to schools to support career and technical education ("CTE") programs, including teacher training, work-based learning opportunities, and career guidance programs.

g. $29,823 for assistance in providing educational services of the Juvenile Detention Center;

h. $125,155 in Adult Education and Family Literacy Act assistance, which supports adult education and literacy programs with the goal of helping adults gain the skills they need to be productive citizens, family members, and workers.

i. $40,000 in McKinney-Vento aid, which provides support for students experiencing homelessness.

9.      In fiscal year 2026, ACPS expects to receive the funding from other government agencies including but not limited to:

a. $9,153,000 in National School Lunch aid from the U.S. Department of Agriculture ("USDA"), which provides funding to school divisions to assist with providing nutritionally balanced meals to students each day including salaries and benefits of ACPS staff who work in food services, funds food and drink purchases and materials and supplies, and ensures ACPS can provide free or reduced-priced meals to its low-income students. ACPS is reimbursed on a monthly basis.

b. $1,900,000 in Medicaid funding from the U.S. Department of Health and Human Services ("HHS"), which reimburses ACPS for partial costs associated with providing medical services to children enrolled in Medicaid or Virginia's Family Access to Medical Insurance Security Plan.

10.     ACPS has never received any warnings from the federal government or VDOE indicating that it has mismanaged its funding such that it should be on notice that a federal agency may designate ACPS as a "high-risk" entity.

11.     With respect to administration of these federal grant funds, ACPS continues to have in place a rigorous process to ensure that those funds are used only for approved purposes, and that all expenditures are accounted for. ACPS employs a grant manager, budget management analyst, program managers, and a financial accounting and reporting team, all of which ensure that federal grant funds are spent appropriately and in accordance with applicable laws.

a. ACPS' Grants Manager identifies and communicates grant opportunities, assists with writing grant proposals, manages the application process to ensure granting agencies' deadlines and requirements are met, writes and obtains letters of support, develops creative partnerships with other organizations to obtain grants, and submits proposals on behalf of ACPS. In addition, once a grant is awarded, a unique code is created in the ACPS financial system, by the financial accounting and reporting team, that segregates any programmatic budget and expenditures that are associated with the grant award. The Grants Manager may also serve as a grant Program Manager. Budget adjustments are monitored by the Grants Manager and must go through the financial accounting and reporting team and a centralized budget management analyst for processes ensuring that proper checks and balances are in place for each grant.

b. Program Managers are responsible for coordinating and implementing the activities and processes to fulfill and achieve the grant objectives. The Program Manager is responsible for authorizing and ensuring all activities and financial transactions occurring or charged to the grant program are appropriate in accordance with the grant requirements and conditions. The Program Manager ensures the grant activities follow the programmatic policies and procedures related to the respective grant(s) or grant class(es) with the financial accounting and reporting team providing review of the programmatic policies and procedures. Interim reports are generated to ensure that these grants are being spent in accordance with the applicable policies.

c. ACPS' financial accounting and reporting team coordinates an annual independent audit which culminates in ACPS's publication of the Annual Comprehensive Financial Report. Additionally, this team is responsible for

preparing federal and state mandated financial reports, developing division-wide financial policies and procedures to protect ACPS' assets, ensuring reliable financial data, and meeting statutory responsibility for the conduct of financial operations.

d.  Finally, ACPS' Office of the Chief Financial Officer (CFO) and financial accounting team monitor internal controls throughout ACPS, reduce non-compliance by identifying and assessing internal control deficiencies, and develop, uphold, and ensure compliance with division-wide financial policies and procedures. The core principles include efficient review of policies and guidelines, communication of standards, internal monitoring and analysis of business areas, follow-up, and education. In addition, ACPS staff within the budget, financial systems, and procurement offices are trained to ensure compliance with federal law and proper tracking, monitoring, and payments for grants.

10.    Moreover, as a general matter, ACPS' management and accounting departments adhere to the highest best practices in their financial management and controls concerning federal grant funds. In addition, ACPS has received the Association of School Business Officials International ("ASBO") Meritorious Budget award for over fifteen consecutive years, and the Government Finance Officers Association of the United States and Canada ("GFOA") Distinguished Budget Presentation award.  For over fifteen straight years, ACPS has also received the GFOA Certificate of Achievement for Excellence in Financial Reporting and the ASBO Certificate of Excellence in Financial Reporting for transparency and quality information in preparation of issuance of the school systems annual financial reports.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2025

Dominie B. Turner

# Exhibit D

**File: JB**

**NONDISCRIMINATION IN EDUCATION**

Alexandria City Public Schools (ACPS) believes every student is entitled to an education that is responsive to one's unique needs to reach their full potential. All individuals have the right to a safe physical, emotional, and social environment where responsibility and respect are demonstrated daily. ACPS is committed to eliminating all forms of unlawful discrimination in the educational environment. Accordingly, no student may be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any ACPS education program or activity on the basis of race, creed, color, national origin, ancestry, ethnicity, disability, religion, political affiliation, sex, sexual orientation, gender, gender identity, gender expression, age, pregnancy, childbirth or related medical conditions, marital or parental status, genetic information, military status or on any other characteristic protected by state or federal law ("**protected characteristic**").

ACPS is committed to engendering respect for the abilities and accomplishments of all people and to providing learning environments free from *all* forms of discrimination and harassment, regardless of whether the basis or characteristic is protected by law (e.g., immigration status, socioeconomic level). To promote a productive learning environment, ACPS encourages an atmosphere that is respectful of individual differences so students can learn in a functional and non-threatening atmosphere. ACPS consistently and vigorously addresses discrimination and harassment so that there is no disruption to the learning environment and learning process.

Through restorative practices and social-emotional teaching and learning, staff and students are encouraged to be reflective, respect and value the diversity of our school community and express themselves in a manner that is reflective of our core values and beliefs. Equitable educational opportunities will be available for all students and educational programs will be designed to meet the varying needs of all students.

**ACPS:**

- Provides facilities, programs and activities that are accessible, usable and available to qualified persons with disabilities;

- Provides a free, appropriate education, including non-academic and extracurricular services to qualified persons with disabilities;

- Does not exclude qualified persons with disabilities, solely on the basis of their disabilities, from any preschool, daycare, adult education or career and technical education program;

- Does not discriminate against qualified persons with disabilities in the provision of health, welfare or social services;

- Provides access for all students to facilities, such as restrooms and locker rooms, that correspond to a student's gender identity; and

File: JB

- Makes single user or gender inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy. Any options offered will be non-stigmatizing and will minimize lost instructional time.

**Complaint Procedure**

- Any person who believes a student has been discriminated against, harassed or bullied by anyone on school property or during a school activity should report the complaint according to the procedures in Regulation JB-R/JFHA-R - Procedures for Investigating Complaints of Discrimination, Harassment and Bullying Against Students.

- Any person who believes a student has been discriminated against, harassed or bullied by anyone on school property or during a school activity on the basis of sex should report the complaint according to the procedures in Regulation JB-R2/JFHA-R2 - Procedures for Investigating Complaints of Discrimination, Harassment and Bullying on the Basis of Sex Against Students.

- Any employee or candidate for employment who believes they have been discriminated against, harassed or bullied by anyone on school property or during a school activity should report the complaint according to the procedures in Regulation GB-R/GFHA-R - Procedures for Investigating Staff Complaints of Discrimination, Harassment and Bullying.

- Any employee or candidate for employment who believes they have discriminated against, harassed or bullied by anyone on school property or during a school activity on the basis of sex should report the complaint according to the procedures in Regulation GB-R2/GFHA-R2 - Procedures for Investigating Complaints of Discrimination, Harassment and Bullying on the Basis of Sex.

**Compliance Officers**

Regulations JB-R/JFHA-R and JB-R2/JFHA-R2 designate the Compliance Officers responsible for identifying, preventing and remedying discrimination as well as receiving, investigating, and acting upon complaints of discrimination prohibited by this policy. The names and contact information for the Compliance Officers are also posted on the Division's website at all times.

The Compliance Officers:

- Receive reports or complaints of discrimination;
- Conduct or oversee the investigation of any alleged discrimination;
- Assess the training needs of the school division in connection with this policy;
- Arrange necessary training to achieve compliance with this policy; and
- Ensure that any discrimination investigation is conducted by an impartial investigator who is trained in the requirements of equal education opportunity and has the authority to protect the alleged victim and others during the investigation.

File:  JB

**Retaliation**

Retaliation against students, parents/legal guardians or employees who report discrimination or participate in any related proceedings is prohibited. ACPS takes appropriate action against any student or employee who retaliates against another student or employee who reports alleged discrimination or participates in related proceedings. The Compliance Officer or Title IX Coordinator will inform:

- those who make complaints;
- those who are the subject of complaints; and
- those who participate in investigations

of the complaint and how to report any subsequent problems.

**Right to Alternative Complaint Procedure**

Nothing in this policy denies the right of any individual to pursue other avenues of recourse to address concerns relating to prohibited discrimination, including initiating civil action, filing a complaint with outside agencies or seeking redress under state or federal law.

**Prevention and Notice of Policy**

Training to prevent discrimination is included in employee and student orientations as well as employee in-service training.

This policy is (1) displayed in prominent areas of each division building in a location accessible to students, parents/legal guardians, and school personnel; (2) included in student and employee handbooks; and (3) sent to parents/legal guardians of all students within 30 calendar days of the start of school. All students and their parents/legal guardians are notified annually of the names and contact information of the Title IX Coordinator and the Compliance Officers.

**False Charges or False Evidence**

Students or school personnel who knowingly make false charges of discrimination, or who knowingly make false statements or submit false information are subject to disciplinary action, as well as any civil or criminal legal proceedings.

Adopted: December 3, 1996
Amended: July 6, 2000
Amended: June 21, 2001
Amended: December 18, 2014
Amended: June 17, 2021

**File: JB**

135    Amended: October 7, 2021
136    Amended: February 20, 2025
137
138
139    Legal Refs:
140     ●   20 U.S.C. §§ 1681-1688.
141     ●   29 U.S.C. §§ 794.
142     ●   42 U.S.C. §§ 2000d through 2000d-7.
143     ●   34 CFR 106.9.
144     ●   Code of Virginia, 1950 as amended, §§ 2.2-3900, 2.2-3901, 2.2-3902, 22.1-23.3,
145         22.1-212.6:1.
146
147    Cross Refs:
148     ●   AC - Nondiscrimination
149     ●   AD - Educational Philosophy of the Alexandria City Public Schools
150     ●   GB - Nondiscrimination in Employment
151     ●   GBA - Prohibition Against Harassment, Bullying, Hostile Work Environment and
152         Retaliation (also JFHA)
153     ●   GB-R/GBA-R - Procedures for Investigating Staff Complaints of Discrimination,
154         Harassment and Bullying.
155     ●   GB-R2/GBA-R2 - Procedures for Investigating Staff Complaints of Discrimination,
156         Harassment and Bullying on the basis of Sex.
157     ●   JB-F/JFHA-F - Report of Discrimination/Harassment
158     ●   JB-R/JFHA-R - Procedures for Investigating Student Complaints of Discrimination,
159         Harassment and Bullying.
160     ●   JB-R2/JFHA-R2 - Procedures for Investigating Student Complaints of Discrimination,
161         Harassment and Bullying on the basis of Sex.
162     ●   JBA - Section 504 Nondiscrimination Policy and Grievance Procedures

Exhibit E

**RESOLUTION AGREEMENT**
**Alexandria City Public Schools**
**OCR Case Numbers 11-25-1305**

Alexandria City Public Schools (hereinafter referred to as "the Division") agrees to fully implement this Resolution Agreement to resolve the allegations investigated in Office for Civil Rights (OCR) Case Number 11-25-1305. This Agreement does not constitute an admission by the Division of a violation of Title IX of the Education Amendments Act of 1972 (Title IX), or any other law enforced by OCR.

## Action Item 1 – Rescission of Policies, Regulations, and Corresponding Guidance

The Division will rescind any components of the following policy pertaining to access to intimate facilities: "Policy JB: Nondiscrimination in Education." The Division will also rescind any corresponding guidance documents, trainings, or other related documents pertaining to the components of the aforementioned policy that apply to intimate facilities.

### Reporting Requirements:

a. By_____2025, the Division will provide OCR with documentation demonstrating that Action Item 1 has been fully implemented.

## Action Item 2 – Issue Memorandum to Schools

The Division will issue a memorandum to each Division school regarding the rescission of the policies and/or regulations outlined in Action Item 1. The memorandum will inform the schools that any future policies related to access to intimate facilities must be consistent with Title IX. The memorandum shall:

a. Specify that Title IX compliance means a school must not – on the basis of *sex* – exclude *female* students from participation in, deny female students the benefits of, or subject female students to discrimination under, any education program or activity including but not limited to the use of intimate facilities including locker rooms and bathrooms.

b. Specify that schools must provide intimate facilities such as locker rooms and bathrooms accessible to students strictly separated on the basis of sex and comparably provided to each sex.

The memorandum will further state that the words *sex, female, male, girls, women, boys, men* as used in the memorandum and as applicable in all practices, policies, and procedures adopted and implemented by the Division pursuant to or consistent with Title IX, mean the following:

*Sex* is a person's immutable biological classification as either male or female.
*Female* is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova).
*Male* is a person of the sex characterized by a reproductive system with the biological function of producing sperm.
*Woman* is an adult human female.
*Girl* is a minor human female.

*Page 2 – Resolution Agreement, Alexandria City Public Schools - 11251305*

        ***Man*** is an adult human male.
        ***Boy*** is a minor human male.

The memorandum will further state that the above meanings of words are to be understood in the context of the facts that *there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm); and the sex of a human – female or male – is determined genetically at conception (fertilization), observable before birth, and unchangeable.*

The Division will post this memorandum in a prominent location on its website.

### Reporting Requirements:

a.  By _____ 2025, the Division will submit a copy of the draft memorandum to OCR for OCR's review and approval.

b.  Within _____ days of receiving OCR's approval, the Division will disseminate the memorandum to the Division schools and provide verification to OCR.

By signing this Agreement, the Division agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. During the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms and obligations of this Agreement.

Upon OCR's acknowledgment of the Division's satisfaction of the commitments made under this Agreement, OCR will close the case.

The Division understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the Division written notice of the alleged breach and 60 calendar days to cure the alleged breach.

The Agreement will become effective immediately upon the signature of the Division's authorized official below.


By: _____    Date: _____
        Name and Title
        Recipient Name

Exhibit F



4020 University Drive, Suite 300
Fairfax, Virginia 22030
T: 703.691.1235
F: 703.691.3913

John F. Cafferky, Esq.
Writer's email: jcafferky@bklawva.com
B&K File No. 4950.2

August 15, 2025

*Via electronic mail to Bradley.Burke@ed.gov*

Bradley R. Burke
Regional Director
U.S. Department of Education
Office for Civil Rights
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

RE:     **OCR Complaint No. 11-25-1305**
          **Alexandria City Public Schools**

Dear Mr. Burke:

I am writing on behalf of the Alexandria City School Board and Alexandria City Public Schools (collectively "ACPS") with respect to the Letter of Findings ("LOF") and proposed Voluntary Resolution Agreement ("VRA") issued by the U.S. Department of Education, Office for Civil Rights ("OCR") to ACPS on July 25, 2025. For a number of reasons, ACPS believes that the reasoning of OCR's LOF is flawed, and ACPS cannot enter into OCR's proposed VRA at this point given that OCR has indicated that it is "firm on [the] key terms" of revising School Board Policy JB in a manner that contradicts current law in Virginia, although ACPS certainly is willing to consider additional discussion and negotiation with OCR.

As you recall, following OCR's February 24, 2025 data request, ACPS submitted its response on March 24, 2025. OCR issued its 21-page LOF and draft VRA over four months later on July 25th, but demanded that ACPS respond just ten days later. Due to the magnitude of the issues raised, and particularly given the time of year, ACPS had sought ninety days to respond, consistent with OCR's own *Case Processing Manual*. In response to that request, you stated that OCR viewed certain items in its proposed VRA as non-negotiable, and provided only eleven more days for ACPS to respond.

The ACPS policy at issue was adopted more than a decade ago with widespread community support *and the express concurrence of OCR*. It has worked well since that time, and as ACPS indicated in its March 24th response, there have been zero reported complaints regarding this policy within the time examined by OCR. Moreover, that policy is consistent with current, directly-applicable binding legal precedent applying Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX") issued by the U.S. Court of Appeals for the Fourth Circuit, including *Grimm v. Gloucester County School Board*, 972 F.3d 586, 619 (4th Cir. 2020), *cert. denied* 114 S. Ct. 2878 (2021). There is no dispute that the decisions of that court apply to ACPS.

OCR's LOF nonetheless concludes that *Grimm* somehow no longer applies. Accordingly, OCR's proposed VRA would require ACPS to rescind applicable portions of its

4020 University Drive, Suite 300, Fairfax, Virginia 22030 | 703.691.1235 TEL | 703.691.3913 FAX | WWW.BKLAWVA.COM

Bradley R. Burke, Regional Director
August 15, 2025
Page 2

nondiscrimination policy, JB, and all related documents, and would mandate that ACPS adopt OCR's preferred definitions of "sex," "female," "male" and other terms across all its policies, practices and procedures.

ACPS prides itself on always being open to discussing ways to improve its policies and advance the educational interests of its students. That is true in this instance as well. Nonetheless, the analysis in OCR's LOF, and terms of its current proposed VRA, are not ones that ACPS could agree to adopt under these circumstances.

Fundamentally, ACPS is committed to following the law and protecting the members of the ACPS community; that means complying with governing law as it exists today. *Grimm* was decided by the Fourth Circuit in 2020, and the U.S. Supreme Court subsequently declined to review that decision. As indicated in ACPS' March 24, 2025 response to OCR referenced above, both the Fourth Circuit itself, and the lower courts within this Circuit, have consistently followed the *Grimm* decision for over five years.[1]

Legally, ACPS cannot agree with the analysis contained in the LOF, or the VRA's attempt to define transgender students out of existence. Insofar as the LOF relies upon precedents from other federal circuits, such as *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022), those decisions are simply inapplicable. Instead, the decision in *Grimm* – holding that Title IX requires school divisions to provide transgender students with access to intimate facilities aligning with their consistent and persistent gender identity – squarely is.

Furthermore, the LOF's reliance on the U.S. Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. ___ (2025) is misplaced. That decision concerned whether a Tennessee law banning certain medical procedures for minors violated the equal protection clause. *Skrmetti* did not involve schools or Title IX, nor did it deal with restrooms or other "intimate facilities." The Court there simply did not overrule or abrogate *Grimm*. Moreover, the LOF's conclusion that Title IX not only permits sex-segregated bathrooms and similar facilities, but compels them, is not supported by Title IX itself, nor any controlling case law. Indeed, were it clear that *Skrmetti* had indirectly overruled *Grimm*, there would have been no reason for the Supreme Court to have granted certiorari, as it recently did, to review the Fourth Circuit's decision in *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, No. 23- 1078 (4th Cir. 2024). The LOF predicts that the U.S. Supreme Court may at some point in the future issue a decision impacting the precedent in *Grimm*, but ACPS is responsible for following the law as it exists today.

Factually, insofar as the LOF suggests that ACPS' policy protecting transgender students has been the cause of "real and serious" harms, that claim is simply not accurate. As ACPS communicated in its response last spring, there were no formal or informal complaints regarding transgender students using intimate spaces last year. Instead, the experience of ACPS for more than a decade has been that schools have functioned well, and without disruption, and that students have felt valued and protected under Policy JB and its predecessors. In sum, the policy's practical approach to these complicated issues is working.

---

[1] This includes the Fourth Circuit's recent order in *Doe v. State of South Carolina*, No. 25-1787 (August 12, 2025), enjoining enforcement of a ban against a transgender student using restrooms consistent with the student's gender identity.

Bradley R. Burke, Regional Director
August 15, 2025
Page 3

While refinement or other revision to policy JB is always possible, any changes would necessarily need to reflect the values of the ACPS community, and be made with input from that community. OCR's LOF, and its timeline for response to the draft VRA, do not allow for such input.

### **Conclusion**

ACPS remains open to discussing improvements that comply with the law and support and protect the ACPS community. OCR's LOF and current proposed VRA do neither.

In the LOF, OCR contends that "the writing on the wall is clear" with respect to *Grimm*, on the basis that the Supreme Court recently granted certiorari in *B.P.J.* and *Hecox v. Little*, 104 F.4th 1061, 1070 (9th Cir. 2024). OCR's views notwithstanding, ACPS cannot follow what OCR believes the law will be in the future, but rather must follow the law as it exists today. Since OCR believes that these cases may impact the precedent established by *Grimm*, ACPS respectfully suggests that OCR, rather than proceed with any threatened enforcement action at this time, pause such contemplated action in order to allow the U.S. Supreme Court to weigh in more definitively on the issues raised this matter.

Sincerely,

John F. Cafferky

cc:     Dr. Melanie Kay-Wyatt, ACPS Division Superintendent
        Robert M. Falconi, Esq. ACPS Division Counsel
        Jakob T. Stalnaker, Esq.

# Exhibit G



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE SECRETARY

August 19, 2025

Melanie Kay-Wyatt
Division Superintendent
Alexandria City Public Schools
1340 Braddock Place
Alexandria, VA 22314
Sent via email to melanie.kay-wyatt@acps.k12.va.us

Re: High Risk Designation and Specific Conditions on Grants

Dear Superintendent Kay-Wyatt,

This letter is to inform you that the U.S. Department of Education (Department) has designated Alexandria City Public School District as a "high-risk" entity, under all the programs administered by the Department for which your division receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10, for the reasons discussed below.  This follows the Department's July 25, 2025 Title IX noncompliance findings and proposed resolution agreement. On August 15, 2025, your division refused to sign the resolution agreement sent to you by the Office for Civil Rights (OCR) and remains in noncompliance with Title IX.

In this letter, we delineate the nature of our concerns with your division's administration of these grants; the reasons the information provided to the Department up to now by your division does not address these concerns; our determination to designate your division as a Department-wide "high-risk" entity; and the specific conditions we are imposing on all grants your division is receiving from the Department.

BACKGROUND

As you are aware, the U.S. Department of Education generously granted an extension for your school division (your division) and four other school divisions in Virginia to come into compliance with Title IX of the Educational Amendments of 1972 (Title IX), and related requirements. Unfortunately, the additional time did not result in a successful outcome in compliance with federal law.

On August 15, 2025, your division stated it does not intend to make the necessary policy changes to come into compliance with Title IX.

It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal activity. Therefore, the Department is designating your division as a Department-wide "high-

risk" entity and placing specific conditions on your division's use of funds in all grants it receives from the Department.

The Department's prior communications with your division identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated. Thus, the Department is concerned with your division's inability to administer and/or manage Department grants properly with appropriate controls in place. These concerns are with all grants your division currently receives, administers, or manages.

In addition, the Department is identifying all the State-administered funds your division receives as a subgrantee from the Virginia Department of Education and any other State division, including under Title I of the Elementary and Secondary Education Act of 1965, as amended, and the Individuals with Disabilities Education Act. The Department expects to urge those entities to take similar actions to those being taken by the Department with regard to those funds. Representatives of the Virginia Department of Education have already agreed to take those steps.

Due to the sizable amount of Federal grant funds that are provided to your division, and concerns discussed in this letter, the Department will place all of your division's grants on reimbursement payment status until your division demonstrates to the Department's satisfaction that the following High-Risk Specific Conditions, specified below, are fully met, and that proper measures to address the problems noted in this letter are taken and are working well for a sustained period of time.

I.      YOUR DIVISION's DESIGNATION AS "HIGH-RISK"

Given these serious and deeply systemic concerns, the Department is taking immediate action to help safeguard public funds with regard to your division's activities with the Department's grants in accordance with statutory and regulatory requirements and the terms of approved grant applications, and with grants for which your division is a primary grantee or subgrantee.

The Department is designating your division as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.10. As part of this "high-risk" designation, we are imposing High-Risk Specific Conditions (noted below) on all of your division's grants. In making this determination and designation, the Department has taken into consideration several factors (some of which are mentioned above), which include, but are not limited to:

• the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;
• the improper organizational management and operations that led to the problems discussed above; and
• concerns regarding your division's lack of proper controls.

II.     HIGH RISK SPECIFIC CONDITIONS

Your division's grants and subgrants from the Department are being placed on a reimbursement method of payment. Under this specific condition, your division will, when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by your division with non-Federal funds.

In addition, within 30 days of the date of this letter:

1.  Your division must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps your division will take to ensure that grant funds will be spent in accordance with all appliable laws (this could include committing to implementing the resolution agreement sent to your division on July 25, 2025, with OCR's findings);

2.  Your division must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan.

The objectives of these specific conditions are to ensure that your division establishes the policies, procedures, and personnel in place to manage its grants and subgrants properly, including adherence to all pertinent federal civil rights laws that apply to your division's grants and subgrants. The Department may impose additional or modified specific conditions at any time through a subsequent letter.  If your division is unable to satisfactorily address these concerns, the Department will consider additional enforcement actions, including the possible termination of all or some of the Department's grants, and may require the recovery of funds.

III.    REMOVAL OF REIMBURSEMENT, HIGH-RISK CONDITIONS AND HIGH-RISK DESIGNATION

The reimbursement specific condition will remain in place until the Department has (1) determined that your division has put into place adequate corrective actions, which could include actions laid out in the OCR proposed resolution agreement, and (2) concluded that the corrective actions have been working appropriately for a period of time that reasonably demonstrates assurance of effective compliance.

IV.    REQUEST FOR RECONSIDERATION

Consistent with 2 C.F.R. § 200.208(d)(5), your division may request reconsideration of its designation as "high-risk", and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of this letter.  Any

request for reconsideration must be submitted via e-mail to Lindsey Burke of the Department, at [lindsey.burke@ed.gov](mailto:lindsey.burke@ed.gov). In a request for a reconsideration, you should include appropriate supporting documentation.

The Department remains committed to working with your division to help with the positive resolution of these concerns. Lindsey Burke is available to answer any questions on the High-Risk Specific Conditions, as well as to help facilitate any necessary support or assistance regarding the status of your grants or subgrants from the Department.

Sincerely yours,

Linda E. McMahon

CC: Emily Anne Gullickson, Virginia State Superintendent

# Exhibit H

🇺🇸 An official website of the United States government   Here's how you know

U.S. Department of Education

HOME / ABOUT US / NEWSROOM / PRESS RELEASES

**PRESS RELEASE**

# U.S. Department of Education Concludes Loudoun County Public Schools Violated Title IX and Retaliated Against Male Students Amid Sexual Harassment Claims

SEPTEMBER 16, 2025

Today, the U.S. Department of Education (the Department)'s Office for Civil Rights (OCR) found that Loudoun County Public Schools (Loudoun County) violated Title IX of the Education Amendments of 1972 (Title IX) by discriminating against male students on the basis of sex. OCR concluded that Loudoun County failed to respond as required by Title IX to reports of sexual harassment in the boys' locker room at a Loudoun County school and retaliated against male students by failing to treat the parties equitably during its grievance and investigative process.

OCR's investigation revealed a sex-based double standard: Loudoun County failed to meaningfully investigate complaints of sexual harassment by two male students concerning the presence of a member of the opposite sex in male-only intimate spaces yet thoroughly investigated the female student's sexual harassment complaint about the boys.

"Loudoun County's adherence to radical gender ideology has repeatedly placed its students in harm's way. First, Loudoun's policy of allowing students to occupy intimate facilities based on 'gender identity' rather than biological sex violates Title IX, compromises safety, and infringes upon the dignity and privacy interests to which students are entitled. Second, Loudoun County failed to treat allegations of sexual harassment equally: it promptly investigated a female

Help improve ED.gov

student's complaint but quickly dismissed and failed to meaningly investigate two of its male students' complaints of sexual harassment," **said Acting Assistant Secretary for Civil Rights Craig Trainor**. "We urge Loudoun County to abandon its reliance upon post-modern ideology and instead embrace the requirements of law by coming into compliance with Title IX. The Trump Administration's dedication to equal protection under the law is unwavering, and we will not permit rogue localities to defy that principle."

Loudoun County Public Schools has ten days to voluntarily enter the Department's Resolution Agreement, which requires Loudoun County to take the following actions:

- Rescind the suspensions imposed on the two male students;
- Review its findings to determine if discipline of the male students is warranted and, if Loudoun County determines that it is, the discipline must not exceed the discipline imposed on students who engaged in similar conduct and who had comparable disciplinary histories;
- Issue letters apologizing for Loudoun County's failure to properly investigate Title IX complaints;
- Notify the students and their parents that Loudoun County Public Schools will promptly investigate the formal Title IX complaints in a manner that is compliant with the requirements of Title IX; and
- Provide training to all high school and Loudoun County staff who receive or respond to reports of sexual harassment under Title IX.

**Background**

Throughout the 2024-2025 school year, a biological female who identified as a male was allowed access to the boys' locker room pursuant to Loudoun County policy. In March 2025, the female student recorded audio and video of two male students. This led the female student's parent and the two male students' parents to file Title IX complaints with the school.

Loudoun County failed to treat the male students equitably throughout the Title IX investigation process, which violates Title IX's prohibition on sex discrimination and retaliation.

In July 2025, OCR found that five Northern Virginia School Divisions, including Loudoun County, violated Title IX by having policies which allow students to occupy intimate facilities based on 'gender identity,' not biological sex. After the Divisions' rejection of OCR's proposed Resolution Agreement to voluntarily resolve its Title IX violations, the Department is seeking suspension of federal financial assistance to the Divisions.

In August 2025, to ensure that the Divisions expend taxpayer dollars consistent with federal law, the Department designated the Divisions as "high-risk" entities and placed the Divisions on reimbursement status for all Department funds, totaling over $50 million.

Title IX and its implementing regulations prohibit discrimination on the basis of sex in federally funded education programs and activities.

---

**CONTACT**

Press Office  |  (202) 401-1576  |  press@ed.gov

---

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: September 16, 2025

**Pay for College**

Fill out the FAFSA

529 Plans

Repay Your Loans

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

## News

Press Releases

Homeroom Blog

Subscriptions

## Research

Data

Education Research

What Works Clearinghouse

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

    

 www.ed.gov

**An official website of the Department of Education**

About Dept of Education          Accessibility Support          No FEAR Act data

Office of the Inspector General          Performance reports          FOIA          Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**