No. 25-2087 (L)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FAIRFAX COUNTY SCHOOL BOARD AND ARLINGTON SCHOOL BOARD,
*Plaintiffs-Appellants,*

v.

LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS SECRETARY OF
EDUCATION OF THE UNITED STATES, AND THE UNITED STATES
DEPARTMENT OF EDUCATION,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia,
Nos. 1:25-cv-01432-RDA-LRV & 1:25-cv-01434-RDA-LRV,
Hon. Rossie D. Alston, Jr.

### Corrected Joint Appendix

Breanna Smith-Bonsu
Chloe Smeltzer
WILLKIE FARR &
  GALLAGHER LLP
300 N. LaSalle Dr.
Chicago, IL 60654
312-728-9000

Timothy Heaphy
  *Counsel of Record*
Joshua N. Mitchell
Fiona Carroll
Lindsay Hemminger
WILLKIE FARR &
  GALLAGHER LLP
1875 K Street Northwest
Washington, DC 20006
202-303-1000
theaphy@willkie.com

[counsel for Defendants-Appellees
listed on inside cover]

*Counsel for Plaintiffs-Appellants*

Stanley Woodward, Jr.
Associate Attorney General

Abhishek Kambli
Deputy Associate Attorney
General

Brett A. Shumate
Assistant Attorney General
Civil Division

Lindsay Halligan
United States Attorney

Matthew J. Mezger
Garry D. Hartlieb
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3741
Email: Matthew.Mezger@usdoj.gov

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

| | Description | Page |
|---|---|---|
| 1 | *Fairfax County School Board v. McMahon*, No. 1:25-cv-01432-RDA-LRV Docket Sheet | JA001 |
| 2 | *Arlington School Board v. McMahon*, No. 1:25-cv-01434-RDA-LRV Docket Sheet | JA007 |
| 3 | Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA012 |
| 4 | Exhibit A to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA043 |
| 5 | Exhibit B to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA048 |
| 6 | Exhibit C to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA053 |
| 7 | Exhibit D to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA060 |
| 8 | Exhibit E to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA063 |
| 9 | Exhibit F to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA067 |
| 10 | Exhibit G to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA076 |
| 11 | Exhibit H to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA098 |
| 12 | Exhibit I to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA101 |
| 13 | Exhibit J to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA105 |
| 14 | Exhibit K to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA110 |
| 15 | Exhibit L to Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA116 |
| 16 | Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA120 |
| 17 | Exhibit A to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA125 |
| 18 | Exhibit B to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA132 |
| 19 | Exhibit C to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA135 |
| 20 | Exhibit D to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA139 |

| 21 | Exhibit E to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA148 |
|----|----|----|
| 22 | Exhibit F to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA170 |
| 23 | Exhibit G to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA173 |
| 24 | Exhibit H to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA177 |
| 25 | Exhibit I to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA182 |
| 26 | Exhibit J to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA188 |
| 27 | Exhibit K to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA192 |
| 28 | Declaration in Support of Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA197 |
| 29 | Exhibit A to Linda McMahon and the U.S. Department of Education's Opposition to Fairfax County School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA207 |
| 30 | Linda McMahon and the U.S. Department of Education's Notice Regarding Factual Background | JA210 |
| 31 | Order Denying Fairfax County School Board and Arlington County School Board's Motions for Preliminary Injunction and/or Temporary Restraining Order and Dismissing Fairfax County School Board and Arlington County School Board's Complaints Without Prejudice | JA213 |
| 32 | Fairfax County School Board's Notice of Appeal | JA226 |
| 33 | Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA230 |
| 34 | Exhibit A to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA260 |
| 35 | Exhibit B to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA265 |
| 36 | Exhibit C to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA270 |
| 37 | Exhibit D to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA273 |
| 38 | Exhibit E to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA277 |
| 39 | Exhibit F to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA285 |
| 40 | Exhibit G to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA307 |

| 41 | Exhibit H to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA310 |
|----|----------------------------------------------------------------------------------------------------------|-------|
| 42 | Exhibit I to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA314 |
| 43 | Exhibit J to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA319 |
| 44 | Exhibit K to Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education | JA325 |
| 45 | Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA329 |
| 46 | Exhibit A to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA334 |
| 47 | Exhibit B to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA337 |
| 48 | Exhibit C to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA341 |
| 49 | Exhibit D to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA349 |
| 50 | Exhibit E to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA371 |
| 51 | Exhibit F to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA374 |
| 52 | Exhibit G to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA378 |
| 53 | Exhibit H to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA383 |
| 54 | Exhibit I to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA389 |
| 55 | Exhibit J to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA393 |
| 56 | Declaration in Support of Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA398 |
| 57 | Exhibit A to Linda McMahon and the U.S. Department of Education's Opposition to Arlington School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order | JA404 |
| 58 | Linda McMahon and the U.S. Department of Education's Notice Regarding Factual Background | JA407 |
| 59 | Arlington School Board's Notice of Appeal | JA410 |
| 60 | Transcript of Hearing on Fairfax County School Board and Arlington School Board's Emergency Motions for Preliminary Injunction and/or Temporary Restraining Order | JA414 |

Dated: October 21, 2025

Respectfully submitted,

/s/ *Timothy J. Heaphy*
Timothy J. Heaphy
*Counsel of Record*
Joshua N. Mitchell
Fiona Carroll
Lindsay Hemminger
WILLKIE FARR &
  GALLAGHER LLP
1875 K Street Northwest
Washington, DC 20006
202-303-1000
theaphy@willkie.com

Breanna Smith-Bonsu
Chloe Smeltzer
WILLKIE FARR &
  GALLAGHER LLP
300 N. LaSalle Dr.
Chicago, IL 60654
312-728-9000

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served on all attorneys of record via the Court's electronic case filing system on October 21, 2025.

/s/ *Timothy J. Heaphy*
Timothy J. Heaphy

Query    Reports ▾    Utilities ▾    Help    Log Out

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:25-cv-01432-RDA-LRV

| | |
|---|---|
| Fairfax County School Board v. McMahon, et al.<br>Assigned to: District Judge Rossie D. Alston, Jr<br>Referred to: Magistrate Judge Lindsey R. Vaala<br>Case in other court: 4th Circuit, 25-02087<br>Cause: 05:702 Administrative Procedure Act | Date Filed: 08/29/2025<br>Date Terminated: 09/05/2025<br>Jury Demand: None<br>Nature of Suit: 899 Other Statutes:<br>Administrative Procedures Act/Review or<br>Appeal of Agency Decision<br>Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Fairfax County School Board**       represented by   **Breanna Smith-Bonsu**
Wilkie Farr & Gallagher LLP (IL-NA)
300 North LaSalle Drive
Chicago, IL 60654
**NA**
312-728-9000
Fax: 312-728-9199
Email: bsmith-bonsu@willkie.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Nathaniel Mitchell**
Wilkie Farr & Gallagher LLP (DC-NA)
1875 K Street NW
Washington, DC 20006
**NA**
202-303-1000
Email: jmitchell@willkie.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy John Heaphy**
Wilkie Farr & Gallagher LLP
1875 K. Street, N.W.
Washington, DC 20006-1238
202-303-1068
Email: theaphy@willkie.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Linda McMahon**       represented by   **Matthew J. Mezger**
*in her official capacity as Secretary of*       DOJ-USAO
*Education of the United States*       United States Attorney's Office
      Eastern District of Virginia

10/21/25, 12:03 PM                                          CM/ECF - vaed

2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: matthew.mezger@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abhishek Kambli**
DOJ-Oasg
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
202-445-5496
Email: abhishek.kambli@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Garry D. Hartlieb**
United States Attorney Office - Norfolk
101 W Main St
Suite 8000
Norfolk, VA 23510
757-441-6331
Email: garry.hartlieb@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Education**         represented by    **Matthew J. Mezger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abhishek Kambli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry D. Hartlieb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**America First Legal Foundation**         represented by    **Andrew Block**
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
202-836-7958
Email: andrew.block@aflegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2025 | 1 | Complaint *Against Linda McMahon, and the U.S. Department of Education* (Filing Fee $405, receipt number AVAEDC-10428636), filed by Fairfax County School Board. |

JA002

| | | |
|---|---|---|
| | | (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 2 | Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order by Fairfax County School Board. (Attachments: # 1 Proposed Order)(Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 3 | Memorandum of Law in Support in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Fairfax County School Board. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 4 | Proposed Summons *for U.S. Department of Education* by Fairfax County School Board (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 5 | Proposed Summons *for U.S. Attorney* by Fairfax County School Board (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 6 | Proposed Summons *for Linda McMahon* by Fairfax County School Board (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 7 | Proposed Summons *for U.S. Attorney General* by Fairfax County School Board (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 8 | NOTICE of Appearance by Timothy John Heaphy on behalf of Fairfax County School Board (Heaphy, Timothy) (Entered: 08/29/2025) |
| 08/29/2025 | 9 | Motion to appear Pro Hac Vice by Breanna Smith-Bonsu and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429170. by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 10 | Motion to appear Pro Hac Vice by Chloe Wehnonah Smeltzer and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429189. by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 11 | Motion to appear Pro Hac Vice by Fiona Louise Carroll and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429210. by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 12 | Motion to appear Pro Hac Vice by Joshua Nathaniel Mitchell and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429216. by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 13 | Motion to appear Pro Hac Vice by Lindsay Hemminger and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429222. by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | | Initial Case Assignment to District Judge Rossie D. Alston, Jr. and Magistrate Judge Lindsey R. Vaala. (swil) (Entered: 08/29/2025) |
| 08/29/2025 | | Motion Hearing set for 9/3/2025 at 09:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. as to 2 Emergency MOTION for Preliminary Injunction |

| | | |
|---|---|---|
| | | *and/or* Temporary Restraining Order (jlan) Modified on 9/2/2025 (triv). (Entered: 08/29/2025) |
| 09/02/2025 | 14 | Summons Issued as to Linda McMahon, United States Department of Education, U.S. Attorney and U.S. Attorney General. NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Notice to Attorney) (triv) (Entered: 09/02/2025) |
| 09/02/2025 | 15 | NOTICE *of Forthcoming Response to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction* by Linda McMahon, United States Department of Education. (Mezger, Matthew) Modified on 9/2/2025 (triv) (Entered: 09/02/2025) |
| 09/02/2025 | 16 | Declaration in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order by Fairfax County School Board. (Heaphy, Timothy) Modified on 9/2/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 17 | MOTION for Leave of Court to File *Brief of Amicus Curiae* by America First Legal Foundation. (Attachments: # 1 Proposed Order, # 2 Proposed Brief of Amicus Curiae, # 3 Exhibit A, # 4 Exhibit B, # 5 Rule 7.1 Disclosure)(Block, Andrew) Modified on 9/3/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 18 | NOTICE of Appearance by Abhishek Kambli on behalf of Linda McMahon, United States Department of Education (Kambli, Abhishek) (Entered: 09/02/2025) |
| 09/02/2025 | 19 | Memorandum of Law in Opposition in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Linda McMahon, United States Department of Education. (Attachments: # 1 Exhibit DEX 1)(Mezger, Matthew) Modified on 9/3/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 20 | NOTICE of Appearance by Matthew J. Mezger on behalf of Linda McMahon, United States Department of Education (Mezger, Matthew) (Entered: 09/02/2025) |
| 09/03/2025 | | Notice of Correction in re 17 MOTION for Leave to File *Brief of Amicus Curiae*. The filing user is notified to file a Notice of Hearing Date or a Waiver of Oral Argument. (triv) (Entered: 09/03/2025) |
| 09/03/2025 | 21 | Waiver of *Oral Argument* in re 17 MOTION for Leave of Court to File *Brief of Amicus Curiae* by America First Legal Foundation (Block, Andrew) Modified on 9/3/2025 (triv). (Entered: 09/03/2025) |
| 09/03/2025 | 22 | Minute Entry for proceedings held before District Judge Rossie D. Alston, Jr: Motion Hearing held on 9/3/2025. Appearance of counsel. Matter on for 2 Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order. 12 Motion to appear Pro Hac Vice by Joshua Nathaniel Mitchell - Granted. 9 Motion to appear Pro Hac Vice by Breanna Smith-Bonsu - Granted. 2 Motion for Preliminary Injunction and/or Temporary Restraining Order argued and taken under advisement. (Court Reporter: T. Harris.)(tarm) (Entered: 09/03/2025) |
| 09/03/2025 | 23 | ORDER granting 9 Motion for Pro hac vice Appointed Breanna Smith-Bonsu for Fairfax County School Board. Signed by District Judge Rossie D. Alston, Jr on 9/3/2025. (swil) (Entered: 09/03/2025) |

| | | |
|---|---|---|
| 09/03/2025 | 24 | ORDER granting 12 Motion for Pro hac vice Appointed Joshua Nathaniel Mitchell for Fairfax County School Board. Signed by District Judge Rossie D. Alston, Jr on 9/3/2025. (swil) (Entered: 09/03/2025) |
| 09/03/2025 | 25 | NOTICE of Appearance by Garry D. Hartlieb on behalf of Linda McMahon, United States Department of Education (Hartlieb, Garry) (Entered: 09/03/2025) |
| 09/03/2025 | 26 | NOTICE *Regarding Factual Background* by Linda McMahon, United States Department of Education (Mezger, Matthew) Modified on 9/4/2025 (triv). (Entered: 09/03/2025) |
| 09/04/2025 | 27 | REPLY in Support in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Fairfax County School Board. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Heaphy, Timothy) Modified on 9/4/2025 (triv). (Entered: 09/04/2025) |
| 09/05/2025 | 28 | ORDER that Plaintiffs' 2 Emergency Motions for Preliminary Injunction and/or Temporary Restraining Order are DENIED; and it is FURTHER ORDERED that the Complaints are DISMISSED WITHOUT PREJUDICE; and it is FURTHER ORDERED that the 17 Motion for Leave to File Brief of Amicus Curiae is DENIED. Signed by District Judge Rossie D. Alston, Jr on 9/5/2025. (tarm) (Entered: 09/05/2025) |
| 09/09/2025 | 29 | SUMMONS Returned Executed by Fairfax County School Board. U.S. Attorney served on 9/3/2025, answer due 11/3/2025; Linda McMahon served on 9/3/2025; United States Department of Education served on 9/3/2025; U.S. Attorney General served on 9/3/2025. (Heaphy, Timothy) Modified on 9/10/2025 (triv). (Entered: 09/09/2025) |
| 09/09/2025 | 30 | NOTICE OF APPEAL as to 28 ORDER, by Fairfax County School Board. Filing Fee $605, receipt number AVAEDC-10453080. (Heaphy, Timothy) (Entered: 09/09/2025) |
| 09/10/2025 | 31 | Transmission of Notice of Appeal to US Court of Appeals in re 30 NOTICE OF APPEAL (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (triv) (Entered: 09/10/2025) |
| 09/11/2025 | 32 | USCA 4th Circuit Case Number 25-2087, Case Manager K. Hancock as to 30 NOTICE OF APPEAL, filed by Fairfax County School Board. (triv) (Entered: 09/11/2025) |
| 09/15/2025 | 33 | TRANSCRIPT of proceedings held on 9/3/2025, before Judge R. Alston, Court Reporter/Transcriber Tonia Harris, Telephone number 703-646-1438. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/15/2025. Redacted Transcript Deadline set for 11/17/2025. Release of Transcript Restriction set for 12/15/2025.(harris, tonia) (Entered: 09/15/2025)** |
| 10/01/2025 | 34 | ORDER of USCA as to 30 NOTICE OF APPEAL. Upon consideration of submissions relative to appellants emergency motion for injunction pending appeal, the court denies the motion. Entered at the direction of Chief Judge Diaz with the concurrence of Judge Richardson and Judge Rushing. (triv) (Entered: 10/02/2025) |
| 10/10/2025 | 35 | ORDER of USCA as to 30 NOTICE OF APPEAL. For reasons appearing to the court, the court consolidates case No. 25-2087 with case No. 25-2107. Upon consideration of submissions relative to appellants motion to expedite appeal, the court grants the motion. (triv) (Entered: 10/10/2025) |

CM/ECF - vaed

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/21/2025 13:03:34 | | | |
| **PACER Login:** | WF000018 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01432-RDA-LRV |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

JA006

**Query    Reports ▾    Utilities ▾    Help    Log Out**

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:25-cv-01434-RDA-LRV

Arlington School Board v. McMahon, et al.
Assigned to: District Judge Rossie D. Alston, Jr
Referred to: Magistrate Judge Lindsey R. Vaala
Case in other court: 4th CCA, case manager K. Hancock,, 25-02107
Cause: 05:702 Administrative Procedure Act

Date Filed: 08/29/2025
Date Terminated: 09/05/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Arlington School Board**                    represented by **Breanna Smith-Bonsu**
Wilkie Farr & Gallagher LLP (IL-NA)
300 North LaSalle Drive
Chicago, IL 60654
**NA**
312-728-9000
Fax: 312-728-9199
Email: bsmith-bonsu@willkie.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Nathaniel Mitchell**
Wilkie Farr & Gallagher LLP (DC-NA)
1875 K Street NW
Washington, DC 20006
**NA**
202-303-1000
Email: jmitchell@willkie.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy John Heaphy**
Wilkie Farr & Gallagher LLP
1875 K. Street, N.W.
Washington, DC 20006-1238
202-303-1068
Email: theaphy@willkie.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Linda McMahon**                    represented by **Matthew J. Mezger**
*in her official capacity as Secretary of*                    DOJ-USAO
*Education of the United States*                    United States Attorney's Office
Eastern District of Virginia

JA007

CM/ECF - vaed

2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: matthew.mezger@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abhishek Kambli**
DOJ-Oasg
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
202-445-5496
Email: abhishek.kambli@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Garry D. Hartlieb**
United States Attorney Office - Norfolk
101 W Main St
Suite 8000
Norfolk, VA 23510
757-441-6331
Email: garry.hartlieb@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Education**          represented by **Matthew J. Mezger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abhishek Kambli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Garry D. Hartlieb**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2025 | 1 | Complaint *Against Linda McMahon, in her official capacity as U.S. Secretary of Education and the U.S. Department of Education* (Filing Fee $405, receipt number AVAEDC-10428693), filed by Arlington School Board. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Heaphy, Timothy) (Entered: 08/29/2025) |
| 08/29/2025 | 2 | Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order by Arlington School Board. (Attachments: # 1 Proposed Order)(Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 3 | Memorandum of Law in Support in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Arlington School Board. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 4 | Proposed Summons *for U.S. Department of Education* by Arlington School Board (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 5 | Proposed Summons *for Erik S. Siebert* by Arlington School Board (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 6 | Proposed Summons *for Linda McMahon* by Arlington School Board (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 7 | Proposed Summons *for Pamela Bondi* by Arlington School Board (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 8 | NOTICE of Appearance by Timothy John Heaphy on behalf of Arlington School Board (Heaphy, Timothy) (Entered: 08/29/2025) |
| 08/29/2025 | 9 | Motion to appear Pro Hac Vice by Breanna Smith-Bonsu and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429230 by Arlington School Board. (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 10 | Motion to appear Pro Hac Vice by Chloe Wehnonah Smeltzer and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429243 by Arlington School Board. (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 11 | Motion to appear Pro Hac Vice by Fiona Louise Carroll and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429252 by Arlington School Board. (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 12 | Motion to appear Pro Hac Vice by Joshua Nathaniel Mitchell and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429263 by Arlington School Board. (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | 13 | Motion to appear Pro Hac Vice by Lindsay Hemminger and Certification of Local Counsel Timothy Heaphy Filing Fee $75, receipt number AVAEDC-10429274 by Arlington School Board. (Heaphy, Timothy) Modified on 8/29/2025 (triv). (Entered: 08/29/2025) |
| 08/29/2025 | | Initial Case Assignment to District Judge Michael S. Nachmanoff and US Magistrate Judge William B. Porter. (triv) (Entered: 08/29/2025) |
| 08/29/2025 | 14 | Summons Issued as to Linda McMahon, United States Department of Education, U.S. Attorney and U.S. Attorney General. NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed as to USA or Summons Returned Unexecuted as to USA. (Attachments: # 1 Notice to Attorney) (triv) (Entered: 08/29/2025) |
| 08/29/2025 | | Case Reassigned to District Judge Rossie D. Alston, Jr. and Magistrate Judge Lindsey R. Vaala. District Judge Michael S. Nachmanoff, US Magistrate Judge William B. Porter no longer assigned to the case. (jlan) (Entered: 08/29/2025) |

| 08/29/2025 | | Motion Hearing set for 9/3/2025 at 09:00 AM in Alexandria Courtroom 1000 before District Judge Rossie D. Alston Jr. as to 2 MOTION for Preliminary Injunction. (jlan) (Entered: 08/29/2025) |
|---|---|---|
| 09/02/2025 | 15 | DOCKETED IN ERROR AND REMOVED (triv) (Entered: 09/02/2025) |
| 09/02/2025 | 16 | NOTICE *of Forthcoming Response* in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order by Linda McMahon, United States Department of Education (Mezger, Matthew) Modified on 9/4/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 17 | Declaration in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order by Arlington School Board. (Heaphy, Timothy) Modified on 9/4/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 18 | NOTICE of Appearance by Abhishek Kambli on behalf of Linda McMahon, United States Department of Education (Kambli, Abhishek) (Entered: 09/02/2025) |
| 09/02/2025 | 19 | Memorandum of Law in Opposition in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Linda McMahon, United States Department of Education. (Attachments: # 1 Exhibit DEX 1)(Mezger, Matthew) Modified on 9/4/2025 (triv). (Entered: 09/02/2025) |
| 09/02/2025 | 20 | NOTICE of Appearance by Matthew J. Mezger on behalf of Linda McMahon, United States Department of Education (Mezger, Matthew) (Entered: 09/02/2025) |
| 09/03/2025 | 21 | Minute Entry for proceedings held before District Judge Rossie D. Alston, Jr: Motion Hearing held on 9/3/2025. Appearance of counsel. Matter on for 2 Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order. 12 Motion to appear Pro Hac Vice by Joshua Nathaniel Mitchell - Granted. 9 Motion to appear Pro Hac Vice by Breanna Smith-Bonsu - Granted. 2 Motion for Preliminary Injunction and/or Temporary Restraining Order argued and taken under advisement. (Court Reporter: T. Harris)(tarm) (Entered: 09/03/2025) |
| 09/03/2025 | 22 | NOTICE of Appearance by Garry D. Hartlieb on behalf of Linda McMahon, United States Department of Education (Hartlieb, Garry) (Entered: 09/03/2025) |
| 09/03/2025 | 23 | ORDER granting 9 Motion for Pro hac vice Appointed. Breanna Smith-Bonsu for Arlington School Board. Signed by District Judge Rossie D. Alston, Jr on 9/3/2025. (kgall) (Entered: 09/03/2025) |
| 09/03/2025 | 24 | ORDER granting 12 Motion for Pro hac vice. Appointed Joshua Nathaniel Mitchell for Arlington School Board. Signed by District Judge Rossie D. Alston, Jr on 9/3/2025. (kgall) (Entered: 09/03/2025) |
| 09/03/2025 | 25 | NOTICE *Regarding Factual Background* by Linda McMahon, United States Department of Education (Mezger, Matthew) Modified on 9/4/2025 (triv). (Entered: 09/03/2025) |
| 09/04/2025 | 26 | REPLY in Support in re 2 Emergency MOTION for Preliminary Injunction *and/or* Temporary Restraining Order filed by Arlington School Board. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Heaphy, Timothy) Modified on 9/4/2025 (triv). (Entered: 09/04/2025) |
| 09/05/2025 | 27 | ORDER that Plaintiffs' 2 Emergency Motions for Preliminary Injunction and/or Temporary Restraining Order are DENIED; and it is FURTHER ORDERED that the Complaints are DISMISSED WITHOUT PREJUDICE; and it is FURTHER ORDERED that the 17 Motion for Leave to File Brief of Amicus Curiae is DENIED. Signed by District Judge Rossie D. Alston, Jr on 9/5/2025. Signed by District Judge Rossie D. Alston, Jr on 9/5/25. (tarm) (Entered: 09/05/2025) |

| 09/09/2025 | 28 | SUMMONS Returned Executed by Arlington School Board. Linda McMahon served on 9/3/2025, answer due 11/3/2025; United States Department of Education served on 9/3/2025, answer due 11/3/2025. (Heaphy, Timothy) (Entered: 09/09/2025) |
| 09/10/2025 | 29 | NOTICE OF APPEAL as to 27 Order on Motion for Preliminary Injunction,, Order on Motion for TRO, by Arlington School Board. Filing fee $ 605, receipt number AVAEDC-10454515. (Heaphy, Timothy) (Entered: 09/10/2025) |
| 09/15/2025 | 30 | Transmission of Notice of Appeal to US Court of Appeals re 29 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 09/15/2025) |
| 09/17/2025 | 31 | USCA Case Number 25-2107 4th CCA, case manager K. Hancock, for 29 Notice of Appeal filed by Arlington School Board. (dvanm) (Entered: 09/17/2025) |
| 10/01/2025 | 32 | ORDER of USCA as to 29 Notice of Appeal filed by Arlington School Board. Upon consideration of submissions relative to appellant's emergency motion for injunction pending appeal, the court denies the motion. Entered at the direction of Chief Judge Diaz with the concurrence of Judge Richardson and Judge Rushing. (dvanm) (Entered: 10/02/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/21/2025 13:05:43 | | |
| **PACER Login:** | WF000018 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01434-RDA-LRV |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | Civil Action No. _____ |
| States; the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | | |

## COMPLAINT

Plaintiff, the Fairfax County School Board ("FCSB"),[1] through its undersigned attorneys,

brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (the "APA"),

and the Declaratory Judgment Act, 28 U.S.C. § 2201, and alleges for its complaint as follows:[2]

## INTRODUCTION

1.      On August 19, 2025, the Department of Education (the "Department") issued a

press release announcing that it was "placing . . . [FCPS] . . . in Northern Virginia on high-risk

status" with the result that "all Department funds including formula funding, discretionary grants,

and impact aid grants" will be "done by reimbursement only."[3]

---

[1] Plaintiff Fairfax County School Board operates, maintains and supervises the Fairfax County Public Schools ("FCPS").

[2] Arlington School Board ("ASB") has filed against Defendants a similar action and motion for immediate issuance of an order for a temporary restraining order and preliminary injunction. Given the similar nature of the action and motions, ASB and FCSB request that the two actions and motions be consolidated.

[3] *See* Ex. A, Office of Comm'cns & Outreach, "U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX," U.S. Dep't of Educ. (Aug. 19, 2025), https://tinyurl.com/26kzwz3y.

2.      The Department sought to justify this decision by a bare, and incorrect, assertion that FCPS (and four other Northern Virginia school districts) have been "in violation of Title IX of the Education Amendments of 1972."[4]  Defendants assert that FCPS violates Title IX by maintaining a policy that permits students to access restrooms and locker rooms ("facilities") that align with their gender identity.

3.      Later on August 19, 2025 Defendant McMahon sent a letter to FCPS notifying it of this change in status and asserting that it encouraged the Virginia Department of Education ("VDOE") to similarly withhold federal funds passed through state funding mechanisms to FCPS. Ex. B.

4.      Defendants' action came a mere two business days after the U.S. Court of Appeals for the Fourth Circuit reaffirmed that its interpretation of Title IX in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020) remains the law in Northern Virginia as well as the rest of the Circuit.  In *Grimm*, the Fourth Circuit held that both the Equal Protection Clause and Title IX compel local school boards to provide students with access to facilities that correspond with their gender identity.  As Fourth Circuit panel precedent, *Grimm* binds FCPS.

5.      Defendants' placement of FCPS on "high-risk status" and conditioning its federal funding is a final agency action subject to APA review.  Defendants' action cannot withstand that review because it is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. Accordingly, this Court must hold unlawful and set aside Defendants' action.  5 U.S.C. § 706.

6.      The Court should separately declare that FCPS's policy does not violate Title IX because *Grimm* is controlling law in the Fourth Circuit.

---

[4] *Id.*

## JURISDICTION AND VENUE

7.       This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–06; the Declaratory Judgment Act, 28 U.S.C. § 2201; and Title IX.

8.       Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants Department of Education and Secretary McMahon are a United States agency and an officer of the United States sued in her official capacity.  FCSB is a public body operating in the Eastern District of Virginia.  FCPS is a local government agency operating in the Eastern District of Virginia.  A substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this District.

## PARTIES

9.       Plaintiff FCSB operates, maintains, and supervises the FCPS.

10.      FCPS is a school district within the Commonwealth of Virginia.  FCPS is the independent branch of the Fairfax County government that administers public schools in Fairfax County and the independent City of Fairfax.

11.      Defendant the Department of Education ("DOE") is an executive department of the United States.  It is headquartered in Washington, D.C.

12.      Defendant Linda McMahon is the United States Secretary of Education and is sued solely in that capacity.  As Secretary of Education, Defendant McMahon is head of the DOE.

## FACTUAL ALLEGATIONS

**I.      Title IX bars discrimination on the basis of sex.**

13.      This matter involves a dispute over the scope of Title IX of the Higher Education Amendments of 1972, Pub. L. No. 92-318, which provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

14.    Nothing in the text of Title IX prohibits schools from allowing transgender students from accessing school facilities that align with their gender identity. To the contrary, several U.S. Courts of Appeals—including the Fourth Circuit—have held that Title IX *requires* schools to *allow* such access.

15.    To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of [20 U.S.C. § 1681] . . . by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682.

16.    Congress expressly declared that any action by the department or agency "terminating or refusing to grant or to continue financial assistance" is subject to judicial review under the APA, that "any State" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion." 20 U.S.C. § 1683.

17.    In a letter sent to FCPS on August 19, 2025, the Department has made clear that FCPS will not receive reimbursement unless it accedes to Defendants' interpretation of Title IX, which is not consistent with the interpretation that binds FCPS (and this Court). Accordingly, the Department's order placing FCPS on "reimbursement-only" status while FCPS complies with the Fourth Circuit's binding interpretation of Title IX constitutes in fact a refusal to continue federal financial assistance within the meaning of 20 U.S.C. §§ 1682 and 1683.

**II.    The Department's regulations echo Title IX's requirements.**

18.    The Department's regulations implementing Title IX are codified at 34 C.F.R. Part 106.

JA015

19.    The Department's regulations require covered entities to "provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.  They do not expressly address a student's ability to access facilities that align with their gender identity.

20.    The Department's regulations adopt and apply the procedures for enforcing Title VI of the Civil Rights Act of 1964 to its Title IX regulations.  34 C.F.R. § 106.81 (adopting and applying 34 C.F.R. §§ 100.6–100.11).

21.    These regulations require that the Department "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part." 34 C.F.R. § 100.6(a).

22.    If noncompliance is found, and it cannot be corrected by informal means, compliance "may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."  34 C.F.R. § 100.8(a); *see also* 28 C.F.R. § 42.108.

23.    Pursuant to the Department's procedures:

> [n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part; and (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

JA016

34 C.F.R. § 100.8(c).

24.    The Department's procedures also provide:

> Any action to suspend or terminate or to refuse to grant or to continue
> Federal financial assistance shall be limited to the particular political entity,
> or part thereof, or other applicant or recipient as to whom such a finding has
> been made and shall be limited in its effect to the particular program, or part
> thereof, in which such noncompliance has been so found.

34 C.F.R. § 100.8(c).

**III.    The Fourth Circuit follows other Circuit Courts of Appeals in concluding that Title IX protects transgender individuals' access to facilities that correspond with their gender identity.**

25.    Defendants' action to suspend federal funds allocated to FCPS has no legal basis, as it relies upon an incorrect interpretation of Title IX that is flatly inconsistent with binding precedent in the Fourth Circuit.

26.    In 2020, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit considered the right of transgender students to access school facilities that correspond with their gender identity.  In that case, a local Virginia school division, in response to backlash about a transgender male student's use of the boys' restroom, implemented a policy under which students could only use restrooms matching their "biological gender." *Grimm*, 972 F.3d at 593.  The policy also required that "students with gender identity issues shall be provided an alternative appropriate private facility." *Id.* at 599.  To effectuate this policy, a number of single-stall unisex restrooms were made available to all students. *Id.* at 600.

27.    The court in *Grimm* analogized the facts at issue to those involved in *Bostock v. Clayton County,* 590 U.S. 644 (2020), in which the United States Supreme Court held that discrimination against a person for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights Act.  *Grimm*, 972 F.3d at 616–19.  Following *Bostock*, the Court of

Appeals concluded that the policy discriminated against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* at 618. Accordingly, the court found Grimm's gender identity to be a protected status pursuant to Title IX, invalidating the school's restroom restriction. *Id.*

28.     *Grimm* stands for the proposition that policies that prohibit transgender students from using the facilities that align with their gender identity constitute sex-based discrimination and violate Title IX. *Id.* The FCPS policy at issue is consistent with *Grimm* and therefore complies with, not violates, Title IX.[5]

29.     Contrary to Defendants' assertions, *Grimm* remains binding law in the Fourth Circuit and has not been abrogated by *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), a case upholding a Tennessee law that prohibited certain medical interventions for minors with gender

---

[5] While most courts which have considered the issue of Title IX's application to gender identity have ruled consistent with the Fourth Circuit in *Grimm*, several courts have issued contrary rulings. *Compare Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (affirming dismissal of lawsuit brought by plaintiffs who alleged a school district's policy permitting students to use facilities that match their gender identity violated Title IX and holding that a transgender student's normal use of facilities alone does not constitute actional "harassment" under Title IX even if some students felt subjectively harassed); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018) (rejecting argument that a school district's policy allowing transgender students to use facilities that align with their gender identity violated Title IX because the policy treated all students equally irrespective of sex); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046–50 (7th Cir. 2017), *abrogated on other grounds as recognized by, Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (holding that a policy requiring students to use a bathroom that conforms with their gender identity punishes those students for their gender nonconformance and therefore violates Title IX), *with Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (11th Cir. 2022) (en banc) (holding that a policy disallowing transgender students from using the bathroom that aligned with their gender identity did not violate Title IX). *See also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024) (interpreting Title IX regulations "[w]ithout deciding any substantive merits questions").

dysphoria as constitutional under the Equal Protection Clause, or any other United States Supreme Court case.

30.    Indeed, on August 15, 2025, the Fourth Circuit reaffirmed that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." *Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025).  The *Doe* case involved a challenge to a South Carolina statute that included a restriction on restroom access to students according to their gender assigned at birth—a policy identical to that struck down in *Grimm*.  *Id.* at **2–3.  Doe moved for a preliminary injunction, relying on *Grimm* in support of his assertion that the South Carolina statute violated Title IX.  *Id.* at *5.

31.    Applying the legal standard for a preliminary injunction, the court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the court's ruling in *Grimm*.  *Id.* at **16–17.  The court also found that Doe had demonstrated irreparable harm, observing that "state action infringing [on] constitutional rights generally constitutes irreparable harm."  *Id.* at *8.  Finally, the court found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm*—a prior, binding decision of this [c]ourt"—was clearly in the public interest.  *Id.* at *9.

32.    In his concurrence to the court's opinion in *Doe*, Chief Judge Diaz directly addressed South Carolina's argument that *Grimm* had been abrogated by prior United States Supreme Court decisions.  *Id.* at **10–11.  He specifically noted that the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) "has little to say about the issues *Grimm* addressed," given that it involved a statute prohibiting medical care that applied to all minors rather than a sex-based restriction on facility access.  *Id.* at *10.  Accordingly, Judge Diaz found that

"*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of *Grimm's* Title IX holding." *Id.* at \*9.

33. Similarly instructive is the concurrence of Judge Agee, who dissented in *Grimm*. Despite his disagreement with the court's holding in *Grimm*, Judge Agee nonetheless stated that it remains binding authority in the Fourth Circuit. "*Grimm* binds all the judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal." *Id.* at \*14.[6]

34. Unless and until either the *en banc* Fourth Circuit reconsiders the holding of *Grimm* or the U.S. Supreme Court decides whether transgender status is a protected class under Title IX, *Grimm* remains controlling in the Fourth Circuit.[7]

**IV. Virginia's anti-discrimination law further requires FCPS to provide access to facilities that match individuals' gender identities.**

35. Virginia law is consistent with *Grimm* and prohibits discrimination based on gender identity. In 2020, the Virginia General Assembly expanded the scope of the Virginia Human Rights Act (VA. CODE ANN. § 2.2-3900–3909), by adopting the Virginia Values Act (the

---

[6] On August 28, 2025, the defendants in *Doe* filed a petition for certiorari in the United States Supreme Court.

[7] The United States Supreme Court has agreed to hear a case involving the scope of Title IX as applied to transgender student participation in school sports in its upcoming term, a case that may but has not yet provided further guidance as to the scope of Title IX. The Court recently granted cert in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth. *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025). The question for the Court in *B.P.J.* is whether Title IX and the Equal Protection Clause prevent a state from designating school sports teams based on biological sex. The Court's decision may provide clarity as to whether or not Title IX requires educational institutions to separate student resources by biological sex, without concern for transgender students.

"Values Act").[8]  The law "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of … gender identity … in places of public accommodation, including educational institutions."  VA. CODE ANN. § 2.2-3900.  The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."  VA. CODE ANN. § 2.2-3901.

36.    Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."  VA. CODE ANN. § 15.2-853.

37.    In 2021, VDOE issued Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[9]

38.    Upon the accession of Glenn Youngkin to the office of Governor of Virginia in 2022, the VDOE issued new guidance on the issue of transgender student access to school facilities.  Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that a student "shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)."

---

[8] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).

[9] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, VIRGINIA DEPARTMENT OF EDUCATION (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

V.    **FCPS's Regulation 2603.2 adheres to federal and state statutes and regulations.**

39.    Pursuant to VDOE's Model Policies, FCPS Regulation 2603.2 "Gender-expansive and Transgender Students" went into effect in October 2020.  Ex. C.  FCPS drafted this regulation in response to the Virginia Values Act, which prevents discrimination based on gender identity.

40.    Section IX of Regulation 2603.2 provides as follows:

a)    "Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity."

b)    "When an instructional or extra-curricular event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity."

c)    "Any student who has a need or desire for increased privacy, regardless of the underlying reason including gender identity, shall be provided with a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to the student's gender identity before or after other students).  Such alternative options will minimize impact to instructional time to the extent possible."

d)    "Any alternative arrangement should be provided in a way that protects the ability of students to keep their gender-expansive or transgender status or other underlying reason for the request confidential.  FCPS will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a student or parent."

JA022

e)    "In no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the student's gender identity or be limited to using only a private area, single-occupancy accommodation, or other single-use facility as described in this section."

f)    "Gender-expansive and transgender students may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth."[10]  Ex. C.

## VI.   The Office of Civil Rights of the Department of Education investigates FCPS's policies.

41.    Despite the clear authority which authorizes the FCPS policy at issue in this matter, the Office for Civil Rights ("OCR") of the United States Department of Education has launched an investigation which seeks to compel FCPS to change its policy in a manner contrary to law.  On February 12, 2025, OCR issued a Notification Letter to FCPS indicating that a complaint had been filed alleging that FCPS's policy regarding use of sex-segregated facilities such as restrooms and locker rooms (Regulation 2603.2) violated Title IX by providing greater rights to students who are transgender than to those who are cisgender.  Ex. D.  On February 24, 2025, OCR sent FCPS a Data Request Letter requesting a number of documents and responses.  Ex. E.

42.    The complaint was generated by America First Legal ("AFL"), a conservative nonprofit organization founded by White House Deputy Chief of Staff Stephen Miller.

43.    FCPS promptly responded on March 24, 2025 with documents and a narrative response defending the policy.  FCPS cited state law and the Fourth Circuit's *Grimm* opinion as

---

[10] *See* FCPS Regulation 2603.2, FAIRFAX_OCR_1307_0000049.  All FCPS policies, bylaws, and
regulations are publicly available at https://insys.fcps.edu/schoolboardapps/report_policy/cache/alpha-A.htm.

JA023

the bases for its protection of transgender students' access to facilities aligned with their gender identity.  Ex. F.

44.    On July 25, 2025, OCR concluded its investigation by issuing a Findings Letter. Ex. G.  In that letter, OCR asserted that the FCPS's policies and similar facilities-access policies of four other school divisions in Northern Virginia—those for Arlington, Loudoun, Prince William, and Alexandria Counties—violate Title IX and its implementing regulations.  *Id.* Accompanying the Findings Letter, OCR delivered a draft Resolution Agreement which requires that each division (1) modify its policy to ensure that access to restroom and locker room facilities will be limited by students' sex assigned at birth; and (2) ensure that all policies adopt OCR's definition of the terms "sex, female, male, girls, women, boys [and] men."  OCR's definitions of these terms treat individuals exclusively according to the sex assigned them at birth.  Ex. H.

45.    On July 29, 2025, counsel to all five of the impacted school divisions submitted a joint request to OCR for 90 days to respond to the July 25, 2025 Findings Letter, consistent with the timeframe for negotiated resolutions provided in the OCR Case Processing Manual.  Ex. I.

46.    On July 31, 2025, OCR's Regional Director Bradley Burke rejected the July 29th request for extension and instead imposed a deadline of August 15, 2025, for FCPS and the other impacted school divisions to notify OCR as to "whether or not [each Division] is willing to consider agreeing to the terms in the draft resolution agreement."  Ex. J.

47.    On August 15, 2025, FCPS submitted a response letter to OCR, stating that FCPS was bound by Fourth Circuit precedent and could not modify its policies or agree to the terms of the Resolution Agreement without exposing itself to a risk of litigation for violating federal and state law.  Ex. K.  FCPS proposed that OCR refrain from referring the matter to the DOJ until the Supreme Court has issued its decision in *West Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164

(certiorari granted July 3, 2025), which raises a related but distinct issue of Title IX transgender sex discrimination in athletic teams. *Id.*

48.    On August 18, 2025, FCPS submitted a supplemental response letter to OCR, providing additional authority for FCPS's position that it is bound by Fourth Circuit precedent— the opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit. Ex. L.

**VII.    Defendants designate FCPS as a "high-risk" entity and place FCPS in "reimbursement only" status.**

49.    On August 19, 2025, the Department "designated [FCPS] as a 'high-risk' entity, under all the programs administered by the Department for which [FCPS] receives funds" due to FCPS's purported "noncompliance with Title IX." Ex. B at 1.

50.    The Department also stated that it has designated FCPS as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.1. Ex. B at 2–3. The factors set forth in § 200.208 that the Department is required to consider include (1) "[r]eview of OMB-designated repositories of government-wide data [] or review of its risk assessment;" (2) FCPS's "history of compliance with the terms and conditions of Federal awards;" (3) FCPS's "ability to meet expected performance goals as described in § 200.211;" or (4) "a determination of whether [FCPS] has inadequate financial capability to perform the Federal award." 2 C.F.R. § 200.208. The Department stated that it considered "the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws," "the improper organizational management and operations that led to the problems discussed above," and "concerns regarding your division's lack of proper controls." Ex. B at 2–3.

51.    The Department stated that it was "placing specific conditions on [FCPS's] use of funds in all grants it receives from the Department." *Id.* at 1–2.  In particular, "[d]ue to the sizable amount of Federal grant funds that are provided to [FCPS], and concerns discussed in this letter, the Department will place all of [FCPS's] grants on reimbursement payment status." *Id.* at 2. "Under this specific condition, [FCPS] will, when it submits a request to drawdown [*sic*] funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by [FCPS] with non-Federal funds." *Id.* at 3.

52.    Further, the Department demanded that "within 30 days of the date of this letter" FCPS would comply with two further "specific conditions":

a)    "[FCPS] must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps [FCPS] will take to ensure that grant funds will be spent in accordance with all appliable [*sic*] laws (this could include committing to implementing the resolution agreement sent to [FCPS] on July 25, 2025, with OCR's findings)."  Ex. B at 3.

b)    "[FCPS] must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the

responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan." *Id.* at 3.

53.    The Department's August 19, 2025 letter makes clear that FCPS will not receive reimbursement unless it accedes to the Department's interpretation of Title IX, which is not consistent with the interpretation that binds FCPS (and this Court).  Accordingly, Defendants' order placing FCPS on "reimbursement-only" status while FCPS complies with the Fourth Circuit's binding interpretation of Title IX constitutes a refusal to continue federal financial assistance within the meaning of Title IX and the Department's regulations implementing it.

54.    Defendants' challenged actions are agency actions within the meaning of the APA because they constitute the entireties or parts of agency orders or sanctions, or the equivalent thereof.  *See* 5 U.S.C. § 551(13).

55.    Defendants' challenged actions are final agency actions because they represent the culmination of Defendants' decision-making process on specific conditions imposed on FCPS due to FCPS's legally mandated facilities-access policies.  Further, Defendants' action has immediate legal and real-world effects—namely, they purport to have adjudicated FCPS to be in violation of Title IX and they have altered the conditions under which FCPS may receive funding to which it is otherwise entitled.  Indeed, because FCPS cannot—consistent with the law that binds it—alter those facilities-access policies without risking litigation, and because Defendants have conditioned reimbursement on FCPS altering those policies, Defendants have in fact refused to continue providing federal funds to FCPS.

**VIII.   FCPS has suffered irreparable harm and the balance of equities weighs in its favor.**

56.    Defendants' action constitutes irreparable harm to FCPS.  Because Defendants have conditioned FCPS's receipt of federal funds on requirements FCPS cannot lawfully satisfy, FCPS has in fact lost access to those funds.

JA027

57.    For fiscal year 2026, FCPS anticipates that roughly $167 million of its budget will comes from the federal government.

58.    The largest portion—$61 million—funds food and nutrition services, which pays the salaries of FCPS's food services staff, allows FCPS to provide low-income students with free and reduced price meals, and ensures that FCPS's cafeterias are operating efficiently so that FCPS can feed its students high-quality meals. FCPS receives another $41 million to ensure that FCPS can provide services to its students with disabilities, as required by the Individuals with Disabilities Education Act (IDEA). The remaining $65 million is used to support students experiencing homelessness, boost the academic performance of low-income students and English learners, increase student achievement, improve the quality, quantity, and effectiveness of FCPS's teachers, principals, and other leaders, and provide career, technical education, and adult and community education programs.

59.    While FCPS's injury is primarily economic, money damages are unavailable as against the Federal Government due to federal sovereign immunity. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation"); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'") (quoting 5 U.S.C. § 702).

60.    The Department and Defendant McMahon, as appendages of the federal Executive Branch, are bound by the President's duty to "take Care that the Laws be faithfully executed." U.S. CONST. art II, § 3. Accordingly, none of the Defendants can have any protectable interest in

enforcing the Department's unlawful order, which is based on the Department's express refusal to follow precedent that binds FCPS, this Court, and Defendants.

61.　　FCPS has an interest in providing its students with "an educational program of high quality" in accordance with its duties under the Virginia Constitution. *See* VA. CONST. art. VIII, § 1.

62.　　FCPS further has an interest in ensuring that its students are afforded all constitutional and legal protections they are due, including those established by binding interpretations of federal anti-discrimination statutes such as Title IX.

63.　　FCPS also has an interest in ensuring that its own actions comply with all legal requirements.

64.　　Accordingly, the balance of equities and the public interest weigh in favor of injunctive relief.

## CAUSES OF ACTION

### Count I − under the Administrative Procedure Act
### (against Defendants McMahon and the Department)

65.　　FCSB repeats and realleges paragraphs 1–64 as though fully set forth herein.

66.　　Defendants Secretary McMahon and the Department's constructive termination of or refusal to continue federal funds owed to FCPS based on Defendants' assertion that FCPS violated Title IX constitutes a final agency action reviewable under the APA. 20 U.S.C. § 1683.

67.　　The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

68.　　Defendants' action designating FCPS as a "high-risk" entity is not based on any identifiable factor or factors set forth in 2 C.F.R. § 200.208. Though Defendants claim to have

- 18 -

considered FCPS's "potential gross mismanagement of public funds," "improper organizational management and operations," and "lack of proper controls," the Department has provided no evidence to support these findings. FCPS has never been notified of a failed audit, mismanagement of specific funds, or issues regarding its internal controls prior to receiving this designation. Accordingly, designating FCPS as "high-risk" based on the Department's purported "consideration" of the § 200.208 factors is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

69.    Defendants' action constructively terminating or refusing to continue funds owed to FCPS is not in accordance with the law set forth in *Grimm*. The refusal to continue funds was premised on FCPS's alleged violation of Title IX as a result of its implementation of Regulation 2603.2, but that regulation merely codifies the holding of *Grimm*, which interpreted Title IX with binding effect on FCPS, this Court, and Defendants.

70.    Defendants' action imposes unwarranted penalties on FCPS not because FCPS has violated any law but because FCPS is bound to follow and is following the Fourth Circuit's precedent, which is binding within FCPS's geographical area (and which, moreover, binds this Court). Defendants' action is accordingly an abuse of discretion and contrary to law. 5 U.S.C. § 706(2)(A).

71.    Defendants' action targeting FCPS (and four other Northern Virginia schools) is arbitrary and capricious because it singles out FCPS, while ignoring similarly situated districts in Virginia and across the country that have similar policies regarding student access to facilities. Defendants have not articulated a sufficient and substantiated reason to explain why FCPS is subject to this action while others are not. This disparate treatment, without a rational basis, violates the fundamental principal that agency action must be based on reasoned decision-making. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

JA030

Agency discretion is not unbounded, and selective enforcement without justification renders Defendants' action arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A); *see Kirk v. Comm'r of SSA*, 987 F.3d 314, 321 (4th Cir. 2021) ("'Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.'") (quoting *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005)).

### Count II – under the Administrative Procedure Act and the Spending Clause (against Defendants McMahon and the Department)

72.    FCSB repeats and realleges paragraphs 1–71 as though fully set forth herein.

73.    Separately, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

74.    The federal government may not compel states to enact or administer federal regulatory programs. *New York v. United States*, 505 U.S. 144, 188 (1992).

75.    Congress's power to legislate is constrained by Article I, and its power to spend the public fisc does not carry with it authority to commandeer the separate sovereign states' legislative or administrative apparatus for federal purposes. *Printz v. United States*, 521 U.S. 898, 933 (1997).

76.    The executive's power with respect to the laws of the United States extends only to the power to "take care that [they] be faithfully executed." U.S. CONST. art. II, § 3. The executive, when executing Congress's laws, accordingly may not do by executive action what Congress is constrained not to do by the Constitution's limitations.

77.    To the contrary, exercising powers beyond those expressly granted to the executive and legislative branches would invade the powers reserved to the states and to the people. U.S. CONST. arts. I, II;  U.S. CONST. amend. X.

78.    Here, the executive seeks to pervert Congress's spending power to compel FCPS and other school divisions in Northern Virginia to enact and administer the executive's administrative program with respect to transgender individuals.

79.    Because the executive's action seeks to commandeer power reserved to the Commonwealth and its people, it is contrary to Constitutional power and must be held unlawful and set aside.  5 U.S.C. § 706(2)(B).

## Count III − under the Administrative Procedure Act, the Declaratory Judgment Act, and the Spending Clause: Lack of Notice
### (against Defendants McMahon and the Department)

80.    FCSB repeats and realleges paragraphs 1–79 as though fully set forth herein.

81.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

82.    Defendants' action interprets Congress's grant of funding to FCPS in a manner that would violate the Spending Clause of the U.S. Constitution because FCPS did not have clear notice that any federal funding would be conditioned on (1) rescinding Regulation 2603.2 and categorically banning students from accessing facilities in accordance with their gender identity or (2) issuing public statements regarding the meaning of Title IX or the definition of sex, female, male, girls, women, boys, or men.

83.    Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

84.    Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "There can, of course, be no knowing acceptance if a [recipient] is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17.

85.    Defendants' sole authority with respect to the laws of the United States is to "take care that [they] be faithfully executed." U.S. CONST. Art. II § 3; *see also* U.S. CONST. Amend. X (reserving to the states and the people those powers not delegated to the federal government by the Constitution). Where Congress may not impose ambiguous or unlawful conditions, the Executive similarly may not interpret acts of Congress to impose those conditions consistent with its duty to take care that the laws be faithfully executed.

86.    FCPS accepted federal funding with the understanding that it was required to comply with Title IX and binding judicial precedent interpreting Title IX.

87.    Congress has not clearly stated, and no court has found, that Title IX prohibits FCPS from maintaining its challenged policies. To the contrary, Regulation 2603.2 complies with and codifies governing Fourth Circuit precedent as set forth in *Grimm*, which holds that excluding transgender students from restrooms consistent with their gender identity violates Title IX and the

JA033

Equal Protection Clause. *See also* Am. Order, *Doe v. S. Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025).

88.      Defendants have nonetheless conditioned FCPS's receipt of essential federal funds on its agreement to abandon its policies in exchange for Defendants' policies and adhere to a new, extratextual interpretation of Title IX that is directly contrary to prior agency interpretation and governing precedent.

89.      Therefore, conditioning the Department funding to enforce a categorical ban on student access to facilities violates this limitation on spending power, because, inter alia, FCPS did not have "clear notice" of such a condition. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

90.      Because Defendants' action is contrary to Congress's constitutional power and to FCPS's constitutional power reserved under the Tenth Amendment, Defendants' action must be held unlawful and set aside.  5 U.S.C. § 706(2)(B).

91.      FCSB is separately entitled to a judicial declaration that Defendants' action is contrary to the federal government's power under the Spending Clause.  28 U.S.C. § 2201.

**Count IV - under the Administrative Procedure Act, the Declaratory Judgment Act, and the Spending Clause: Unconstitutional Coercion (against Defendants McMahon and the Department)**

92.      FCSB repeats and realleges paragraphs 1–91 as though fully set forth herein.

93.      The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

94.      Pursuant to the Spending Clause of the United States Constitution, "spending-power conditions are legitimate only if the [recipient's] acceptance of them is in fact voluntary."

*Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2232 n.4 (2025) (citing *NFIB v. Sebelius*, 567 U.S. 519, 581-82 (2012)).

95.    The Spending Clause permits the federal government to "encourage[]" compliance through funding conditions, not to punish or impose sanctions absent statutory authorization. *Sebelius*, 567 U.S. at 581.  The federal government may not wield its spending power as a "gun to the head." *Id.*

96.    Defendants' sole authority with respect to the laws of the United States is to "take care that [they] be faithfully executed."  U.S. CONST. Art. II, § 3; *see also* U.S. CONST. Amend. X (reserving to the states and the people those powers not delegated to the federal government by the Constitution).  Where Congress may not impose ambiguous or unlawful conditions, the Executive similarly may not interpret acts of Congress to impose those conditions consistent with its duty to take care that the laws be faithfully executed.

97.    FCPS receives federal education funds under several federal statutes including Title I of the Elementary and Secondary Education Act of 1965 (20 U.S.C. §§ 6301 et seq.) and the Individuals With Disabilities Education Act (20 U.S.C. §§ 1400 et seq.).  These funds are critical to FCPS's ability to provide state and federally mandated, education related services to its students, particularly its most vulnerable students.  Loss of these funds is existential.

98.    Defendants' decision to designate FCPS as "high-risk," place of all federal funds on reimbursement status, and urge state entities to do the same because FCPS did not agree with Defendants' unilateral interpretation—directly at odds with binding legal precedent—that the District's policies violate Title IX.

99.    By designating FCPS as "high-risk" unless and until FCPS agrees with Defendants' interpretation of Title IX and rescinds Regulation 2603.2, Defendants are conditioning essential federal funding on FCPS's capitulation to Defendants' extralegal demands.

100.    "Appeal" of FCPS's "high-risk" status to Defendants is futile and does not afford it meaningful review, as Defendants have made clear that compliance with their demands is the only pathway for FCPS to continue to receive essential federal funding.

101.    This threat amounts to unconstitutional coercion under the Spending Clause. *Sebelius*, 567 U.S. at 581.  Placing FCPS on "high-risk" status and withholding all federal funding, including State-administered funds earmarked for the FCPS's most vulnerable students, until FCPS accepts Defendants' demands, leaves FCPS with no meaningful choice but to comply.  And this is so even when acceptance of Defendants' terms means that FCPS must surrender local control over its lawful policies, violate state law, eschew controlling judicial precedent, and expose itself to liability for violating the rights of students under that precedent.  This funding threat compels capitulation, not voluntary agreement.  *See Medina*, 145 S. Ct. at 2232 n. 4.

102.    Because Defendants' action is contrary to Congress's constitutional power and to FCPS's constitutional power reserved under the Tenth Amendment, Defendants' action must be held unlawful and set aside.  5 U.S.C. § 706(2)(B).

103.    FCPS is separately entitled to a judicial declaration that Defendants' action is contrary to the federal government's power under the Spending Clause.  28 U.S.C. § 2201.

**Count V – *Ultra Vires***
**(against Defendants McMahon and the Department)**

104.    FCSB repeats and realleges paragraphs 1–103 as though fully set forth herein.

105.    An agency cannot take any action that exceeds the scope of its constitutional or statutory authority.

- 25 -

106.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).  The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

107.    Defendants have no authority under the Constitution or any statute to demand that FCPS rescind Regulation 2603.2 based on their erroneous interpretation of Title IX in order for FCPS to receive federal funding.

108.    Pursuant to 28 U.S.C. § 2201(a), FCSB is entitled to a declaration that Defendants acted *ultra vires* by demanding that FCSB rescind its regulation in order for FCPS to receive federal funding.

### Count VI – under the Declaratory Judgment Act
### (against Defendants McMahon and the Department)

109.    FCSB repeats and realleges paragraphs 1–108 as though fully set forth herein.

110.    An actual and justiciable controversy exists between the parties with respect to the enforceability of *Grimm*.  Defendants have asserted, and continue to assert, that *Grimm* has been abrogated, and therefore, FCPS's implementation of Regulation 2603.2 is in violation of Title IX.

111.    FCSB's position—and that of the Fourth Circuit, *see Doe*, 2025 WL 2375386—is that *Grimm* remains binding law in the Fourth Circuit and FCPS is bound to follow that law.  As such, Regulation 2603.2 is not only constitutional, but compelled by federal law.

112.    Accordingly, FCSB and Defendants have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment on the disputed matters raised herein.

JA037

113.    FCSB is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that Regulation 2603.2 does not violate Title IX.

114.    FCSB is further entitled to a judicial declaration that Defendants' action is arbitrary, capricious, an abuse of discretion, and contrary to law.

## **PRAYER FOR RELIEF**

For relief, FCSB requests that the Court:

a)    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' decision to designate FCPS as "high-risk";

b)    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' action constructively denying funds allocated to FCPS and any other further actions taken by Defendants to implement their freeze on federal funds allocated to FCPS;

c)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' conditioning and freezing of federal funds allocated to FCPS is an unlawful act violative of the APA;

d)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' conditioning and freezing of federal funds allocated to FCPS is an unlawful act violative of the Spending Clause;

e)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that the legal principles and holdings announced in *Grimm* and reaffirmed in the Fourth Circuit's August 15, 2025 Amended Order in *Doe*, 2025 WL 2375386, remain valid and binding legal precedent;

f)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Regulation 2603.2 does not violate Title IX;

JA038

g)      Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that federal funds are not conditioned on compliance with Defendants' demands, including prohibiting students from accessing facilities in accordance with their gender identity;

h)      Preliminarily and permanently enjoin Defendants (including any officers, employees, and agents thereof) from taking enforcement action on the ground that Regulation 2603.2 violates Title IX;

i)      Preliminarily and permanently enjoin Defendants from conditioning, terminating, freezing, or otherwise impeding access to federal funds allocated to FCPS based on FCPS's alleged violation of Title IX;

j)      Require that Defendants immediately pay to FCPS any funds that have been denied pursuant to Defendants' August 19, 2025 letter, Ex. B, and/or Defendants' belief that FCPS and/or Regulation 2603.2 violate or have violated Title IX;

k)      Award FCSB its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

l)      Grant all other such relief as this Court deems appropriate, just, and proper.

Dated: August 29, 2025                     Respectfully submitted,

                                           /s/ _____Timothy Heaphy_____

                                           Timothy Heaphy
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street Northwest
                                           Washington, District of Columbia 20006-1238
                                           Tel: (202) 303-1000
                                           theaphy@willkie.com
                                           Virginia State Bar I.D. Number: 68912

                                           Joshua Mitchell (*pro hac vice* forthcoming)
                                           Fiona L. Carroll (*pro hac vice* forthcoming)
                                           Lindsay Hemminger (*pro hac vice* forthcoming)

JA039

WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Fairfax County School Board*

JA040

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

|  |  |  |
|---|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | Civil Action No. _____ |
| States; the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of August, 2025, I electronically filed a true and correct copy of **PLAINTIFF FAIRFAX COUNTY SCHOOL BOARD'S COMPLAINT** with the Clerk of Court using the CM/ECF system.  A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon

Respectfully submitted,

/s/    *Timothy Heaphy*

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912
Joshua Mitchell (*pro hac vice* forthcoming)

- 30 -

JA041

Fiona L. Carroll (*pro hac vice* forthcoming)
Lindsay Hemminger (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Fairfax County School Board*

JA042

# EXHIBIT A

8/20/25, 12:07 PM     U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

Case 1:25-cv-01432     Document 1-2     Filed 08/29/25     Page 2 of 5 PageID# 34

🇺🇸 An official website of the United States government  Here's how you know

### U.S. Department of Education

HOME  /  ABOUT US  /  NEWSROOM  /  PRESS RELEASES

PRESS RELEASE

# U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX

AUGUST 19, 2025

Today, the U.S. Department of Education (the Department) announced it is placing Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions) in Northern Virginia on high-risk status with the condition that all federal funding flowing to these districts is done by reimbursement only. This action is being taken after all five Divisions have been found in violation of Title IX of the Education Amendments of 1972 (Title IX). The Department found the Divisions in violation of Title IX last month for their policies allowing students to occupy intimate facilities based on "gender identity," not biological sex. The Divisions refused to sign the Department's proposed Resolution Agreement to voluntarily resolve their Title IX violations by last Friday's (August 15th) deadline and have instead chosen to remain in violation of Title IX.

As a result of the Divisions' rejection of the Resolution Agreement, the Department is commencing administrative proceedings seeking suspension or termination of federal financial assistance to the Divisions.

Additionally, to ensure that grantees expend federal funds consistent with federal law, the Department is placing these Divisions on reimbursement status for all Department funds including formula funding, discretionary grants, and impact aid grants, totaling over $50 million. The Divisions will now be required to pay their education expenses up front and then request reimbursement for expenditures to access funds obligated by the Department.

To indicate that the Divisions have failed to uphold the conditions of their federal grant agreements by violating federal law, the Department will classify the five Divisions as "high-

risk" within the federal grant system.

"States and school districts cannot openly violate federal law while simultaneously receiving federal funding with no additional scrutiny. The Northern Viriginia School Divisions that are choosing to abide by woke gender ideology in place of federal law must now prove they are using every single federal dollar for a legal purpose," **said U.S. Secretary of Education Linda McMahon.** "We have given these Northern Virginia School Divisions every opportunity to rectify their policies which blatantly violate Title IX. Today's accountability measures are necessary because they have stubbornly refused to provide a safe environment for young women in their schools."

Pursuant to its regulatory authority, the Department may place grantees on high-risk status and impose High-Risk Specific Conditions on all grants for the Divisions' failure to comply with conditions of their grant agreements by violating federal law. Such restrictions are imposed to ensure that a grantee is spending federal funds consistent with the terms and conditions of the grant program and in conformity with federal law.

**Background:**

On July 25, the Department's Office for Civil Rights (OCR) concluded its investigation of the Divisions and found that they violated Title IX by allowing students to occupy intimate facilities based on "gender identity," not biological sex. OCR generously granted the Divisions' request for an extension to reach a voluntary resolution with OCR, or agree to the government's proposed Resolution Agreement, to resolve their Title IX violations, which the Divisions rejected last Friday.

The "high-risk" designation in the federal grant system alerts all federal agencies of the entity's failure to comply with the terms of their federal grant agreements.

Title IX prohibits discrimination on the basis of sex in educational programs or activities receiving federal financial assistance.

---

**CONTACT**

Press Office  |  (202) 401-1576  |  press@ed.gov

---

**Office of Communications and Outreach (OCO)**

USCA4 Appeal: 25-2087      Doc: 49          Filed: 10/21/2025      Pg: 53 of 461

Case 1:25-cv-01432    Document 1-2    Filed 08/29/25    Page 4 of 5 PageID# 36

8/20/25, 12:07 PM          U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

Page Last Reviewed: August 19, 2025

## Pay for College

Fill out the FAFSA

529 Plans

Repay Your Loans

1098 Tax Forms

## Educational Resources

504 Plans

FERPA

IEPs (Individualized Education Program)

## Teaching Resources

Education Research

Professional Resources

School Safety and Security

Teaching Abroad

## File a Report

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

## About Us

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

JA046

USCA4 Appeal: 25-2087    Doc: 49    Filed: 10/21/2025    Pg: 54 of 461

8/20/25, 12:07 PM    U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

Case 1:25-cv-01432    Document 1-2    Filed 08/29/25    Page 5 of 5 PageID# 37

News

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

     



**www.ed.gov**

**An official website of the Department of Education**

About Dept of Education    Accessibility Support    No FEAR Act data

Office of the Inspector General    Performance reports    FOIA    Privacy Policy    ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

JA047

# EXHIBIT B

JA048

THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 19, 2025

Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
Sent via email to superintendent@fcps.edu

Re: High Risk Designation and Specific Conditions on Grants

Dear Superintendent Reid,

This letter is to inform you that the U.S. Department of Education (Department) has designated Fairfax County Public School District as a "high-risk" entity, under all of the programs administered by the Department for which your division receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10, for the reasons discussed below. This follows the Department's July 25, 2025, Title IX noncompliance findings and proposed resolution agreement. On August 15, 2025, your division refused to sign the resolution agreement sent to you by the Office for Civil Rights (OCR) and remains in noncompliance with Title IX.

In this letter, we delineate the nature of our concerns with your division's administration of these grants; the reasons the information provided to the Department up to now by your division does not address these concerns; our determination to designate your division as a Department-wide "high-risk" entity; and the specific conditions we are imposing on all grants your division is receiving from the Department.

BACKGROUND

As you are aware, the U.S. Department of Education generously granted an extension for your school division (your division) and four other school divisions in Virginia to come into compliance with Title IX of the Educational Amendments of 1972 (Title IX), and related requirements. Unfortunately, the additional time did not result in a successful outcome in compliance with federal law.

On August 15, 2025, your division stated it does not intend to make the necessary policy changes to come into compliance with Title IX.

It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal

JA049

Page 2

activity. Therefore, the Department is designating your division as a Department-wide "high-risk" entity and placing specific conditions on your division's use of funds in all grants it receives from the Department.

The Department's prior communications with your division identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated. Thus, the Department is concerned with your division's inability to administer and/or manage Department grants properly with appropriate controls in place. These concerns are with all grants your division currently receives, administers, or manages.

In addition, the Department is identifying all the State-administered funds your division receives as a subgrantee from the Virginia Department of Education and any other State division, including under Title I of the Elementary and Secondary Education Act of 1965, as amended, and the Individuals with Disabilities Education Act. The Department expects to urge those entities to take similar actions to those being taken by the Department with regard to those funds. Representatives of the Virginia Department of Education have already agreed to take those steps.

Due to the sizable amount of Federal grant funds that are provided to your division, and concerns discussed in this letter, the Department will place all of your division's grants on reimbursement payment status until your division demonstrates to the Department's satisfaction that the following High-Risk Specific Conditions, specified below, are fully met, and that proper measures to address the problems noted in this letter are taken and are working well for a sustained period of time.

I.      YOUR DIVISION's DESIGNATION AS "HIGH-RISK"

Given these serious and deeply systemic concerns, the Department is taking immediate action to help safeguard public funds with regard to your division's activities with the Department's grants in accordance with statutory and regulatory requirements and the terms of approved grant applications, and with grants for which your division is a primary grantee or subgrantee.

The Department is designating your division as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.10. As part of this "high-risk" designation, we are imposing High-Risk Specific Conditions (noted below) on all of your division's grants. In making this determination and designation, the Department has taken into consideration several factors (some of which are mentioned above), which include, but are not limited to:

- the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;
- the improper organizational management and operations that led to the problems discussed above;

Page 3

- and
- concerns regarding your division's lack of proper controls.

## II.    HIGH RISK SPECIFIC CONDITIONS

Your division's grants and subgrants from the Department are being placed on a reimbursement method of payment. Under this specific condition, your division will, when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by your division with non-Federal funds.

In addition, within 30 days of the date of this letter:

1. Your division must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps your division will take to ensure that grant funds will be spent in accordance with all appliable laws (this could include committing to implementing the resolution agreement sent to your division on July 25, 2025, with OCR's findings);

2. Your division must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan.

The objectives of these specific conditions are to ensure that your division establishes the policies, procedures, and personnel in place to manage its grants and subgrants properly, including adherence to all pertinent federal civil rights laws that apply to your division's grants and subgrants. The Department may impose additional or modified specific conditions at any time through a subsequent letter.  If your division is unable to satisfactorily address these concerns, the Department will consider additional enforcement actions, including the possible termination of all or some of the Department's grants, and may require the recovery of funds.

## III.    REMOVAL OF REIMBURSEMENT, HIGH-RISK CONDITIONS AND HIGH-RISK DESIGNATION

The reimbursement specific condition will remain in place until the Department has (1) determined that your division has put into place adequate corrective actions, which could include actions laid out in the OCR proposed resolution agreement, and (2) concluded that the corrective actions have been working appropriately for a period of time that reasonably demonstrates assurance of effective compliance.

Page 4

IV.    REQUEST FOR RECONSIDERATION

Consistent with 2 C.F.R. § 200.208(d)(5), your division may request reconsideration of its designation as "high-risk", and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of this letter. Any request for reconsideration must be submitted via e-mail to Lindsey Burke of the Department, at lindsey.burke@ed.gov. In a request for a reconsideration, you should include appropriate supporting documentation.

The Department remains committed to working with your division to help with the positive resolution of these concerns. Lindsey Burke is available to answer any questions on the High-Risk Specific Conditions, as well as to help facilitate any necessary support or assistance regarding the status of your grants or subgrants from the Department.

Sincerely yours,

Linda E. McMahon

CC: Emily Anne Gullickson, Virginia State Superintendent

JA052

# EXHIBIT C

**Regulation 2603.2**
Special Services
Office of Intervention and
    Prevention Services
School Counseling Services
Effective 04/21/22

**SPECIAL SERVICES**

**Health and Welfare**

**Gender-expansive and Transgender Students**

This regulation supersedes Regulation 2603.1

## I. PURPOSE

To establish procedures and guidelines for schools to ensure that all students, including gender-expansive and transgender students experience a safe, supportive, and inclusive school environment.

All students have a right to privacy in Fairfax County Public School (FCPS) facilities or while participating in FCPS sponsored events. Any student who has a need or desire for increased privacy, regardless of the underlying reason, shall be provided with reasonable, non-stigmatizing accommodations. Students shall not disclose private information about another student's reason for seeking privacy. Additionally, school personnel should not disclose information about a student's gender-expansive or transgender status, legal name, or sex assigned at birth, including to other school personnel who do not have a need to know, unless the student has authorized such disclosure, or unless legally required to do so as further outlined below.

## II. DEFINITIONS

Official Transcript: to include legal name at the time of the awarded credit. Documents are signed by the school official with name and title or transmitted and verified through a verified electronic method.

## III. SUMMARY OF CHANGES SINCE LAST PUBLICATION

A. Section II., removed the definition of parent and added the definition of official transcript.

B. Section IV., added definition of parent.

C. Section VI.B., added language to reflect that a student can request an alternate and/or unofficial diploma or transcript.

D. Section VI.D., added "and transcript assistants."

E. Legal References., added the proposed Virginia Code 8VAC20-160-3D

JA054

Regulation 2603.2
Page 2

## IV. IDENTIFICATION OF GENDER-EXPANSIVE AND TRANSGENDER STUDENTS

Schools shall accept a student or parent's (use of this term herein includes parent, guardian, legal custodian, or other person having control or charge of a child) assertion of a student's gender-expansive or transgender status.

A. When a school is made aware of a student's gender-expansive or transgender status, the school shall offer to convene a support team for the student or the parents. The support team shall be a multidisciplinary team that may consist of the student, parents if the student is willing, classroom teacher(s), administrator, school counselor, school psychologist, school social worker, and/or other staff members as appropriate for this collaboration. The student or the student's parents may have input into the composition of the team and also may invite any representatives of their choosing to include physical and mental health professionals or advocates.

B. Support teams shall develop a student-specific support plan to provide the gender-expansive or transgender student with safe and equitable access to all school and school division facilities and activities, addressing any particular issues raised by the student or the student's parents. The support team shall consider the student's needs, protection of student privacy, maximization of social integration, minimization of stigmatization, student age, and any perceived safety risks as they contemplate appropriate supports and arrangements. The plan may include, but is not limited to:

1. Annual conferences with a student support team, the student, and/or the student's parents to discuss any necessary accommodations for the school year.

2. Regular check-ins with the student and/or the student's parents by the school counselor, administrator, school psychologist, school social worker, or other designated staff member deemed appropriate.

3. Meetings to support the student from academic year to academic year.

4. Information about community resources.

5. School staff should provide information and referral to resources to support a student in coping with a lack of support at home and seek opportunities to foster a better relationship between the student and their family.

6. A timeline to support student transition from one gender to another, if applicable.

7. Decisions regarding use of student name and pronouns, restroom and locker room access, gender specific courses, sports, student activities, and extended instructional field trips or athletic events. School staff will address the student using the asserted name and gender as communicated by the student. This plan should be maintained in the school file (i.e., school counselor office) to be accessible to the members of the support team. This plan is subject to the same privacy guidelines as are other student records.

C. In situations where a student may be transitioning from one gender to another, either prior to the beginning of or during the current school year, school teams shall consider

JA055

Regulation 2603.2
Page 3

providing staff training on gender diversity to include responsibilities to support gender-expansive and transgender students under Title IX and Policy 1450, Nondiscrimination.  This training should be generalized to honor the privacy and confidentiality of the student.

D.  A student or parent may request that the support team be reconvened at any time.

E.  Every effort shall be made to encourage and support communication between gender-expansive or transgender students and the student's parents.  Schools may offer to meet jointly with the parents and the student at school.

## V.  STUDENT NAMES AND PRONOUNS

Students who identify as gender-expansive or transgender should be called by their chosen name and pronouns, regardless of the name and gender recorded in the student's permanent pupil record.  School counselors, administrators, or other designated school personnel should work with the student and/or the student's parents to determine the best course of action to inform teachers, coaches, and other school personnel of this request.  Every effort should be made by the student's teachers to reasonably inform substitute teachers of the student's chosen name and pronouns.

## VI.  PERMANENT STUDENT RECORDS

A.  Each school is required to maintain a permanent pupil record of each student.  The student's legal name, birth date, sex assigned at birth, and parent(s) name as they appear on the birth certificate shall be considered the student's official identification and shall be entered in the FCPS student scholastic record.  A court order or an official government document, such as an updated birth certificate or passport attesting to any changes in student identification, to include legal name and sex, is required before any changes will be made to the student scholastic record.

B.  If a gender-expansive or transgender student and the student's parents request a diploma and/or transcript with the student's chosen name, schools will provide a student with both a diploma and/or transcript reflecting the student's legal name as well as an alternate diploma and/or alternate, unofficial transcript with the student's chosen name that reflects the student's gender identity.  Students who are 18 or older may request an additional diploma and/or unofficial transcript with their chosen name, without parent permission being received by FCPS.

C.  For current FCPS students, legal name and/or gender marker changes will be reflected throughout the time of enrollment.

D.  Staff access to permanent student records that contain a gender-expansive or transgender student's legal name and/or sex assigned at birth will be limited to the following staff members: administrators, directors of student services, counselors, school psychologists, school social workers, SIAs/SSAs, and transcript assistants based on their legitimate educational interest in this information.

E.  In situations where school staff is required to use or to report a transgender student's legal name or sex assigned at birth, such as for purposes of standardized testing,

**Regulation 2603.2**
Page 4

school staff and administrators will adopt practices to avoid the inadvertent disclosure of such information to individuals outside of the reporting requirement.

F.  FCPS graduates may change their permanent records under the same requirements as current FCPS students.

## VII.  CLASSROOM RECORDS

A.  Internally generated and shared school lists of students (e.g., honor roll, graduation programs) shall identify gender-expansive or transgender students by their chosen names and genders.  Additionally, school documents such as yearbooks, school newspapers, and communications to outside media shall identify gender-expansive or transgender students by their chosen names and appropriate gender markers.

B.  FCPS electronic systems which will be seen by staff (including teachers and substitutes) should reflect the student's chosen name and pronoun (when possible) as designated by the student or parents.

## VIII.  PRIVACY AND EDUCATIONAL RECORDS

Information about students' transgender status, legal name, or sex assigned at birth constitutes confidential personally identifiable and medical information.  Such information should not be disclosed unless required by law.

## IX.  ACCESS TO FACILITIES

A.  Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity.

B.  When an instructional or extra-curricular event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

C.  Any student who has a need or desire for increased privacy, regardless of the underlying reason including gender identity, shall be provided with a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to the student's gender identity before or after other students).  Such alternative options will minimize impact to instructional time to the extent possible.

D.  Any alternative arrangement should be provided in a way that protects the ability of students to keep their gender-expansive or transgender status or other underlying reason for the request confidential.  FCPS will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a student or parent.

E.  In no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the student's gender identity or be limited to using

JA057

**Regulation 2603.2**
Page 5

only a private area, single-occupancy accommodation, or other single-use facility as described in this section.

F.  Gender-expansive and transgender students may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth.

## X.  STUDENT ACTIVITIES AND ATHLETICS

A.  Student participation in Virginia High School League (VHSL) sponsored programs, or another organization such as the Virginia Scholastic Rowing Association (VASRA), as well as middle school athletics, are governed by policies and rules of those organizations.  Gender-expansive and transgender students shall participate in such sponsored activities in accordance with these policies.

B.  Student participation in school-sponsored programs, clubs, activities, and sports (other than those sponsored by VHSL) shall allow gender-expansive and transgender students to participate in accordance with the student's gender identity.

## XI.  GENDER SPECIFIC COURSES

A.  Schools should eliminate or reduce the segregation of students by gender to the extent possible.

B.  When schools offer a gender specific course or a course with a gender specific section, gender-expansive and transgender students shall be allowed to enroll in the course corresponding with the student's gender identity.

C.  In courses where specific units are taught in a way that divides students into groups by gender (e.g., Family Life Education), gender-expansive and transgender students, shall be allowed to participate with the gender group corresponding to the student's gender identity.

## XII.  GENDER SEGREGATION IN OTHER AREAS

As a general rule, in any other circumstances where students are separated by gender in school activities, gender-expansive and transgender students shall be permitted to participate in accordance with the student's gender identity consistently asserted at schools.  Activities that may involve the need for accommodations to address student privacy concerns will be addressed on a case-by-case basis.

## XIII.  DRESS CODES

All students are required to dress in clothing that follow the guidelines as listed in Policy 2613, Student Dress Code as well as Regulation 2601, Student Rights and Responsibilities Booklet (SR&R), regardless of gender identity.  There are no separate categories of clothing requirements for either males or females, therefore, gender-expansive and transgender students shall be allowed to dress in any clothing that meets the guidelines in the policies referenced above.  Requirements for attire for school-related

JA058

**Regulation 2603.2**
Page 6

programs, activities, and events shall be gender-neutral.  These guidelines shall be enforced impartially regardless of a student's gender identity or expression.

## XIV. TRAINING FOR EMPLOYEES

All school staff will be trained annually on topics relating to transgender students, including procedures for preventing and responding to harassment and bullying based on gender identity and expression.  This includes that a persistent refusal to use a student's chosen name and pronouns constitutes discrimination.  School mental health professionals shall be trained annually on topics relating to safety and support of these students.

## XV. COMPLAINTS

Parents and students may direct complaints to the school principal, the Region Office, or to the Office of Equity and Employee Relations.

Legal References:

        Family Educational Rights & Privacy Act, 20 U.S.C. § 1232g; 34 C.F.R. Part 99; Virginia Code Sections 22.1-23.3, 2.2-3901, Virginia Administrative Code 8VAC20-160-3D Proposed

See also the current versions of:

        Policy 1450, Nondiscrimination
        Policy 2613, Student Dress Code
        Policy 2730, Confidentiality of Student Information
        Regulation 2202, Required Admission Credentials for Students
        Regulation 2601, Student Rights and Responsibilities  Booklet
        Regulation 2701, Student Personal Data
        Regulation 4952, Discrimination and Harassment on a   Protected Class
        Management of the Student Scholastic Records Manual, Virginia High School League, Inc. Handbook and Policy Manual

FAIRFAX COUNTY PUBLIC SCHOOLS

JA059

# EXHIBIT D



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

February 12, 2025

By email only to superintendent@fcps.edu

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042

Re:    Case No. 11-25-1307
       Fairfax County Public Schools

Dear Dr. Reid:

On February 4, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), received a complaint against Fairfax County Public Schools (the Division).  The complaint alleges that the Division's anti-discrimination policy pertaining to transgender students "provides greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."  Specifically, the complaint alleges that Division Regulation 2603.2, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance.  As a recipient of federal financial assistance from the Department of Education, the Division must comply with this law.

OCR is opening the complaint for investigation.  OCR will investigate whether Division Regulation 2603.2, violates Title IX.  Please note that opening an investigation does not mean that OCR has made a final determination with regard to the merits.  During the investigation, OCR is neutral; OCR will collect and analyze the evidence it needs in order to make a decision about the complaint.  OCR will ensure that its investigation is legally sufficient in accordance with OCR's Case Processing Manual (CPM) (July 18, 2022) and OCR's Complaint Processing Procedures.  The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

JA061

Page 2 – Case No. 11-25-1307

under a law enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

OCR will contact Division officials within a week of the date of this letter to arrange for the next steps in the investigation, including requesting access to data and personnel.  If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN
GREENSPAHN

Digitally signed by DAN
GREENSPAHN
Date: 2025.02.12 14:36:57 -05'00'

Dan Greenspahn
Team Leader, Team I
Office for Civil Rights
District of Columbia Office

cc:    Jeanne-Marie Burke (jsburke@fcps.edu)

JA062

# EXHIBIT E



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

February 24, 2025

<u>By email only</u> to <u>superintendent@fcps.edu</u>

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042

Re:    Case No. 11-25-1307
       <u>Fairfax County Public Schools</u>

Dear Dr. Reid:

On February 12, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), notified you that OCR was opening an investigation of Fairfax County Public Schools (the Division) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As explained in that letter, OCR will investigate whether Division Regulation 2603.2, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

As an initial data request, please submit the items listed below to OCR **by March 17, 2025**. Please note that OCR may request supplemental data and documents relevant to the investigation.

1. The name and contact information of the individual who will serve as OCR's contact person during the investigation of this complaint.

2. The Division's narrative response to the allegation under investigation and all documents or records referenced in the narrative response.

3. The Division's Title IX grievance procedures, and where those procedures are published.

4. The name and contact information of the Division's Title IX Coordinator.

5. The Division's policies and procedures regarding student access to and use of sex-segregated restrooms, locker rooms, and/or other intimate facilities in its schools.

6. A list of any formal or informal complaints the Division has received during the 2024-2025 school year alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, and/or other intimate facilities. For each complaint,

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

<u>www.ed.gov</u>

JA064

Page 2 of 3 – Case No. 11-25-1307

please note: the date of the complaint; the identity of the complainant (e.g. parent, student, teacher); any school(s) named in the complaint; a summary of the complaint; and a brief description of the Division's response to the complaint.

7.  Any additional information the Division believes may be helpful in resolving this complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We look forward to your cooperation during the resolution of this complaint. If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN GREENSPAHN

Digitally signed by DAN GREENSPAHN
Date: 2025.02.24 14:05:26 -05'00'

Dan Greenspahn
Team Leader, Team 1
District of Columbia Office
Office for Civil Rights

JA065

Page 3 of 3 – Case No. 11-25-1307

## Data Request Instructions

If any item in our request is unclear, or if you experience any difficulty complying with this request, please contact the staff member(s) identified above prior to the due date. OCR requests that you submit information electronically, if feasible. Upon request, OCR may create a secure external sharing site for you to upload the submission. You may contact us for more information about this option. Please do not provide the information via an electronic cloud format such as Google Docs. If any of the requested information is available to the public on the Internet, you may provide the website address. If any responsive documents contain Social Security numbers, please redact them before producing the documents to OCR.

The Department of Education's regulation implementing Title VI of the Civil Rights Act of 1964, at 34 C.F.R. § 100.6(c), which is incorporated by reference in the Title IX regulation at 34 C.F.R. § 106.81, gives OCR the authority to request this information. In addition, in accordance with the regulation implementing the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, at 34 C.F.R. § 99.31(a)(3)(iii), and the Title VI regulation at 34 C.F.R. § 100.6(c), OCR may review personally identifiable records without regard to considerations of privacy or confidentiality. OCR will take all proper precautions to protect the identity of any individuals named in the records.

OCR may request supplemental data and documents that are relevant to the allegation under investigation. If the Division obtains any additional information or documents responsive to this data request or otherwise relevant to the allegations in this case, the Division must promptly inform OCR of its existence and supplement the data response within 15 days of its discovery. OCR reminds the Division that a failure to provide requested information may be considered a denial of access in violation of the regulations cited above. Please ensure that Division employees preserve all data and documents that are relevant to the allegation under investigation until OCR closes this case.

# EXHIBIT F

JA067

**WILLKIE FARR & GALLAGHER** LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

March 24, 2025

Dan Greenspahn, Esq.
U.S. Department of Education
Office for Civil Rights
District of Columbia Office
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

Re: <u>OCR Case No. 11-25-1307 - Fairfax County Public Schools</u>

Dear Mr. Greenspahn,

On February 12, 2025, Fairfax County Public Schools ("FCPS") received a letter from the District of Columbia Office for Civil Rights ("OCR") regarding Case No. 11-25-1307 (the "Notification Letter"). FCPS subsequently received a Data Request Letter from OCR on February 24, 2025 (the "Request"). The Notification Letter indicates that a complaint was filed with OCR alleging that FCPS's Regulation 2603.2 violates Title IX of the Educational Amendments of 1972 ("Title IX") by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restrooms and locker rooms (collectively, "facilities"). The Notification Letter does not identify the complainant or whether the complaint was made on behalf of any individual FCPS students or in regard to any specific incident at FCPS.[1]

As you are aware, I represent FCPS in this matter. On March 17, 2025, we produced documents and information responsive to OCR's Requests 1, 3, 4, 5, and 6, contained in the February 24 Data Request Letter. Those documents included:

- FCPS Regulations 2118, 4950, 4952, 4953, and 2603;
- Regulation 2603 Gender-Expansive and Transgender Students Guidance Document;
- Transgender Students and School Bathrooms FAQ;
- A declaration from Title IX Coordinator Colby Bruno; and
- The Second Amended Petition for Declaratory, Injunctive, and Additional Relief in *Jane Doe et al. v. Fairfax County School Board*, No. 24-3171 (Va. Cir. Ct. Aug. 22, 2024).

With this letter, we provide additional information responsive to Data Requests 2 and 7.[2] As discussed below, FCPS denies that Regulation 2603.2 violates Title IX. Regulation 2603.2 provides *all* students the option of using facilities consistent with their gender identity or access to

---

[1] A press release from the America First Legal Foundation claims that this investigation was opened in response to an administrative complaint submitted by that organization. This press release and a copy of the Request for Investigation Letter it references does not indicate that the complaint was made on behalf of any individual FCPS students or in regards to any specific incidents at FCPS. *See* America First Legal, *VICTORY — In Response to AFL's Complaint, the U.S. Department of Education Office for Civil Rights Opens Investigation into Five Northern Virginia K-12 Schools Illegal "Gender Identity" Policies*, (Feb. 14, 2025), https://aflegal.org/victory-in-response-to-afls-complaint-the-u-s-department-of-education-office-for-civil-rights-opens-investigation-into-five-northern-virginia-k-12-schools-illegal-gender/.

[2] Unless otherwise noted, all documents referenced in this letter were produced on March 17, 2025.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA068

private restroom or locker room facilities. This regulation complies with binding state and federal law governing the use of facilities in Virginia and all other localities within the jurisdiction of the United States Court of Appeals for the Fourth Circuit and has been implemented without disruption or controversy in our schools. Accordingly, OCR should not issue a finding of a Title IX violation or take any other enforcement action in this matter.

## I.     FCPS Regulations and Policies

FCPS Regulation 2603 "Gender-expansive and Transgender Students" went into effect in October 2020. FCPS drafted this regulation in response to the passage of House Bill 145 and Senate Bill 161 by the Virginia General Assembly during the spring 2020 session.[3] Those bills modified the Virginia Code to state that the "Department of Education shall develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that address common issues regarding transgender students," including students' "use of school facilities."[4] In 2021, the Virginia Department of Education ("VDOE") issued its Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[5]

Upon the election of Governor Glenn Youngkin in 2021, the Virginia Department of Education issued new guidance on the issue of transgender student access to school facilities. Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that a student "shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)." As described more fully below, the Fourth Circuit in the *Grimm* case held that requiring students to use facilities that align with their biological gender violates Title IX. The citation to *Grimm* confirms that the VDOE guidance continues to require Virginia schools to facilitate student access to facilities that correspond to their gender identity. Accordingly, FCPS continues to adhere to both federal law and VDOE guidance in facilitating student access to facilities according to their gender identity.

The provision relevant to this OCR investigation is Regulation 2603.2, Section IX. Access to Facilities, which states as follows:

> A. Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity.
>
> B. When an instructional or extra-curricular event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

---

[3]  *See* Regulation 2603: Gender-Expansive and Transgender Students Guidance Document, FAIRFAX_OCR_1307_0000055, at 3.
[4] VA. CODE ANN. § 22.1-23.3.
[5] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, VIRGINIA DEPARTMENT OF EDUCATION (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

JA069

C. Any student who has a need or desire for increased privacy, regardless of the underlying reason including gender identity, shall be provided with a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to the student's gender identity before or after other students). Such alternative options will minimize impact to instructional time to the extent possible.

D. Any alternative arrangement should be provided in a way that protects the ability of students to keep their gender-expansive or transgender status or other underlying reason for the request confidential. FCPS will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a student or parent.

E. In no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the student's gender identity or be limited to using only a private area, single-occupancy accommodation, or other single-use facility as described in this section.

F. Gender-expansive and transgender students may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth.[6]

## II.    Legal Analysis

The policy at issue in this inquiry is facially neutral and provides the same access to FCPS facilities to all students, regardless of gender identity. FCPS is governed by Virginia and Fourth Circuit law which requires that all individuals within the Commonwealth be safeguarded from unlawful discrimination because of gender identity in places of public accommodation, including educational institutions. Taking any steps to ban transgender students from using the facilities that align with their gender identity would violate Virginia and federal law.

A.    FCPS Regulation 203.2 provides equal access to facilities to all students.

The February 12 letter indicates that OCR has received a complaint alleging that Regulation 2603.2 "provides greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex." *See* Notification Letter at 1. We strongly deny the allegation that the regulation affords any individual student, regardless of gender identity, greater rights than any other. Section IX of the Regulation allows *all* students the option of using a locker room or restroom consistent with their gender identity – providing no more nor no less access to transgender students as that provided any others. The peers of transgender boys are other boys, and the peers of transgender girls are other girls. If a transgender girl wants to use the girl's facilities, she is allowed to do so. If any other girl wants to use those same facilities, she has the right to do so as well.

Section IX also provides an alternative facility option to any student who desires additional privacy, again regardless of gender identity. More specifically, that provision allows *any* student

---

[6] *See* FCPS Regulation 2603.2, FAIRFAX_OCR_1307_0000049. All FCPS policies, bylaws, and regulations are publicly available at https://insys.fcps.edu/schoolboardapps/report_policy/cache/alpha-A.htm.

for *any* reason to request additional, reasonable privacy measures in their use of school facilities. This provision requires that, upon request, students shall be provided with an alternative private area or an alternative facility-use schedule that allows for increased privacy in a non-stigmatizing way. These accommodations are explicitly offered to *all* students and are not specially reserved for transgender students. This right could be invoked by a student recovering from an injury, illness or medical procedure, a student who has an implanted medical device such as a colostomy bag or insulin pump, or a student who deals with any of the myriad insecurities that present themselves to young people on their journey through their growth and development during K-12 education.

The facial neutrality of Regulation 2603.2 should end this inquiry, as it defeats any argument that some category of FCPS students is treated differently than another in violation of Title IX. Without some exclusion from an FCPS program or discriminatory impact of a policy, there is no basis on which OCR could find a violation. If FCPS were to change its policy and exclude access to facilities based on gender identity, that restriction would impermissibly deprive some students of a benefit and risk liability for a Title IX violation. As explained below, a change in policy would also directly contradict Virginia law and binding federal precedent.

      B.    <u>Virginia law requires FCPS to make facilities available without regard to gender identity</u>.

In 2020, the Virginia General Assembly expanded the scope of the Virginia Human Rights Act[7] by adopting the Virginia Values Act (the "Values Act").[8] The law "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of … gender identity … in places of public accommodation, including educational institutions."[9] The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."[10]

Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in … education on the basis of … gender identity" [11] This provision explicitly provides authority for Regulation 2603.2. The Fairfax County School Board has enacted a valid policy that protects access to facilities for all students, regardless of gender identity. This regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. In short, the FCPS transgender policy was both compelled by Virginia law and within the school board's authority to promulgate.

      C.    <u>As determined by controlling federal authority, Title IX compels FCPS to make facilities available without regard to gender identity</u>.

FCPS's decision to implement Regulation 2603.2 is not only consistent with Virginia law, it is also required by Title IX as determined by the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit has explicitly held that Title IX compels local school boards to provide students with access to restroom facilities that correspond to their gender identity. As explained below, the Fourth Circuit Court of Appeals followed Supreme Court precedent in its baseline recognition of

---

[7] VA. CODE ANN. § 2.2-3900–3909.
[8] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[9] VA. CODE ANN. § 2.2-3900.
[10] *Id.* at § 2.2-3901.
[11] VA. CODE ANN. § 15.2-853.

JA071

gender identity as a protected class under Title VII, which it then applied to the analogous provision of Title IX. Accordingly, any change in FCPS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

The Court of Appeals considered the right of transgender students to access school facilities that correspond with their gender identity in the case of *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). In that case, a local Virginia school division, in response to backlash about a transgender male student's use of the boy's restroom, implemented a policy under which students could only use restrooms matching their "biological gender." *Id.* at 593. The policy also required that "students with gender identity issues shall be provided an alternative appropriate private facility." *Id.* at 599. To effectuate this policy, a number of single-stall unisex restrooms were made available to all students. *Id.* at 600. This is precisely the type of facility access policy that the OCR complaint believes is required by FCPS and seeks to compel.

Gavin Grimm, a transgender student, sued the Gloucester School Board, arguing that the restroom policy violated his rights under Title IX. *Grimm,* 972 F.3d at 593. Grimm prevailed on his Equal Protection Clause and Title IX claims at the summary judgment stage. *Id.* at 603. When the School Board appealed, the Fourth Circuit created legal precedent for local public schools under its jurisdiction. The court analogized the facts in *Grimm* to those involved in *Bostock v. Clayton County,* 590 U.S. 644 (2020), in which the Supreme Court held that discrimination against a person for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights Act. *Grimm,* 972 F.3d at 616–619. The court read *Bostock* to require that Grimm's gender identity was a similarly protected status pursuant to Title IX of that same statute. *Id.*

Having made the threshold finding that Grimm was a member of a protected class according to *Bostock*, the Court of Appeals upheld the district court's decision. *Grimm*, 972 F.3d at 619–620. First, the court held that the school board policy at issue constituted "sex-based discrimination," violating Grimm's equal protection rights. *Id.* at 613. The court dismissed the Board's argument that the policy was substantially related to its goal of protecting students' privacy, noting that the Board "cite[d] to no incident, either in Gloucester County or elsewhere" and "ignore[d] the growing number of school districts across the country who are successfully allowing transgender students such as Grimm to use the bathroom matching their gender identity, without incident." *Id.* at 614. Next, the Court of Appeals concluded that the policy discriminated against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* at 618.[12] In affirming the district court's judgment, the Fourth Circuit stated that it was "left without a doubt that the Board acted to protect cisgender boys from Gavin's mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life." *Id.* at 620.[13]

---

[12] The Fourth Circuit also held that the School Board violated Title IX when it refused to update Grimm's sex listed in his school records. *Grimm,* 972 F.3d at 619. The court determined that the Board "based its decision . . . on his sex," which "harmed Grimm." *Id.* The discrimination was unlawful because "it treat[ed] him worse than other similarly situated students, whose records reflect their correct sex." *Id.*

[13] As a result of the *Grimm* decision, the Gloucester County school division was required to pay $1.3 million in the plaintiff's attorneys fees and costs, in addition to what was certainly a significant amount of its own legal expenses to fight the case. On June 28, 2023, the Supreme Court denied the school board's petition for a writ of certiorari.

*Grimm* established that a policy that prohibits a transgender student from using facilities that corresponds to their gender identity and instead forces them to use the opposite sex facilities or a separate unisex facility is discriminatory under Title IX in the Fourth Circuit. *Grimm* is dispositive here and supports FCPS policy at issue in the instant investigation. Section IX of Regulation 2603.2 protects transgender students from the type of unlawful sex discrimination found in *Grimm* by allowing them to use the facilities that correspond with their gender identity and prohibiting their assignment to a separate single-use facility. *See* Subsections IX.A, C, and E. Modification of Regulation 2603.2 in a manner requested by the complaint is impermissible. If FCPS decided to rescind such policy and require that transgender students use the bathroom that corresponds with their sex assigned at birth, FCPS would be in violation of both Virginia and federal law.

### III.    Formal and Informal Title IX Complaints Regarding Regulation 2603

#### A.    2024-2025 School Year

Consistent with the experience of numerous school districts across the country, including districts within Virginia, FCPS has implemented this policy without disruption or controversy. FCPS has not received a single formal or informal Title IX complaint about Regulation 2603.2 in the 2024-2025 school year or any school year since the current version of the regulation was implemented in 2022. *See* Title IX Coordinator Declaration ("Declaration"). The Title IX office uses a case management intake system and database called Guardian, which came online prior to the start of the 2024-2025 school year. There are no responsive complaints in that database. *See* Declaration. Nor has the Title IX office or the Office of Division Counsel received any formal or informal complaints outside of the Guardian database during the 2024-2025 school year.

#### B.    Prior to the 2024-2025 School Year

As stated in her declaration, Ms. Bruno is not aware of any other formal Title IX complaints regarding Regulation 2603.2 prior to the 2024-2025 school year. However, during the 2023-2024 school year, a parent of a then-FCPS senior raised concerns about Regulation 2603.2 with a principal and assistant superintendent, specifically the subsection regarding access to facilities. The parent was concerned about a student who identifies as "gender-expansive" as defined by Regulation 2603.2, using the male and female restrooms interchangeably. Second Amended Petition ¶ 127, *Doe v. FCSB*, No. CL-2024-3171 (Va. Cir. Ct. Aug. 2024). She did not allege that the student took any deliberate actions to make other students uncomfortable. FCPS informed the parent that Regulation 2603.2 was an enforceable policy and reminded her that her child could opt to use the single-user restrooms. Dissatisfied with FCPS's response, the student, who was over the age of 18, filed suit against the Fairfax County School Board. The student, identified by pseudonym Jane Doe, did not bring federal claims, but alleged violations under the Virginia Constitution and Virginia's RFRA statute. Jane Doe graduated, however, and her claims for injunctive relief were dismissed as moot. *See* Second Amended Petition. Three additional (male) petitioners, through their mother, joined the suit and alleged the same violations. They allege that by enacting Regulation 2603.2, the School Board violated their "free speech, free exercise, due process, and equal protection rights" under the Virginia Constitution. *Id.* ¶ 2. Petitioners argued that requiring students to share a restroom with someone who is transgender or otherwise use single-use restrooms constitutes religious and sex-based discrimination. *Id.* ¶¶ 198–220. In response to the School Board's demurrers to the Second Amended Petition, the Circuit Court dismissed all claims that the restroom-access policy constituted religious discrimination or

a free-exercise violation. The Circuit Court further dismissed the three male petitioners' sex-discrimination claims for lack of standing because they had alleged no actual injury. The Circuit Court permitted Jane Doe's claim of sex-based discrimination under the Virginia Constitution to proceed, but only for nominal damages. On January 27, 2025, FCPS filed its answer and affirmative defenses. FCPS intends to continue defending itself against this lawsuit, given that Regulation 2603.2 is consistent with binding Fourth Circuit and Virginia law.

### C. Support for Regulation 2603 since 2020

Regulation 2603.2 has received strong support from students, parents, and community members in various public forums since its enactment in 2020. FCPS parents and students have rallied to protect Regulation 2603.2 in front of the FCPS school board and the local media.[14] At a July 15, 2021 board meeting, one parent testified that his transgender son would have "benefitted greatly" from a regulation like 2603.2 back when he was a student, as "the Fairfax County school administrators were not prepared to affirm and support him fully at a time when he really needed it."[15] Students describe Regulation 2603 "as critical to creating a safe, welcoming environment for LGBTQ+ individuals."[16] The Fairfax County Council PTA has expressed its support for regulations like 2603.2 that recognize LGBTQ+ student rights.[17] The policy works well and is broadly supported within the Division.

### IV.   Conclusion

The policy at issue in this complaint is working well and will not be modified by the Fairfax County School Board. The policy is compelled by Virginia law and consistent with binding federal precedent. Moreover, it has been implemented without disruption and generated minimal opposition within the FCPS division. Changing the policy would fly in the face of these practical benefits and legal requirements. A policy requiring students to use the facilities that correspond to their gender at birth would create an undue danger of harm to certain FCPS students and expose FCPS to substantial litigation risk in state and federal court. Accordingly, the policy will remain in place unless some new legal authority requires that it be changed.

If you have questions or need additional verification of the matters set forth in this letter, please feel free to reach me at the number below.

---

[14] FCPS School Board Meeting, YouTube (July 15, 2021), https://www.youtube.com/watch?v=Sus0WQL2bVA&t=2s; Michael Key, *Activists rally at Fairfax County School Board meeting*, Washington Blade, (Oct. 8, 2022), https://www.washingtonblade.com/2022/10/08/activists-rally-at-fairfax-county-school-board-meeting/.
[15] *See* FCPS School Board Meeting, at 1:30:00.
[16] Angela Woolsey, *With FCPS facing lawsuit, students to rally tonight in support of pro-LGBTQ policies*, (Mar. 21, 2024), https://www.ffxnow.com/2024/03/21/with-fcps-facing-lawsuit-students-to-rally-tonight-in-support-of-pro-lgbtq-policies/.
[17] Jenna White, *FCCPTA Statement on the Proposed Virginia Department of Education Guidance Document*, Fairfax County Council PTA (Sep. 24, 2022), https://www.fccpta.org/post/fccpta-statement-on-the-proposed-virginia-department-of-education-guidance-document; *Resolution: Protection of and Support for Lesbian, Gay, Bisexual, Transgender and Queer/Questioning (LGBTQ+) Individuals* (2023), https://www.pta.org/docs/default-source/files/advocacy/2023/position-statements/resolution-on-the-protection-of-and-support-for-lgbtq-individualsv2.pdf.

JA074

Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

JA075

# EXHIBIT G

JA076



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

July 25, 2025

By email only to: robert.falconi@acps.k12.va.us; jcafferky@bklawva.com;
jstalnaker@bklawva.com; christine.smith@apsva.us; THeaphy@willkie.com; jefoster@fcps.edu;
edkennedy@fcps.edu; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com;
HSiegmund@mcguirewoods.com

Dr. Melanie Kay-Wyatt
Superintendent of Schools
Alexandria City Public Schools
1340 Braddock Place
Alexandria, VA 22314
c/o    Robert M. Falconi, Division Counsel (robert.falconi@acps.k12.va.us)
       John F. Cafferky (jcafferky@bklawva.com)
       Jakob T. Stalnaker (jstalnaker@bklawva.com)

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204
c/o    Chrissy Smith, Division Counsel (christine.smith@apsva.us)
       Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
c/o    John Foster, Division Counsel (jefoster@fcps.edu)
       Ellen Kennedy, Deputy Division Counsel (edkennedy@fcps.edu)
       Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Aaron Spence
Superintendent
Loudoun County Public Schools
21000 Education Court
Ashburn, VA 20148
c/o    Wesley Allen, Division Counsel (Wesley.Allen@lcps.org)
       John F. Cafferky (jcafferky@bklawva.com)
       Jakob T. Stalnaker (jstalnaker@bklawva.com)

JA077

*Page 2 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Dr. LaTanya D. McDade
Superintendent of Schools
Prince William County Public Schools
14715 Bristow Road
Manassas, VA 20112
c/o   Laura Colombell Marshall (LMarshall@mcguirewoods.com)
        Heidi Siegmund (HSiegmund@mcguirewoods.com)

Re:    Case No. 11-25-1305 – Alexandria City Public Schools
        Case No. 11-25-1306 – Arlington Public Schools
        Case No. 11-25-1307 – Fairfax County Public Schools
        Case No. 11-25-1308 – Loudoun County Public Schools
        Case No. 11-25-1309 – Prince William County Public Schools

Dear Dr. Kay-Wyatt, Dr. Durán, Dr. Reid, Dr. Spence, and Dr. McDade:

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its investigation of the complaints filed against Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions).  The complaint alleges that the Divisions' anti-discrimination policies pertaining to "trans-identifying" students "provide greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."  Specifically, the complaint alleges that the Divisions' policies related to the use of intimate, sex-segregated facilities, including restrooms and locker rooms, violate Title IX.[1]

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106,[2] which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As recipients of federal financial assistance from the Department of Education, the Divisions must comply with this law and its implementing regulations.

In reaching a determination, OCR reviewed publicly available information, information provided by the Complainant, and documents provided by the Divisions. After carefully considering all of the information obtained during the investigation, OCR finds that the Divisions are in violation of Title IX and its implementing regulations. OCR's findings, analysis, and conclusions are discussed below.

## I.    Factual Background

The Divisions currently maintain the following policies, each of which include similarities with respect to access to intimate facilities for students whose "gender identity" does not correspond to his/her sex.

---

[1] The terms bathrooms and restrooms throughout this letter are used interchangeably.

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

*Page 3 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

- Alexandria City Public Schools: "Policy JB: Nondiscrimination in Education"
  This policy states, in part, that the Division must "[p]rovide[] access for all students to facilities, such as restrooms and locker rooms, that correspond to a student's gender identity." The policy defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary" and adds that it "is an innate part of a person's identity and can be the same or different from society's expectations with the sex they were assigned at birth." The policy notes that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

- Arlington County Public Schools: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools"
  This policy states that "[a]ccess to facilities that correspond to a student's gender identity will be available to all students." It defines "gender identity" as "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." The policy also requires single-use, gender-neutral facilities for individuals seeking privacy.

- Fairfax County Public Schools: "Regulation 2603.2 – Gender-expansive and Transgender Students"
  This regulation states, in part, that "[g]ender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity." The regulation adds that these students "may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth." A corresponding document, entitled "Regulation 2603-Gender-Expansive and Transgender Students Guidance Document," defines gender-expansive (among other terms) as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "an individual whose gender identity is different from that associated with the individual's sex assigned at birth." The regulation states that any student who wishes for privacy must be provided with "a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-us/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to a student's gender identity before or after other students)." These alternatives are intended to minimize the impact on lost instructional time.

- Loudoun County Public Schools: "Policy 8040 – Rights of Transgender and Gender-expansive Students"
  This policy states, in part, that "[s]tudents should be allowed to use the facility that corresponds to their consistently asserted gender identity. While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-use restrooms commensurate with the size of the school." A corresponding regulation, "Regulation 8040-REG," defines gender-expansive (among

*Page 4 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other terms) as "convey[ing] a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "[a] self-identifying term that describes a person whose gender identity is different from their sex assigned at birth." The policy states that the Division will modernize its restrooms and locker rooms to improve privacy and that it will have single-user restrooms.

- Prince William County Public Schools: "Regulation 738-5 – Treatment of Transgender and Gender Nonconforming Students"
  This regulation states that "[a]ll students shall have access to facilities (e.g., restrooms and locker rooms) that correspond to their gender identity." It defines gender identity as "[a]n internal sense of one's own identity as a boy/man, girl/woman, something in between, or something outside the male/female binary," adding that it is "an innate part of a person's identity and can be the same as, or different from, the sex assigned at birth." The regulation states that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

These policies are an outgrowth of model policies issued by the Virginia Department of Education on July 18, 2023, entitled "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools." These model policies state, in part, that "[s]tudents shall use bathrooms that correspond to his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir 2020)."[3]

---

[3] In *Grimm*, the Fourth Circuit held that a School Board could not prohibit a female student who "consistently and persistently" identified as male from using a high school's sex-separated male bathroom under both the Equal Protection Clause and Title IX. 972 F.3d at 619-20. The court found "that transgender persons constitute a quasi-suspect class" and applied heightened scrutiny to reach its equal-protection holding. *Id.* at 613.

In a recent seminal decision, however, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibits providing controversial medical interventions to minors to address "gender dysphoria." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). While acknowledging that trans-identification does not (indeed, cannot) change one's sex, *id.* at 1830 n.2, the Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status," *id.* at 1829-37. The law, the Court explained, easily passed the rational-basis standard because of the "'medical and scientific uncertainty'" surrounding interventions for "gender dysphoria." *Id.* at 1836-37. Further, several justices of the Supreme Court signaled that "transgender status" or "gender identity" is not a category or characteristic warranting heightened scrutiny under the Equal Protection Clause due to the mutability of the concept of "transgender" or "gender identity." *See id.* at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status

*Page 5 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Since on or about the start of the 2024-2025 school year, two Divisions (Alexandria and Arlington) reported to OCR not having received any complaints alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, or other intimate facilities. Fairfax County Public Schools informed OCR that one student filed a lawsuit just before the start of the 2024-2025 school year, which was subsequently joined by three additional students, alleging that Regulation 2603.2 violated their free speech, free exercise, due process, and equal protection rights because it required students to share a restroom with someone who is trans-identifying or, alternatively, use single-use restrooms. According to an Amended Petition for Declaratory, Injunctive, and Additional Relief submitted by the Petitioners to the court and reviewed by OCR, as a result of the Division's regulation, one of the students "avoided using school restrooms and only did so when absolutely necessary." Loudoun County Public Schools asserted that it received two informal complaints about a male student's presence in a female locker room making female students uncomfortable; one complaint from a female student of bullying and harassment in the male locker room; and three complaints related to the female student's presence in the male locker room, making the three complaining male students feel "discomfort, embarrassment, and vulnerability." As to the two informal complaints about a male student in the female locker room, the complaint stated that the male student made sexual jokes, momentarily touched other students, and watched female students changing in the locker room. Lastly, Prince William County Public Schools reported to OCR that it received one complaint of a female student's presence in a male locker room, and a second anonymous complaint that a boy dressed as a girl was in a female locker room, making the complaining student feel uncomfortable.

## II.   Legal Standard

### A.   Title IX prohibits discrimination on the basis of sex.

Title IX of the Education Amendments of 1972 (Title IX) states a general prohibition on sex discrimination in education programs or activities that receive federal funding:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Maintaining sex-separated facilities would thus need only pass rational-basis review under constitutional scrutiny, and schools have a legitimate interest in separating males from females in intimate spaces.

Moreover, *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions. Indeed, the Supreme Court has granted, vacated, and remanded numerous cases, including a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

*Page 6 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

20 U.S.C. § 1681(a).[4] After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX also empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The relevant department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletics, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).

One Title IX regulation states the general prohibition on sex discrimination under Title IX:

(a) General. Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

(b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or

---

[4] Title IX defines "Education institution" as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). And Title IX's implementing regulation defines "program or activity" to include: "[a] department, agency, special purpose district, or other instrumentality of a State or local government"; "[t]he entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"; and "[a] college, university, or other postsecondary institution, or a public system of higher education." 34 C.F.R. § 106.2.

*Page 7 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other treatment;

.    .    .

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31.

Another Title IX regulation provides that recipients of federal funding may have sex-separated bathrooms and locker rooms as long as those facilities are comparable:

> Comparable facilities. A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33.

## B.    Under Title IX, "sex" means biological sex and does not include "gender identity."

Title IX and its implementing regulation use the term "sex." The term "sex" is an objective factor. Title IX and its implementing regulations use the term "sex" to mean biological sex. "Sex" does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex).

What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations … reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and does not include "gender identity." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

*Page 8 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell….

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female" "male" "girl" "woman" "boy" "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[5]

Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. The term "gender identity" is, at best, a subjective factor, "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 145 S. Ct. 1816 (2025). According to some, "gender identity" is "a three-dimensional 'galaxy.'" *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020); *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring). And according to a once blindly followed but now discredited partisan organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *see, e.g.*, Executive Order 14187, *Protecting Children From Chemical and Surgical*

---

[5] https://womenshealth.gov/article/sex-based-definitions (U.S. Department of Health and Human Services).

*Page 9 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

*Mutilation*, 90 Fed. Reg. 8,771, (Jan. 28, 2025) (noting that WPATH "lacks scientific integrity"); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring) ("But recent revelations indicate that WPATH's lodestar is ideology, not science. For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, 'our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" (alteration omitted)); *Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 1849 (WPATH and other "prominent medical professionals … have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). The ACLU even contends that trans-identifying individuals include anyone not matching their sex-stereotype. *See* ACLU, *Transgender People and the Law*, at 19-20 ("transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender").[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth" or really at any period of time. *L.W.*, 83 F.4th at 487; *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Or as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] … but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7]

In short, Title IX is not a statute about "gender identity," but sex discrimination. As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams*, 57 F.4th at 814-15; *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

## C.    Title IX's prohibition against sex discrimination does not include discrimination based on "gender identity."

*Bostock v. Clayton County*'s interpretation of Title VII does not defeat this straightforward reading of Title IX's text, context, and history. 590 U.S. 644 (2020). *Bostock* itself made clear that

---

[6]https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services (May 1, 2025), https://opa.hhs.gov/gender-dysphoria-report, at p. 34.

*Page 10 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

it did not "prejudge" the interpretation of other statutes like Title IX and did not "purport to address bathrooms, locker rooms, or anything else of the kind" under the statute it did interpret. 590 U.S. at 681. And for good reason: *Bostock*'s "text-driven reasoning applies only to Title VII," as "many subsequent cases make clear." *L.W.*, 83 F.4th at 484; *accord Tennessee*, 2024 WL 3453880, at *2 ("*Bostock* is a Title VII case."). "As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination" like Title IX. *Id.* (collecting cases). *Bostock* "bears minimal relevance to cases involving a different law and a different factual context," as is the case with Title IX. *Alabama*, 2024 WL 3981994, at *5 (cleaned up). While *Bostock* "involved employment discrimination under Title VII," Title IX "is about schools and children—and the school is not the workplace." *Id.* (cleaned up); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII … is a vastly different statute from Title IX."). And "'Title IX, unlike Title VII, includes express statutory and regulatory carveouts for differentiating between the sexes,'" so "if *Bostock* applied, it 'would swallow the carve-outs,'" "'render them meaningless,'" and absurdly provide more protection for "gender-identity discrimination" than sex discrimination. *Alabama*, 2024 WL 3981994, at *5 (quoting *Adams*, 57 F.4th at 811 & 814 n.7). Thus, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see, e.g.*, *Alabama*, 2024 WL 3981994, at *4-5 (collecting cases concluding the same); *cf. Dep't of Ed. v. Louisiana*, 603 U.S. 866, 867 (2024) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Department of Education's predecessor to create regulations "implementing … [T]itle IX." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including bathrooms and athletics. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

*Page 11 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on bathrooms and athletics. That "highly counterintuitive result" cannot be right. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address "gender-identity discrimination" as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and "gender identity." *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).

Even if *Bostock* were relevant to Title IX's scope, it would not change the Department's reading of Title IX and its implementing regulations. Indeed, *Bostock* makes clear that it requires a similarly separation in bathrooms and locker rooms. Under *Bostock*, Title IX permits sex situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. That is not true here. Unlike in *Bostock*, males and females are not similarly situated when it comes to bathrooms or locker rooms; given their real biological differences, sex is relevant to such decisions. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *Adams*, 57 F.4th at 814-17; *Bostock*, 590 U.S. at 725-28 (Alito, J., dissenting). And as explained below, Title IX not only allows sex-separate bathrooms but requires them.

Page 12 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

## III.    Analysis

### A.    The Divisions have violated and are still violating Title IX and its implementing regulations.

As explained, Title IX is not a statute about "gender identity" or "gender-identity discrimination" but one about sex discrimination. "Sex" does not mean, and has never meant, "gender identity." Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. By allowing males to invade sensitive female-only spaces like bathrooms (and vice versa), the Divisions intentionally, or with deliberate indifference, endanger students' safety, privacy, and dignity; create a hostile environment for students; and deny them access to educational activities or programs. *See, e.g.*, *Tennessee*, 737 F. Supp. 3d at 561 ("ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities"). The Divisions are thus violating Title IX.

Title IX is consistent with longstanding tradition of sex-separated sensitive facilities like bathrooms. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05; *see, e.g.*, Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes (Jan. 28, 2023), [https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/](https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/) ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

In line with this tradition, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Further recognizing that sex separation is necessary to adhere to Title IX's requirements, one of Title IX's implementation regulation—which has existed since Title IX's enactment—expressly permits a recipient to provide separate toilet, locker room, and shower facilities based on sex. 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignitary interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room. Eliminating sex-separate bathrooms and locker rooms, as the Divisions have here, "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559. And it creates a hostile educational environment that denies students educational opportunities.

Although self-evident, a recently released report finds requiring girls to undress or use the bathroom in the presence of boys, causes distress in girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities. *See* Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N.

*Page 13 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id.*; *see Tennessee*, 737 F. Supp. 3d at 562 ("the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened too"). Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Id.* at 561.

This harm is not hypothetical. The Divisions' policies affect real students. For example, OCR learned that since the start of the 2024-2025 school year, Fairfax County Public Schools was subject to a lawsuit filed on behalf of a student—and later joined by three additional students—alleging that sharing a restroom with students of the opposite sex violated, among other things, the students' equal-protection rights. In that filing, the petitioners alleged that one of the students avoided using school restrooms whenever possible because of the Division's regulation. Loudoun County Public Schools also received five reports from both male and female students about a student of the opposite sex's presence in the locker rooms, resulting in, as one complaint put it, "discomfort, embarrassment, and vulnerability." In two of those complaints, female students alleged that a male student made sexual jokes, momentarily touched other students in an inappropriate manner, and watched female students changing in the locker room. And Prince William County Public Schools reported two complaints about the presence of individuals of the opposite sex in the locker rooms, resulting in students' discomfort.

Students at school have enough to worry about; worrying about whether it is safe to use the bathroom or change in a locker room cannot be one of them. The Divisions' bathroom, locker room, and sex-segregated intimate facilities policies or regulations violate Title IX and its implementing regulations because they permit access to intimate facilities that correspond with a student's "gender identity," which, in turn, requires students to use these intimate facilities in the presence of members of the opposite sex. In so doing, the Divisions are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent. Put differently, the Divisions are creating a hostile education environment that denies students the benefits of an education program or activity based on sex, in violation of Title IX and its implementing regulations.

**B.    The Divisions' reliance on *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), does not shield it from liability under Title IX.**

*Grimm* does not change the Department's conclusion that the Divisions have violated and are violating Title IX. The Supreme Court in *Skrmetti* abrogated *Grimm* and other Fourth Circuit precedents in key respects, showing that a sex-separated bathroom policy is permissible under Title IX and the Equal Protection Clause. Regardless, *Grimm*'s conclusions hinged on certain factual findings that, as the record shows, are debunked. Moreover, many of the Divisions' policies do not limit bathroom access to consistent or persistent assertions of a certain "gender identity" and thus are overbroad.

**1.    *Skrmetti* abrogated *Grimm* in key respects.**

Key aspects of *Grimm* are no longer binding in light of *Skrmetti*. The Supreme Court granted, vacated, and remanded the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which heavily relied on *Grimm*, showing that *Grimm* is out of step with Supreme

*Page 14 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Court precedent. *See Folwell v. Kadel*, No. 24-99, 2025 WL 1787687, at *1 (U.S. June 30, 2025) ("The petition for writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025)."). And *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions, especially given that the Supreme Court granted, vacated, and remanded cases outside the medical-intervention context, including in a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

   ***First***, *Grimm*'s Title IX ruling hinged on the correctness of its equal-protection analysis, specifically the conclusion that a sex-separated bathroom policy classifies based on sex. *See Grimm*, 972 F.3d at 618 ("*In light of our equal protection discussion above*, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." (emphasis added)). But that analysis has been abrogated by the Supreme Court in *Skrmetti*. *Skrmetti* made clear that the key question is whether the policy "prohibit[s] conduct for one sex that it permits for the other." 145 S. Ct. at 1831. And that is not true for sex-separated bathrooms. Neither sex may use the bathroom of their choosing; both sexes must use the bathroom consistent with his or her sex.

   ***Second***, in *Grimm*, the Fourth Circuit relied heavily on *Bostock*, which it imported to Title IX with little analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." *Grimm*, 972 F.3d at 616 (cleaned up). But *Bostock* does not apply to Title IX. Even if it did, *Bostock* does not establish that a sex-separated bathroom policy discriminates based on sex in violation of Title IX.

   To begin with, the Supreme Court has recently made clear that it has not "considered whether *Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. In so doing, however, the Supreme Court also made clear that *Bostock*'s "'because of' test" derived from Title VII's "because of" language, which "incorporates the traditional but-for causation standard." *Id.* As explained above, *Bostock* simply does not apply outside Title VII and does not apply to Title IX. *See, e.g.*, *Tennessee*, 2024 WL 3453880, at *2; *Alabama*, 2024 WL 3981994, at *4-5; *cf. Louisiana*, 603 U.S. at 867 (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

   In any event, the Supreme Court has clarified *Bostock*'s analysis in *Skrmetti*, abrogating *Grimm*. According to *Skrmetti*, *Bostock* concluded that sex is a but-for cause when for similarly situated individuals, the entity "penalize[s] a member of one sex for a trait or action that it tolerates in members of the other." *Skrmetti*, 145 S. Ct. at 1834. That is not true for sex-separated bathrooms because "changing the [applicant's] sex … does not automatically change the operation of" the sex-separated bathroom policy. *See id.* at 1834-35. For example, if a female seeks to choose her own bathroom, a sex-separate bathroom policy prohibits her from doing so—and requires that her bathroom choice reflect biological reality, regardless of whether that reality matches the person's

*Page 15 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

asserted "gender identity." Change that person's sex from "female to male," *id.* at 1834, and the bathroom policy would still prohibit him from choosing his own bathroom—and would still require that his bathroom reflect biological reality, regardless of whether that reality matches the person's "gender identity." Thus, under such a policy, sex is not "the but-for cause" of one's inability to self-select a bathroom based on one's "gender identity." *Id.* A sex-separated bathroom policy does not "intentionally penalize[]" a male "for a trait" that the policy "tolerates" in a female, *id.*, so it does not discriminate based on sex under *Bostock*'s reasoning, as clarified by *Skrmetti*.

**Third,** the Fourth Circuit in *Grimm* alternatively concluded that a sex-separated bathroom policy triggered intermediate scrutiny under the Equal Protection Clause because it thought "transgender status" was a "quasi-suspect class" and that such a policy classifies based on "transgender status." *Grimm*, 972 F.3d at 613. Even if *Skrmetti* has not abrogated this analysis, *see* 145 S. Ct. at 1832-34 (state child-protection law did not classify based on trans-identification), it does not mean that the Divisions' overbroad policies follow Title IX, as explained below. In any event, the Fourth Circuit's conclusion that "trans-identification" is a quasi-suspect class is inconsistent with subsequent Supreme Court dicta. The Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class." *Skrmetti*, 145 S. Ct. at 1832. And rightly so. As three Justices explained in *Skrmetti*, "transgender status" or "gender identity" is not a class that warrants heightened scrutiny. *See id.* at 1855 (Barrett, J., concurring, joined by Thomas, J.) ("The Equal Protection Clause does not demand heightened judicial scrutiny of laws that classify based on transgender status," and, thus, "[r]ational-basis review applies."); *id.* at 1860 (Alito, J., concurring in part and in the judgment) ("[T]ransgender status does not qualify under our precedents as a suspect or 'quasi-suspect' class.").

To start, "transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." *Id.* at 1851 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class."). It is not "definitively ascertainable," let alone "at the moment of birth," as "detransition[ers]" show. *Id.* at 1851 (Barrett, J., concurring) (cleaned up). It is not a "discrete group" because the category of trans-identifying individuals "is large, diverse, and amorphous" and "not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Id.* at 1851-52 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."). And trans-identification, "unlike race and sex, is often not accompanied by visibly identifiable characteristics" because an individual's "'gender identity' is an 'internal sense,'" which does not "necessarily tend to 'carry an obvious badge' of their membership in the class that might serve to exacerbate discrimination." *Id.* at 1866-67. This alone "is enough to demonstrate that transgender status does not define a suspect class." *Id.* at 1853 (Barrett, J., concurring).

But there is more. The group has not, "as a historical matter, been subjected to discrimination." *Id.* (cleaned up). That is because this group has not "suffered a history of *de jure* discrimination." *Id.*; *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("[T]ransgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or 'quasi-suspect.'"). Indeed, "there is no evidence that transgender individuals, like racial minorities and

*Page 16 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

women, have been excluded from participation in the political process." *Id.* at 1866. To the contrary, "despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems." *Id.* This too separately shows "transgender status" does not warrant heightened scrutiny.

Thus, the Divisions' reliance on the Fourth Circuit's opinion in *Grimm* that "transgender status" or "gender identity" is a quasi-suspect class that is subject to heightened scrutiny, is wrong. Indeed, Justice Barrett specifically cited *Grimm* as an example of a lower court erroneously employing "sociological intuitions about a group's relative political power" while failing to rely upon "objective, legally grounded standard[s] that courts can apply consistently." *Id.* at 1855 (Barrett, J., concurring).

***Fourth,*** even if heightened scrutiny applied,[9] a sex-separate bathroom policy would easily satisfy that standard. In *Skrmetti*, the Supreme Court explained that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on *impermissible* stereotypes." 145 S. Ct. at 1832 (emphasis added). Because sex-separate bathrooms are necessary to preserve students' privacy, safety, and dignity, they "do not themselves evince sex-based stereotyping." *Id.*; *see Skrmetti*, 83 F.4th at 486 ("Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping.").

### 2.    *Grimm* hinged on certain factual findings that are refuted based on the record in this investigation.

More fundamentally, *Grimm* is premised on factual findings and conclusions that are clearly distinguished from the facts in this investigation. *Grimm* does not apply to this investigation because the Department has developed a different record than the limited record in *Grimm*, and the "question [in *Grimm* was] limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *See Grimm*, 972 F.3d at 596.

***First,*** per *Grimm*, a female who identifies as a boy is "similarly situated" to a male because a trans-identifying female is somehow a boy. *See Grimm*, 972 F.3d at 610 n.10 ("To avoid a conclusion that Grimm was similarly situated to other boys, the dissent fails to meaningfully reckon with what it means for [Grimm] to be a transgender boy. We have been presented with a strong record documenting the modern medical understanding of what it means to be transgender, and considering that evidence is definitively the role of this Court." (cleaned up)). Indeed, *Grimm*

---

[9] To the extent that *Grimm* is still binding, the Department preserves the right to challenge this precedent. At any rate, the writing on the wall is clear: The Supreme Court recently granted certiorari in two cases that clearly signals that whatever is left of *Grimm*, it will no longer be good law or, at the very least, shows that *Grimm* should be seriously reconsidered. *See W. Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025); *Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S. July 3, 2025). These cases will address whether Title IX or the Equal Protection Clause prevents a State from having sex-separated sports teams. The Supreme Court will also consider, among other things, whether *Bostock* extends to Title IX and whether classification based on "transgender status" is subject to heightened scrutiny.

*Page 17 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

claimed that a sex-separate bathroom policy defining "sex" to mean objective biological facts is based on nothing more than an "invented classification" and "discriminatory notion." *See, e.g.*, *id.* at 618-19.

But *Grimm*'s conclusions are refuted by the facts found in this investigation, which shows Grimm's conclusions are contrary to science and biological reality. *See, e.g.*, *supra* n.3. The Supreme Court in *Skrmetti* recognized that trans-identification does not (indeed, cannot) change one's sex. *See* 145 S. Ct. at 1830 n.2; *see also, e.g.*, *Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (cleaned up)). And as noted above, the President and the Department of Health and Human Services have also recognized that a trans-identifying male is not similarly situated to a female and that biological sex is not invented but based on scientific truth.

In claiming otherwise, the Fourth Circuit heavily relied on WPATH. *See, e.g.*, *Grimm*, 972 F.3d at 595-96 (claiming WPATH "represent[s] the consensus approach of the medical and mental health community" and relying on WPATH). But as explained, WPATH is a discredited, partisan advocacy group. *See, e.g.*, Amicus Brief of Alabama in *United States v. Skrmetti*, No. 23-477 (filed Oct. 15, 2024)[10]; The Cass Review: Independent Review of Gender Identity Services for Children and Young People (Apr. 2024).[11] WPATH's opinions are not based on appropriate evidence but rather the biased motivation to help "social justice lawyers." *Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring) (cleaned up).

*Grimm*'s conclusion also ignores the physical reality of how humans use restrooms. Simply making male and female restrooms available to both sexes based on "gender identity" does not provide the same services to male and female students. As one court noted, "[i]f defendant provided 'identical' men's and women's restrooms … each containing two toilet stalls and seventeen urinals, few would argue that the facilities were functionally comparable notwithstanding their physical similarity. The benefits and services derived by one group would be substantially less than the benefits and services derived by the other.*" Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 733 (D. Or. 1997), *supplemented*, 1 F. Supp. 2d 1159 (D. Or. 1998). Or as another court has explained, "[n]ot to be unduly technical, but transgender girls would use individual stalls because female restrooms do not contain urinals. And transgender boys cannot physically use urinals and would, therefore, also use individual stalls." *Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315-DCN, 2023 WL 6690596, at *9 (D. Idaho Oct. 12, 2023), *aff'd*, 131 F.4th 975 (9th Cir. 2025).  By ignoring objective biological facts, and instead basing bathroom policies on a subjective factor like "gender identity," the school divisions of Alexandria, Arlington, Fairfax, Loudoun, or Prince William engage in the different treatment of male and female students, in violation of Title IX.

---

[10] https://www.supremecourt.gov/DocketPDF/23/23477/328275/20241015131826340_20
24.10.15%20-%20Ala.%20Amicus%20Br.%20iso%20TN%20FINAL.pdf.
[11] https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.inde
pendent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf.

*Page 18 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

In short, common sense and overwhelming evidence establishes that a boy is a boy, and a girl is a girl, regardless if the boy or girl has undergone medical interventions, and that a boy and a girl are not similarly situated when it comes to bathrooms and other intimate facilities.

**Second**, contrary to *Grimm*, the privacy and security concerns of students are not "sheer conjecture and abstraction" but real and serious. *Grimm*, 972 F.3d at 614. There is evidence that "trans-identifying" individuals using bathrooms not in line with their sex has led to privacy, security, and dignitary harms. *Contra Grimm*, 972 F.3d at 614 ("The Board does not present any evidence that a transgender student, let alone Grimm, is likely to be a peeping tom, rather than minding their own business like any other student. Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys' restrooms did not increase when Grimm was banned from those restrooms."). As noted above, students have filed lawsuits or complaints with some of the Divisions, alleging that students have suffered privacy and safety harms from these Divisions' bathroom policies.

The Virginia Attorney General recently released findings in an investigation conducted in March 2025, involving a female student who identified as a male student and was recording male students inside the boys' locker room and restroom in the Loudoun County Public Schools. The report indicates that when the boys expressed their concerns about sharing a locker room with a female student, the school division investigated the boys for voicing those concerns.

In 2021, public reports indicate a male student, who had conveyed to a classmate that he told his mother he was "pansexual," wore his hair in a bun, and would sometimes dress in a skirt and wear fishnet gloves, sexually assaulted a 15-year-old female classmate in a girls' restroom at Stone Bridge High School in Loudoun County Public Schools. That male was later adjudicated guilty of the assault in court. The same male student was then transferred to another school in the same division and sexually assaulted another female student less than six weeks after the first assault. He was adjudicated guilty of that assault as well.[12]

What has been seen in the Divisions has also been seen throughout the country. For example, on April 15, 2025, a high school track student athlete spoke during public comment at the Lucia Mar School District Board of Education in Arroyo Grande, California about the impact the Board's policy of allowing boys who identify as girls to use locker rooms and restrooms designated for girls, had on her. The student recounted how she had recently gone into the women's locker room at school to change for track practice. While she was changing her clothes, a male student was sitting in the locker room watching her and the other female students undress. The young lady stated the experience was traumatizing. She stated the male student had already dressed for track practice at the beginning of the day. The male student had no reason to be in a locker room other than to watch girls undress.

In June 2024, a 16-year-old female student at Stewartville High School in Minnesota expressed her experience having to share restroom and locker room facilities with boys at school,

---

[12] Report Regarding Investigation into Misconduct at Stone Bridge High School and Broad Run High School, December 31. 2021.

*Page 19 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

and the impact it had on her educational opportunities.[13] The young lady reported that she was in the locker room after gym class getting ready to change clothes and she heard a male's voice inside the women's locker room and when she turned to look, she saw a boy in the locker room. She indicated that she talked to her school principal about feeling uncomfortable about changing in the locker room in the presence of a boy, but he told her that students can "be whoever they want to be." She also indicated she is scared about boys pretending to be girls, then touching them or taking cellphone photos of girls in restrooms or locker rooms, and that other girls she knows share her concerns. The mother of two other female students spoke up raising similar concerns. Parents have also spoken out about school district policies allowing teen-age boys to share locker rooms and restrooms with teen-age girls at Rochester Public Schools in Minnesota. One parent indicated she had to move her daughters to another school district because of restroom and locker room policies allowing boys into restrooms and locker rooms designated for girls.[14]

Public reports indicate in March 2023, four 14-year-old freshman girls in the Sun Prairie Area School District in Wisconsin were showering in the girls' locker room when they were exposed to the genitalia of an 18-year-old senior male student who told the girls he was "trans."

There are unfortunately more examples. *See, e.g.*, Declaration of A.C. in *Sexuality and Gender Alliance v. Critchfield*, No. 1:23-cv-00315, Doc. 90-1 ¶¶ 4-7 (D. Idaho July 21, 2025) (girl student detailing how, at her school that allows boys into the girls' bathroom, a male was "masturbating in the adjacent stall" to hers in the girls' bathroom).

***Third***, in *Grimm*, the Court stated "the heart of [the] appeal is whether equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender." 972 F.3d at 593. What is at the heart of this investigation, however, is an issue not considered by the Court in *Grimm*. This investigation is evaluating whether the Divisions are taking action that denies students who are not "transgender" equal access to education benefits and opportunities in programs and activities offered by the Divisions. In *Grimm*, the Court was concerned that Grimm practiced bathroom avoidance resulting in urinary tract infections and felt "unsafe, anxious, and disrespected" because of the Board's policy requiring students to use the restroom that corresponds to their sex. *Id.* at 600. Those same concerns are present for students who are not "transgender" and who are forced to share a restroom or locker room with a member of the opposite sex. The Divisions have an obligation under Title IX to all students in the provision of restrooms and locker rooms, not just students who identify as "transgender."

> 3.    **Regardless, many of the Divisions' policies are overbroad, showing that even applying *Grimm*, they violate Title IX.**

Even if *Grimm* were still binding, four of the five school divisions at issue in this investigation (Alexandria, Arlington, Fairfax, and Prince Williams) violate Title IX by not limiting their intimate-facilities policies to students that "consistently and persistently" assert a "gender

---

[13] https://www.dailysignal.com/2024/06/13/really-uncomfortable-16-year-old-girl-speaks-sharing-school-bathrooms-locker-rooms-males/.

[14] https://www.dailysignal.com/2024/06/11/concerned-daughters-safety-13-minnesota-school-districts-issue-transgender-guidelines-allowing-boys-girls-spaces/; https://alphanews.org/infuriating-minnesota-mom-slams-school-districts-radical-transgender-restroom-guidelines/.

*Page 20 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

identity."[15] *Grimm* was crystal clear that its decision was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a binary gender." 972 F.3d at 596 (emphasis added); *accord id.* at 610 ("Grimm, however, did not question his gender identity at all; he knew he was a boy."); *id.* at 619 ("Grimm *consistently and persistently* identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys' restrooms as part of the appropriate treatment." (emphasis added)). In other words, these school divisions allow individuals that do not assert a consistent and persistent "gender identity" to use facilities of the opposite sex. Because Grimm is premised on this limitation, policies without that limitation cannot rely on *Grimm*. Thus, these four school divisions have overbroad policies that are not justified by *Grimm* and violate Title IX.

For these reasons, OCR concludes that *Grimm* does not apply and that, even assuming it does apply, would not change the outcome of this investigation. The Divisions' policies that allow teenage boys to share intimate facilities with teenage girls violate common sense, create unnecessary distress and risk of harm, and deny students the availability of sex-separated locker rooms and bathrooms. These policies result in hostile environments and a denial of the overall benefits of an education program or activity based on sex. The Divisions are thus violating Title IX and its implementing regulations.

## IV.    Conclusion

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the Divisions' compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

---

[15]    *See,*  https://go.boarddocs.com/va/acps/Board.nsf/files/DE62ZL049E89/$file/JB%20-%20Nondiscrimination%20in%20Education.pdf;https://go.boarddocs.com/vsba/arlington/Board.nsf/files/BDNQEE68DE84/$file/J-2%20PIP-2%20Transgender%20Students%20in%20Schools.pdf;https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/CDPTV8792B2E/$file/R2603.pdf;https://go.boarddocs.com/vsba/pwcs/Board.nsf/goto?open&id=C3VP7R61926D.

*Page 21 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

This letter is accompanied by a draft resolution agreement that specifies the actions that, when taken by the Division, will remedy the violation of Title IX. Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter.

If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse.

Sincerely,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2025.07.25 10:21:48 -05'00'

Bradley R. Burke
Regional Director

Enclosure

JA097

# EXHIBIT H

## RESOLUTION AGREEMENT
### Fairfax County Public Schools
### OCR Case Numbers 11-25-1307

Fairfax County Public Schools (hereinafter referred to as "the Division") agrees to fully implement this Resolution Agreement to resolve the allegations investigated in Office for Civil Rights (OCR) Case Number 11-25-1307. This Agreement does not constitute an admission by the Division of a violation of Title IX of the Education Amendments Act of 1972 (Title IX), or any other law enforced by OCR.

### Action Item 1 – Rescission of Policies, Regulations, and Corresponding Guidance

The Division will rescind any components of the following regulation pertaining to access to intimate facilities: "Regulation 2603.2 – Gender-expansive and Transgender Students." The Division will also rescind any corresponding guidance documents, trainings, or other related documents pertaining to the components of the aforementioned regulation that apply to intimate facilities.

### Reporting Requirements:

    a.    By_____2025, the Division will provide OCR with documentation demonstrating that Action Item 1 has been fully implemented.

### Action Item 2 – Issue Memorandum to Schools

The Division will issue a memorandum to each Division school regarding the rescission of the policies and/or regulations outlined in Action Item 1. The memorandum will inform the schools that any future policies related to access to intimate facilities must be consistent with Title IX. The memorandum shall:

    a.    Specify that Title IX compliance means a school must not – on the basis of *sex* – exclude *female* students from participation in, deny female students the benefits of, or subject female students to discrimination under, any education program or activity including but not limited to the use of intimate facilities including locker rooms and bathrooms.

    b.    Specify that schools must provide intimate facilities such as locker rooms and bathrooms accessible to students strictly separated on the basis of sex and comparably provided to each sex.

The memorandum will further state that the words *sex, female, male, girls, women, boys, men* as used in the memorandum and as applicable in all practices, policies, and procedures adopted and implemented by the Division pursuant to or consistent with Title IX, mean the following:

    *Sex* is a person's immutable biological classification as either male or female.

    *Female* is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova).

    *Male* is a person of the sex characterized by a reproductive system with the biological function of producing sperm.

    *Woman* is an adult human female.

JA099

*Page 2 – Resolution Agreement, Fairfax County Public Schools - 11251307*

> ***Girl*** is a minor human female.
> ***Man*** is an adult human male.
> ***Boy*** is a minor human male.

The memorandum will further state that the above meanings of words are to be understood in the context of the facts that *there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm); and the sex of a human – female or male – is determined genetically at conception (fertilization), observable before birth, and unchangeable.*

The Division will post this memorandum in a prominent location on its website.

**Reporting Requirements:**

a.  By _____2025, the Division will submit a copy of the draft memorandum to OCR for OCR's review and approval.

b.  Within _____days of receiving OCR's approval, the Division will disseminate the memorandum to the Division schools and provide verification to OCR.

By signing this Agreement, the Division agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement.  During the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms and obligations of this Agreement.

Upon OCR's acknowledgment of the Division's satisfaction of the commitments made under this Agreement, OCR will close the case.

The Division understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the Division written notice of the alleged breach and 60 calendar days to cure the alleged breach.

The Agreement will become effective immediately upon the signature of the Division's authorized official below.

By: _____    Date: _____
       Name and Title
       Recipient Name

# EXHIBIT I

JA101

Confidential Treatment Requested

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

July 29, 2025

Bradley Burke
Regional Director
United States Department of Education
Office for Civil Rights

Re:    Case No. 11-25-1305 – Alexandria City Public Schools
       Case No. 11-25-1306 – Arlington Public Schools
       Case No. 11-25-1307 – Fairfax County Public Schools
       Case No. 11-25-1308 – Loudoun County Public Schools
       Case No. 11-25-1309 – Prince William County Public Schools

Dear Mr. Burke,

We are in receipt of the Letter of Findings ("LOF")  and accompanying draft resolution agreements
that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Alexandria City
Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public
Schools, and Prince William County Public Schools (the "Divisions") on July 25, 2025.  As explained
below, the Divisions respectfully request the opportunity to negotiate with OCR for up to 90 calendar
days, as guaranteed by Section 303(f) of the OCR Case Processing Manual ("OCR Manual").

In February, 2025, OCR issued a Notification Letter and a Data Request Letter to the Divisions
indicating that a complaint was filed with OCR alleging that the Divisions' policies violated Title IX
by providing greater rights to students who are transgender than to those who are not in regards to the
use of intimate, sex-segregated facilities such as restroom and locker rooms.  The Divisions timely
responded to the Data Request Letter and provided both documents and narrative responses in March
2025.

On July 25, OCR issued its LOF and accompanying draft resolution agreements.  The LOF specifically
provides:  "Given the serious violation of Title IX, OCR will conclude that attempts to secure the
Division's voluntary compliance are at an impasse unless the Division indicates a willingness to
execute a resolution agreement within 10 days of the date of this letter.  If the Divisions have not
indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that
confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the
Division that OCR will issue a letter of impending enforcement action 10 days following the letter of
impasse."

Pursuant to Section 303(f) of the OCR Manual: "From the date that the proposed resolution agreement
is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within
which to reach final agreement."  Section 303(h) of the OCR Manual further provides that "when it is
clear that agreement will not be reached . . . OCR shall issue an Impasse Letter that informs the recipient
that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution
agreement is not reached within that 10-day period."

BRUSSELS    CHICAGO    DALLAS    FRANKFURT    HAMBURG    HOUSTON    LONDON    LOS ANGELES
MILAN    MUNICH    NEW YORK    PALO ALTO    PARIS    ROME    SAN FRANCISCO    WASHINGTON

Confidential Treatment Requested

Your letter and the 10-day deadline it imposes for a response suggests that OCR believes the parties have reached an impasse, triggering the 10-day notice provision of Section 303(h). The Divisions disagree with that characterization of the status of negotiations, as we have only received OCR's LOF and draft resolution agreements less than two business days ago. The LOF contains a complex legal analysis of recent Supreme Court precedent. The draft resolution agreement demands substantial changes to school division policies and regulations and the redefinition of fundamental terms therein. It is premature to declare negotiations at an "impasse" when we have only just received OCR's LOF and demand for substantial changes to policies and/or regulations. The Divisions have not yet had an opportunity to evaluate, much less respond to those assertions. Accordingly, we believe that the 90-day period provided by Section 303(f) of the Manual applies, as the Divisions intend to engage in their respective good-faith discussions with OCR and attempt to negotiate a resolution agreement.

The Divisions will use the additional time to engage in an evaluation process, including by involving their respective elected school boards as appropriate, in order to respond to OCR's proposed resolution agreement. The policies at issue impact a wide array of stakeholders. Matters of policy as well as resolution of federal investigations often require the involvement of the elected school boards of each Division. As a practical constraint, given the summer recess, some of the Divisions' school boards will not reconvene for several weeks from now and must comply with Virginia public meetings law when scheduling meetings. It is not possible for the school boards to meet, evaluate the OCR LOF and draft resolution agreement, consider stakeholder feedback as appropriate, and make consequential decisions within 10 days.

Moreover, compliance with the proposed resolution agreement is more complex than simply rescinding the policies at issue, as some of the specific Division policies involved in this matter contain components that are not subject to the resolution agreement and will be impacted by the proposed changes. Just as these policies were not enacted within ten days, but rather over the course of an appreciable timeframe that allowed for thoughtful deliberation and consideration, reframing the policies to comply with the proposed resolution agreement cannot be done on the highly abbreviated timeframe provided by the OCR LOF. Ninety days will allow time for the Divisions to discuss and evaluate the LOF and proposed resolution agreements, solicit feedback from relevant invested parties as appropriate, and engage in negotiations with OCR in a good faith effort to resolve the matter.

For these reasons, the Divisions respectfully request that OCR honor the terms of the OCR Manual by providing the Divisions with a minimum of 90 days to negotiate with OCR.

Respectfully,

*/s/* Timothy J. Heaphy
Timothy J. Heaphy
*On behalf of Fairfax County Public Schools and Arlington Public Schools*
Willkie Farr & Gallagher LLP
THeaphy@willkie.com
PH: 202-303-1069

cc:
Michelle C. Reid, Ed.D., Division Superintendent, FCPS
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

Confidential Treatment Requested

Francisco Duran, Ed.D., Superintendent, APS
Chrissy Smith, Division Counsel, APS

John F. Cafferky
*On behalf of Alexandria City Public Schools and Loudoun County Public Schools*
Blankingship & Keith PC
jcafferky@bklawva.com
jstalnaker@bklawva.com
PH: 703-279-7201
PH: 703-691-1235

cc:
Melanie Kay-Wyatt, Ed.D., Division Superintendent, ACPS
Robert M. Falconi, Division Counsel, ACPS
Aaron Spence, Ed.D., Division Superintendent, LCPS
Wesley Allen, Division Counsel, LCPS

*/s/* Laura Colombell Marshall
Laura Colombell Marshall
Heidi Siegmund
*On behalf of Prince William County Public Schools*
McGuireWoods LLP
LMarshall@mcguirewoods.com
HSiegmund@mcguirewoods.com
PH: 202-857-1700
PH: 804-775-1049

cc:
Dr. LaTanya D. McDade, Superintendent
Wade T. Anderson, Division Counsel

# EXHIBIT J

**Hemminger, Lindsay**

| | |
|---|---|
| **From:** | Burke, Bradley <Bradley.Burke@ed.gov> |
| **Sent:** | Thursday, July 31, 2025 2:25 PM |
| **To:** | Heaphy, Timothy; jcafferky@bklawva.com; jstalnaker@bklawva.com; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com |
| **Cc:** | Hemminger, Lindsay; Carroll, Fiona |
| **Subject:** | RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**\*\*\* EXTERNAL EMAIL \*\*\***

Counsel,

I received your letter, dated July 29, 2025.

First, your letter incorrectly asserts that "OCR believes the parties have reached an impasse." We have not reached an impasse because your clients have contacted OCR within 10 days of our Letter of Finding and indicated a willingness to negotiate a resolution agreement in these cases. If your clients are, in fact, serious about coming into compliance with Title IX, we are all ears. But we expect to engage in discussions with dispatch. Every day that goes by without a satisfactory resolution agreement is a day that children in the five Northern Virginian school divisions are at risk of grave harm.

Second, your letter incorrectly asserts that OCR's Case Processing Manual (CPM) requires a 90-day period to engage in a resolution agreement negotiation. As a threshold matter, the CPM neither creates rights, nor is it governed by the Administrative Procedure Act. Relevant here, we refer you to CPM Section 303(g), which states that OCR "may end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached," including "the recipient's refusal to agree to a key resolution term." Given that your clients have indicated a willingness to negotiate in good faith about coming into compliance with Title IX, we have neither ended negotiations, nor reached an impasse.

Nevertheless, OCR's proposed resolution agreement was intentional and specific about its key resolution terms. And we do not intend to allow recipients who are not serious about coming into compliance with Title IX—including acknowledging that Title IX is a statute only about sex discrimination and that the term "sex" in Title IX refers only to biological sex and not gender identity—to drag out discussions unnecessarily. We are, therefore, asking counsel for each recipient to indicate whether or not your client is willing to consider agreeing to the terms in the draft resolution agreement. We are, of course, open to additional terms, but OCR is firm on these key terms. As a result, we expect a response to this specific inquiry no later than August 15, 2025.

Respectfully,
Brad Burke

Bradley R. Burke

1

JA106

U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Wednesday, July 30, 2025 9:24 AM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** Re: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Brad.

_

On July 30, 2025 at 9:56:28 AM EDT, Burke, Bradley <Bradley.Burke@ed.gov> wrote:

**\*\*\* EXTERNAL EMAIL \*\*\***

Good morning Mr. Heaphy, and all.

Thank you for reaching out.  I'll review your letter and respond shortly.

Respectfully,

Brad Burke

Bradley R. Burke
U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

---

**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Tuesday, July 29, 2025 5:28 PM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and
11251309

JA107

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Mr. Burke,

On behalf of the 5 northern Virginia school districts referenced in the above-referenced OCR investigations, please see the attached letter.  We request confidential treatment of this and other communications as the matter proceeds.

Thank you,

Tim Heaphy

**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

**From:** Burke, Bradley <Bradley.Burke@ed.gov>
**Sent:** Friday, July 25, 2025 11:31 AM
**To:** robert.falconi@acps.k12.va.us; jcafferky@bklawva.com; jstalnaker@bklawva.com; christine.smith@apsva.us; Heaphy, Timothy <THeaphy@willkie.com>; jefoster@fcps.edu; Kennedy, Ellen D <edkennedy@fcps.edu>; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Subject:** Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

**\*\*\* EXTERNAL EMAIL \*\*\***

Good morning,

Please see the attached Letter of Findings and draft Resolution Agreements in the above referenced cases.

Respectfully,

Brad Burke

Bradley R. Burke
Regional Director
U.S. Department of Education
Office for Civil Rights

Email: Bradley.Burke@ed.gov



JA108

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

JA109

# EXHIBIT K

JA110

**WILLKIE FARR & GALLAGHER** LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

August 15, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via email: Bradley.Burke@ed.gov

Re: OCR Case No. 11-25-1307 – Fairfax County Public Schools

Dear Mr. Burke,

We write in response to the Letter of Findings (the "LOF") and the accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Fairfax County Public Schools ("FCPS") on July 25, 2025, and your email of July 31, 2025, in which you requested a response no later than August 15.[1]

As explained below, FCPS seeks to ensure its ongoing compliance with Title IX of the Education Amendments of 1972 and its implementing regulations, as well as its compliance with applicable federal court precedent and Virginia state law. FCPS is willing to consider agreeing to the terms in any Resolution Agreement that comply with this applicable law and ensure that FCPS can continue to safeguard all students from unlawful discrimination. Accordingly, FCPS cannot agree to the Resolution Agreement as drafted because complete rescission of Regulation 2603.2 "Gender-expansive and Transgender Students" (the "Regulation") would violate Fourth Circuit and Virginia state law.

Contrary to your assertions in the LOF, the U.S. Supreme Court's 2025 decision in *United States v. Skrmetti* did not "abrogate" the Fourth Circuit authority of *Grimm v. Gloucester County School Board* that compels the current FCPS policy, as it involved both facts and law materially different from those involved in *Grimm*. The U.S. Supreme Court has accepted certiorari in *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025), a case raising the precise legal issue at stake in the instant investigation. Given the looming guidance from the Court as to whether Title IX restricts or protects access to facilities based on gender identity, FCPS proposes that OCR not refer this matter for enforcement while we continue our discussions regarding a potential Resolution Agreement.

## I.     Procedural History

In February 2025, OCR issued a Notification Letter and a Data Request Letter to FCPS indicating that a complaint was filed with OCR alleging that FCPS's policies violated Title IX by providing

---

[1] This letter is submitted on behalf of Fairfax County Public Schools only and does not bind or represent the position of the other four public school divisions in Northern Virginia listed in the LOF. While our firm represents both FCPS and Arlington Public Schools in this matter, this letter is submitted solely on behalf of FCPS.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HAMBURG   HOUSTON   LONDON   LOS ANGELES
MILAN   MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA111

greater rights to students who are transgender than to those who are not with regard to the use of intimate, sex-segregated facilities such as restrooms and locker rooms. FCPS responded promptly to the Data Request Letter and provided both documents and narrative responses in March 2025. On July 25, 2025, OCR issued the LOF and accompanying Resolution Agreement. On July 29, 2025, FCPS responded to OCR with a letter requesting additional time to evaluate the LOF and Resolution Agreement and engage in negotiations with OCR. On July 31, 2025, OCR clarified that the parties have not yet reached an impasse given FCPS's willingness to negotiate in good faith about the Resolution Agreement, and provided FCPS with a deadline of August 15, 2025 to indicate whether FCPS is willing to consider agreeing to the Resolution Agreement's terms.

## II.   FCPS's Regulations and Policies Are Compelled by Virginia Law and Binding Authority in the Fourth Circuit

On March 24, 2025, we submitted a letter to Dan Greenspahn of OCR that addressed the issues raised in the Notification Letter. In that letter, we explained that both Virginia law and binding federal precedent compel FCPS to provide access to facilities to students based on their gender identity. More specifically, we cited the Virginia Values Act (the "Values Act"),[2] which "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity . . . in places of public accommodation, including educational institutions."[3] Consistent with the Values Act, the Code of Virginia provides that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."[4] The Regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. Moreover, FCPS received significant Fairfax community input and discussion over the years in support of maintaining Regulation 2603.2.

Regulation 2603.2 is not only consistent with Virginia law, it is consistent with federal precedent which recognizes gender identity as a protected class pursuant to Title IX. As thoroughly described in our March 24, 2025 letter to Mr. Greenspahn, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit explicitly held that Title IX compels local school boards to provide students with access to restroom facilities that correspond to their gender identity. Regulation 2603.2 does that. We will not restate the facts involved in *Grimm* or explain its holding here, beyond noting that it continues to support the Regulation at issue in the instant investigation. Any change in FCPS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

## III.   The U.S. Supreme Court Has Not Yet but Will Soon Provide Crucial Clarity and Guidance on the Treatment of Transgender Students Under Title IX

Contrary to OCR's position, the U.S. Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) does not abrogate the Fourth Circuit's decision in *Grimm*. The *Skrmetti* case involved materially distinct facts and did not include a Title IX claim, separating it from the issues considered and resolved by the Fourth Circuit in *Grimm*. *Skrmetti*'s lack of relevance to the issues involved here is emphatically demonstrated by the U.S. Supreme Court's decision to accept certiorari in *W. Virginia State Bd. Of Educ. v. B.P.J.*, a case that will provide crucial clarity on

---

[2] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[3] VA. CODE ANN. § 2.2-3900.
[4] VA. CODE ANN. § 15.2-853.

whether Title IX and the Equal Protection Clause of the Fourteenth Amendment prevent a state from limiting participation on school sports teams to a student's sex assigned at birth. Until the U.S. Supreme Court issues its ruling in *B.P.J.*, *Grimm* remains binding law in the Fourth Circuit.

      A.    <u>The U.S. Supreme Court's decision in *Skrmetti* does not abrogate *Grimm*, which is binding authority in the Fourth Circuit.</u>

The LOF states that *Grimm* is no longer good law because it was abrogated by the Supreme Court's June 2025 decision in *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). The Court in *Skrmetti* considered whether a Tennessee law that prohibits certain medical interventions and procedures for minors with "gender dysphoria" is constitutional under the Equal Protection Clause. In holding that the law is constitutional, the Supreme Court rejected the plaintiff's argument that heightened scrutiny of the Tennessee statute is warranted given that the law relies on sex-based classifications. *Id*. at 1828–29. The Court stated that the law *does not* classify on the basis of transgender status because it prohibits healthcare providers from administering puberty blockers or hormones to minors for certain medical uses, regardless of the minor's sex. *Id*. at 1837. Accordingly, the Court applied rational basis review and found that the Tennessee law is supported by the legislature's policy goal of protecting public health. *Id.* at 1835–37.

*Skrmetti* differs from *Grimm* in several significant ways. It resolved the constitutionality of a specific Tennessee law prohibiting the use of certain medical treatments on children absent limited circumstances. The Court cited authority for the harms potentially done by the treatments prohibited by the Tennessee statute—a much different policy rationale than the facility access issues involved in *Grimm* and the instant investigation. The Court's consideration of the Tennessee law at issue in *Skrmetti* involved a Constitutional challenge rather than a Title IX claim as that involved in *Grimm*. The Court's discussion of the standard of review was commensurate with the legal basis for the challenge to the Tennessee law—the Equal Protection Clause. While several justices went beyond the Court's holding to observe that "gender identity" should not be viewed as a suspect class, the dicta in those concurrences is potentially inconsistent with the Court's holding in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in which the Supreme Court held that employment actions based on sexual preference and gender identity constitute discrimination "on the basis of sex" under Title VII of the Civil Rights Act. In sum, *Skrmetti* is both factually and legally distinguishable from *Grimm* and does not diminish the Fourth Circuit's dispositive holding in that case.[5]

      B.    <u>*Grimm*'s continued viability is illustrated by the U.S. Supreme Court's grant of certiorari in *B.P.J.*, which will provide clarity and guidance on Title IX protection for transgender individuals.</u>

OCR's assertion that *Grimm* has been "abrogated" by *Skrmetti* is flatly inconsistent with the fact that the U.S. Supreme Court has agreed to hear a case that squarely raises the issue at stake in this

---

[5] The continued viability of *Grimm* has been recognized by the Fourth Circuit in a recent Order granting a preliminary injunction in the case of *John Doe et al. v. State of South Carolina*, 2:24-cv-06420-RMG. The plaintiffs in the *Doe* case moved to enjoin the enforcement of a South Carolina statute which requires schools to restrict restroom use to students' gender assigned at birth. In asking the Court of Appeals to grant an injunction, the plaintiffs asserted that *Skrmetti* does not abrogate *Grimm*, given the different factual context and legal bases for that decision. On August 12, 2025, the Court of Appeals agreed, granting the preliminary injunction motion and indicating that "an opinion explaining the Court's action will follow."

matter—whether "gender identity" is a protected class under Title IX. As indicated above, the U.S. Supreme Court recently granted certiorari in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth. 98 F.4th 542, 550 (4th Cir.). Had the extent of legal protection based on "gender identity" been resolved by *Skrmetti* as the LOF suggests, the U.S. Supreme Court would not have been forced to resolve those issues in *B.P.J.* Contrary to OCR's position, the U.S. Supreme Court's decision to accept review in *B.P.J.* demonstrates that the circuit split on the important issues of transgender access under Title IX remains, necessitating Court resolution. If OCR's expansive view of *Skrmetti* were correct, *B.P.J.* would not be docketed for the upcoming U.S. Supreme Court term. Just yesterday, another federal court struck down attempts by the U.S. Department of Education to rush decisions on matters that warrant additional discussion and deliberation. *See* ECF No. 83, *American Federation of Teachers et al. v. U.S. Department of Education et al.*, No. 25-cv-00628-SAG (D. Md. Aug. 14, 2025).

When it hears the *B.P.J.* case next term, the Court will decide whether Title IX and the Equal Protection Clause prevent a state from limiting participation on school sports teams to students based on biological sex. *B.P.J.* raises the precise issues that underlie the FCPS policies at stake in the current investigation. Until this dispositive issue is answered by the U.S. Supreme Court, *Grimm* remains controlling in the Fourth Circuit and mandates the FCPS policy at issue.

IV.    **The Instant Investigation Should Be Paused Until the U.S. Supreme Court Answers the Central Legal Issue That Controls the Regulation at Stake**

When the U.S. Supreme Court decides *B.P.J.*, it will answer the critical question of whether Title IX requires educational institutions to separate student resources by biological sex. Unless and until the U.S. Supreme Court places further restrictions on the reach of Title IX to exclude transgender students, *Grimm* is the governing law in the Fourth Circuit and any suggestions that *Grimm* will be overruled are mere speculation.

Should FCPS comply with the actions outlined in the LOF and Resolution Agreement, the district risks litigation based on a failure to follow governing Fourth Circuit law. Transgender students and their families would have a cognizable claim that a policy limiting their access to facilities that correspond to their gender at birth violates Title IX, as defined by *Grimm* and Virginia law. The Resolution Agreement offered by OCR presents great litigation risk, as it would effectively require FCPS to violate binding Fourth Circuit precedent.

As indicated above and in prior correspondence, FCPS is committed to strict compliance with Title IX and will follow the law when implementing policies. FCPS is also committed to the protection of all students against discrimination of any kind, which informs all Division policies. The specific contours of legal compliance with respect to transgender student access to facilities will soon be made clear when the U.S. Supreme Court decides *B.P.J.* That case will be argued in the fall of 2025 and likely result in an opinion sometime in the first half of 2026. While that case is pending, *Grimm* remains good law and binds FCPS and its policies.

In light of this dilemma, FCPS requests that OCR clarify the Resolution Agreement in light of the U.S. Supreme Court granting certiorari in *B.P.J.* Should the Court in that case find that gender identity is not protected by Title IX, *Grimm* will indeed be abrogated, necessitating a change in policy by FCPS. If, however, the U.S. Supreme Court follows *Bostock* and extends to Title IX the protection for gender identity it recognized under Title VII, *Grimm* (and the Regulation) will be

JA114

upheld.  FCPS will follow that clear precedent.  Accordingly, we respectfully request that OCR not refer this matter for enforcement action while we continue our discussions in this matter.

Thank you in advance for your consideration.  If you have questions or would like to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS

# EXHIBIT L

JA116

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC
20006-1238

August 18, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via email: Bradley.Burke@ed.gov

Dear Mr. Burke,

On August 15, 2025, we submitted a letter setting forth our response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Fairfax County Public Schools ("FCPS") on July 25, 2025. We write today to provide additional authority for our position– an opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, No. 25-1787, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit.

The *Doe* case cited above involves a challenge to a South Carolina statute that seeks to enforce a rule identical to that contained in the Resolution Agreement you have demanded our client enter with OCR – a restriction on restroom access to students according to their gender assigned at birth. Doe, a 9th grader in Berkeley County, South Carolina public school, challenges that law and moved for a preliminary injunction against its enforcement. On August 12, 2025, the day before Doe began his 9th grade year, the Court of Appeals granted that preliminary injunction. The practical effect of that injunction is to invalidate the South Carolina statute at issue in the litigation, allowing Doe to access restrooms in his public school consistent with his gender identity.

On Friday, August 15, 2025, the Court of Appeals issued a lengthy Amended Order ("Order") explaining its rationale for granting Doe's motion for a preliminary injunction. The Order, which we have attached to this letter as an Exhibit, flatly states "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." Order at 17. Applying the legal standard for a preliminary injunction, the Court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the Court's ruling in *Grimm*, invalidating an identical restriction on restroom access. Order at 16-17. The Court also found that Doe had demonstrated irreparable harm, observing that "state action infringing on constitutional rights generally constitutes irreparable harm." Order at 17. The Court finally found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm* – a prior binding decision of this Court" was clearly in the public interest. Order at 18.

Two concurrences in the Order reinforce the Court's holding. Judge Diaz specifically rebutted the state's argument that you have made in the instant case – that *Skrmetti* abrogated *Grimm*. Judge Diaz observed that "[t]he Court's decision in United States v. *Skrmetti* . . . has little to say about the issues Grimm addressed." Order at 21. He noted that the ban on gender affirming care upheld

127241224.1

in *Skrmetti* differs significantly from the restroom access policy at issue in *Grimm* and did not involve a Title IX claim. Order at 21-22. Accordingly, Judge Diaz concluded that "*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of Grimm's Title IX holding." Order at 22.

Perhaps more significant is Judge Agee's concurrence in *Doe*. Judge Agee dissented in *Grimm* and continues to assert that the decision was wrongly decided. Nonetheless, he concurred in the Court's Order granting the injunction because he recognizes that *Grimm* remains binding authority in the Fourth Circuit. He rejected South Carolina's arguments that the law is "unsettled" and that *Grimm* is factually distinguishable from Doe, writing:

> none of this matters for purposes of deciding the issue presented by Doe's motion for an injunction pending appeal. *Grimm* binds all judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. **The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal**.

Order at 29 (emphasis added).

*Doe* reinforces our position that *Grimm* remains viable post-*Skrmetti* and requires FCPS to continue to facilitate restroom access for students consistent with their gender identity. The South Carolina statute at issue in *Doe* attempts to do exactly what the proposed Resolution Agreement in the instant matter would require – limit restroom access to students' gender assigned at birth. The Fourth Circuit has invalidated that South Carolina law and rejected the position taken by OCR in the instant investigation. Even Judge Agee, who shares your position on the scope of Title IX and its application to the issue of facility access, agrees that *Grimm* controls, entitling Doe to injunctive relief and access to restrooms that correspond to his gender identity. If FCPS agreed to the terms in the Resolution Agreement, we would be acting in direct contradiction to *Doe* and *Grimm*, which we simply cannot agree to do.

Any attempt to enforce OCR's demand that the current policy be changed will result in litigation in which FCPS, like Doe, will ask the Court to enjoin any enforcement activity. In such litigation, we will cite the clear authority that compels the current restroom access policy. The Department of Justice will be limited to the same arguments rejected first in *Grimm* and reaffirmed last week in *Doe* – essentially asking the Court to disregard binding precedent recognized even by the dissenting judge in *Grimm*. While we expect that any litigation in which we seek to enforce these rights will be readily successful given the authority presented herein and in prior correspondence, it would be costly, disruptive, and create great uncertainty among thousands of FCPS students and families. Accordingly, we ask again that OCR not refer this matter for enforcement action and rather pause this investigation as the Supreme Court considers these important issues in its upcoming term.

Thank you in advance for your consideration. If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

JA118

127241224.1

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS

JA119

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
|  | ) | |
| *Plaintiff,* | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| LINDA McMAHON, in her official capacity | ) | Civil Action No. _____ |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
|  | ) | |
| *Defendants.* | ) | |

## FAIRFAX COUNTY SCHOOL BOARD'S
## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

Plaintiff Fairfax County School Board ("FCSB")[1] respectfully moves this Court for a preliminary injunction and/or temporary restraining order as set out below and for the reasons provided in the accompanying Memorandum of Law in Support of FCSB's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order ("Memorandum").[2] Fed. R. Civ. P. 65(a). FCSB moves to preliminarily enjoin and/or temporarily restrain Defendants, including their officers, employees, agents, attorneys, and any person working in concert or participation with any Defendant or under any Defendant's supervision, direction or control, from

---

[1] Plaintiff Fairfax County School Board operates, maintains, and supervises Fairfax County Public Schools ("FCPS").

[2] Arlington School Board ("ASB") has filed against Defendants the Department of Education and Secretary Linda McMahon ("Defendants") a similar action and motion for immediate issuance of an order for a temporary restraining order and preliminary injunction. Given the similar nature of the action and motions, ASB and FCSB request that the two actions and motions be consolidated.

designating FCPS as "high-risk" and requiring that FCPS receive federal funds by reimbursement. FCSB also seeks that this Court enter an order waiving the requirement for bond or security.

As set forth in detail in the accompanying Memorandum, and supported by the filed Complaint, Defendants are in violation of the Administrative Procedure Act and the Spending Clause set forth in the United States Constitution, and FCSB is entitled to a declaratory judgment stating that Defendants violated the APA by designating FCPS as "high risk" and requiring that FCPS receive federal funds by reimbursement. FCSB thus seeks a preliminary injunction and/or restraining order enjoining and restraining Defendants and their officers, employees, agents, attorneys, and any person working in concert or participation with any Defendant or under any Defendant's supervision, direction or control, from designating FCPS as "high-risk" and requiring that FCPS receive federal funds by reimbursement.

Dated: August 29, 2025                    Respectfully submitted,

                                           /s/ *Timothy Heaphy*
                                           _____

                                           Timothy Heaphy
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street Northwest
                                           Washington, District of Columbia 20006-1238
                                           Tel: (202) 303-1000
                                           theaphy@willkie.com
                                           Virginia State Bar I.D. Number: 68912

                                           Joshua Mitchell (*pro hac vice* forthcoming)
                                           Fiona L. Carroll (*pro hac vice* forthcoming)
                                           Lindsay Hemminger (*pro hac vice* forthcoming)
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street Northwest
                                           Washington, District of Columbia 20006-1238
                                           Tel: (202) 303-1000
                                           jmitchell@willkie.com
                                           fcarroll@willkie.com
                                           lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Fairfax County School Board*

JA122

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| LINDA McMAHON, in her official capacity | ) |
| as Secretary of Education of the United | )     Civil Action No. _____ |
| States, and the UNITED STATES | ) |
| DEPARTMENT OF EDUCATION, | ) |
| | ) |
| *Defendants*. | ) |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 29th day of August, 2025, I electronically filed a true and correct copy of **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER** and accompanying documents with the Clerk of Court using the CM/ECF system. A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon

/s/ *Timothy Heaphy*
_____

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number: 68912

JA123

Joshua Mitchell (*pro hac vice* forthcoming)
Fiona L. Carroll (*pro hac vice* forthcoming)
Lindsay Hemminger (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Fairfax County School Board*

JA124

# EXHIBIT A

JA125

**Regulation 2603.2**
Special Services
Office of Intervention and
  Prevention Services
School Counseling Services
Effective 04/21/22

**SPECIAL SERVICES**

**Health and Welfare**

**Gender-expansive and Transgender Students**

This regulation supersedes Regulation 2603.1

## I. PURPOSE

To establish procedures and guidelines for schools to ensure that all students, including gender-expansive and transgender students experience a safe, supportive, and inclusive school environment.

All students have a right to privacy in Fairfax County Public School (FCPS) facilities or while participating in FCPS sponsored events. Any student who has a need or desire for increased privacy, regardless of the underlying reason, shall be provided with reasonable, non-stigmatizing accommodations. Students shall not disclose private information about another student's reason for seeking privacy. Additionally, school personnel should not disclose information about a student's gender-expansive or transgender status, legal name, or sex assigned at birth, including to other school personnel who do not have a need to know, unless the student has authorized such disclosure, or unless legally required to do so as further outlined below.

## II. DEFINITIONS

Official Transcript: to include legal name at the time of the awarded credit. Documents are signed by the school official with name and title or transmitted and verified through a verified electronic method.

## III. SUMMARY OF CHANGES SINCE LAST PUBLICATION

A. Section II., removed the definition of parent and added the definition of official transcript.

B. Section IV., added definition of parent.

C. Section VI.B., added language to reflect that a student can request an alternate and/or unofficial diploma or transcript.

D. Section VI.D., added "and transcript assistants."

E. Legal References., added the proposed Virginia Code 8VAC20-160-3D

Regulation 2603.2
Page 2

## IV. IDENTIFICATION OF GENDER-EXPANSIVE AND TRANSGENDER STUDENTS

Schools shall accept a student or parent's (use of this term herein includes parent, guardian, legal custodian, or other person having control or charge of a child) assertion of a student's gender-expansive or transgender status.

A. When a school is made aware of a student's gender-expansive or transgender status, the school shall offer to convene a support team for the student or the parents. The support team shall be a multidisciplinary team that may consist of the student, parents if the student is willing, classroom teacher(s), administrator, school counselor, school psychologist, school social worker, and/or other staff members as appropriate for this collaboration. The student or the student's parents may have input into the composition of the team and also may invite any representatives of their choosing to include physical and mental health professionals or advocates.

B. Support teams shall develop a student-specific support plan to provide the gender-expansive or transgender student with safe and equitable access to all school and school division facilities and activities, addressing any particular issues raised by the student or the student's parents. The support team shall consider the student's needs, protection of student privacy, maximization of social integration, minimization of stigmatization, student age, and any perceived safety risks as they contemplate appropriate supports and arrangements. The plan may include, but is not limited to:

1. Annual conferences with a student support team, the student, and/or the student's parents to discuss any necessary accommodations for the school year.

2. Regular check-ins with the student and/or the student's parents by the school counselor, administrator, school psychologist, school social worker, or other designated staff member deemed appropriate.

3. Meetings to support the student from academic year to academic year.

4. Information about community resources.

5. School staff should provide information and referral to resources to support a student in coping with a lack of support at home and seek opportunities to foster a better relationship between the student and their family.

6. A timeline to support student transition from one gender to another, if applicable.

7. Decisions regarding use of student name and pronouns, restroom and locker room access, gender specific courses, sports, student activities, and extended instructional field trips or athletic events. School staff will address the student using the asserted name and gender as communicated by the student. This plan should be maintained in the school file (i.e., school counselor office) to be accessible to the members of the support team. This plan is subject to the same privacy guidelines as are other student records.

C. In situations where a student may be transitioning from one gender to another, either prior to the beginning of or during the current school year, school teams shall consider

JA127

Regulation 2603.2
Page 3

providing staff training on gender diversity to include responsibilities to support gender-expansive and transgender students under Title IX and Policy 1450, Nondiscrimination.  This training should be generalized to honor the privacy and confidentiality of the student.

D.   A student or parent may request that the support team be reconvened at any time.

E.   Every effort shall be made to encourage and support communication between gender-expansive or transgender students and the student's parents.  Schools may offer to meet jointly with the parents and the student at school.

## V.   STUDENT NAMES AND PRONOUNS

Students who identify as gender-expansive or transgender should be called by their chosen name and pronouns, regardless of the name and gender recorded in the student's permanent pupil record.  School counselors, administrators, or other designated school personnel should work with the student and/or the student's parents to determine the best course of action to inform teachers, coaches, and other school personnel of this request. Every effort should be made by the student's teachers to reasonably inform substitute teachers of the student's chosen name and pronouns.

## VI.  PERMANENT STUDENT RECORDS

A.   Each school is required to maintain a permanent pupil record of each student.  The student's legal name, birth date, sex assigned at birth, and parent(s) name as they appear on the birth certificate shall be considered the student's official identification and shall be entered in the FCPS student scholastic record.  A court order or an official government document, such as an updated birth certificate or passport attesting to any changes in student identification, to include legal name and sex, is required before any changes will be made to the student scholastic record.

B.   If a gender-expansive or transgender student and the student's parents request a diploma and/or transcript with the student's chosen name, schools will provide a student with both a diploma and/or transcript reflecting the student's legal name as well as an alternate diploma and/or alternate, unofficial transcript with the student's chosen name that reflects the student's gender identity.  Students who are 18 or older may request an additional diploma and/or unofficial transcript with their chosen name, without parent permission being received by FCPS.

C.   For current FCPS students, legal name and/or gender marker changes will be reflected throughout the time of enrollment.

D.   Staff access to permanent student records that contain a gender-expansive or transgender student's legal name and/or sex assigned at birth will be limited to the following staff members: administrators, directors of student services, counselors, school psychologists, school social workers, SIAs/SSAs, and transcript assistants based on their legitimate educational interest in this information.

E.   In situations where school staff is required to use or to report a transgender student's legal name or sex assigned at birth, such as for purposes of standardized testing,

**Regulation 2603.2**
Page 4

school staff and administrators will adopt practices to avoid the inadvertent disclosure of such information to individuals outside of the reporting requirement.

F.  FCPS graduates may change their permanent records under the same requirements as current FCPS students.

## VII.  CLASSROOM RECORDS

A.  Internally generated and shared school lists of students (e.g., honor roll, graduation programs) shall identify gender-expansive or transgender students by their chosen names and genders.  Additionally, school documents such as yearbooks, school newspapers, and communications to outside media shall identify gender-expansive or transgender students by their chosen names and appropriate gender markers.

B.  FCPS electronic systems which will be seen by staff (including teachers and substitutes) should reflect the student's chosen name and pronoun (when possible) as designated by the student or parents.

## VIII. PRIVACY AND EDUCATIONAL RECORDS

Information about students' transgender status, legal name, or sex assigned at birth constitutes confidential personally identifiable and medical information.  Such information should not be disclosed unless required by law.

## IX.  ACCESS TO FACILITIES

A.  Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity.

B.  When an instructional or extra-curricular event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

C.  Any student who has a need or desire for increased privacy, regardless of the underlying reason including gender identity, shall be provided with a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to the student's gender identity before or after other students).  Such alternative options will minimize impact to instructional time to the extent possible.

D.  Any alternative arrangement should be provided in a way that protects the ability of students to keep their gender-expansive or transgender status or other underlying reason for the request confidential.  FCPS will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a student or parent.

E.  In no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the student's gender identity or be limited to using

JA129

**Regulation 2603.2**
Page 5

only a private area, single-occupancy accommodation, or other single-use facility as described in this section.

F.  Gender-expansive and transgender students may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth.

## X.  STUDENT ACTIVITIES AND ATHLETICS

A.  Student participation in Virginia High School League (VHSL) sponsored programs, or another organization such as the Virginia Scholastic Rowing Association (VASRA), as well as middle school athletics, are governed by policies and rules of those organizations.  Gender-expansive and transgender students shall participate in such sponsored activities in accordance with these policies.

B.  Student participation in school-sponsored programs, clubs, activities, and sports (other than those sponsored by VHSL) shall allow gender-expansive and transgender students to participate in accordance with the student's gender identity.

## XI.  GENDER SPECIFIC COURSES

A.  Schools should eliminate or reduce the segregation of students by gender to the extent possible.

B.  When schools offer a gender specific course or a course with a gender specific section, gender-expansive and transgender students shall be allowed to enroll in the course corresponding with the student's gender identity.

C.  In courses where specific units are taught in a way that divides students into groups by gender (e.g., Family Life Education), gender-expansive and transgender students, shall be allowed to participate with the gender group corresponding to the student's gender identity.

## XII.  GENDER SEGREGATION IN OTHER AREAS

As a general rule, in any other circumstances where students are separated by gender in school activities, gender-expansive and transgender students shall be permitted to participate in accordance with the student's gender identity consistently asserted at schools.  Activities that may involve the need for accommodations to address student privacy concerns will be addressed on a case-by-case basis.

## XIII. DRESS CODES

All students are required to dress in clothing that follow the guidelines as listed in Policy 2613, Student Dress Code as well as Regulation 2601, Student Rights and Responsibilities Booklet (SR&R), regardless of gender identity.  There are no separate categories of clothing requirements for either males or females, therefore, gender-expansive and transgender students shall be allowed to dress in any clothing that meets the guidelines in the policies referenced above.  Requirements for attire for school-related

**Regulation 2603.2**
Page 6

programs, activities, and events shall be gender-neutral.  These guidelines shall be enforced impartially regardless of a student's gender identity or expression.

## XIV. TRAINING FOR EMPLOYEES

All school staff will be trained annually on topics relating to transgender students, including procedures for preventing and responding to harassment and bullying based on gender identity and expression.  This includes that a persistent refusal to use a student's chosen name and pronouns constitutes discrimination.  School mental health professionals shall be trained annually on topics relating to safety and support of these students.

## XV. COMPLAINTS

Parents and students may direct complaints to the school principal, the Region Office, or to the Office of Equity and Employee Relations.

Legal References:

Family Educational Rights & Privacy Act, 20 U.S.C. § 1232g; 34 C.F.R. Part 99; Virginia Code Sections 22.1-23.3, 2.2-3901, Virginia Administrative Code 8VAC20-160-3D Proposed

See also the current versions of:

Policy 1450, Nondiscrimination
Policy 2613, Student Dress Code
Policy 2730, Confidentiality of Student Information
Regulation 2202, Required Admission Credentials for Students
Regulation 2601, Student Rights and Responsibilities  Booklet
Regulation 2701, Student Personal Data
Regulation 4952, Discrimination and Harassment on a   Protected Class
Management of the Student Scholastic Records Manual, Virginia High
   School League, Inc. Handbook and Policy Manual

FAIRFAX COUNTY PUBLIC SCHOOLS

JA131

# EXHIBIT B



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

February 12, 2025

By email only to superintendent@fcps.edu

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042

Re:    Case No. 11-25-1307
       Fairfax County Public Schools

Dear Dr. Reid:

On February 4, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), received a complaint against Fairfax County Public Schools (the Division).  The complaint alleges that the Division's anti-discrimination policy pertaining to transgender students "provides greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."  Specifically, the complaint alleges that Division Regulation 2603.2, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance.  As a recipient of federal financial assistance from the Department of Education, the Division must comply with this law.

OCR is opening the complaint for investigation.  OCR will investigate whether Division Regulation 2603.2, violates Title IX.  Please note that opening an investigation does not mean that OCR has made a final determination with regard to the merits.  During the investigation, OCR is neutral; OCR will collect and analyze the evidence it needs in order to make a decision about the complaint.  OCR will ensure that its investigation is legally sufficient in accordance with OCR's Case Processing Manual (CPM) (July 18, 2022) and OCR's Complaint Processing Procedures.  The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

JA133

Page 2 – Case No. 11-25-1307

under a law enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

OCR will contact Division officials within a week of the date of this letter to arrange for the next steps in the investigation, including requesting access to data and personnel.  If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN
GREENSPAHN

Digitally signed by DAN
GREENSPAHN
Date: 2025.02.12 14:36:57 -05'00'

Dan Greenspahn
Team Leader, Team I
Office for Civil Rights
District of Columbia Office

cc:     Jeanne-Marie Burke (jsburke@fcps.edu)

JA134

# EXHIBIT C



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

February 24, 2025

<u>By email only</u> to <u>superintendent@fcps.edu</u>

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042

Re:     Case No. 11-25-1307
        <u>Fairfax County Public Schools</u>

Dear Dr. Reid:

On February 12, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), notified you that OCR was opening an investigation of Fairfax County Public Schools (the Division) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As explained in that letter, OCR will investigate whether Division Regulation 2603.2, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

As an initial data request, please submit the items listed below to OCR **by March 17, 2025**. Please note that OCR may request supplemental data and documents relevant to the investigation.

1.  The name and contact information of the individual who will serve as OCR's contact person during the investigation of this complaint.

2.  The Division's narrative response to the allegation under investigation and all documents or records referenced in the narrative response.

3.  The Division's Title IX grievance procedures, and where those procedures are published.

4.  The name and contact information of the Division's Title IX Coordinator.

5.  The Division's policies and procedures regarding student access to and use of sex-segregated restrooms, locker rooms, and/or other intimate facilities in its schools.

6.  A list of any formal or informal complaints the Division has received during the 2024-2025 school year alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, and/or other intimate facilities. For each complaint,

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

Page 2 of 3 – Case No. 11-25-1307

please note: the date of the complaint; the identity of the complainant (e.g. parent, student, teacher); any school(s) named in the complaint; a summary of the complaint; and a brief description of the Division's response to the complaint.

7. Any additional information the Division believes may be helpful in resolving this complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We look forward to your cooperation during the resolution of this complaint. If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN
GREENSPAHN

Digitally signed by DAN
GREENSPAHN
Date: 2025.02.24 14:05:26 -05'00'

Dan Greenspahn
Team Leader, Team 1
District of Columbia Office
Office for Civil Rights

JA137

Page 3 of 3 – Case No. 11-25-1307

## Data Request Instructions

If any item in our request is unclear, or if you experience any difficulty complying with this request, please contact the staff member(s) identified above prior to the due date. OCR requests that you submit information electronically, if feasible. Upon request, OCR may create a secure external sharing site for you to upload the submission. You may contact us for more information about this option. Please do not provide the information via an electronic cloud format such as Google Docs. If any of the requested information is available to the public on the Internet, you may provide the website address. If any responsive documents contain Social Security numbers, please redact them before producing the documents to OCR.

The Department of Education's regulation implementing Title VI of the Civil Rights Act of 1964, at 34 C.F.R. § 100.6(c), which is incorporated by reference in the Title IX regulation at 34 C.F.R. § 106.81, gives OCR the authority to request this information. In addition, in accordance with the regulation implementing the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, at 34 C.F.R. § 99.31(a)(3)(iii), and the Title VI regulation at 34 C.F.R. § 100.6(c), OCR may review personally identifiable records without regard to considerations of privacy or confidentiality. OCR will take all proper precautions to protect the identity of any individuals named in the records.

OCR may request supplemental data and documents that are relevant to the allegation under investigation. If the Division obtains any additional information or documents responsive to this data request or otherwise relevant to the allegations in this case, the Division must promptly inform OCR of its existence and supplement the data response within 15 days of its discovery. OCR reminds the Division that a failure to provide requested information may be considered a denial of access in violation of the regulations cited above. Please ensure that Division employees preserve all data and documents that are relevant to the allegation under investigation until OCR closes this case.

JA138

# EXHIBIT D

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

March 24, 2025

Dan Greenspahn, Esq.
U.S. Department of Education
Office for Civil Rights
District of Columbia Office
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

Re: OCR Case No. 11-25-1307 - Fairfax County Public Schools

Dear Mr. Greenspahn,

On February 12, 2025, Fairfax County Public Schools ("FCPS") received a letter from the District of Columbia Office for Civil Rights ("OCR") regarding Case No. 11-25-1307 (the "Notification Letter"). FCPS subsequently received a Data Request Letter from OCR on February 24, 2025 (the "Request"). The Notification Letter indicates that a complaint was filed with OCR alleging that FCPS's Regulation 2603.2 violates Title IX of the Educational Amendments of 1972 ("Title IX") by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restrooms and locker rooms (collectively, "facilities"). The Notification Letter does not identify the complainant or whether the complaint was made on behalf of any individual FCPS students or in regard to any specific incident at FCPS.[1]

As you are aware, I represent FCPS in this matter. On March 17, 2025, we produced documents and information responsive to OCR's Requests 1, 3, 4, 5, and 6, contained in the February 24 Data Request Letter. Those documents included:

- FCPS Regulations 2118, 4950, 4952, 4953, and 2603;
- Regulation 2603 Gender-Expansive and Transgender Students Guidance Document;
- Transgender Students and School Bathrooms FAQ;
- A declaration from Title IX Coordinator Colby Bruno; and
- The Second Amended Petition for Declaratory, Injunctive, and Additional Relief in *Jane Doe et al. v. Fairfax County School Board*, No. 24-3171 (Va. Cir. Ct. Aug. 22, 2024).

With this letter, we provide additional information responsive to Data Requests 2 and 7.[2] As discussed below, FCPS denies that Regulation 2603.2 violates Title IX. Regulation 2603.2 provides *all* students the option of using facilities consistent with their gender identity or access to

---

[1] A press release from the America First Legal Foundation claims that this investigation was opened in response to an administrative complaint submitted by that organization. This press release and a copy of the Request for Investigation Letter it references does not indicate that the complaint was made on behalf of any individual FCPS students or in regards to any specific incidents at FCPS. *See* America First Legal, *VICTORY — In Response to AFL's Complaint, the U.S. Department of Education Office for Civil Rights Opens Investigation into Five Northern Virginia K-12 Schools Illegal "Gender Identity" Policies*, (Feb. 14, 2025), https://aflegal.org/victory-in-response-to-afls-complaint-the-u-s-department-of-education-office-for-civil-rights-opens-investigation-into-five-northern-virginia-k-12-schools-illegal-gender/.

[2] Unless otherwise noted, all documents referenced in this letter were produced on March 17, 2025.

BRUSSELS    CHICAGO    DALLAS    FRANKFURT    HOUSTON    LONDON    LOS ANGELES    MILAN
MUNICH    NEW YORK    PALO ALTO    PARIS    ROME    SAN FRANCISCO    WASHINGTON

private restroom or locker room facilities. This regulation complies with binding state and federal law governing the use of facilities in Virginia and all other localities within the jurisdiction of the United States Court of Appeals for the Fourth Circuit and has been implemented without disruption or controversy in our schools. Accordingly, OCR should not issue a finding of a Title IX violation or take any other enforcement action in this matter.

## I.     FCPS Regulations and Policies

FCPS Regulation 2603 "Gender-expansive and Transgender Students" went into effect in October 2020. FCPS drafted this regulation in response to the passage of House Bill 145 and Senate Bill 161 by the Virginia General Assembly during the spring 2020 session.[3] Those bills modified the Virginia Code to state that the "Department of Education shall develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that address common issues regarding transgender students," including students' "use of school facilities."[4] In 2021, the Virginia Department of Education ("VDOE") issued its Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[5]

Upon the election of Governor Glenn Youngkin in 2021, the Virginia Department of Education issued new guidance on the issue of transgender student access to school facilities. Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that a student "shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)." As described more fully below, the Fourth Circuit in the *Grimm* case held that requiring students to use facilities that align with their biological gender violates Title IX. The citation to *Grimm* confirms that the VDOE guidance continues to require Virginia schools to facilitate student access to facilities that correspond to their gender identity. Accordingly, FCPS continues to adhere to both federal law and VDOE guidance in facilitating student access to facilities according to their gender identity.

The provision relevant to this OCR investigation is Regulation 2603.2, Section IX. Access to Facilities, which states as follows:

> A. Gender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity.

> B. When an instructional or extra-curricular event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

---

[3]     *See* Regulation 2603: Gender-Expansive and Transgender Students Guidance Document, FAIRFAX_OCR_1307_0000055, at 3.

[4] VA. CODE ANN. § 22.1-23.3.

[5] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, VIRGINIA DEPARTMENT OF EDUCATION (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

C. Any student who has a need or desire for increased privacy, regardless of the underlying reason including gender identity, shall be provided with a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-use/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to the student's gender identity before or after other students). Such alternative options will minimize impact to instructional time to the extent possible.

D. Any alternative arrangement should be provided in a way that protects the ability of students to keep their gender-expansive or transgender status or other underlying reason for the request confidential. FCPS will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a student or parent.

E. In no case shall a gender-expansive or transgender student be required to use a locker room or restroom that conflicts with the student's gender identity or be limited to using only a private area, single-occupancy accommodation, or other single-use facility as described in this section.

F. Gender-expansive and transgender students may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth.[6]

## II.    Legal Analysis

The policy at issue in this inquiry is facially neutral and provides the same access to FCPS facilities to all students, regardless of gender identity. FCPS is governed by Virginia and Fourth Circuit law which requires that all individuals within the Commonwealth be safeguarded from unlawful discrimination because of gender identity in places of public accommodation, including educational institutions. Taking any steps to ban transgender students from using the facilities that align with their gender identity would violate Virginia and federal law.

    A.    <u>FCPS Regulation 203.2 provides equal access to facilities to all students.</u>

The February 12 letter indicates that OCR has received a complaint alleging that Regulation 2603.2 "provides greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex." *See* Notification Letter at 1. We strongly deny the allegation that the regulation affords any individual student, regardless of gender identity, greater rights than any other. Section IX of the Regulation allows *all* students the option of using a locker room or restroom consistent with their gender identity – providing no more nor no less access to transgender students as that provided any others. The peers of transgender boys are other boys, and the peers of transgender girls are other girls. If a transgender girl wants to use the girl's facilities, she is allowed to do so. If any other girl wants to use those same facilities, she has the right to do so as well.

Section IX also provides an alternative facility option to any student who desires additional privacy, again regardless of gender identity. More specifically, that provision allows *any* student

---

[6] *See* FCPS Regulation 2603.2, FAIRFAX_OCR_1307_0000049. All FCPS policies, bylaws, and regulations are publicly available at https://insys.fcps.edu/schoolboardapps/report_policy/cache/alpha-A.htm.

for *any* reason to request additional, reasonable privacy measures in their use of school facilities. This provision requires that, upon request, students shall be provided with an alternative private area or an alternative facility-use schedule that allows for increased privacy in a non-stigmatizing way. These accommodations are explicitly offered to *all* students and are not specially reserved for transgender students. This right could be invoked by a student recovering from an injury, illness or medical procedure, a student who has an implanted medical device such as a colostomy bag or insulin pump, or a student who deals with any of the myriad insecurities that present themselves to young people on their journey through their growth and development during K-12 education.

The facial neutrality of Regulation 2603.2 should end this inquiry, as it defeats any argument that some category of FCPS students is treated differently than another in violation of Title IX. Without some exclusion from an FCPS program or discriminatory impact of a policy, there is no basis on which OCR could find a violation. If FCPS were to change its policy and exclude access to facilities based on gender identity, that restriction would impermissibly deprive some students of a benefit and risk liability for a Title IX violation. As explained below, a change in policy would also directly contradict Virginia law and binding federal precedent.

      B.    <u>Virginia law requires FCPS to make facilities available without regard to gender identity</u>.

In 2020, the Virginia General Assembly expanded the scope of the Virginia Human Rights Act[7] by adopting the Virginia Values Act (the "Values Act").[8] The law "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of … gender identity … in places of public accommodation, including educational institutions."[9] The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."[10]

Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in … education on the basis of … gender identity"[11] This provision explicitly provides authority for Regulation 2603.2. The Fairfax County School Board has enacted a valid policy that protects access to facilities for all students, regardless of gender identity. This regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. In short, the FCPS transgender policy was both compelled by Virginia law and within the school board's authority to promulgate.

      C.    <u>As determined by controlling federal authority, Title IX compels FCPS to make facilities available without regard to gender identity</u>.

FCPS's decision to implement Regulation 2603.2 is not only consistent with Virginia law, it is also required by Title IX as determined by the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit has explicitly held that Title IX compels local school boards to provide students with access to restroom facilities that correspond to their gender identity. As explained below, the Fourth Circuit Court of Appeals followed Supreme Court precedent in its baseline recognition of

---

[7] VA. CODE ANN. § 2.2-3900–3909.
[8] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[9] VA. CODE ANN. § 2.2-3900.
[10] *Id.* at § 2.2-3901.
[11] VA. CODE ANN. § 15.2-853.

- 4 -

JA143

gender identity as a protected class under Title VII, which it then applied to the analogous provision of Title IX. Accordingly, any change in FCPS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

The Court of Appeals considered the right of transgender students to access school facilities that correspond with their gender identity in the case of *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). In that case, a local Virginia school division, in response to backlash about a transgender male student's use of the boy's restroom, implemented a policy under which students could only use restrooms matching their "biological gender." *Id.* at 593. The policy also required that "students with gender identity issues shall be provided an alternative appropriate private facility." *Id.* at 599. To effectuate this policy, a number of single-stall unisex restrooms were made available to all students. *Id.* at 600. This is precisely the type of facility access policy that the OCR complaint believes is required by FCPS and seeks to compel.

Gavin Grimm, a transgender student, sued the Gloucester School Board, arguing that the restroom policy violated his rights under Title IX. *Grimm,* 972 F.3d at 593. Grimm prevailed on his Equal Protection Clause and Title IX claims at the summary judgment stage. *Id.* at 603. When the School Board appealed, the Fourth Circuit created legal precedent for local public schools under its jurisdiction. The court analogized the facts in *Grimm* to those involved in *Bostock v. Clayton County,* 590 U.S. 644 (2020), in which the Supreme Court held that discrimination against a person for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights Act. *Grimm*, 972 F.3d at 616–619. The court read *Bostock* to require that Grimm's gender identity was a similarly protected status pursuant to Title IX of that same statute. *Id.*

Having made the threshold finding that Grimm was a member of a protected class according to *Bostock*, the Court of Appeals upheld the district court's decision. *Grimm*, 972 F.3d at 619–620. First, the court held that the school board policy at issue constituted "sex-based discrimination," violating Grimm's equal protection rights. *Id.* at 613. The court dismissed the Board's argument that the policy was substantially related to its goal of protecting students' privacy, noting that the Board "cite[d] to no incident, either in Gloucester County or elsewhere" and "ignore[d] the growing number of school districts across the country who are successfully allowing transgender students such as Grimm to use the bathroom matching their gender identity, without incident." *Id.* at 614. Next, the Court of Appeals concluded that the policy discriminated against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* at 618.[12] In affirming the district court's judgment, the Fourth Circuit stated that it was "left without a doubt that the Board acted to protect cisgender boys from Gavin's mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life." *Id.* at 620.[13]

---

[12] The Fourth Circuit also held that the School Board violated Title IX when it refused to update Grimm's sex listed in his school records. *Grimm,* 972 F.3d at 619. The court determined that the Board "based its decision . . . on his sex," which "harmed Grimm." *Id.* The discrimination was unlawful because "it treat[ed] him worse than other similarly situated students, whose records reflect their correct sex." *Id.*

[13] As a result of the *Grimm* decision, the Gloucester County school division was required to pay $1.3 million in the plaintiff's attorneys fees and costs, in addition to what was certainly a significant amount of its own legal expenses to fight the case. On June 28, 2023, the Supreme Court denied the school board's petition for a writ of certiorari.

JA144

*Grimm* established that a policy that prohibits a transgender student from using facilities that corresponds to their gender identity and instead forces them to use the opposite sex facilities or a separate unisex facility is discriminatory under Title IX in the Fourth Circuit. *Grimm* is dispositive here and supports FCPS policy at issue in the instant investigation. Section IX of Regulation 2603.2 protects transgender students from the type of unlawful sex discrimination found in *Grimm* by allowing them to use the facilities that correspond with their gender identity and prohibiting their assignment to a separate single-use facility. *See* Subsections IX.A, C, and E. Modification of Regulation 2603.2 in a manner requested by the complaint is impermissible. If FCPS decided to rescind such policy and require that transgender students use the bathroom that corresponds with their sex assigned at birth, FCPS would be in violation of both Virginia and federal law.

## III.    Formal and Informal Title IX Complaints Regarding Regulation 2603

### A.    2024-2025 School Year

Consistent with the experience of numerous school districts across the country, including districts within Virginia, FCPS has implemented this policy without disruption or controversy. FCPS has not received a single formal or informal Title IX complaint about Regulation 2603.2 in the 2024-2025 school year or any school year since the current version of the regulation was implemented in 2022. *See* Title IX Coordinator Declaration ("Declaration"). The Title IX office uses a case management intake system and database called Guardian, which came online prior to the start of the 2024-2025 school year. There are no responsive complaints in that database. *See* Declaration. Nor has the Title IX office or the Office of Division Counsel received any formal or informal complaints outside of the Guardian database during the 2024-2025 school year.

### B.    Prior to the 2024-2025 School Year

As stated in her declaration, Ms. Bruno is not aware of any other formal Title IX complaints regarding Regulation 2603.2 prior to the 2024-2025 school year. However, during the 2023-2024 school year, a parent of a then-FCPS senior raised concerns about Regulation 2603.2 with a principal and assistant superintendent, specifically the subsection regarding access to facilities. The parent was concerned about a student who identifies as "gender-expansive" as defined by Regulation 2603.2, using the male and female restrooms interchangeably. Second Amended Petition ¶ 127, *Doe v. FCSB*, No. CL-2024-3171 (Va. Cir. Ct. Aug. 2024). She did not allege that the student took any deliberate actions to make other students uncomfortable. FCPS informed the parent that Regulation 2603.2 was an enforceable policy and reminded her that her child could opt to use the single-user restrooms. Dissatisfied with FCPS's response, the student, who was over the age of 18, filed suit against the Fairfax County School Board. The student, identified by pseudonym Jane Doe, did not bring federal claims, but alleged violations under the Virginia Constitution and Virginia's RFRA statute. Jane Doe graduated, however, and her claims for injunctive relief were dismissed as moot. Three additional (male) petitioners, through their mother, joined the suit and alleged the same violations. *See* Second Amended Petition. They allege that by enacting Regulation 2603.2, the School Board violated their "free speech, free exercise, due process, and equal protection rights" under the Virginia Constitution. *Id.* ¶ 2. Petitioners argued that requiring students to share a restroom with someone who is transgender or otherwise use single-use restrooms constitutes religious and sex-based discrimination. *Id.* ¶¶ 198–220. In response to the School Board's demurrers to the Second Amended Petition, the Circuit Court dismissed all claims that the restroom-access policy constituted religious discrimination or

a free-exercise violation.  The Circuit Court further dismissed the three male petitioners' sex-discrimination claims for lack of standing because they had alleged no actual injury.  The Circuit Court permitted Jane Doe's claim of sex-based discrimination under the Virginia Constitution to proceed, but only for nominal damages.  On January 27, 2025, FCPS filed its answer and affirmative defenses.  FCPS intends to continue defending itself against this lawsuit, given that Regulation 2603.2 is consistent with binding Fourth Circuit and Virginia law.

### C.  Support for Regulation 2603 since 2020

Regulation 2603.2 has received strong support from students, parents, and community members in various public forums since its enactment in 2020.  FCPS parents and students have rallied to protect Regulation 2603.2 in front of the FCPS school board and the local media.[14]  At a July 15, 2021 board meeting, one parent testified that his transgender son would have "benefitted greatly" from a regulation like 2603.2 back when he was a student, as "the Fairfax County school administrators were not prepared to affirm and support him fully at a time when he really needed it."[15]  Students describe Regulation 2603 "as critical to creating a safe, welcoming environment for LGBTQ+ individuals."[16]  The Fairfax County Council PTA has expressed its support for regulations like 2603.2 that recognize LGBTQ+ student rights.[17]  The policy works well and is broadly supported within the Division.

## IV.    Conclusion

The policy at issue in this complaint is working well and will not be modified by the Fairfax County School Board.  The policy is compelled by Virginia law and consistent with binding federal precedent.  Moreover, it has been implemented without disruption and generated minimal opposition within the FCPS division.  Changing the policy would fly in the face of these practical benefits and legal requirements.  A policy requiring students to use the facilities that correspond to their gender at birth would create an undue danger of harm to certain FCPS students and expose FCPS to substantial litigation risk in state and federal court.  Accordingly, the policy will remain in place unless some new legal authority requires that it be changed.

If you have questions or need additional verification of the matters set forth in this letter, please feel free to reach me at the number below.

---

[14]    FCPS School Board Meeting, YouTube (July 15, 2021), https://www.youtube.com/watch?v=Sus0WQL2bVA&t=2s; Michael Key, *Activists rally at Fairfax County School Board meeting*, Washington Blade, (Oct. 8, 2022), https://www.washingtonblade.com/2022/10/08/activists-rally-at-fairfax-county-school-board-meeting/.

[15] *See* FCPS School Board Meeting, at 1:30:00.

[16] Angela Woolsey, *With FCPS facing lawsuit, students to rally tonight in support of pro-LGBTQ policies*, (Mar. 21, 2024), https://www.ffxnow.com/2024/03/21/with-fcps-facing-lawsuit-students-to-rally-tonight-in-support-of-pro-lgbtq-policies/.

[17] Jenna White, *FCCPTA Statement on the Proposed Virginia Department of Education Guidance Document*, Fairfax County Council PTA (Sep. 24, 2022), https://www.fccpta.org/post/fccpta-statement-on-the-proposed-virginia-department-of-education-guidance-document; *Resolution: Protection of and Support for Lesbian, Gay, Bisexual, Transgender and Queer/Questioning (LGBTQ+) Individuals* (2023), https://www.pta.org/docs/default-source/files/advocacy/2023/position-statements/resolution-on-the-protection-of-and-support-for-lgbtq-individualsv2.pdf.

JA146

Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

JA147

# EXHIBIT E



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

July 25, 2025

By email only to: robert.falconi@acps.k12.va.us; jcafferky@bklawva.com;
jstalnaker@bklawva.com; christine.smith@apsva.us; THeaphy@willkie.com; jefoster@fcps.edu;
edkennedy@fcps.edu; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com;
HSiegmund@mcguirewoods.com

Dr. Melanie Kay-Wyatt
Superintendent of Schools
Alexandria City Public Schools
1340 Braddock Place
Alexandria, VA 22314
c/o   Robert M. Falconi, Division Counsel (robert.falconi@acps.k12.va.us)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204
c/o   Chrissy Smith, Division Counsel (christine.smith@apsva.us)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
c/o   John Foster, Division Counsel (jefoster@fcps.edu)
      Ellen Kennedy, Deputy Division Counsel (edkennedy@fcps.edu)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Aaron Spence
Superintendent
Loudoun County Public Schools
21000 Education Court
Ashburn, VA 20148
c/o   Wesley Allen, Division Counsel (Wesley.Allen@lcps.org)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

*Page 2 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Dr. LaTanya D. McDade
Superintendent of Schools
Prince William County Public Schools
14715 Bristow Road
Manassas, VA 20112
c/o    Laura Colombell Marshall (LMarshall@mcguirewoods.com)
        Heidi Siegmund (HSiegmund@mcguirewoods.com)

Re:    Case No. 11-25-1305 – Alexandria City Public Schools
        Case No. 11-25-1306 – Arlington Public Schools
        Case No. 11-25-1307 – Fairfax County Public Schools
        Case No. 11-25-1308 – Loudoun County Public Schools
        Case No. 11-25-1309 – Prince William County Public Schools

Dear Dr. Kay-Wyatt, Dr. Durán, Dr. Reid, Dr. Spence, and Dr. McDade:

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its investigation of the complaints filed against Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions). The complaint alleges that the Divisions' anti-discrimination policies pertaining to "trans-identifying" students "provide greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex." Specifically, the complaint alleges that the Divisions' policies related to the use of intimate, sex-segregated facilities, including restrooms and locker rooms, violate Title IX.[1]

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106,[2] which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As recipients of federal financial assistance from the Department of Education, the Divisions must comply with this law and its implementing regulations.

In reaching a determination, OCR reviewed publicly available information, information provided by the Complainant, and documents provided by the Divisions. After carefully considering all of the information obtained during the investigation, OCR finds that the Divisions are in violation of Title IX and its implementing regulations. OCR's findings, analysis, and conclusions are discussed below.

## I.    Factual Background

The Divisions currently maintain the following policies, each of which include similarities with respect to access to intimate facilities for students whose "gender identity" does not correspond to his/her sex.

---

[1] The terms bathrooms and restrooms throughout this letter are used interchangeably.

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

*Page 3 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

- <u>Alexandria City Public Schools: "Policy JB: Nondiscrimination in Education"</u>
  This policy states, in part, that the Division must "[p]rovide[] access for all students to facilities, such as restrooms and locker rooms, that correspond to a student's gender identity." The policy defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary" and adds that it "is an innate part of a person's identity and can be the same or different from society's expectations with the sex they were assigned at birth." The policy notes that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

- <u>Arlington County Public Schools: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools"</u>
  This policy states that "[a]ccess to facilities that correspond to a student's gender identity will be available to all students." It defines "gender identity" as "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." The policy also requires single-use, gender-neutral facilities for individuals seeking privacy.

- <u>Fairfax County Public Schools: "Regulation 2603.2 – Gender-expansive and Transgender Students"</u>
  This regulation states, in part, that "[g]ender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity." The regulation adds that these students "may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth." A corresponding document, entitled "Regulation 2603-Gender-Expansive and Transgender Students Guidance Document," defines gender-expansive (among other terms) as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "an individual whose gender identity is different from that associated with the individual's sex assigned at birth." The regulation states that any student who wishes for privacy must be provided with "a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-us/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to a student's gender identity before or after other students)." These alternatives are intended to minimize the impact on lost instructional time.

- <u>Loudoun County Public Schools: "Policy 8040 – Rights of Transgender and Gender-expansive Students"</u>
  This policy states, in part, that "[s]tudents should be allowed to use the facility that corresponds to their consistently asserted gender identity. While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-use restrooms commensurate with the size of the school." A corresponding regulation, "Regulation 8040-REG," defines gender-expansive (among

*Page 4 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other terms) as "convey[ing] a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "[a] self-identifying term that describes a person whose gender identity is different from their sex assigned at birth." The policy states that the Division will modernize its restrooms and locker rooms to improve privacy and that it will have single-user restrooms.

- <u>Prince William County Public Schools: "Regulation 738-5 – Treatment of Transgender and Gender Nonconforming Students"</u>
  This regulation states that "[a]ll students shall have access to facilities (e.g., restrooms and locker rooms) that correspond to their gender identity." It defines gender identity as "[a]n internal sense of one's own identity as a boy/man, girl/woman, something in between, or something outside the male/female binary," adding that it is "an innate part of a person's identity and can be the same as, or different from, the sex assigned at birth." The regulation states that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

These policies are an outgrowth of model policies issued by the Virginia Department of Education on July 18, 2023, entitled "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools." These model policies state, in part, that "[s]tudents shall use bathrooms that correspond to his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir 2020)."[3]

---

[3] In *Grimm*, the Fourth Circuit held that a School Board could not prohibit a female student who "consistently and persistently" identified as male from using a high school's sex-separated male bathroom under both the Equal Protection Clause and Title IX. 972 F.3d at 619-20. The court found "that transgender persons constitute a quasi-suspect class" and applied heightened scrutiny to reach its equal-protection holding. *Id.* at 613.

In a recent seminal decision, however, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibits providing controversial medical interventions to minors to address "gender dysphoria." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). While acknowledging that trans-identification does not (indeed, cannot) change one's sex, *id.* at 1830 n.2, the Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status," *id.* at 1829-37. The law, the Court explained, easily passed the rational-basis standard because of the "'medical and scientific uncertainty'" surrounding interventions for "gender dysphoria." *Id.* at 1836-37. Further, several justices of the Supreme Court signaled that "transgender status" or "gender identity" is not a category or characteristic warranting heightened scrutiny under the Equal Protection Clause due to the mutability of the concept of "transgender" or "gender identity." *See id.* at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status

*Page 5 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Since on or about the start of the 2024-2025 school year, two Divisions (Alexandria and Arlington) reported to OCR not having received any complaints alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, or other intimate facilities. Fairfax County Public Schools informed OCR that one student filed a lawsuit just before the start of the 2024-2025 school year, which was subsequently joined by three additional students, alleging that Regulation 2603.2 violated their free speech, free exercise, due process, and equal protection rights because it required students to share a restroom with someone who is trans-identifying or, alternatively, use single-use restrooms. According to an Amended Petition for Declaratory, Injunctive, and Additional Relief submitted by the Petitioners to the court and reviewed by OCR, as a result of the Division's regulation, one of the students "avoided using school restrooms and only did so when absolutely necessary." Loudoun County Public Schools asserted that it received two informal complaints about a male student's presence in a female locker room making female students uncomfortable; one complaint from a female student of bullying and harassment in the male locker room; and three complaints related to the female student's presence in the male locker room, making the three complaining male students feel "discomfort, embarrassment, and vulnerability." As to the two informal complaints about a male student in the female locker room, the complaint stated that the male student made sexual jokes, momentarily touched other students, and watched female students changing in the locker room. Lastly, Prince William County Public Schools reported to OCR that it received one complaint of a female student's presence in a male locker room, and a second anonymous complaint that a boy dressed as a girl was in a female locker room, making the complaining student feel uncomfortable.

## II.    Legal Standard

### A.    Title IX prohibits discrimination on the basis of sex.

Title IX of the Education Amendments of 1972 (Title IX) states a general prohibition on sex discrimination in education programs or activities that receive federal funding:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Maintaining sex-separated facilities would thus need only pass rational-basis review under constitutional scrutiny, and schools have a legitimate interest in separating males from females in intimate spaces.

Moreover, *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions. Indeed, the Supreme Court has granted, vacated, and remanded numerous cases, including a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

*Page 6 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

20 U.S.C. § 1681(a).[4] After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX also empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The relevant department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletics, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).

One Title IX regulation states the general prohibition on sex discrimination under Title IX:

(a) General. Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

(b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or

---

[4] Title IX defines "Education institution" as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). And Title IX's implementing regulation defines "program or activity" to include: "[a] department, agency, special purpose district, or other instrumentality of a State or local government"; "[t]he entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"; and "[a] college, university, or other postsecondary institution, or a public system of higher education." 34 C.F.R. § 106.2.

*Page 7 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other treatment;

.    .    .

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31.

Another Title IX regulation provides that recipients of federal funding may have sex-separated bathrooms and locker rooms as long as those facilities are comparable:

> Comparable facilities. A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33.

## B.    Under Title IX, "sex" means biological sex and does not include "gender identity."

Title IX and its implementing regulation use the term "sex." The term "sex" is an objective factor. Title IX and its implementing regulations use the term "sex" to mean biological sex. "Sex" does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex).

What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations … reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and does not include "gender identity." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

*Page 8 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell….

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female" "male" "girl" "woman" "boy" "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[5]

Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. The term "gender identity" is, at best, a subjective factor, "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 145 S. Ct. 1816 (2025). According to some, "gender identity" is "a three-dimensional 'galaxy.'" *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020); *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring). And according to a once blindly followed but now discredited partisan organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *see, e.g.*, Executive Order 14187, *Protecting Children From Chemical and Surgical*

---

[5] https://womenshealth.gov/article/sex-based-definitions (U.S. Department of Health and Human Services).

*Page 9 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

*Mutilation*, 90 Fed. Reg. 8,771, (Jan. 28, 2025) (noting that WPATH "lacks scientific integrity"); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring) ("But recent revelations indicate that WPATH's lodestar is ideology, not science. For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, 'our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" (alteration omitted)); *Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 1849 (WPATH and other "prominent medical professionals … have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). The ACLU even contends that trans-identifying individuals include anyone not matching their sex-stereotype. *See* ACLU, *Transgender People and the Law*, at 19-20 ("transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender").[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth" or really at any period of time. *L.W.*, 83 F.4th at 487; *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Or as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] … but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7]

In short, Title IX is not a statute about "gender identity," but sex discrimination. As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams*, 57 F.4th at 814-15; *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

## C. Title IX's prohibition against sex discrimination does not include discrimination based on "gender identity."

*Bostock v. Clayton County*'s interpretation of Title VII does not defeat this straightforward reading of Title IX's text, context, and history. 590 U.S. 644 (2020). *Bostock* itself made clear that

---

[6]https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services (May 1, 2025), https://opa.hhs.gov/gender-dysphoria-report, at p. 34.

*Page 10 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

it did not "prejudge" the interpretation of other statutes like Title IX and did not "purport to address bathrooms, locker rooms, or anything else of the kind" under the statute it did interpret. 590 U.S. at 681. And for good reason: *Bostock*'s "text-driven reasoning applies only to Title VII," as "many subsequent cases make clear." *L.W.*, 83 F.4th at 484; *accord Tennessee*, 2024 WL 3453880, at *2 ("*Bostock* is a Title VII case."). "As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination" like Title IX. *Id.* (collecting cases). *Bostock* "bears minimal relevance to cases involving a different law and a different factual context," as is the case with Title IX. *Alabama*, 2024 WL 3981994, at *5 (cleaned up). While *Bostock* "involved employment discrimination under Title VII," Title IX "is about schools and children—and the school is not the workplace." *Id.* (cleaned up); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII … is a vastly different statute from Title IX."). And "'Title IX, unlike Title VII, includes express statutory and regulatory carveouts for differentiating between the sexes,'" so "if *Bostock* applied, it 'would swallow the carve-outs,'" "'render them meaningless,'" and absurdly provide more protection for "gender-identity discrimination" than sex discrimination. *Alabama*, 2024 WL 3981994, at *5 (quoting *Adams*, 57 F.4th at 811 & 814 n.7). Thus, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see, e.g.*, *Alabama*, 2024 WL 3981994, at *4-5 (collecting cases concluding the same); *cf. Dep't of Ed. v. Louisiana*, 603 U.S. 866, 867 (2024) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Department of Education's predecessor to create regulations "implementing … [T]itle IX." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including bathrooms and athletics. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

*Page 11 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on bathrooms and athletics. That "highly counterintuitive result" cannot be right. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address "gender-identity discrimination" as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and "gender identity." *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).

Even if *Bostock* were relevant to Title IX's scope, it would not change the Department's reading of Title IX and its implementing regulations. Under *Bostock*, Title IX permits sex separation in bathrooms and locker rooms. Indeed, *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. That is not true here. Unlike in *Bostock*, males and females are not similarly situated when it comes to bathrooms or locker rooms; given their real biological differences, sex is relevant to such decisions. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *Adams*, 57 F.4th at 814-17; *Bostock*, 590 U.S. at 725-28 (Alito, J., dissenting). And as explained below, Title IX not only allows sex-separate bathrooms but requires them.

*Page 12 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

## III.    Analysis

### A.    The Divisions have violated and are still violating Title IX and its implementing regulations.

As explained, Title IX is not a statute about "gender identity" or "gender-identity discrimination" but one about sex discrimination. "Sex" does not mean, and has never meant, "gender identity." Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. By allowing males to invade sensitive female-only spaces like bathrooms (and vice versa), the Divisions intentionally, or with deliberate indifference, endanger students' safety, privacy, and dignity; create a hostile environment for students; and deny them access to educational activities or programs. *See, e.g.*, *Tennessee*, 737 F. Supp. 3d at 561 ("ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities"). The Divisions are thus violating Title IX.

Title IX is consistent with longstanding tradition of sex-separated sensitive facilities like bathrooms. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05; *see, e.g.*, WOMEN'S SPORTS POL'Y WORKING GRP., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes (Jan. 28, 2023), https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

In line with this tradition, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Further recognizing that sex separation is necessary to adhere to Title IX's requirements, one of Title IX's implementation regulation—which has existed since Title IX's enactment—expressly permits a recipient to provide separate toilet, locker room, and shower facilities based on sex. 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignitary interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room. Eliminating sex-separate bathrooms and locker rooms, as the Divisions have here, "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559. And it creates a hostile educational environment that denies students educational opportunities.

Although self-evident, a recently released report finds requiring girls to undress or use the bathroom in the presence of boys, causes distress in girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities. *See* Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N.

*Page 13 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id.*; *see Tennessee*, 737 F. Supp. 3d at 562 ("the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened too"). Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Id.* at 561.

This harm is not hypothetical. The Divisions' policies affect real students. For example, OCR learned that since the start of the 2024-2025 school year, Fairfax County Public Schools was subject to a lawsuit filed on behalf of a student—and later joined by three additional students— alleging that sharing a restroom with students of the opposite sex violated, among other things, the students' equal-protection rights. In that filing, the petitioners alleged that one of the students avoided using school restrooms whenever possible because of the Division's regulation. Loudoun County Public Schools also received five reports from both male and female students about a student of the opposite sex's presence in the locker rooms, resulting in, as one complaint put it, "discomfort, embarrassment, and vulnerability." In two of those complaints, female students alleged that a male student made sexual jokes, momentarily touched other students in an inappropriate manner, and watched female students changing in the locker room. And Prince William County Public Schools reported two complaints about the presence of individuals of the opposite sex in the locker rooms, resulting in students' discomfort.

Students at school have enough to worry about; worrying about whether it is safe to use the bathroom or change in a locker room cannot be one of them. The Divisions' bathroom, locker room, and sex-segregated intimate facilities policies or regulations violate Title IX and its implementing regulations because they permit access to intimate facilities that correspond with a student's "gender identity," which, in turn, requires students to use these intimate facilities in the presence of members of the opposite sex. In so doing, the Divisions are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent. Put differently, the Divisions are creating a hostile education environment that denies students the benefits of an education program or activity based on sex, in violation of Title IX and its implementing regulations.

**B.    The Divisions' reliance on *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), does not shield it from liability under Title IX.**

*Grimm* does not change the Department's conclusion that the Divisions have violated and are violating Title IX. The Supreme Court in *Skrmetti* abrogated *Grimm* and other Fourth Circuit precedents in key respects, showing that a sex-separated bathroom policy is permissible under Title IX and the Equal Protection Clause. Regardless, *Grimm*'s conclusions hinged on certain factual findings that, as the record shows, are debunked. Moreover, many of the Divisions' policies do not limit bathroom access to consistent or persistent assertions of a certain "gender identity" and thus are overbroad.

**1.    *Skrmetti* abrogated *Grimm* in key respects.**

Key aspects of *Grimm* are no longer binding in light of *Skrmetti*. The Supreme Court granted, vacated, and remanded the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which heavily relied on *Grimm*, showing that *Grimm* is out of step with Supreme

*Page 14 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Court precedent. *See Folwell v. Kadel*, No. 24-99, 2025 WL 1787687, at *1 (U.S. June 30, 2025) ("The petition for writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025)."). And *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions, especially given that the Supreme Court granted, vacated, and remanded cases outside the medical-intervention context, including in a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

**First**, *Grimm*'s Title IX ruling hinged on the correctness of its equal-protection analysis, specifically the conclusion that a sex-separated bathroom policy classifies based on sex. *See Grimm*, 972 F.3d at 618 ("*In light of our equal protection discussion above*, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." (emphasis added)). But that analysis has been abrogated by the Supreme Court in *Skrmetti*. *Skrmetti* made clear that the key question is whether the policy "prohibit[s] conduct for one sex that it permits for the other." 145 S. Ct. at 1831. And that is not true for sex-separated bathrooms. Neither sex may use the bathroom of their choosing; both sexes must use the bathroom consistent with his or her sex.

**Second**, in *Grimm*, the Fourth Circuit relied heavily on *Bostock*, which it imported to Title IX with little analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." *Grimm,* 972 F.3d at 616 (cleaned up). But *Bostock* does not apply to Title IX. Even if it did*, Bostock* does not establish that a sex-separated bathroom policy discriminates based on sex in violation of Title IX.

To begin with, the Supreme Court has recently made clear that it has not "considered whether *Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. In so doing, however, the Supreme Court also made clear that *Bostock*'s "'because of' test" derived from Title VII's "because of" language, which "incorporates the traditional but-for causation standard." *Id.* As explained above, *Bostock* simply does not apply outside Title VII and does not apply to Title IX. *See, e.g.*, *Tennessee*, 2024 WL 3453880, at *2; *Alabama*, 2024 WL 3981994, at *4-5; *cf. Louisiana*, 603 U.S. at 867 (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

In any event, the Supreme Court has clarified *Bostock*'s analysis in *Skrmetti*, abrogating *Grimm*. According to *Skrmetti*, *Bostock* concluded that sex is a but-for cause when for similarly situated individuals, the entity "penalize[s] a member of one sex for a trait or action that it tolerates in members of the other." *Skrmetti*, 145 S. Ct. at 1834. That is not true for sex-separated bathrooms because "changing the [applicant's] sex … does not automatically change the operation of" the sex-separated bathroom policy. *See id.* at 1834-35. For example, if a female seeks to choose her own bathroom, a sex-separate bathroom policy prohibits her from doing so—and requires that her bathroom choice reflect biological reality, regardless of whether that reality matches the person's

*Page 15 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

asserted "gender identity." Change that person's sex from "female to male," *id.* at 1834, and the bathroom policy would still prohibit him from choosing his own bathroom—and would still require that his bathroom reflect biological reality, regardless of whether that reality matches the person's "gender identity." Thus, under such a policy, sex is not "the but-for cause" of one's inability to self-select a bathroom based on one's "gender identity." *Id.* A sex-separated bathroom policy does not "intentionally penalize[]" a male "for a trait" that the policy "tolerates" in a female, *id.*, so it does not discriminate based on sex under *Bostock*'s reasoning, as clarified by *Skrmetti.*

**Third,** the Fourth Circuit in *Grimm* alternatively concluded that a sex-separated bathroom policy triggered intermediate scrutiny under the Equal Protection Clause because it thought "transgender status" was a "quasi-suspect class" and that such a policy classifies based on "transgender status." *Grimm*, 972 F.3d at 613. Even if *Skrmetti* has not abrogated this analysis, *see* 145 S. Ct. at 1832-34 (state child-protection law did not classify based on trans-identification), it does not mean that the Divisions' overbroad policies follow Title IX, as explained below. In any event, the Fourth Circuit's conclusion that "trans-identification" is a quasi-suspect class is inconsistent with subsequent Supreme Court dicta. The Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class." *Skrmetti*, 145 S. Ct. at 1832. And rightly so. As three Justices explained in *Skrmetti*, "transgender status" or "gender identity" is not a class that warrants heightened scrutiny. *See id.* at 1855 (Barrett, J., concurring, joined by Thomas, J.) ("The Equal Protection Clause does not demand heightened judicial scrutiny of laws that classify based on transgender status," and, thus, "[r]ational-basis review applies."); *id.* at 1860 (Alito, J., concurring in part and in the judgment) ("[T]ransgender status does not qualify under our precedents as a suspect or 'quasi-suspect' class.").

To start, "transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." *Id.* at 1851 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class."). It is not "definitively ascertainable," let alone "at the moment of birth," as "detransition[ers]" show. *Id.* at 1851 (Barrett, J., concurring) (cleaned up). It is not a "discrete group" because the category of trans-identifying individuals "is large, diverse, and amorphous" and "not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Id.* at 1851-52 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."). And trans-identification, "unlike race and sex, is often not accompanied by visibly identifiable characteristics" because an individual's "'gender identity' is an 'internal sense,'" which does not "necessarily tend to 'carry an obvious badge' of their membership in the class that might serve to exacerbate discrimination." *Id.* at 1866-67. This alone "is enough to demonstrate that transgender status does not define a suspect class." *Id.* at 1853 (Barrett, J., concurring).

But there is more. The group has not, "as a historical matter, been subjected to discrimination." *Id.* (cleaned up). That is because this group has not "suffered a history of *de jure* discrimination." *Id.*; *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("[T]ransgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or 'quasi-suspect.'"). Indeed, "there is no evidence that transgender individuals, like racial minorities and

*Page 16 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

women, have been excluded from participation in the political process." *Id.* at 1866. To the contrary, "despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems." *Id.* This too separately shows "transgender status" does not warrant heightened scrutiny.

Thus, the Divisions' reliance on the Fourth Circuit's opinion in *Grimm* that "transgender status" or "gender identity" is a quasi-suspect class that is subject to heightened scrutiny, is wrong. Indeed, Justice Barrett specifically cited *Grimm* as an example of a lower court erroneously employing "sociological intuitions about a group's relative political power" while failing to rely upon "objective, legally grounded standard[s] that courts can apply consistently." *Id.* at 1855 (Barrett, J., concurring).

***Fourth,*** even if heightened scrutiny applied,[9] a sex-separate bathroom policy would easily satisfy that standard. In *Skrmetti*, the Supreme Court explained that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on *impermissible* stereotypes." 145 S. Ct. at 1832 (emphasis added). Because sex-separate bathrooms are necessary to preserve students' privacy, safety, and dignity, they "do not themselves evince sex-based stereotyping." *Id.*; *see Skrmetti*, 83 F.4th at 486 ("Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping.").

### 2. ***Grimm*** **hinged on certain factual findings that are refuted based on the record in this investigation.**

More fundamentally, *Grimm* is premised on factual findings and conclusions that are clearly distinguished from the facts in this investigation. *Grimm* does not apply to this investigation because the Department has developed a different record than the limited record in *Grimm*, and the "question [in *Grimm* was] limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *See Grimm*, 972 F.3d at 596.

***First,*** per *Grimm*, a female who identifies as a boy is "similarly situated" to a male because a trans-identifying female is somehow a boy. *See Grimm*, 972 F.3d at 610 n.10 ("To avoid a conclusion that Grimm was similarly situated to other boys, the dissent fails to meaningfully reckon with what it means for [Grimm] to be a transgender boy. We have been presented with a strong record documenting the modern medical understanding of what it means to be transgender, and considering that evidence is definitively the role of this Court." (cleaned up)). Indeed, *Grimm*

---

[9] To the extent that *Grimm* is still binding, the Department preserves the right to challenge this precedent. At any rate, the writing on the wall is clear: The Supreme Court recently granted certiorari in two cases that clearly signals that whatever is left of *Grimm*, it will no longer be good law or, at the very least, shows that *Grimm* should be seriously reconsidered. *See W. Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025); *Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S. July 3, 2025). These cases will address whether Title IX or the Equal Protection Clause prevents a State from having sex-separated sports teams. The Supreme Court will also consider, among other things, whether *Bostock* extends to Title IX and whether classification based on "transgender status" is subject to heightened scrutiny. *Grimm*

*Page 17 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

claimed that a sex-separate bathroom policy defining "sex" to mean objective biological facts is based on nothing more than an "invented classification" and "discriminatory notion." *See, e.g.*, *id.* at 618-19.

But *Grimm*'s conclusions are refuted by the facts found in this investigation, which shows Grimm's conclusions are contrary to science and biological reality. *See, e.g.*, *supra* n.3. The Supreme Court in *Skrmetti* recognized that trans-identification does not (indeed, cannot) change one's sex. *See* 145 S. Ct. at 1830 n.2; *see also, e.g.*, *Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (cleaned up)). And as noted above, the President and the Department of Health and Human Services have also recognized that a trans-identifying male is not similarly situated to a female and that biological sex is not invented but based on scientific truth.

In claiming otherwise, the Fourth Circuit heavily relied on WPATH. *See, e.g.*, *Grimm*, 972 F.3d at 595-96 (claiming WPATH "represent[s] the consensus approach of the medical and mental health community" and relying on WPATH). But as explained, WPATH is a discredited, partisan advocacy group. *See, e.g.*, Amicus Brief of Alabama in *United States v. Skrmetti*, No. 23-477 (filed Oct. 15, 2024)[10]; The Cass Review: Independent Review of Gender Identity Services for Children and Young People (Apr. 2024).[11] WPATH's opinions are not based on appropriate evidence but rather the biased motivation to help "social justice lawyers." *Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring) (cleaned up).

*Grimm*'s conclusion also ignores the physical reality of how humans use restrooms. Simply making male and female restrooms available to both sexes based on "gender identity" does not provide the same services to male and female students. As one court noted, "[i]f defendant provided 'identical' men's and women's restrooms … each containing two toilet stalls and seventeen urinals, few would argue that the facilities were functionally comparable notwithstanding their physical similarity. The benefits and services derived by one group would be substantially less than the benefits and services derived by the other*." Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 733 (D. Or. 1997), *supplemented*, 1 F. Supp. 2d 1159 (D. Or. 1998). Or as another court has explained, "[n]ot to be unduly technical, but transgender girls would use individual stalls because female restrooms do not contain urinals. And transgender boys cannot physically use urinals and would, therefore, also use individual stalls." *Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315-DCN, 2023 WL 6690596, at *9 (D. Idaho Oct. 12, 2023), *aff'd*, 131 F.4th 975 (9th Cir. 2025). By ignoring objective biological facts, and instead basing bathroom policies on a subjective factor like "gender identity," the school divisions of Alexandria, Arlington, Fairfax, Loudoun, or Prince William engage in the different treatment of male and female students, in violation of Title IX.

---

[10] https://www.supremecourt.gov/DocketPDF/23/23477/328275/20241015131826340_20 24.10.15%20-%20Ala.%20Amicus%20Br.%20iso%20TN%20FINAL.pdf.
[11] https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.inde pendent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf.

*Page 18 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

In short, common sense and overwhelming evidence establishes that a boy is a boy, and a girl is a girl, regardless if the boy or girl has undergone medical interventions, and that a boy and a girl are not similarly situated when it comes to bathrooms and other intimate facilities.

**Second**, contrary to *Grimm*, the privacy and security concerns of students are not "sheer conjecture and abstraction" but real and serious. *Grimm*, 972 F.3d at 614. There is evidence that "trans-identifying" individuals using bathrooms not in line with their sex has led to privacy, security, and dignitary harms. *Contra Grimm*, 972 F.3d at 614 ("The Board does not present any evidence that a transgender student, let alone Grimm, is likely to be a peeping tom, rather than minding their own business like any other student. Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys' restrooms did not increase when Grimm was banned from those restrooms."). As noted above, students have filed lawsuits or complaints with some of the Divisions, alleging that students have suffered privacy and safety harms from these Divisions' bathroom policies.

The Virginia Attorney General recently released findings in an investigation conducted in March 2025, involving a female student who identified as a male student and was recording male students inside the boys' locker room and restroom in the Loudoun County Public Schools. The report indicates that when the boys expressed their concerns about sharing a locker room with a female student, the school division investigated the boys for voicing those concerns.

In 2021, public reports indicate a male student, who had conveyed to a classmate that he told his mother he was "pansexual," wore his hair in a bun, and would sometimes dress in a skirt and wear fishnet gloves, sexually assaulted a 15-year-old female classmate in a girls' restroom at Stone Bridge High School in Loudoun County Public Schools. That male was later adjudicated guilty of the assault in court. The same male student was then transferred to another school in the same division and sexually assaulted another female student less than six weeks after the first assault. He was adjudicated guilty of that assault as well.[12]

What has been seen in the Divisions has also been seen throughout the country. For example, on April 15, 2025, a high school track student athlete spoke during public comment at the Lucia Mar School District Board of Education in Arroyo Grande, California about the impact the Board's policy of allowing boys who identify as girls to use locker rooms and restrooms designated for girls, had on her. The student recounted how she had recently gone into the women's locker room at school to change for track practice. While she was changing her clothes, a male student was sitting in the locker room watching her and the other female students undress. The young lady stated the experience was traumatizing. She stated the male student had already dressed for track practice at the beginning of the day. The male student had no reason to be in a locker room other than to watch girls undress.

In June 2024, a 16-year-old female student at Stewartville High School in Minnesota expressed her experience having to share restroom and locker room facilities with boys at school,

---

[12] Report Regarding Investigation into Misconduct at Stone Bridge High School and Broad Run High School, December 31. 2021.

*Page 19 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

and the impact it had on her educational opportunities.[13] The young lady reported that she was in the locker room after gym class getting ready to change clothes and she heard a male's voice inside the women's locker room and when she turned to look, she saw a boy in the locker room. She indicated that she talked to her school principal about feeling uncomfortable about changing in the locker room in the presence of a boy, but he told her that students can "be whoever they want to be." She also indicated she is scared about boys pretending to be girls, then touching them or taking cellphone photos of girls in restrooms or locker rooms, and that other girls she knows share her concerns. The mother of two other female students spoke up raising similar concerns. Parents have also spoken out about school district policies allowing teen-age boys to share locker rooms and restrooms with teen-age girls at Rochester Public Schools in Minnesota. One parent indicated she had to move her daughters to another school district because of restroom and locker room policies allowing boys into restrooms and locker rooms designated for girls.[14]

Public reports indicate in March 2023, four 14-year-old freshman girls in the Sun Prairie Area School District in Wisconsin were showering in the girls' locker room when they were exposed to the genitalia of an 18-year-old senior male student who told the girls he was "trans."

There are unfortunately more examples. *See, e.g.*, Declaration of A.C. in *Sexuality and Gender Alliance v. Critchfield*, No. 1:23-cv-00315, Doc. 90-1 ¶¶ 4-7 (D. Idaho July 21, 2025) (girl student detailing how, at her school that allows boys into the girls' bathroom, a male was "masturbating in the adjacent stall" to hers in the girls' bathroom).

***Third***, in *Grimm*, the Court stated "the heart of [the] appeal is whether equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender." 972 F.3d at 593. What is at the heart of this investigation, however, is an issue not considered by the Court in *Grimm*. This investigation is evaluating whether the Divisions are taking action that denies students who are not "transgender" equal access to education benefits and opportunities in programs and activities offered by the Divisions. In *Grimm*, the Court was concerned that Grimm practiced bathroom avoidance resulting in urinary tract infections and felt "unsafe, anxious, and disrespected" because of the Board's policy requiring students to use the restroom that corresponds to their sex. *Id.* at 600. Those same concerns are present for students who are not "transgender" and who are forced to share a restroom or locker room with a member of the opposite sex. The Divisions have an obligation under Title IX to all students in the provision of restrooms and locker rooms, not just students who identify as "transgender."

   3.   **Regardless, many of the Divisions' policies are overbroad, showing that even applying *Grimm*, they violate Title IX.**

Even if *Grimm* were still binding, four of the five school divisions at issue in this investigation (Alexandria, Arlington, Fairfax, and Prince Williams) violate Title IX by not limiting their intimate-facilities policies to students that "consistently and persistently" assert a "gender

---

[13] https://www.dailysignal.com/2024/06/13/really-uncomfortable-16-year-old-girl-speaks-sharing-school-bathrooms-locker-rooms-males/.

[14] https://www.dailysignal.com/2024/06/11/concerned-daughters-safety-13-minnesota-school-districts-issue-transgender-guidelines-allowing-boys-girls-spaces/; https://alphanews.org/infuriating-minnesota-mom-slams-school-districts-radical-transgender-restroom-guidelines/.

*Page 20 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

identity."[15] *Grimm* was crystal clear that its decision was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a binary gender." 972 F.3d at 596 (emphasis added); *accord id.* at 610 ("Grimm, however, did not question his gender identity at all; he knew he was a boy."); *id.* at 619 ("Grimm *consistently and persistently* identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys' restrooms as part of the appropriate treatment." (emphasis added)). In other words, these school divisions allow individuals that do not assert a consistent and persistent "gender identity" to use facilities of the opposite sex. Because Grimm is premised on this limitation, policies without that limitation cannot rely on *Grimm*. Thus, these four school divisions have overbroad policies that are not justified by *Grimm* and violate Title IX.

For these reasons, OCR concludes that *Grimm* does not apply and that, even assuming it does apply, would not change the outcome of this investigation. The Divisions' policies that allow teenage boys to share intimate facilities with teenage girls violate common sense, create unnecessary distress and risk of harm, and deny students the availability of sex-separated locker rooms and bathrooms. These policies result in hostile environments and a denial of the overall benefits of an education program or activity based on sex. The Divisions are thus violating Title IX and its implementing regulations.

## IV.   Conclusion

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the Divisions' compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

---

[15]   *See,*   https://go.boarddocs.com/va/acps/Board.nsf/files/DE62ZL049E89/$file/JB%20-%20Nondiscrimination%20in%20Education.pdf;https://go.boarddocs.com/vsba/arlington/Board.nsf/files/BDNQEE68DE84/$file/J-2%20PIP-2%20Transgender%20Students%20in%20Schools.pdf;https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/CDPTV8792B2E/$file/R2603.pdf;https://go.boarddocs.com/vsba/pwcs/Board.nsf/goto?open&id=C3VP7R61926D.

*Page 21 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

      This letter is accompanied by a draft resolution agreement that specifies the actions that, when taken by the Division, will remedy the violation of Title IX. Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter.

      If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse.

      Sincerely,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2025.07.25 10:21:48 -05'00'

Bradley R. Burke
Regional Director

Enclosure

JA169

# EXHIBIT F

JA170

<u>**RESOLUTION AGREEMENT**</u>
**Fairfax County Public Schools**
**OCR Case Numbers 11-25-1307**

Fairfax County Public Schools (hereinafter referred to as "the Division") agrees to fully implement this Resolution Agreement to resolve the allegations investigated in Office for Civil Rights (OCR) Case Number 11-25-1307. This Agreement does not constitute an admission by the Division of a violation of Title IX of the Education Amendments Act of 1972 (Title IX), or any other law enforced by OCR.

<u>**Action Item 1 – Rescission of Policies, Regulations, and Corresponding Guidance**</u>

The Division will rescind any components of the following regulation pertaining to access to intimate facilities: "Regulation 2603.2 – Gender-expansive and Transgender Students." The Division will also rescind any corresponding guidance documents, trainings, or other related documents pertaining to the components of the aforementioned regulation that apply to intimate facilities.

<u>**Reporting Requirements:**</u>

    a. By_____2025, the Division will provide OCR with documentation demonstrating that Action Item 1 has been fully implemented.

<u>**Action Item 2 – Issue Memorandum to Schools**</u>

The Division will issue a memorandum to each Division school regarding the rescission of the policies and/or regulations outlined in Action Item 1. The memorandum will inform the schools that any future policies related to access to intimate facilities must be consistent with Title IX. The memorandum shall:

    a. Specify that Title IX compliance means a school must not – on the basis of *sex* – exclude *female* students from participation in, deny female students the benefits of, or subject female students to discrimination under, any education program or activity including but not limited to the use of intimate facilities including locker rooms and bathrooms.

    b. Specify that schools must provide intimate facilities such as locker rooms and bathrooms accessible to students strictly separated on the basis of sex and comparably provided to each sex.

The memorandum will further state that the words *sex, female, male, girls, women, boys, men* as used in the memorandum and as applicable in all practices, policies, and procedures adopted and implemented by the Division pursuant to or consistent with Title IX, mean the following:

    *Sex* is a person's immutable biological classification as either male or female.
    *Female* is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova).
    *Male* is a person of the sex characterized by a reproductive system with the biological function of producing sperm.
    *Woman* is an adult human female.

JA171

*Page 2 – Resolution Agreement, Fairfax County Public Schools - 11251307*

> ***Girl*** is a minor human female.
> ***Man*** is an adult human male.
> ***Boy*** is a minor human male.

The memorandum will further state that the above meanings of words are to be understood in the context of the facts that *there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm); and the sex of a human – female or male – is determined genetically at conception (fertilization), observable before birth, and unchangeable.*

The Division will post this memorandum in a prominent location on its website.

**<u>Reporting Requirements:</u>**

a. By _____2025, the Division will submit a copy of the draft memorandum to OCR for OCR's review and approval.

b. Within _____days of receiving OCR's approval, the Division will disseminate the memorandum to the Division schools and provide verification to OCR.

By signing this Agreement, the Division agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. During the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms and obligations of this Agreement.

Upon OCR's acknowledgment of the Division's satisfaction of the commitments made under this Agreement, OCR will close the case.

The Division understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the Division written notice of the alleged breach and 60 calendar days to cure the alleged breach.

The Agreement will become effective immediately upon the signature of the Division's authorized official below.

By: _____    Date: _____
       Name and Title
       Recipient Name

JA172

# EXHIBIT G

JA173

Confidential Treatment Requested

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

July 29, 2025

Bradley Burke
Regional Director
United States Department of Education
Office for Civil Rights

Re:    Case No. 11-25-1305 – Alexandria City Public Schools
       Case No. 11-25-1306 – Arlington Public Schools
       Case No. 11-25-1307 – Fairfax County Public Schools
       Case No. 11-25-1308 – Loudoun County Public Schools
       Case No. 11-25-1309 – Prince William County Public Schools

Dear Mr. Burke,

We are in receipt of the Letter of Findings ("LOF")  and accompanying draft resolution agreements that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the "Divisions") on July 25, 2025.  As explained below, the Divisions respectfully request the opportunity to negotiate with OCR for up to 90 calendar days, as guaranteed by Section 303(f) of the OCR Case Processing Manual ("OCR Manual").

In February, 2025, OCR issued a Notification Letter and a Data Request Letter to the Divisions indicating that a complaint was filed with OCR alleging that the Divisions' policies violated Title IX by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restroom and locker rooms.  The Divisions timely responded to the Data Request Letter and provided both documents and narrative responses in March 2025.

On July 25, OCR issued its LOF and accompanying draft resolution agreements.  The LOF specifically provides:  "Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter.  If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse."

Pursuant to Section 303(f) of the OCR Manual: "From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within which to reach final agreement."  Section 303(h) of the OCR Manual further provides that "when it is clear that agreement will not be reached . . . OCR shall issue an Impasse Letter that informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period."

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HAMBURG   HOUSTON   LONDON   LOS ANGELES
MILAN   MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

Confidential Treatment Requested

Your letter and the 10-day deadline it imposes for a response suggests that OCR believes the parties have reached an impasse, triggering the 10-day notice provision of Section 303(h). The Divisions disagree with that characterization of the status of negotiations, as we have only received OCR's LOF and draft resolution agreements less than two business days ago. The LOF contains a complex legal analysis of recent Supreme Court precedent. The draft resolution agreement demands substantial changes to school division policies and regulations and the redefinition of fundamental terms therein. It is premature to declare negotiations at an "impasse" when we have only just received OCR's LOF and demand for substantial changes to policies and/or regulations. The Divisions have not yet had an opportunity to evaluate, much less respond to those assertions. Accordingly, we believe that the 90-day period provided by Section 303(f) of the Manual applies, as the Divisions intend to engage in their respective good-faith discussions with OCR and attempt to negotiate a resolution agreement.

The Divisions will use the additional time to engage in an evaluation process, including by involving their respective elected school boards as appropriate, in order to respond to OCR's proposed resolution agreement. The policies at issue impact a wide array of stakeholders. Matters of policy as well as resolution of federal investigations often require the involvement of the elected school boards of each Division. As a practical constraint, given the summer recess, some of the Divisions' school boards will not reconvene for several weeks from now and must comply with Virginia public meetings law when scheduling meetings. It is not possible for the school boards to meet, evaluate the OCR LOF and draft resolution agreement, consider stakeholder feedback as appropriate, and make consequential decisions within 10 days.

Moreover, compliance with the proposed resolution agreement is more complex than simply rescinding the policies at issue, as some of the specific Division policies involved in this matter contain components that are not subject to the resolution agreement and will be impacted by the proposed changes. Just as these policies were not enacted within ten days, but rather over the course of an appreciable timeframe that allowed for thoughtful deliberation and consideration, reframing the policies to comply with the proposed resolution agreement cannot be done on the highly abbreviated timeframe provided by the OCR LOF. Ninety days will allow time for the Divisions to discuss and evaluate the LOF and proposed resolution agreements, solicit feedback from relevant invested parties as appropriate, and engage in negotiations with OCR in a good faith effort to resolve the matter.

For these reasons, the Divisions respectfully request that OCR honor the terms of the OCR Manual by providing the Divisions with a minimum of 90 days to negotiate with OCR.

Respectfully,

*/s/* Timothy J. Heaphy
Timothy J. Heaphy
*On behalf of Fairfax County Public Schools and Arlington Public Schools*
Willkie Farr & Gallagher LLP
THeaphy@willkie.com
PH: 202-303-1069

cc:
Michelle C. Reid, Ed.D., Division Superintendent, FCPS
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

JA175

Confidential Treatment Requested

Francisco Duran, Ed.D., Superintendent, APS
Chrissy Smith, Division Counsel, APS


John F. Cafferky
*On behalf of Alexandria City Public Schools and Loudoun County Public Schools*
Blankingship & Keith PC
jcafferky@bklawva.com
jstalnaker@bklawva.com
PH: 703-279-7201
PH: 703-691-1235


cc:
Melanie Kay-Wyatt, Ed.D., Division Superintendent, ACPS
Robert M. Falconi, Division Counsel, ACPS
Aaron Spence, Ed.D., Division Superintendent, LCPS
Wesley Allen, Division Counsel, LCPS


*/s/* Laura Colombell Marshall
Laura Colombell Marshall
Heidi Siegmund
*On behalf of Prince William County Public Schools*
McGuireWoods LLP
LMarshall@mcguirewoods.com
HSiegmund@mcguirewoods.com
PH: 202-857-1700
PH: 804-775-1049


cc:
Dr. LaTanya D. McDade, Superintendent
Wade T. Anderson, Division Counsel

JA176

# EXHIBIT H

JA177

**Hemminger, Lindsay**

| | |
|---|---|
| **From:** | Burke, Bradley <Bradley.Burke@ed.gov> |
| **Sent:** | Thursday, July 31, 2025 2:25 PM |
| **To:** | Heaphy, Timothy; jcafferky@bklawva.com; jstalnaker@bklawva.com; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com |
| **Cc:** | Hemminger, Lindsay; Carroll, Fiona |
| **Subject:** | RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**\*\*\* EXTERNAL EMAIL \*\*\***

Counsel,

I received your letter, dated July 29, 2025.

First, your letter incorrectly asserts that "OCR believes the parties have reached an impasse." We have not reached an impasse because your clients have contacted OCR within 10 days of our Letter of Finding and indicated a willingness to negotiate a resolution agreement in these cases. If your clients are, in fact, serious about coming into compliance with Title IX, we are all ears. But we expect to engage in discussions with dispatch. Every day that goes by without a satisfactory resolution agreement is a day that children in the five Northern Virginian school divisions are at risk of grave harm.

Second, your letter incorrectly asserts that OCR's Case Processing Manual (CPM) requires a 90-day period to engage in a resolution agreement negotiation. As a threshold matter, the CPM neither creates rights, nor is it governed by the Administrative Procedure Act. Relevant here, we refer you to CPM Section 303(g), which states that OCR "may end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached," including "the recipient's refusal to agree to a key resolution term." Given that your clients have indicated a willingness to negotiate in good faith about coming into compliance with Title IX, we have neither ended negotiations, nor reached an impasse.

Nevertheless, OCR's proposed resolution agreement was intentional and specific about its key resolution terms. And we do not intend to allow recipients who are not serious about coming into compliance with Title IX—including acknowledging that Title IX is a statute only about sex discrimination and that the term "sex" in Title IX refers only to biological sex and not gender identity—to drag out discussions unnecessarily. We are, therefore, asking counsel for each recipient to indicate whether or not your client is willing to consider agreeing to the terms in the draft resolution agreement. We are, of course, open to additional terms, but OCR is firm on these key terms. As a result, we expect a response to this specific inquiry no later than August 15, 2025.

Respectfully,
Brad Burke

Bradley R. Burke

U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Wednesday, July 30, 2025 9:24 AM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** Re: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thanks Brad.

_

On July 30, 2025 at 9:56:28 AM EDT, Burke, Bradley <Bradley.Burke@ed.gov> wrote:

> **\*\*\* EXTERNAL EMAIL \*\*\***

Good morning Mr. Heaphy, and all.

Thank you for reaching out.  I'll review your letter and respond shortly.

Respectfully,

Brad Burke

Bradley R. Burke
U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov


**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Tuesday, July 29, 2025 5:28 PM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and
11251309

JA179

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Mr. Burke,

On behalf of the 5 northern Virginia school districts referenced in the above-referenced OCR investigations, please see the attached letter.  We request confidential treatment of this and other communications as the matter proceeds.

Thank you,

Tim Heaphy


**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

**From:** Burke, Bradley <Bradley.Burke@ed.gov>
**Sent:** Friday, July 25, 2025 11:31 AM
**To:** robert.falconi@acps.k12.va.us; jcafferky@bklawva.com; jstalnaker@bklawva.com; christine.smith@apsva.us; Heaphy, Timothy <THeaphy@willkie.com>; jefoster@fcps.edu; Kennedy, Ellen D <edkennedy@fcps.edu>; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Subject:** Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

**\*\*\* EXTERNAL EMAIL \*\*\***

Good morning,

Please see the attached Letter of Findings and draft Resolution Agreements in the above referenced cases.

Respectfully,

Brad Burke

Bradley R. Burke
Regional Director
U.S. Department of Education
Office for Civil Rights

Email: Bradley.Burke@ed.gov



JA180

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

JA181

# EXHIBIT I

**WILLKIE FARR & GALLAGHER** LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

August 15, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via email:  Bradley.Burke@ed.gov

Re: <u>OCR Case No. 11-25-1307 – Fairfax County Public Schools</u>

Dear Mr. Burke,

We write in response to the Letter of Findings (the "LOF") and the accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Fairfax County Public Schools ("FCPS") on July 25, 2025, and your email of July 31, 2025, in which you requested a response no later than August 15.[1]

As explained below, FCPS seeks to ensure its ongoing compliance with Title IX of the Education Amendments of 1972 and its implementing regulations, as well as its compliance with applicable federal court precedent and Virginia state law.  FCPS is willing to consider agreeing to the terms in any Resolution Agreement that comply with this applicable law and ensure that FCPS can continue to safeguard all students from unlawful discrimination.  Accordingly, FCPS cannot agree to the Resolution Agreement as drafted because complete rescission of Regulation 2603.2 "Gender-expansive and Transgender Students" (the "Regulation") would violate Fourth Circuit and Virginia state law.

Contrary to your assertions in the LOF, the U.S. Supreme Court's 2025 decision in *United States v. Skrmetti* did not "abrogate" the Fourth Circuit authority of *Grimm v. Gloucester County School Board* that compels the current FCPS policy, as it involved both facts and law materially different from those involved in *Grimm*.  The U.S. Supreme Court has accepted certiorari in *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025), a case raising the precise legal issue at stake in the instant investigation.  Given the looming guidance from the Court as to whether Title IX restricts or protects access to facilities based on gender identity, FCPS proposes that OCR not refer this matter for enforcement while we continue our discussions regarding a potential Resolution Agreement.

### I.     Procedural History

In February 2025, OCR issued a Notification Letter and a Data Request Letter to FCPS indicating that a complaint was filed with OCR alleging that FCPS's policies violated Title IX by providing

---

[1] This letter is submitted on behalf of Fairfax County Public Schools only and does not bind or represent the position of the other four public school divisions in Northern Virginia listed in the LOF.  While our firm represents both FCPS and Arlington Public Schools in this matter, this letter is submitted solely on behalf of FCPS.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HAMBURG   HOUSTON   LONDON   LOS ANGELES
MILAN   MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

greater rights to students who are transgender than to those who are not with regard to the use of intimate, sex-segregated facilities such as restrooms and locker rooms. FCPS responded promptly to the Data Request Letter and provided both documents and narrative responses in March 2025. On July 25, 2025, OCR issued the LOF and accompanying Resolution Agreement. On July 29, 2025, FCPS responded to OCR with a letter requesting additional time to evaluate the LOF and Resolution Agreement and engage in negotiations with OCR. On July 31, 2025, OCR clarified that the parties have not yet reached an impasse given FCPS's willingness to negotiate in good faith about the Resolution Agreement, and provided FCPS with a deadline of August 15, 2025 to indicate whether FCPS is willing to consider agreeing to the Resolution Agreement's terms.

## II. FCPS's Regulations and Policies Are Compelled by Virginia Law and Binding Authority in the Fourth Circuit

On March 24, 2025, we submitted a letter to Dan Greenspahn of OCR that addressed the issues raised in the Notification Letter. In that letter, we explained that both Virginia law and binding federal precedent compel FCPS to provide access to facilities to students based on their gender identity. More specifically, we cited the Virginia Values Act (the "Values Act"),[2] which "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity . . . in places of public accommodation, including educational institutions."[3] Consistent with the Values Act, the Code of Virginia provides that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."[4] The Regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. Moreover, FCPS received significant Fairfax community input and discussion over the years in support of maintaining Regulation 2603.2.

Regulation 2603.2 is not only consistent with Virginia law, it is consistent with federal precedent which recognizes gender identity as a protected class pursuant to Title IX. As thoroughly described in our March 24, 2025 letter to Mr. Greenspahn, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit explicitly held that Title IX compels local school boards to provide students with access to restroom facilities that correspond to their gender identity. Regulation 2603.2 does that. We will not restate the facts involved in *Grimm* or explain its holding here, beyond noting that it continues to support the Regulation at issue in the instant investigation. Any change in FCPS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

## III. The U.S. Supreme Court Has Not Yet but Will Soon Provide Crucial Clarity and Guidance on the Treatment of Transgender Students Under Title IX

Contrary to OCR's position, the U.S. Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) does not abrogate the Fourth Circuit's decision in *Grimm*. The *Skrmetti* case involved materially distinct facts and did not include a Title IX claim, separating it from the issues considered and resolved by the Fourth Circuit in *Grimm*. *Skrmetti*'s lack of relevance to the issues involved here is emphatically demonstrated by the U.S. Supreme Court's decision to accept certiorari in *W. Virginia State Bd. Of Educ. v. B.P.J.*, a case that will provide crucial clarity on

---

[2] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[3] VA. CODE ANN. § 2.2-3900.
[4] VA. CODE ANN. § 15.2-853.

whether Title IX and the Equal Protection Clause of the Fourteenth Amendment prevent a state from limiting participation on school sports teams to a student's sex assigned at birth.  Until the U.S. Supreme Court issues its ruling in *B.P.J.*, *Grimm* remains binding law in the Fourth Circuit.

      A.    <u>The U.S. Supreme Court's decision in *Skrmetti* does not abrogate *Grimm*, which is binding authority in the Fourth Circuit.</u>

The LOF states that *Grimm* is no longer good law because it was abrogated by the Supreme Court's June 2025 decision in *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025).  The Court in *Skrmetti* considered whether a Tennessee law that prohibits certain medical interventions and procedures for minors with "gender dysphoria" is constitutional under the Equal Protection Clause. In holding that the law is constitutional, the Supreme Court rejected the plaintiff's argument that heightened scrutiny of the Tennessee statute is warranted given that the law relies on sex-based classifications.  *Id*. at 1828–29.  The Court stated that the law *does not* classify on the basis of transgender status because it prohibits healthcare providers from administering puberty blockers or hormones to minors for certain medical uses, regardless of the minor's sex.  *Id*. at 1837. Accordingly, the Court applied rational basis review and found that the Tennessee law is supported by the legislature's policy goal of protecting public health.  *Id.* at 1835–37.

*Skrmetti* differs from *Grimm* in several significant ways.  It resolved the constitutionality of a specific Tennessee law prohibiting the use of certain medical treatments on children absent limited circumstances.  The Court cited authority for the harms potentially done by the treatments prohibited by the Tennessee statute—a much different policy rationale than the facility access issues involved in *Grimm* and the instant investigation.  The Court's consideration of the Tennessee law at issue in *Skrmetti* involved a Constitutional challenge rather than a Title IX claim as that involved in *Grimm*.  The Court's discussion of the standard of review was commensurate with the legal basis for the challenge to the Tennessee law—the Equal Protection Clause.  While several justices went beyond the Court's holding to observe that "gender identity" should not be viewed as a suspect class, the dicta in those concurrences is potentially inconsistent with the Court's holding in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in which the Supreme Court held that employment actions based on sexual preference and gender identity constitute discrimination "on the basis of sex" under Title VII of the Civil Rights Act.  In sum, *Skrmetti* is both factually and legally distinguishable from *Grimm* and does not diminish the Fourth Circuit's dispositive holding in that case.[5]

      B.    <u>*Grimm*'s continued viability is illustrated by the U.S. Supreme Court's grant of certiorari in *B.P.J.*, which will provide clarity and guidance on Title IX protection for transgender individuals.</u>

OCR's assertion that *Grimm* has been "abrogated" by *Skrmetti* is flatly inconsistent with the fact that the U.S. Supreme Court has agreed to hear a case that squarely raises the issue at stake in this

---

[5] The continued viability of *Grimm* has been recognized by the Fourth Circuit in a recent Order granting a preliminary injunction in the case of *John Doe et al. v. State of South Carolina*, 2:24-cv-06420-RMG.  The plaintiffs in the *Doe* case moved to enjoin the enforcement of a South Carolina statute which requires schools to restrict restroom use to students' gender assigned at birth.  In asking the Court of Appeals to grant an injunction, the plaintiffs asserted that *Skrmetti* does not abrogate *Grimm*, given the different factual context and legal bases for that decision.  On August 12, 2025, the Court of Appeals agreed, granting the preliminary injunction motion and indicating that "an opinion explaining the Court's action will follow."

matter—whether "gender identity" is a protected class under Title IX. As indicated above, the U.S. Supreme Court recently granted certiorari in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth. 98 F.4th 542, 550 (4th Cir.). Had the extent of legal protection based on "gender identity" been resolved by *Skrmetti* as the LOF suggests, the U.S. Supreme Court would not have been forced to resolve those issues in *B.P.J.* Contrary to OCR's position, the U.S. Supreme Court's decision to accept review in *B.P.J.* demonstrates that the circuit split on the important issues of transgender access under Title IX remains, necessitating Court resolution. If OCR's expansive view of *Skrmetti* were correct, *B.P.J.* would not be docketed for the upcoming U.S. Supreme Court term. Just yesterday, another federal court struck down attempts by the U.S. Department of Education to rush decisions on matters that warrant additional discussion and deliberation. *See* ECF No. 83, *American Federation of Teachers et al. v. U.S. Department of Education et al.*, No. 25-cv-00628-SAG (D. Md. Aug. 14, 2025).

When it hears the *B.P.J.* case next term, the Court will decide whether Title IX and the Equal Protection Clause prevent a state from limiting participation on school sports teams to students based on biological sex. *B.P.J.* raises the precise issues that underlie the FCPS policies at stake in the current investigation. Until this dispositive issue is answered by the U.S. Supreme Court, *Grimm* remains controlling in the Fourth Circuit and mandates the FCPS policy at issue.

IV.    **The Instant Investigation Should Be Paused Until the U.S. Supreme Court Answers the Central Legal Issue That Controls the Regulation at Stake**

When the U.S. Supreme Court decides *B.P.J.*, it will answer the critical question of whether Title IX requires educational institutions to separate student resources by biological sex. Unless and until the U.S. Supreme Court places further restrictions on the reach of Title IX to exclude transgender students, *Grimm* is the governing law in the Fourth Circuit and any suggestions that *Grimm* will be overruled are mere speculation.

Should FCPS comply with the actions outlined in the LOF and Resolution Agreement, the district risks litigation based on a failure to follow governing Fourth Circuit law. Transgender students and their families would have a cognizable claim that a policy limiting their access to facilities that correspond to their gender at birth violates Title IX, as defined by *Grimm* and Virginia law. The Resolution Agreement offered by OCR presents great litigation risk, as it would effectively require FCPS to violate binding Fourth Circuit precedent.

As indicated above and in prior correspondence, FCPS is committed to strict compliance with Title IX and will follow the law when implementing policies. FCPS is also committed to the protection of all students against discrimination of any kind, which informs all Division policies. The specific contours of legal compliance with respect to transgender student access to facilities will soon be made clear when the U.S. Supreme Court decides *B.P.J.* That case will be argued in the fall of 2025 and likely result in an opinion sometime in the first half of 2026. While that case is pending, *Grimm* remains good law and binds FCPS and its policies.

In light of this dilemma, FCPS requests that OCR clarify the Resolution Agreement in light of the U.S. Supreme Court granting certiorari in *B.P.J.* Should the Court in that case find that gender identity is not protected by Title IX, *Grimm* will indeed be abrogated, necessitating a change in policy by FCPS. If, however, the U.S. Supreme Court follows *Bostock* and extends to Title IX the protection for gender identity it recognized under Title VII, *Grimm* (and the Regulation) will be

upheld.  FCPS will follow that clear precedent.  Accordingly, we respectfully request that OCR not refer this matter for enforcement action while we continue our discussions in this matter.

Thank you in advance for your consideration.  If you have questions or would like to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS

# EXHIBIT J

**WILLKIE FARR & GALLAGHER** LLP

1875 K Street, N.W.
Washington, DC
20006-1238

August 18, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via email: Bradley.Burke@ed.gov

Dear Mr. Burke,

On August 15, 2025, we submitted a letter setting forth our response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Fairfax County Public Schools ("FCPS") on July 25, 2025. We write today to provide additional authority for our position– an opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, No. 25-1787, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit.

The *Doe* case cited above involves a challenge to a South Carolina statute that seeks to enforce a rule identical to that contained in the Resolution Agreement you have demanded our client enter with OCR – a restriction on restroom access to students according to their gender assigned at birth. Doe, a 9th grader in Berkeley County, South Carolina public school, challenges that law and moved for a preliminary injunction against its enforcement. On August 12, 2025, the day before Doe began his 9th grade year, the Court of Appeals granted that preliminary injunction. The practical effect of that injunction is to invalidate the South Carolina statute at issue in the litigation, allowing Doe to access restrooms in his public school consistent with his gender identity.

On Friday, August 15, 2025, the Court of Appeals issued a lengthy Amended Order ("Order") explaining its rationale for granting Doe's motion for a preliminary injunction. The Order, which we have attached to this letter as an Exhibit, flatly states "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." Order at 17. Applying the legal standard for a preliminary injunction, the Court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the Court's ruling in *Grimm*, invalidating an identical restriction on restroom access. Order at 16-17. The Court also found that Doe had demonstrated irreparable harm, observing that "state action infringing on constitutional rights generally constitutes irreparable harm." Order at 17. The Court finally found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm* – a prior binding decision of this Court" was clearly in the public interest. Order at 18.

Two concurrences in the Order reinforce the Court's holding. Judge Diaz specifically rebutted the state's argument that you have made in the instant case – that *Skrmetti* abrogated *Grimm*. Judge Diaz observed that "[t]he Court's decision in United States v. *Skrmetti* . . . has little to say about the issues Grimm addressed." Order at 21. He noted that the ban on gender affirming care upheld

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA189

127241224.1

in *Skrmetti* differs significantly from the restroom access policy at issue in *Grimm* and did not involve a Title IX claim. Order at 21-22. Accordingly, Judge Diaz concluded that "*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of Grimm's Title IX holding." Order at 22.

Perhaps more significant is Judge Agee's concurrence in *Doe*. Judge Agee dissented in *Grimm* and continues to assert that the decision was wrongly decided. Nonetheless, he concurred in the Court's Order granting the injunction because he recognizes that *Grimm* remains binding authority in the Fourth Circuit. He rejected South Carolina's arguments that the law is "unsettled" and that *Grimm* is factually distinguishable from Doe, writing:

> none of this matters for purposes of deciding the issue presented by Doe's motion for an injunction pending appeal. *Grimm* binds all judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. **The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal**.

Order at 29 (emphasis added).

*Doe* reinforces our position that *Grimm* remains viable post-*Skrmetti* and requires FCPS to continue to facilitate restroom access for students consistent with their gender identity. The South Carolina statute at issue in *Doe* attempts to do exactly what the proposed Resolution Agreement in the instant matter would require – limit restroom access to students' gender assigned at birth. The Fourth Circuit has invalidated that South Carolina law and rejected the position taken by OCR in the instant investigation. Even Judge Agee, who shares your position on the scope of Title IX and its application to the issue of facility access, agrees that *Grimm* controls, entitling Doe to injunctive relief and access to restrooms that correspond to his gender identity. If FCPS agreed to the terms in the Resolution Agreement, we would be acting in direct contradiction to *Doe* and *Grimm*, which we simply cannot agree to do.

Any attempt to enforce OCR's demand that the current policy be changed will result in litigation in which FCPS, like Doe, will ask the Court to enjoin any enforcement activity. In such litigation, we will cite the clear authority that compels the current restroom access policy. The Department of Justice will be limited to the same arguments rejected first in *Grimm* and reaffirmed last week in *Doe* – essentially asking the Court to disregard binding precedent recognized even by the dissenting judge in *Grimm*. While we expect that any litigation in which we seek to enforce these rights will be readily successful given the authority presented herein and in prior correspondence, it would be costly, disruptive, and create great uncertainty among thousands of FCPS students and families. Accordingly, we ask again that OCR not refer this matter for enforcement action and rather pause this investigation as the Supreme Court considers these important issues in its upcoming term.

Thank you in advance for your consideration. If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

JA190

127241224.1

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Michelle C. Reid, Ed.D., Division Superintendent
John Foster, Division Counsel, FCPS

JA191

# EXHIBIT K

JA192

THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 19, 2025

Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
Sent via email to superintendent@fcps.edu

Re: High Risk Designation and Specific Conditions on Grants

Dear Superintendent Reid,

This letter is to inform you that the U.S. Department of Education (Department) has designated Fairfax County Public School District as a "high-risk" entity, under all of the programs administered by the Department for which your division receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10, for the reasons discussed below. This follows the Department's July 25, 2025, Title IX noncompliance findings and proposed resolution agreement. On August 15, 2025, your division refused to sign the resolution agreement sent to you by the Office for Civil Rights (OCR) and remains in noncompliance with Title IX.

In this letter, we delineate the nature of our concerns with your division's administration of these grants; the reasons the information provided to the Department up to now by your division does not address these concerns; our determination to designate your division as a Department-wide "high-risk" entity; and the specific conditions we are imposing on all grants your division is receiving from the Department.

BACKGROUND

As you are aware, the U.S. Department of Education generously granted an extension for your school division (your division) and four other school divisions in Virginia to come into compliance with Title IX of the Educational Amendments of 1972 (Title IX), and related requirements. Unfortunately, the additional time did not result in a successful outcome in compliance with federal law.

On August 15, 2025, your division stated it does not intend to make the necessary policy changes to come into compliance with Title IX.

It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal

Page 2

activity. Therefore, the Department is designating your division as a Department-wide "high-risk" entity and placing specific conditions on your division's use of funds in all grants it receives from the Department.

The Department's prior communications with your division identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated. Thus, the Department is concerned with your division's inability to administer and/or manage Department grants properly with appropriate controls in place. These concerns are with all grants your division currently receives, administers, or manages.

In addition, the Department is identifying all the State-administered funds your division receives as a subgrantee from the Virginia Department of Education and any other State division, including under Title I of the Elementary and Secondary Education Act of 1965, as amended, and the Individuals with Disabilities Education Act. The Department expects to urge those entities to take similar actions to those being taken by the Department with regard to those funds. Representatives of the Virginia Department of Education have already agreed to take those steps.

Due to the sizable amount of Federal grant funds that are provided to your division, and concerns discussed in this letter, the Department will place all of your division's grants on reimbursement payment status until your division demonstrates to the Department's satisfaction that the following High-Risk Specific Conditions, specified below, are fully met, and that proper measures to address the problems noted in this letter are taken and are working well for a sustained period of time.

I.    YOUR DIVISION's DESIGNATION AS "HIGH-RISK"

Given these serious and deeply systemic concerns, the Department is taking immediate action to help safeguard public funds with regard to your division's activities with the Department's grants in accordance with statutory and regulatory requirements and the terms of approved grant applications, and with grants for which your division is a primary grantee or subgrantee.

The Department is designating your division as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.10. As part of this "high-risk" designation, we are imposing High-Risk Specific Conditions (noted below) on all of your division's grants. In making this determination and designation, the Department has taken into consideration several factors (some of which are mentioned above), which include, but are not limited to:

- the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;
- the improper organizational management and operations that led to the problems discussed above;

JA194

Page 3

and
- concerns regarding your division's lack of proper controls.

II.     HIGH RISK SPECIFIC CONDITIONS

Your division's grants and subgrants from the Department are being placed on a reimbursement method of payment. Under this specific condition, your division will, when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by your division with non-Federal funds.

In addition, within 30 days of the date of this letter:

1.  Your division must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps your division will take to ensure that grant funds will be spent in accordance with all appliable laws (this could include committing to implementing the resolution agreement sent to your division on July 25, 2025, with OCR's findings);

2.  Your division must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative). If deemed necessary, the Department may require additional actions to be included in the plan.

The objectives of these specific conditions are to ensure that your division establishes the policies, procedures, and personnel in place to manage its grants and subgrants properly, including adherence to all pertinent federal civil rights laws that apply to your division's grants and subgrants. The Department may impose additional or modified specific conditions at any time through a subsequent letter. If your division is unable to satisfactorily address these concerns, the Department will consider additional enforcement actions, including the possible termination of all or some of the Department's grants, and may require the recovery of funds.

III.    REMOVAL OF REIMBURSEMENT, HIGH-RISK CONDITIONS AND HIGH-RISK DESIGNATION

The reimbursement specific condition will remain in place until the Department has (1) determined that your division has put into place adequate corrective actions, which could include actions laid out in the OCR proposed resolution agreement, and (2) concluded that the corrective actions have been working appropriately for a period of time that reasonably demonstrates assurance of effective compliance.

JA195

Page 4

IV.      REQUEST FOR RECONSIDERATION

Consistent with 2 C.F.R. § 200.208(d)(5), your division may request reconsideration of its designation as "high-risk", and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of this letter. Any request for reconsideration must be submitted via e-mail to Lindsey Burke of the Department, at lindsey.burke@ed.gov. In a request for a reconsideration, you should include appropriate supporting documentation.

The Department remains committed to working with your division to help with the positive resolution of these concerns. Lindsey Burke is available to answer any questions on the High-Risk Specific Conditions, as well as to help facilitate any necessary support or assistance regarding the status of your grants or subgrants from the Department.

Sincerely yours,

Linda E. McMahon

CC: Emily Anne Gullickson, Virginia State Superintendent

JA196

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, )<br><br>*Plaintiff,* )<br><br>v. )<br><br>LINDA McMAHON, in her official capacity )<br>as Secretary of Education of the United )<br>States, and the UNITED STATES )<br>DEPARTMENT OF EDUCATION, )<br><br>*Defendants.* ) | Civil Action No. 25-cv-01432 |

## DECLARATION OF LEIGH BURDEN

I, Leigh Burden, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Leigh Burden, and I am Chief Financial Officer of Fairfax County Public Schools ("FCPS"). Unless otherwise indicated, I have personal knowledge of the matters set forth herein and would be competent to testify to those matters if called upon to do so.

2.      For fiscal year 2026, FCPS expects to receive $160,591,512 in federal funding from various government agencies, including the Department of Education ("DOE"), which supports 667.6 positions, majority of which are school-based and in direct support of students.

3.      FCPS receives most of this federal aid by submitting grant applications to the relevant government agencies. Once the agency reviews and approves the application and awards the grant, the money becomes available and may be accounted for in FCPS's annual budget. All of FCPS' grant applications required compliance with the Elementary and Secondary Education Act ("ESEA") and General Education Provisions Act ("GEPA"). FCPS believes we are in

compliance with the law and none of the applications required FCPS to comply with DOE's interpretation of Title IX to receive funding.

      4.     Almost all of the funds that FCPS receives from federal agencies are provided on a reimbursement basis.  Once FCPS's grant application is approved, FCPS submits for reimbursement on a yearly, monthly, bi-monthly basis or pursuant to a particular schedule.  On average, FCPS receives approximately $17 million in reimbursements from federal agencies each month, much of which comes from DOE.

      5.     In fiscal year 2026, FCPS expects to receive the following in federal funds from DOE:

        a.    $40,531,682 in Individuals with Disabilities Education Act ("IDEA") aid, which funds special education and related services as FCPS is required to provide by law. This funding is passed through the Virginia Department of Education ("VDOE") to FCPS. FCPS is reimbursed on a monthly basis.

        b.    $35,446,615 in Title I Part A aid, which provides financial assistance to local educational agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

        c.    $4,536,536 in Title III aid, which supports ELLs and immigrant students in the United States to become proficient in English and meet state academic standards. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

d. $3,302,657 in Title II Part A aid, which provides funding to increase student achievement consistent with the challenging state academic standards, improve the quality and effectiveness of teachers, principals, and other school leaders, increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement in schools, and provide low-income and minority students greater access to effective teachers, principals, and other school leaders. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

e. $3,297,944 in Federal Impact Aid, which provides assistance local school districts that educate federally connected children and have lost a portion of their local tax base because of federal ownership of property. This funding comes directly from the federal government and is received in December, April, and May.

f. $2,870,120 in Title IV – Part A aid, which provides financial assistance to local educational agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

g. $2,022,877 in Perkins aid, which is a federal grant program designed to provide funding to schools to improve and expand their career and technical education ("CTE") programs, often by supporting equipment purchases, teacher training, work-based learning opportunities, and career guidance programs. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

JA199

h.  $2,004,090 in ACE Adult English for Speakers of Other Languages ("ESOL") aid, which supports adult education and literacy programs with the goal of helping adults gain the skills they need to be productive citizens, family members, and workers. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a quarterly basis.

i.  $914,844 in IDEA Preschool aid, which allows infants and toddlers with disabilities and their families to receive early intervention services under IDEA. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

j.  $750,000 in Federal Impact Aid for Children with Disabilities – Disabled Students, which provides assistance local school districts that educate federally connected children with disabilities and have lost a portion of their local tax base because of federal ownership of property. This funding comes directly from the federal government. FCPS is reimbursed once a year.

k.  $204,678 in Corrections Education and Other Institutionalized Individuals Program aid, which requires regional providers to offer correctional education instruction that conforms to the federal purpose and allowable activities of this funding opportunity to support educational services for criminal offenders in correctional institutions and for other institutionalized individuals. This funding is passed through VDOE to FCPS. FCPS is reimbursed on a quarterly basis.

l.  $100,000 in ACE English Literacy and Civics Education Program aid, that enables adult English Language Learners ("ELL") increase their proficiency in reaching, writing, and comprehension skills in English and mathematics in order to understand and navigate American systems of government, individual freedom, and

JA200

responsibilities of citizenship. This funding is passed through VDOE to FCPS.
FCPS is reimbursed on a quarterly basis.

m. $37,630 in Federal Special Education Hearing Appeal aid, which helps offset the
costs associated with special education due process hearings which are guaranteed
by federal and state law and are used to resolve disagreements between parents and
FCPS over issues related to special education services. This funding is passed
through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

n. $150,000 in McKinney-Vento aid, which provides support for students
experiencing homelessness. This aid supports case management/navigation
assistance for newcomers to the U.S who are also experiencing homelessness and
funds basic needs assistance, tutoring support, school supplies, housing stipends,
and transportation and funds professional development for staff members and
central registration staff to assist students who are experiencing homelessness. This
funding is passed through VDOE to FCPS. FCPS is reimbursed on a monthly basis.

o. $25,000 in interpreter training program aid. This funding is passed through VDOE
to FCPS. FCPS is reimbursed on October 30, 2025.

6. In fiscal year 2026, FCPS expects to receive the following funding from other
government agencies, which are passed through VDOE:

a. $52,896,720 in National School Lunch aid from the U.S. Department of Agriculture
("USDA"), which provides funding to school divisions to assist with providing
nutritionally balanced meals to students each day including salaries and benefits of
FCPS staff who work in food services, funds food and drink purchases and

materials and supplies, and ensures FCPS can provide free or reduced-priced meals to its low-income students.  FCPS is reimbursed on a monthly basis.

b.   $3,303,983 in Medicaid funding from the U.S. Department of Health and Human Services ("HHS"), which reimburses FCPS for partial costs associated with providing medical services to children enrolled in Medicaid or Virginia's Family Access to Medical Insurance Security Plan.  FCPS is reimbursed on a monthly basis as well as quarterly.

c.   $1,501,721 in USDA Summer Reimbursement aid, which provides breakfast and lunch reimbursements related to the Summer Food Service Program.  FCPS is reimbursed in July, September or October and May or June.

d.   $6,132,630 in USDA Commodities aid, which is an annual entitlement payment for participating in the USDA Commodity Letters of Credit/Cash Program.  FCPS is reimbursed on a monthly basis.

e.   $561,785 in Child and Adult Care Food Program ("CACFP"), which provides reimbursements for nutritious meals and snacks to eligible children who are participating in afterschool care programs and enrolled in day care facilities. CACFP contributes to the wellness, healthy growth, and development of young children and adults in the United States.  FCPS is reimbursed on a monthly basis.

7.     FCPS has never received any warnings from the federal government or VDOE indicating that it has mismanaged its funding such that it should be on notice that a federal agency may designate FCPS as a "high-risk" entity.

8.     FCPS employs a grant management team, an outreach and compliance team, a financial accounting and reporting team, and an independent Office of Auditor General.

a. FCPS' Grants Management team is comprised of 2.5 positions and identifies and communicates grant opportunities, assists with writing grant proposals, manages the application process to ensure granting agencies' deadlines and requirements are met, writes and obtains letters of support, develops creative partnerships with other organizations to obtain grants, and submits proposals on behalf of the division. In addition, once a grant is awarded a unique code is created in the financial system that segregates programmatic budget and expenditures associated with the grant award. Budget adjustments are monitored and must go through the program team, and a centralized budget analyst for processes ensuring proper checks and balances are in place.

b. FCPS' Office of the Auditor General independently determines whether the ongoing processes for controlling fiscal and administrative operations throughout FCPS are adequately designed, functioning in an effective manner, and fully accountable to its citizens. The office is comprised of 8.0 positions and is responsible for conducting audits and management advisory services and evaluating FCPS activities, programs, and services.

c. FCPS' financial account and reporting team coordinates the annual independent audit which culminates in the publication of the Annual Comprehensive Financial Report. Additionally, this team is responsible for preparing federal and state-mandated financial reports, developing division wide financial policies and procedures to protect FCPS' assets, ensuring reliable financial data; and meeting statutory responsibility for the conduct of financial operations.

JA203

    d. FCPS' outreach and compliance team monitor internal controls throughout FCPS, strives to reduce non-compliance by identifying and assessing internal control deficiencies, and develops, upholds, and ensures compliance with division wide financial policies and procedures. The core principles include efficient review of policies and guidelines, communication of standards, internal monitoring and analysis of business areas, follow-up, and education. The financial accounting and reporting and outreach and compliance team consists of 14.7 positions that support these functions. In addition, FCPS staff within the comptrollers, budget, and procurement offices are trained to ensure compliance with federal law and proper tracking, monitoring, and payments for grants.

9.    Over the past 3 years, which is the federal requirement for records retention, FCPS has never received a negative audit. FCPS follows The Single Audit Act, which is an audit of non-Federal entity's financial statements and of its expenditures of Federal awards, conducted in accordance with Generally Accepted Government Auditing Standards ("GAGAS") and is a requirement of the Uniform Guidance. FCPS has received a clean opinion on the annual external single audits for the past decade.

10.    In addition, FCPS has received the Association of School Business Officials International ("ASBO") Meritorious Budget award for over 10 years, the Government Finance Officers Association of the United States and Canada ("GFOA") Best Practices in School Budgeting award for FY 2025. For the past 30 years FCPS has also received the GFOA Certificate of Achievement for Excellence in Financial Report and the GFOA Award for Outstanding Achievement in Popular Annual Financial Reporting, a prestigious national award recognizing conformance with the highest standards for preparation of state and local government popular

reports, and the ASBO Certificate of Excellence in Financial Reporting for transparency and quality information in preparation of issuance of the school systems annual financial reports.

11.    Most recently, on August 13, 2025, FCPS received a notification from VDOE that FCPS will not require onsite monitoring or targeted technical assistance, specific to IDEA fiscal responsibilities due to the divisions level of fiscal risk.  In addition, August 18, 2025, FCPS was informed that, after conducting monitoring, VDOE found that FCPS's Title II, Part A program and activities met the requirements under the Elementary and Secondary Education Act of 1965.

12.    An FCPS program manager reports that when they logged on to the G5 reimbursement system associated with a federal grant that FCPS receives from DOE, he/she could not submit for reimbursement and is awaiting further instruction from the DOE program team.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 2, 2025

/s/ Leigh Burden
Leigh Burden

JA205

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|                                                                 |     |                              |
|-----------------------------------------------------------------|-----|------------------------------|
| FAIRFAX COUNTY SCHOOL BOARD,                                    | )   |                              |
|                                                                 | )   |                              |
| *Plaintiff*,                                                    | )   |                              |
|                                                                 | )   |                              |
| v.                                                              | )   |                              |
|                                                                 | )   |                              |
| LINDA McMAHON, in her official capacity                         | )   | Civil Action No. 25-cv-01432 |
| as Secretary of Education of the United                         | )   |                              |
| States, and the UNITED STATES                                   | )   |                              |
| DEPARTMENT OF EDUCATION,                                        | )   |                              |
|                                                                 | )   |                              |
| *Defendants.*                                                   | )   |                              |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd day of September, 2025, I electronically filed a true and

correct copy of **DECLARATION OF LEIGH BURDEN** with the Clerk of Court using the

CM/ECF system.  A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon

/s/ *Timothy Heaphy*
_____

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

# DEX 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, <br><br> Plaintiff, <br><br> v. <br><br> LINDA McMAHON, in her official capacity as Secretary of Education of the United States, and the UNITED STATES DEPARTMENT OF EDUCATION, <br><br> Defendants. | Civil Action No. 1:25-cv-01432 |

### DECLARATION OF MURRAY BESSETTE

1. My name is Murray Bessette. I make this Declaration based on my own personal knowledge, on information contained in the records of the U.S. Department of Education ("Department"), and/or on information provided to me by Department employees. I make this declaration in opposition to the temporary restraining order and preliminary injunction sought by the Plaintiff in this matter.

2. I am currently employed as Acting Assistant Secretary for the Department's Office of Planning, Evaluation, and Policy Development ("OPEPD") headquartered in Washington, D.C. I began my service at the Department on February 24, 2025. OPEPD advises the Secretary of Education ("Secretary") on policy development, implementation, and review, including grant policies.

3. Under the General Education Provisions Act (GEPA), section 423 (20 U.S.C. § 1226a-1) the Secretary may determine the method of payment, including reimbursement, under a grant program. Under the Uniform Guidance applicable to federal agencies including the Department, the Department may adjust specific conditions imposed on grant recipients, and specific conditions may include requiring payments as reimbursements rather than advance payments (2 C.F.R. § 200.208). Under regulation applicable to the Department, 2 C.F.R. § 3474.10, the Secretary may designate specific conditions as "high-risk conditions" and may designate a non-Federal entity subject to specific conditions as "high-risk."

4. Plaintiff incorrectly asserts that by designating Plaintiff as "high-risk" and imposing the specific condition of a reimbursement method of payment, the Department has "effectively blocked access" to Plaintiff's federal funding. High-risk designation and a reimbursement method of payment do not freeze or cut off an entity's access to federal funds. Rather, those

designations allow the Department to account for identified risks and potential risks and appropriately monitor the grantee to mitigate those risks.

5.  Prior to terminating federal financial assistance should the Department find a violation of Title IX, the Department would follow the administrative process set forth in 2 C.F.R. § 200.339 or 34 C.F.R. § 100.8; with respect to Plaintiff, the process to which OCR is bound for enforcement of its findings of violation of federal civil rights law is still on-going, and termination of federal financial assistance would not occur until that process had concluded.

6.  Discretionary grants made directly to the Plaintiff by the Department are now, as a result of the challenged designations, placed on reimbursement method of payment. However, as to Department formula funds, each State may choose the method of payment for distributing those funds to their local educational agencies (LEAs) (e.g., school districts or divisions). Virginia had chosen as a matter of policy (prior to the challenged designations by the Department) a reimbursement method of payment for all of its LEAs; thus, Plaintiff already receives its federal formula grant funds under a reimbursement method of payment.

7.  The "High-Risk Letter" (ECF No. 3, Exh. K) from the Secretary to the Plaintiff, does not effectuate or indicate any imminent freeze, "block," or termination of Plaintiff's federal funds. That letter described to Plaintiff how Plaintiff might seek reconsideration of the high-risk status and specific condition determinations; however, Plaintiff has not submitted any such request for reconsideration to the Department. As to districts that have submitted requests for reconsideration, the Department is undertaking individualized reconsideration based on each district's submission.


***


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 2nd day of September, 2025.


_____
Murray Bessette

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 1:25-cv-1432 (RDA/LRV) |
| | ) |
| LINDA McMAHON, Secretary of the | ) |
| Department of Education, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' NOTICE REGARDING FACTUAL BACKGROUND

Defendants respectfully submit this notice to correct a factual representation in their Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 19) and address a matter discussed on the record during today's hearing on Plaintiff's motion for emergency relief.

Defendants previously asserted that Plaintiff had not requested reconsideration in response to the Department of Education's ("ED") August 19, 2025 letter notifying Plaintiff of its high-risk designation and of the specific conditions ED was imposing on grants Plaintiff received from ED. *See* ECF No. 19 at 8.  At the time its brief was filed, ED did not have knowledge that reconsideration had been filed.  After Plaintiff's representations during argument today, ED conducted further investigation of the matter and discovered that on August 26, 2025, Plaintiff submitted a request for reconsideration via e-mail.  It appears ED did not have knowledge that such request was submitted because the e-mail was caught by a spam filter.  Plaintiff did not attach the request for reconsideration to their Complaint or Motion, and Defendants likewise do not believe it is necessary to put in the record now beyond clarifying its existence.

JA210

Notwithstanding this factual clarification, Plaintiff's request for reconsideration does not change the thrust of Defendants' arguments, including specifically that Plaintiff failed to exhaust administrative remedies.  Plaintiff filed suit and requested a temporary restraining order only three days after submitting its reconsideration request and represented at the hearing that it did not believe it needed to wait for a response before filing suit.  Defendants remain willing to consider the reconsideration request, but believe that if Plaintiff seeks for this to be resolved at the agency level – as its request for reconsideration suggests – that this action should be dismissed or stayed until such time as such reconsideration process concludes.

[*Signature page follows.*]

JA211

Dated: September 3, 2025                Respectfully submitted,

                                        ERIK S. SIEBERT
                                        United States Attorney

                              By:       _____/s/_____
                                        MATTHEW J. MEZGER
                                        Assistant United States Attorney
                                        Office of the United States Attorney
                                        2100 Jamieson Avenue
                                        Alexandria, Virginia 22314
                                        Tel:    (703) 299-3741
                                        Fax:    (703) 299-3983
                                        Email: matthew.mezger@usdoj.gov

                                        CHAD MIZELLE
                                        Acting Associate Attorney General

                                        ABHISHEK KAMBLI
                                        Deputy Associate Attorney General

                                        BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        DIANE KELLEHER
                                        Director
                                        Civil Division, Federal Programs Branch

                                        GARRY D. HARTLIEB
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, DC 20005
                                        Tel: (202) 305-0568
                                        E-mail:  Garry.Hartlieb2@usdoj.gov

                                        *Counsel for Defendants*

JA212

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FAIRFAX COUNTY SCHOOL BOARD,<br><br>  Plaintiff,<br><br>  v.<br><br>LINDA MCMAHON, *et al.*,<br><br>  Defendants. | Civil Action No. 1:25-cv-1432 (RDA/LRV) |
| ARLINGTON SCHOOL BOARD,<br><br>  Plaintiff,<br><br>  v.<br><br>LINDA MCMAHON, *et al.*,<br><br>  Defendants. | Civil Action No. 1:25-cv-1434 (RDA/LRV) |

**<u>ORDER</u>**

  This matter comes before the Court in the above-captioned actions on Plaintiff Fairfax County

School Board's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order,

Civil Action No. 1:25-cv-1432 ("*FCSB*"), Dkt. 2, Plaintiff Arlington School Board's Emergency

Motion for Preliminary Injunction and/or Temporary Restraining Order, Civil Action No. 1:25-cv-

1434 ("*ASB*"), Dkt. 2, (collectively, the "Motions"), and the respective Complaints, *FCSB*, Dkt. 1;

*ASB*, Dkt. 1.[1]  Considering the Complaints, the Motions, Plaintiffs' Memoranda in Support, *FCSB*,

---

[1] In the Complaints, Plaintiffs noted the similar nature of the above-captioned actions and Motions and requested that the actions be consolidated.  *FCSB*, Dkt. 1 at 1 n.2; *ASB*, Dkt. 1 at 1 n.2.  Defendants have consented to this consolidation.  Accordingly, for good cause shown and by the express agreement of the parties to the litigation, the Court exercises its discretion pursuant to Federal Rule of Civil Procedure 42(a)(2) to consolidate these actions and will address the Motions together.

JA213

Dkt. 3; *ASB*, Dkt. 3, Plaintiffs' Declarations, *FCSB*, Dkt. 16; *ASB*, Dkt. 17, Defendants'[2] Oppositions, *FCSB*, Dkt. 19; *ASB*, Dkt. 19, the parties' arguments at the hearing held by the Court on September 3, 2025, Defendants' Notices Regarding Factual Background, *FCSB*, Dkt. 26; *ASB*, Dkt. 25, and Plaintiffs' Replies, *FCSB*, Dkt. 27; *ASB*, Dkt. 26, the Court DENIES Plaintiffs' Motions and DISMISSES the Complaints for lack of subject matter jurisdiction because, pursuant to the Tucker Act, jurisdiction appropriately lies with the Court of Federal Claims for the reasons that follow.

## I. BACKGROUND

This case arises out of Defendant United States Department of Education's (the "Department") August 19, 2025 placement of Fairfax County Public Schools ("FCPS") and Arlington Public Schools ("APS") "on high-risk status[] with the result that all Department funds . . . will be done by reimbursement only." *FCSB*, Dkt. 1 ¶ 1; *ASB*, Dkt. 1 ¶ 1. According to Plaintiffs, to support this "high-risk status," "Defendants assert that [FCPS and APS] violate[] Title IX by maintaining a policy that permits students to access restrooms and locker rooms . . . that align with their gender identity." *FCSB*, Dkt. 1 ¶ 2; *ASB*, Dkt. 1 ¶ 2.

 On Friday, August 29, 2025, Plaintiffs, who operate, maintain, and supervise FCPS and APS, filed suit in this Court, alleging six claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(B), and the Declaratory Judgment Act, 28 U.S.C. § 2201. *FCSB*, Dkt. 1; *ASB*, Dkt. 1. At the same time, Plaintiffs also filed Emergency Motions for Preliminary Injunctions and/or Temporary Restraining Orders. *FCSB*, Dkt. 2; *ASB*, Dkt. 2. Both cases were assigned to this judge at approximately 4:30 p.m. on Friday, August 29, 2025, and the Court, despite the intervening national Labor Day Holiday, promptly set a hearing on the Motions for the following Wednesday, September 3, at 9:00 a.m. given the emergency nature of the Motions.

---

[2] Defendants are Linda McMahon, in her official capacity as Secretary of Education of the United States, and the United States Department of Education.

On Tuesday, September 2, at approximately 4:30 p.m., Defendants filed Notices indicating that, due to the Labor Day weekend, necessary federal personnel were unavailable and that Oppositions to the Motions would be forthcoming. *FCSB*, Dkt. 15; *ASB*, Dkt. 16. That same day, Plaintiffs filed Declarations in support of the Motions. *FCSB*, Dkt. 16; *ASB*, Dkt. 17. At approximately 11:30 p.m. on the same day, Defendants filed their Oppositions. *FCSB*, Dkt. 19; *ASB*, Dkt. 19.

On Wednesday, September 3, at 9:00 a.m., the Court held the hearing on the Motions, the parties presented argument, and the Court took the matter under advisement. *FCSB*, Dkt. 22; *ASB*, Dkt. 21. Later that day, at approximately 5:00 p.m., Defendants filed a Notice to correct a factual inaccuracy asserted in their Oppositions and at the hearing.[3] *FCSB*, Dkt. 26; *ASB*, Dkt. 25.

On Thursday, September 4, at approximately 12:00 p.m., Plaintiffs filed Replies in support of their Motions. *FCSB*, Dkt. 27; *ASB*, Dkt. 26.

## II. LEGAL STANDARD

In their Motions, Plaintiffs seek preliminary injunctions or temporary restraining orders—each "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request "involv[es] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). To be eligible for a preliminary injunction or temporary restraining order, Plaintiffs must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22. As particularly relevant to the Court's analysis here, the requirement for showing a clear likelihood of success on the merits "is far stricter than a requirement

---

[3] During the hearing, Defendants had asserted that Plaintiffs had failed to file a request for reconsideration. After the hearing, Defendants reported that they discovered that Plaintiffs' request for the Department's reconsideration had been "caught by a spam filter." *FCSB*, Dkt. 26 at 1; *ASB*, Dkt. 25 at 1.

3

JA215

that the [moving party] demonstrate only a grave or serious question for litigation." *Sarsour*, 245 F. Supp. 3d at 729 (cleaned up). Fundamentally, as is the case with any action filed in a federal district court, a federal court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (internal citation omitted).

III. ANALYSIS

The parties' briefing and oral argument raised a number of legal issues. In their Motions, Plaintiffs address the merits of their requests for injunctive relief and rely primarily on the Fourth Circuit's precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). This Court unconditionally recognizes that *Grimm* "remains the law of this Circuit" and thus binds both this Court and parties within the Fourth Circuit. *Doe v. South Carolina*, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025). In their Oppositions, however, Defendants raise the threshold question of this Court's subject matter jurisdiction. Under controlling Supreme Court and Fourth Circuit precedent, this Court lacks subject matter jurisdiction. Thus, this Court "may not rule on the merits" of the questions raised by Plaintiffs. *Sinochem Int'l*, 549 U.S. at 430.

**A.    Whether the Court Has Jurisdiction to Provide the Relief Requested in the Motions**

Earlier this year, in *Department of Education v. California*, the Supreme Court of the United States granted a stay of a federal district court order[4] which had (1) enjoined the Department from terminating various education-related grants and (2) required the Department to pay out past-due grant obligations and continue paying obligations as they accrued. 145 S. Ct. 966, 968 (2025). In so doing, the Supreme Court held that the Department was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA" because "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or

---

[4] The order was styled as a temporary restraining order; however, the Court construed the order as an appealable preliminary injunction. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025).

4

impliedly forbids the relief which is sought.'" *Id.* (quoting 5 U.S.C. § 702). While the Supreme Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)), "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the district court ordered." *Id.* Rather, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

Despite the recency of the *California* decision, the Fourth Circuit has already applied *California* in other cases. In *Sustainability Institute v. Trump*, the Fourth Circuit granted a stay of a district court order requiring the Government "to restore [the plaintiffs'] access to grant funds immediately" and prohibiting the Government from "freezing, terminating or otherwise interfering with the funding of [the grants] . . . without written authorization from the Court." 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (quoting *Sustainability Inst. v. Trump*, 2025 WL 1486979, at *4, *10 (D.S.C. May 20, 2025)). Following the Supreme Court's specific direction in *California*, the Fourth Circuit held that the Government was likely to succeed in showing that the district court lacked subject matter jurisdiction over the plaintiffs' claims. *Id.* The Fourth Circuit noted that, "like the grants in *California*, the grants [in *Sustainability*] were awarded by federal executive agencies to specific grantees from a generalized fund . . . and it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Id.* at *2. While the district court had relied on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), in exercising jurisdiction, the Fourth Circuit rejected this approach, noting that "the Supreme Court distinguished *Bowen* in *California*, highlighting the meaningful difference between the relief in that case and an order 'to enforce a contractual obligation to pay money' along the lines of what the district court entered." *Id.* And the Fourth Circuit held that it was "unlikely that [the plaintiffs'] ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended [the plaintiffs'] grants, would provide a detour around

the Tucker Act." *Id.* (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to . . . implied statutory limitations," and "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001))); *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43-44 (1991); *Widakuswara v. Lake*, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025) (staying injunction in a similar case raising APA claims and "mandamus, impoundment, Presentment Clause, Appropriations Clause, Spending Clause, Take Care Clause, Separation-of-Powers, and *ultra vires* claims")).[5]

Just two weeks ago, on August 21, 2025, in *National Institutes of Health v. American Public Health Association*, the Supreme Court stayed a district court's order vacating the Government's termination of various research grants pursuant to *California* but denied the application for a stay as to the district court's order vacating various related internal guidance documents describing the National Institutes of Health's ("NIH") new priorities as arbitrary and capricious and unlawful in violation of the APA. 2025 WL 2415669, *1 (U.S. August 21, 2025). The Supreme Court divided 4-1-4, and Justice Amy Coney Barrett provided the critical, and what may ultimately be the decisive, analytical perspective for assisting lower courts in their efforts to navigate an ever-evolving federal jurisprudence. *Id.* In her concurrence, Justice Barrett emphasized that, in the case before the Supreme Court, both the district court and court of appeals had treated NIH's termination of grants and its issuance of guidance as distinct agency actions. *Id.* at *2 (Barrett, J., concurring). Relying on this fact, Justice Barrett found that just because "the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.*

---

[5] The Fourth Circuit has also cited *California* as support for staying other district court injunctions. *See Maryland v. U.S. Dep't of Agric.*, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (staying injunction related to the Department's termination of grants awarded for teachers).

at *2. Justice Barrett also emphasized the lack of a causal connection between the two actions, noting that vacating the agency guidance did not reinstate the terminated grants. *Id.*; *see also id.* at *3 (noting that she was "not sure" that the challenges to the guidance and the grant terminations arise from substantially the same operative facts).

Turning to the instant case, in their Motions, Plaintiffs request that this Court "preliminarily enjoin and/or temporarily restrain Defendants, including their officers, employees, agents, attorneys, and any person working in concert or participation with any Defendant or under any Defendant's supervision, direction or control, from designating [FCPS/APS] as 'high-risk' and requiring that [FCPS/APS] receive federal funds by reimbursement." *FCSB*, Dkt. 2 at 1-2; *ASB*, Dkt. 2 at 1-2. Because the relief that Plaintiffs seek ultimately requires this Court "to order the payment of money," this Court lacks subject matter jurisdiction under controlling Supreme Court and Fourth Circuit precedent as discussed *supra*. *See California*, 145 S. Ct. at 968 (holding a district court likely lacked jurisdiction to enjoin the Department from terminating grants); *Sustainability*, 2025 WL 1587100, at *1 (holding a district court likely lacked jurisdiction to require the Government to restore access to grant funds immediately and prohibit the Government from freezing, terminating, or otherwise interfering with the funding of the grants without court authorization); *NIH*, 2025 WL 2415669, *1 (holding a district court likely lacked jurisdiction to vacate the Government's termination of grants).

Because this Court is bound by controlling authority, Plaintiffs' arguments to the contrary are unavailing. As a preliminary matter, Plaintiffs focus on the argument that they did not explicitly request "money damages," and thus cannot be subject to the Tucker Act. This argument cannot endure as it is not only contrary to the Supreme Court's recent decisions in *California* and *NIH* and the Fourth Circuit's admonition in *Sustainability* but also is contrary to an established line of authority from the Fourth Circuit and other courts holding that plaintiffs may not artfully plead around Tucker Act jurisdiction. *See Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("This is because plaintiffs can bypass Tucker Act jurisdiction by converting complaints which

7

JA219

'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions. Because this forum shopping circumvents a primary purpose of the Act— to ensure that a central body adjudicates most claims against the United States Treasury, we have stated that 'jurisdiction under the Tucker Act cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief.'" (internal citations omitted)); *see also Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 474 (4th Cir. 1983) ("Although the [plaintiff's] amended complaint phrases its request for money as a request for equitable relief, Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms."). Thus, even if Plaintiffs had avoided pleading an explicit request for money damages (which they did not, as their Complaints seek to compel Defendants to "immediately pay"), their avoidance of those words would not overcome the direct connection that their Motions and Complaints draw between the relief sought here and the disbursement of federal funds. This connection compels the Court to find that, under the Tucker Act, jurisdiction is lacking here.

Moreover, Plaintiffs' reliance on 20 U.S.C. § 1683 is unavailing.[6] That provision states that, "[i]n the case of action, ***not otherwise subject to judicial review***, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5 . . . ." 20 U.S.C. § 1683 (emphasis added). But here the action is subject to judicial review in the Court of Federal Claims. *California*, 145 S. Ct. at 968 ("[T]he Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" (quoting 28 U.S.C. § 1491(a)(1))). Accordingly, that provision does not apply here.

---

[6] Plaintiffs made a singular reference to 20 U.S.C. § 1683 in their Memoranda in Support of their Motions. *FCSB*, Dkt. 3 at 16; *ASB*, Dkt. 3 at 16. It was not until their Reply Briefs that Plaintiffs devoted any analysis to Section 1683. *FCSB*, Dkt. 27 at 6; *ASB*, Dkt. 26 at 6. Thus, Defendants did not have an opportunity to respond.

Plaintiffs also attempt to place their claims within the realm of those that Justice Barrett found distinguishable in *NIH*, arguing that the Court of Federal Claims is unable to afford them relief given that they "seek[] prospective equitable relief demanding . . . that Defendants comply with Title IX's procedural requirements." *FCSB*, Dkt. 27 at 9; *ASB*, Dkt. 26 at 9.  But, respectfully, that is not relief that Plaintiffs seek in their Motions or Complaints, and Plaintiffs do not identify any count or relief sought that relates to Title IX's procedural requirements.

Moreover, in Justice Barrett's concurrence, she explained that "vacating the guidance" at issue there "does not reinstate the terminated grants" and that such claims, although perhaps topically related, were "legally distinct." *NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring); *see also id.* at *3 (noting that she was "not sure" that the challenges to the guidance and the grant terminations arise from substantially the same operative facts).  Although Plaintiffs here have exercised a degree of ingenuity, it is Plaintiffs who have blurred the line in this case and expressly linked their claims to the disbursement of money.  Indeed, the Motions specifically condition the need for "immediate action" justifying injunctive relief on "the federal funds that Defendants have effectively frozen." *FCSB*, Dkt. 3 at 16; *APS*, Dkt. 3 at 16; *see also FCSB*, Dkt. 1 at 28 ¶ (j); *ASB*, Dkt. 1 at 27 ¶ (j).  Plaintiffs' proposed orders in support of injunctive relief refer to no specific count, no specific claim, and seek, as a singular relief, to enjoin Defendants "from designating [FCPS/APS] as 'high-risk' and requiring that [FCPS/APS] receive federal funds by reimbursement." *FCSB*, Dkt. 2-1 at 2; *ASB*, Dkt. 2-1 at 2. Indeed, throughout their briefing, almost every time Plaintiffs mention the "high-risk" designation, it is in conjunction with the effect that this determination has had or will have on the disbursement of federal funds.  Moreover, despite the discussion at the September 3, 2025 hearing and the Court's questions regarding how the Tucker Act applies to specific counts, Plaintiffs continue to refer broadly to the Complaints in their entirety.   Thus, the Court is left without a principled basis on which it could carve out any particular count from the overarching reinstatement-of-grants framework and craft a non-

causally or legally related relief. Again, this compels the conclusion that this Court lacks subject matter jurisdiction.

Finally, with respect to the recently issued case *President & Fellows of Harvard College v. United States Department of Justice*, No. 25-cv-11048, Dkt. 238 (D. Mass. Sept. 3, 2025) ("*Harvard*") (addressing allegations relating to antisemitism and the First Amendment),[7] this Court agrees with the very contemplative statement of U.S. District Judge Allison D. Burroughs opining that the boundary between the APA and the Tucker Act remains, at least somewhat, "elusive" given the procedural posture of the cases in which these lines are being drawn. *See id.* at 24. But, to be sure, based on the record before the Court, the relief sought, and more importantly the Fourth Circuit law binding this Court (which are not precedents binding the District of Massachusetts), this Court finds that the case here falls on the other side of the line. *See Sustainability*, 2025 WL 1587100, at *2 (holding it was "unlikely that [the plaintiffs'] ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended [the plaintiffs'] grants, would provide a detour around the Tucker Act"). And, in the *Harvard* case, Judge Burroughs specifically held that, "[r]egardless of how these claims are resolved, the government will not necessarily be obligated to disburse any additional funds . . . ." *Id.* at 31. Again, Plaintiffs here provide this Court with no sustainable basis on which to make a similar finding, especially when the very first paragraph of the Complaints alleges that Defendants' placement of FCPS and APS on high-risk status had "the result that" federal funding would be done by reimbursement only, where the emergency nature of the relief sought is premised on "freezing federal funds," and where Plaintiffs specifically seek immediate payment of federal funds in their Complaints. *FCSB*, Dkt. 1 ¶ 1 ("On August 19, 2025, the Department of Education . . . issued a press release announcing that it was 'placing . . . [FCPS] . . . in Northern Virginia on high-risk status' with

---

[7] The *Harvard* decision was issued on September 3, 2025, the same day that this Court held argument in these cases. Thus, the parties did not have an opportunity to raise this decision at oral argument, and it has only been discussed in Plaintiffs' Reply Briefs.

the result that 'all Department funds including formula funding, discretionary grants, and impact aid grants' will be 'done by reimbursement only.'"); *ASB*, Dkt. 1 ¶ 1 (same for APS); *FCSB*, Dkt. 1 at 28 ¶ (j) (asking this Court to "[r]equire that Defendants immediately pay to FCBS . . . funds"); *ASB*, Dkt. 1 at 27 ¶ (j) (same for ASB); *FCSB*, Dkt. 3 at 16 ("Because the federal funds that Defendants have effectively frozen are essential . . . , immediate action is needed."); *ASB*, Dkt. 3 at 16 (same). Accordingly, this Court lacks jurisdiction, and Plaintiffs' Motions will be denied.

B.     **Whether the Complaints Will Be Dismissed for Lack of Subject Matter Jurisdiction**

The lack of subject matter jurisdiction to provide the relief requested in the Motions also compels the Court to examine the Complaints. As noted *supra*, at oral argument, the Court asked questions of all parties to determine whether any of the specific counts alleged here should be treated differently from one another—no party argued they should. Accordingly, the Court, like the parties, will address the Complaint as a whole.[8]

For much the same reason that the Court lacks subject matter jurisdiction over the Motions, the Court also lacks subject matter jurisdiction over the Complaints. The Court notes that almost every count in the Complaint contains specific references to grants, funds, or reimbursements. *See, e.g.*, *FCSB*, Dkt. 1 ¶¶ 66 ("constructive termination or refusal to continue federal funds owed to FCPS"), 69 ("Defendants' actions constructively terminating or refusing to continue funds owed to FCPS"), 88 ("Defendants have nonetheless conditioned FCPS's receipt of federal funds . . . ."), 89 ("conditioning the Department funding"), 97 ("FCPS receives federal education funds under several federal statutes . . . . These funds are critical to FCPS's ability to provide state and federally mandated education-related services . . . ."), 99 ("Defendants are conditioning essential federal funding . . . ."), 101 ("[t]his

---

[8] Judge Burroughs found in the *Harvard* case that "splitting [those] claims between two forums [was] procedurally unworkable." No. 25-cv-11048, Dkt. 238, at 29. Here, too, Plaintiffs' claims are inextricably intertwined and must "rise [and] fall together" unlike the guidance and terminations in *NIH*. *Id.* Thus, Plaintiffs' claims, which ultimately and fundamentally seek immediate disbursement of funds, fall within the Tucker Act and the instruction and precedents of the Supreme Court and Fourth Circuit.

11

JA223

funding threat"), 107 ("Defendants have no authority . . . to demand FCPS rescind Regulation 2603.2 . . . in order for FCPS to receive federal funding."), 108 ("FCSB is entitled to a declaration that Defendants acted *ultra vires* by demanding that FCSB rescind its policy in order for FCPS to receive federal funding."), 112 ("FCSB and Defendant have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" where the issue requiring immediacy is the disbursement of funds); *ASB*, Dkt. 1 ¶¶ 66, 69, 88, 89, 97, 99, 101, 107, 108, 112 (same allegations by ASB).  As noted above, the Complaints also specifically seek to have Defendants "immediately pay" Plaintiffs funds.  *FCSB*, Dkt. 1 at 28 ¶ (j); *ASB*, Dkt. 1 at 27 ¶ (j).  Thus, under binding Supreme Court and Fourth Circuit precedent, because Plaintiffs base their Complaints around requests "to order the payment of money," this Court lacks subject matter jurisdiction over the actions.  *See California*, 145 S. Ct. at 968 (holding a district court likely lacked jurisdiction to enjoin the Department from terminating grants); *Sustainability*, 2025 WL 1587100, at *1 (holding a district court likely lacked jurisdiction to require the Government to restore access to grant funds immediately and prohibit the Government from freezing, terminating, or otherwise interfering with the funding of the grants without court authorization); *NIH*, 2025 WL 2415669, *1 (holding a district court likely lacked jurisdiction to vacate the Government's termination of grants).  Accordingly, the Complaints will be dismissed.

*    *    *

Accordingly, for the foregoing reasons, it is hereby ORDERED that Plaintiffs' Emergency Motions for Preliminary Injunction and/or Temporary Restraining Order (*FCSB*, Dkt. 2; *ASB*, Dkt. 2) are **DENIED**; and it is

FURTHER ORDERED that the Complaints (*FCSB*, Dkt. 1; *ASB*, Dkt. 1) are **DISMISSED WITHOUT PREJUDICE**; and it is

12

JA224

FURTHER ORDERED that the Motion for Leave to File Brief of *Amicus Curiae* (*FCSB*, Dkt. 17) is **DENIED**.[9]

The Clerk of the Court is directed to provide copies of this Order to all counsel of record and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
September 5, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge

---

[9] A federal district court has "broad discretion in deciding whether to allow a non-party to participate as *amicus curiae*." *F.E.R.C. v. Powhatan Energy Fund, LLC*, 2017 WL 11682615, at *1 (E.D. Va. Mar. 15, 2017). Further, a court should only grant leave to file an *amicus curiae* brief if the court "deems the proffered information timely and useful." *Id.* Counsel for both the Plaintiffs and the Government have zealously, professionally, and most competently assisted the Court in reaching its decision. Here, while the Court appreciates the time and energy exercised by the *amicus* in support of its perspective, the proffered *amicus* brief does not aid the Court in analyzing the issues presented to it. Accordingly, the Court exercises its discretion to deny the motion.

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 1:25-cv-01432 (RDA/LRV) |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF FAIRFAX COUNTY SCHOOL BOARD'S NOTICE OF APPEAL**

Plaintiff Fairfax County School Board appeals to the United States Court of Appeals for the Fourth Circuit from the Court's order (Dkt. No. 28) denying Plaintiff's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. No. 2) and dismissing Plaintiff's Complaint (Dkt. No. 1) issued on September 5, 2025.

JA226

Dated:  September 9, 2025                    Respectfully submitted,


                                            /s/ *Timothy Heaphy*
                                            _____

                                            Timothy Heaphy
                                            WILLKIE FARR & GALLAGHER LLP
                                            1875 K Street Northwest
                                            Washington, District of Columbia 20006-1238
                                            Tel:  (202) 303-1000
                                            theaphy@willkie.com
                                            Virginia State Bar I.D. Number:  68912


                                            Joshua Mitchell (admitted *pro hac vice*)
                                            WILLKIE FARR & GALLAGHER LLP
                                            1875 K Street Northwest
                                            Washington, District of Columbia 20006-1238
                                            Tel:  (202) 303-1000
                                            jmitchell@willkie.com
                                            District of Columbia Bar I.D. Number:  1012854


                                            Breanna Smith-Bonsu (admitted *pro hac vice*)
                                            WILLKIE FARR & GALLAGHER LLP
                                            300 North LaSalle Drive
                                            Chicago, Illinois 60654-3406
                                            Tel:  (312) 728-9000
                                            bsmith-bonsu@willkie.com
                                            Illinois State Bar I.D. Number:  6330468


                                            *Attorneys for Fairfax County School Board*

JA227

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| FAIRFAX COUNTY SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No. 1:25-cv-01432 |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2025, I electronically filed a true and

correct copy of the foregoing memorandum and accompanying documents with the Clerk of Court

using the CM/ECF system.  A copy of the foregoing will be sent to the following parties:


Matthew J. Mezger
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Matthew.mezger@usdoj.gov

Abhishek Kambli
United States Department of Justice
950 Pennsylvania Avenue Northwest
Washington, D.C. 20530-0001
(202) 445-5496
Abhishek.kambli@usdoj.gov

Garry D. Hartlieb
United States Attorney's Office – Norfolk
101 West Main Street
Suite 8000
Norfolk, Virginia 23510
(757) 441-6331 Garry.hartlieb@usdoj.gov

*Counsel for the U.S. Department of*
*Education and Secretary Of Education*
*Linda McMahon*

JA228

/s/ *Timothy Heaphy*

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

Joshua Mitchell (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
jmitchell@willkie.com
District of Columbia Bar I.D. Number:  1012854

Breanna Smith-Bonsu (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312) 728-9000
bsmith-bonsu@willkie.com
Illinois State Bar I.D. Number:  6330468

*Attorneys for Fairfax County School Board*

JA229

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | Civil Action No. _____ |
| as Secretary of Education of the United | ) | |
| States; the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | | |

## COMPLAINT

Plaintiff, Arlington School Board ("ASB"),[1] through its undersigned attorneys, brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (the "APA") and the Declaratory Judgment Act, 28 U.S.C. § 2201, and alleges for its complaint as follows:[2]

## **INTRODUCTION**

1.      On August 19, 2025, the Department of Education (the "Department") issued a press release announcing that it was "placing . . . [APS] . . . in Northern Virginia on high-risk status" with the result that "all Department funds including formula funding, discretionary grants, and impact aid grants" will be "done by reimbursement only."[3]

---

[1] Plaintiff Arlington School Board operates, maintains, and supervises Arlington Public Schools ("APS").

[2] Fairfax County School Board ("FCSB") has filed against Defendants a similar action and motion for immediate issuance of an order for a temporary restraining order and preliminary injunction. Given the similar nature of the action and motions, ASB and FCSB request that the two actions and motions be consolidated.

[3] *See* Ex. A, Office of Comm'cns & Outreach, "U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX," U.S. DEP'T OF EDUC. (Aug. 19, 2025), https://tinyurl.com/26kzwz3y.

2.      The Department sought to justify this decision by a bare, and incorrect, assertion that APS (and four other Northern Virginia school districts) have been "in violation of Title IX of the Education Amendments of 1972."[4]   Defendants assert that APS violates Title IX by maintaining a policy that permits students to access restrooms and locker rooms ("facilities") that align with their gender identity.

3.      Later on August 19, 2025, Defendant McMahon sent a letter to APS notifying it of this change in status and asserting that it encouraged the Virginia Department of Education ("VDOE") to similarly withhold federal funds passed through state funding mechanisms to APS. Ex. B.

4.      Defendants' action came a mere two business days after the U.S. Court of Appeals for the Fourth Circuit reaffirmed that its interpretation of Title IX in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), remains the law in Northern Virginia as well as the rest of the Circuit.  In *Grimm*, the Fourth Circuit held that both the Equal Protection Clause and Title IX compel local school boards to provide students with access to facilities that correspond with their gender identity.  As Fourth Circuit panel precedent, *Grimm* binds APS.

5.      Defendants' placement of APS on "high-risk status" and conditioning its federal funding is a final agency action subject to APA review.  Defendants' action cannot withstand that review, because it is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. Accordingly, this Court must hold unlawful and set aside Defendants' action.  5 U.S.C. § 706.

6.      The Court should separately declare that APS's policy does not violate Title IX because *Grimm* is controlling law in the Fourth Circuit.

---

[4] *Id*.

JA231

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–06; the Declaratory Judgment Act, 28 U.S.C. § 2201; and Title IX.

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants Department of Education and Secretary McMahon are a United States agency and an officer of the United States sued in her official capacity.  ASB is a public body operating in the Eastern District of Virginia.  APS is a local government agency operating in the Eastern District of Virginia.  A substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within this District.

## PARTIES

9.      Plaintiff ASB operates, maintains, and supervises APS.

10.     APS is a school district within the Commonwealth of Virginia.  APS is the independent branch of the Arlington County government that administers public schools in Arlington, Virginia.

11.     Defendant the Department is an executive department of the United States.  It is headquartered in Washington, D.C.

12.     Defendant Linda McMahon is the United States Secretary of Education and is sued solely in that capacity.  As Secretary of Education, Defendant McMahon is head of the DOE.

## FACTUAL ALLEGATIONS

**I.      Title IX bars discrimination on the basis of sex.**

13.     This matter involves a dispute over the scope of Title IX of the Higher Education Amendments of 1972, Pub. L. No. 92-318, which provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

14.     Nothing in the text of Title IX prohibits schools from allowing transgender students from accessing school facilities that align with their gender identity. To the contrary, several U.S. Courts of Appeals—including the Fourth Circuit—have held that Title IX *requires* schools to *allow* such access.

15.     To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of [20 U.S.C. § 1681] . . . by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682.

16.     Congress expressly declared that any action by the department or agency "terminating or refusing to grant or to continue financial assistance" is subject to judicial review under the APA, that "any State" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion." 20 U.S.C. § 1683.

17.     In a letter sent to APS on August 19, 2025, the Department has made clear that APS will not receive reimbursement unless it accedes to Defendants' interpretation of Title IX, which is not consistent with the interpretation that binds APS (and this Court). Accordingly, the Department's order placing APS on "reimbursement-only" status while APS complies with the Fourth Circuit's binding interpretation of Title IX constitutes in fact a refusal to continue federal financial assistance within the meaning of 20 U.S.C. §§ 1682 and 1683.

**II.     The Department's regulations echo Title IX's requirements.**

18.     The Department's regulations implementing Title IX are codified at 34 C.F.R. Part 106.

JA233

19.     The Department's regulations require covered entities to "provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.  They do not expressly address a student's ability to access facilities that align with their gender identity.

20.     The Department's regulations adopt and apply the procedures for enforcing Title VI of the Civil Rights Act of 1964 to its Title IX regulations.  34 C.F.R. § 106.81 (adopting and applying 34 C.F.R. §§ 100.6–100.11).

21.     These regulations require that the Department "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part." 34 C.F.R. § 100.6(a).

22.     If noncompliance is found, and it cannot be corrected by informal means, compliance "may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."  34 C.F.R. § 100.8(a); *see also* 28 C.F.R. § 42.108.

23.     Pursuant to the Department's procedures:

> [n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part; and (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

JA234

34 C.F.R. § 100.8(c).

> 24.     The Department's procedures also provide:
>
>> Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.

34 C.F.R. § 100.8(c).

### III.    The Fourth Circuit follows other Circuit Courts of Appeals in concluding that Title IX protects transgender individuals' access to facilities that correspond with their gender identity.

25.     Defendants' action to suspend federal funds allocated to APS has no legal basis, as it relies upon an incorrect interpretation of Title IX that is flatly inconsistent with binding precedent in the Fourth Circuit.

26.     In 2020, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit considered the right of transgender students to access school facilities that correspond with their gender identity. In that case, a local Virginia school division, in response to backlash about a transgender male student's use of the boys' restroom, implemented a policy under which students could only use restrooms matching their "biological gender." *Grimm*, 972 F.3d at 593. The policy also required that "students with gender identity issues shall be provided an alternative appropriate private facility." *Id*. at 599. To effectuate this policy, a number of single-stall unisex restrooms were made available to all students. *Id*. at 600.

27.     The court in *Grimm* analogized the facts at issue to those involved in *Bostock v. Clayton County,* 590 U.S. 644 (2020), in which the United States Supreme Court held that discrimination against a person for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights Act. *Grimm*, 972 F.3d at 616–19. Following *Bostock*, the Court of

JA235

Appeals concluded that the policy discriminated against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id*. at 618. Accordingly, the court found Grimm's gender identity to be a protected status pursuant to Title IX, invalidating the school's restroom restriction. *Id*.

28.    *Grimm* stands for the proposition that policies that prohibit transgender students from using the facilities that align with their gender identity constitute sex-based discrimination and violate Title IX. *Id.* The APS policy at issue is consistent with *Grimm* and therefore complies with, not violates, Title IX.[5]

29.    Contrary to Defendants' assertions, *Grimm* remains binding law in the Fourth Circuit and has not been abrogated by *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), a case upholding a Tennessee law that prohibited certain medical interventions for minors with gender

---

[5] While most courts which have considered the issue of Title IX's application to gender identity have ruled consistent with the Fourth Circuit in *Grimm*, several courts have issued contrary rulings. *Compare Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (affirming dismissal of lawsuit brought by plaintiffs who alleged a school district's policy permitting students to use facilities that match their gender identity violated Title IX and holding that a transgender student's normal use of facilities alone does not constitute actional "harassment" under Title IX even if some students felt subjectively harassed); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018) (rejecting argument that a school district's policy allowing transgender students to use facilities that align with their gender identity violated Title IX because the policy treated all students equally irrespective of sex); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046–50 (7th Cir. 2017), abrogated on other grounds as recognized by, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (holding that a policy requiring students to use a bathroom that conforms with their gender identity punishes those students for their gender nonconformance and therefore violates Title IX), *with Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (11th Cir. 2022) (en banc) (holding that a policy disallowing transgender students from using the bathroom that aligned with their gender identity did not violate Title IX). *See also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610–11 (6th Cir. 2024) (interpreting Title IX regulations "[w]ithout deciding any substantive merits questions").

dysphoria as constitutional under the Equal Protection Clause, or any other United States Supreme Court case.

30.    Indeed, on August 15, 2025, the Fourth Circuit reaffirmed that "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." *Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025).  The *Doe* case involved a challenge to a South Carolina statute that included a restriction on restroom access to students according to their gender assigned at birth—a policy identical to that struck down in *Grimm*.  *Id.* at **2–3.  Doe moved for a preliminary injunction, relying on *Grimm* in support of his assertion that the South Carolina statute violated Title IX.  *Id.* at *5.

31.    Applying the legal standard for a preliminary injunction, the court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the court's ruling in *Grimm*.  *Id.* at **16–17.  The court also found that Doe had demonstrated irreparable harm, observing that "state action infringing [on] constitutional rights generally constitutes irreparable harm."  *Id.* at *8.  Finally, the court found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm*—a prior, binding decision of this [c]ourt"—was clearly in the public interest.  *Id.* at *9.

32.    In his concurrence to the court's opinion in *Doe*, Chief Judge Diaz directly addressed South Carolina's argument that *Grimm* had been abrogated by prior United States Supreme Court decisions.  *Id.* at **10–11.  He specifically noted that the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) "has little to say about the issues *Grimm* addressed," given that it involved a statute prohibiting medical care that applied to all minors rather than a sex-based restriction on facility access.  *Id.* at *10.  Accordingly, Judge Diaz found that

- 8 -

JA237

"*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of *Grimm's* Title IX holding." *Id*. at *9.

33.    Similarly instructive is the concurrence of Judge Agee, who dissented in *Grimm*. Despite his disagreement with the Court's holding in *Grimm*, Judge Agee nonetheless stated that it remains binding authority in the Fourth Circuit.  "*Grimm* binds all the judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action.  The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal." *Id*. at *14.[6]

34.    Unless and until either the *en banc* Fourth Circuit reconsiders the holding of *Grimm* or the U.S. Supreme Court decides whether transgender status is a protected class under Title IX, *Grimm* remains controlling in the Fourth Circuit.[7]

**IV.    Virginia's anti-discrimination law further requires APS to provide access to facilities that match individuals' gender identities.**

35.    Virginia law is consistent with *Grimm* and prohibits discrimination based on gender identity.  In 2020, the Virginia General Assembly expanded the scope of the Virginia Human

---

[6] On August 28, 2025, the Defendants in *Doe* filed a petition for certiorari with the United States Supreme Court.

[7] The United States Supreme Court has agreed to hear a case involving the scope of Title IX as applied to transgender student participation in school sports in its upcoming term, a case that may but has not yet provided further guidance as to the scope of Title IX.  The Court recently granted cert in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth.  *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025).  The question for the Court in *B.P.J.* is whether Title IX and the Equal Protection Clause prevent a state from designating school sports teams based on biological sex.  The Court's decision may provide clarity as to whether or not Title IX requires educational institutions to separate student resources by biological sex, without concern for transgender students.

Rights Act (VA. CODE ANN. § 2.2-3900–3909), by adopting the Virginia Values Act (the "Values Act").[8]  The law "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity . . . in places of public accommodation, including educational institutions."  VA. CODE ANN. § 2.2-3900.  The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."  VA. CODE ANN. § 2.2-3901.

36.    Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."  VA. CODE ANN. § 15.2-853.

37.    In 2021, VDOE issued Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[9]

38.    Upon the accession of Glenn Youngkin to the office of Governor of Virginia in 2022, the VDOE issued new guidance on the issue of transgender student access to school facilities.  Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that a student "shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)."

---

[8] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[9] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, VIRGINIA DEPARTMENT OF EDUCATION (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

JA239

**V.    APS's J-2 PIP-2 Policy adheres to federal and state statutes and regulations.**

39.    Pursuant to VDOE's Model Policies, APS implemented J-2 PIP-2 in July 2019.

Ex. C.

40.    J-2 PIP-2 states:

a)    "It is the responsibility of each Arlington Public Schools (APS) staff member

to ensure that all students, including transgender students, have safe, supportive,

and inclusive school environments.  School-based procedures provide APS staff

with guidance to ensure compliance with the School Board Policy J-2 Student

Equal Educational Opportunities-Nondiscrimination. These procedures are

detailed in this document and will be disseminated to staff through

administrative processes and specific guidelines."

b)    "'Gender Identity' is one's sense of self as male, female, or an alternative

gender that may or may not correspond to a person's sex assigned at birth

(American Psychological Association, 2015)."

c)    "'Transgender' is an umbrella term used to describe individuals whose gender

identity, expression, or behavior does not conform with that typically associated

with the sex to which they were assigned at birth (National School Boards

Association, 2017)."

d)    "Access to facilities that correspond to a student's gender identity will be

available to all students.  Single user, gender neutral facilities will be made

available to all users who seek privacy."[10]  Ex. C.

_____

[10] *See* APS J-2 PIP-2 Policy. Ex. C.  All APS policies, bylaws, and regulations are publicly
available at https://www.apsva.us/wp-content/uploads/sites/57/2024/08/APS-Handbook-2024-25-
final.pdf.

**VI.    The Office of Civil Rights of the Department of Education investigates APS's policies.**

41.    Despite the clear authority which authorizes the APS policy at issue in this matter, the Office for Civil Rights ("OCR") of the United States Department of Education has launched an investigation which seeks to compel APS to change its policy in a manner contrary to law.  On February 12, 2025, OCR issued a Notification Letter to APS indicating that a complaint had been filed alleging that APS's policy regarding use of sex-segregated facilities such as restrooms and locker rooms (J-2 PIP-2) violated Title IX by providing greater rights to students who are transgender than to those who are cisgender.  *See* Ex. D.  On February 24, 2025, OCR sent APS a Data Request Letter requesting a number of documents and responses.  Ex. D.

42.    The complaint was generated by America First Legal ("AFL"), a conservative nonprofit organization founded by White House Deputy Chief of Staff Stephen Miller.

43.    APS promptly responded on March 20, 2025 with documents and a narrative response defending the policy.  APS cited state law and the Fourth Circuit's *Grimm* opinion as the bases for its protection of transgender students' access to facilities aligned with their gender identity.  Ex. E.

44.    On July 25, 2025, OCR concluded its investigation by issuing a Findings Letter.  Ex. F.  In that letter, OCR asserted that the APS policies and similar facilities-access policies of four other school divisions in Northern Virginia—those for Fairfax, Loudoun, Prince William, and Alexandria Counties—violate Title IX and its implementing regulations.  *Id.*  Accompanying the Findings Letter, OCR delivered a draft Resolution Agreement, which requires that each division (1) modify its policy to ensure that access to restroom and locker room facilities will be limited by students' sex assigned at birth; and (2) ensure that all policies adopt OCR's definition of the terms "sex, female, male, girls, women, boys [and] men."  Ex. G.  OCR's definitions of these terms treat individuals exclusively according to the sex assigned them at birth.  *Id.*

- 12 -

JA241

45.     On July 29, 2025, counsel to all five of the impacted school divisions submitted a joint request to OCR for 90 days to respond to the July 25, 2025 Findings Letter, consistent with the timeframe for negotiated resolutions provided in the OCR Case Processing Manual.  Ex. H.

46.     On July 31, 2025, OCR's Regional Director Bradley Burke rejected the July 29th request for extension and instead imposed a deadline of August 15, 2025, for APS and the other impacted school divisions to notify OCR as to "whether or not [each Division] is willing to consider agreeing to the terms in the draft resolution agreement."  Ex. I.

47.     On August 15, 2025, APS submitted a response letter to OCR, stating that APS was bound by Fourth Circuit precedent and could not modify its policies or agree to the terms of the Resolution Agreement without exposing itself to a risk of litigation for violating federal and state law.  Ex. J.  APS proposed that OCR refrain from referring the matter to the DOJ until the Supreme Court has issued its decision in *West Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (certiorari granted July 3, 2025), which raises a related but distinct issue of Title IX transgender sex discrimination in athletic teams.  *Id.*

48.     On August 18, 2025, APS submitted a supplemental response letter to OCR, providing additional authority for APS's position that it is bound by Fourth Circuit precedent— the opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit.  Ex. K.

**VII.   Defendants designate APS as a "high-risk" entity and place APS in "reimbursement only" status.**

49.     On August 19, 2025, the Department "designated [APS] as a 'high-risk' entity, under all the programs administered by the Department for which [APS] receives funds" due to APS's purported "noncompliance with Title IX."  Ex. B at 1.

50.     The Department also stated that it has designated APS as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.1. Ex. B at 2–3.  The factors set forth in § 200.208 that the Department is required to consider include (1) "[r]eview of OMB-designated repositories of government-wide data [] or review of its risk assessment;" (2) APS's "history of compliance with the terms and conditions of Federal awards;" (3) APS's "ability to meet expected performance goals as described in § 200.211;" or (4) "a determination of whether [APS] has inadequate financial capability to perform the Federal award."  2 C.F.R. § 200.208.  The Department stated that it considered "the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws," "the improper organizational management and operations that led to the problems discussed above," and "concerns regarding your division's lack of proper controls." Ex. B at 2–3.

51.     The Department stated that it was "placing specific conditions on [APS's] use of funds in all grants it receives from the Department." *Id*. at 1–2.  In particular, "[d]ue to the sizable amount of Federal grant funds that are provided to [APS], and concerns discussed in this letter, the Department will place all of [APS's] grants on reimbursement payment status."  *Id*. at 2. "Under this specific condition, [APS] will, when it submits a request to drawdown [*sic*] funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by [APS] with non-Federal funds." *Id*. at 3.

52.     Further, the Department demanded that "within 30 days of the date of this letter" APS would comply with two further "specific conditions":

a)  "[APS] must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps [APS] will take to ensure that grant funds will be spent in accordance with all appliable [*sic*] laws (this could include committing to implementing the resolution agreement sent to [APS] on July 25, 2025, with OCR's findings)."  Ex. B at 3.

b)  "[APS] must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan."  *Id*. at 3.

53.    The Department's August 19, 2025 letter makes clear that APS will not receive reimbursement unless it accedes to the Department's and OCR's interpretation of Title IX, which is not consistent with the interpretation that binds APS (and this Court).  Accordingly, Defendants' order placing APS on "reimbursement-only" status while APS complies with the Fourth Circuit's binding interpretation of Title IX constitutes a refusal to continue federal financial assistance within the meaning of Title IX and the Department's regulations implementing it.

54.    Defendants' challenged actions are agency actions within the meaning of the APA because they constitute the entireties or parts of agency orders or sanctions, or the equivalent thereof.  *See* 5 U.S.C. § 551(13).

JA244

55.    Defendants' challenged actions are final agency actions because they represent the culmination of Defendants' decision-making process on specific conditions imposed on APS due to APS's legally mandated facilities-access policies.  Further, Defendants' action has immediate legal and real-world effects—namely, they purport to have adjudicated APS to be in violation of Title IX and they have altered the conditions under which APS may receive funding to which it is otherwise entitled.  Indeed, because APS cannot—consistent with the law that binds it—alter those facilities-access policies without risking litigation, and because Defendants have conditioned reimbursement on APS altering those policies, Defendants have in fact refused to continue providing federal funds to APS.

**VIII.    APS has suffered irreparable harm and the balance of equities weighs in its favor.**

56.    Defendants' action constitutes irreparable harm to APS.  Because Defendants have conditioned APS's receipt of federal funds on requirements APS cannot lawfully satisfy, APS has in fact lost access to those funds.

57.    APS relies on approximately $23 million in federal funding to execute its budget.

58.    The largest portion—about $8.6 million—funds food and nutrition services, which allows APS to pay the salaries of the food services staff and provide high-quality meals that meet federal nutrition standards.  APS receives an additional $6 million in IDEA grants to provide one-on-one special education instructional assistants for students needing extraordinary supports in the education setting.  This money also funds positions for student support coordinators, who conduct Individualized Education Plan ("IEP") meetings, and transition coordinators, who prepare students with IEPs as they transition to jobs and adult learning programs after leaving APS.

59.    While APS's injury is primarily economic, money damages are unavailable as against the Federal Government due to federal sovereign immunity.  *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("economic damages

- 16 -

JA245

may constitute irreparable harm where no remedy is available at the conclusion of litigation"); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'") (quoting 5 U.S.C. § 702).

60.    The Department and Defendant McMahon, as appendages of the federal Executive Branch, are bound by the President's duty to "take Care that the Laws be faithfully executed." U.S. CONST. art II, § 3.  Accordingly, none of the Defendants can have any protectable interest in enforcing the Department's unlawful order, which is based on the Department's express refusal to follow precedent that binds APS, this Court, and Defendants.

61.    APS has an interest in providing its students with "an educational program of high quality" in accordance with its duties under the Virginia Constitution. *See* VA. CONST. art. VIII, § 1.

62.    APS further has an interest in ensuring that its students are afforded all constitutional and legal protections they are due, including those established by binding interpretations of federal anti-discrimination statutes such as Title IX.

63.    APS also has an interest in ensuring that its own actions comply with all legal requirements.

64.    Accordingly, the balance of equities and the public interest weigh in favor of injunctive relief.

## CAUSES OF ACTION

### Count I – under the Administrative Procedure Act
### (against Defendants McMahon and the Department)

65.    ASB repeats and realleges paragraphs 1–64 as though fully set forth herein.

66.    Defendants Secretary McMahon and the Department's constructive termination of or refusal to continue federal funds owed to APS based on Defendants' assertion that APS violated Title IX constitutes a final agency action reviewable under the APA.  20 U.S.C. § 1683.

67.    The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

68.    Defendants' action designating APS as a "high-risk" entity is not based on any identifiable factor or factors set forth in 2 C.F.R. § 200.208.  Though Defendants claim to have considered APS's "potential gross mismanagement of public funds," "improper organizational management and operations," and "lack of proper controls," the Department has provided no evidence to support these findings.  APS has never been notified of a failed audit, mismanagement of specific funds, or issues regarding its internal controls prior to receiving this designation.  Accordingly, designating APS as "high-risk" based on the Department's purported "consideration" of the § 200.208 factors is arbitrary and capricious.  5 U.S.C. § 706(2)(A).

69.    Defendants' action constructively terminating or refusing to continue funds owed to APS is not in accordance with the law set forth in *Grimm*.  The refusal to continue funds was premised on APS's alleged violation of Title IX as a result of its implementation of J-2 PIP-2, but that policy merely codifies the holding of *Grimm*, which interpreted Title IX with binding effect on APS, this Court, and Defendants.

70.    Defendants' action imposes unwarranted penalties on APS not because APS has violated any law but because APS is bound to follow and is following the Fourth Circuit's precedent, which is binding within APS's geographical area (and which, moreover, binds this

Court). Defendants' action is accordingly an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2)(A).

71.    Defendants' action targeting APS (and four other Northern Virginia schools) is arbitrary and capricious because it singles out APS, while ignoring similarly situated districts in Virginia and across the country that have similar policies regarding student access to facilities. Defendants have not articulated a sufficient and substantiated reason to explain why APS is subject to this action while others are not. This disparate treatment, without a rational basis, violates the fundamental principal that agency action must be based on reasoned decision-making. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency discretion is not unbounded, and selective enforcement without justification renders Defendants' action arbitrary and capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A); *see Kirk v. Comm'r of SSA*, 987 F.3d 314, 321 (4th Cir. 2021) ("'Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.'") (quoting *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005)).

### Count II – under the Administrative Procedure Act and the Spending Clause (against Defendants McMahon and the Department)

72.    ASB repeats and realleges paragraphs 1–71 as though fully set forth herein.

73.    Separately, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

74.    The federal government may not compel states to enact or administer federal regulatory programs. *New York v. United States*, 505 U.S. 144, 188 (1992).

- 19 -

JA248

75.    Congress's power to legislate is constrained by Article I, and its power to spend the public fisc does not carry with it authority to commandeer the separate sovereign states legislative or administrative apparatus for federal purposes. *Printz v. United States*, 521 U.S. 898, 933 (1997).

76.    The executive's power with respect to the laws of the United States extends only to the power to "take care that [they] be faithfully executed." U.S. CONST. art. II, § 3. The executive, when executing Congress's laws, accordingly may not do by executive action what Congress is constrained not to do by the Constitution's limitations.

77.    To the contrary, exercising powers beyond those expressly granted to the executive and legislative branches would invade the powers reserved to the states and to the people. U.S. CONST. arts. I, II; U.S. CONST. amend. X.

78.    Here, the executive seeks to pervert Congress's spending power to compel APS and other school divisions in Northern Virginia to enact and administer the executive's administrative program with respect to transgender individuals.

79.    Because the executive's action seeks to commandeer power reserved to the Commonwealth and its people, it is contrary to Constitutional power and must be held unlawful and set aside. 5 U.S.C. § 706(2)(B).

**Count III – under the APA, the Declaratory Judgment Act, and the Spending Clause: Lack of Notice**
**(against Defendants McMahon and the Department)**

80.    ASB repeats and realleges paragraphs 1–79 as though fully set forth herein.

81.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

82.    Defendants' action interprets Congress's grant of funding to APS in a manner that would violate the Spending Clause of the U.S. Constitution because APS did not have clear notice

JA249

that any federal funding would be conditioned on (1) rescinding J-2 PIP-2 and categorically banning students from accessing facilities in accordance with their gender identity or (2) issuing public statements regarding the meaning of Title IX or the definition of sex, female, male, girls, women, boys, or men.

83.    Article I of the U.S. Constitution specifically grants Congress the power "to pay the Debts and provide for common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

84.    Incident to the spending power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "There can, of course, be no knowing acceptance if a [recipient] is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17.

85.    Defendants' sole authority with respect to the laws of the United States is to "take care that [they] be faithfully executed." U.S. CONST. Art. II § 3; *see also* U.S. CONST. Amend. X (reserving to the states and the people those powers not delegated to the federal government by the Constitution). Where Congress may not impose ambiguous or unlawful conditions, the Executive similarly may not interpret acts of Congress to impose those conditions consistent with its duty to take care that the laws be faithfully executed.

86.    APS accepted federal funding with the understanding that it was required to comply with Title IX and binding judicial precedent interpreting Title IX.

JA250

87.    Congress has not clearly stated, and no court has found, that Title IX prohibits APS from maintaining its challenged policies.  To the contrary, J-2 PIP-2 complies with and codifies governing Fourth Circuit precedent as set forth in *Grimm*, which holds that excluding transgender students from restrooms consistent with their gender identity violates Title IX and the Equal Protection Clause.  *See also* Am. Order, *Doe v. S. Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025).

88.    Defendants have nonetheless conditioned APS's receipt of essential federal funds on its agreement to abandon its policies in exchange for Defendants' policies and adhere to a new, extratextual interpretation of Title IX that is directly contrary to prior agency interpretation and governing precedent.

89.    Therefore, conditioning the Department funding to enforce a categorical ban on student access to facilities violates this limitation on spending power, because, *inter alia*, APS did not have "clear notice" of such a condition.  *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

90.    Because Defendants' action is contrary to Congress's constitutional power and to APS's constitutional power reserved under the Tenth Amendment, Defendants' action must be held unlawful and set aside.  5 U.S.C. § 706(2)(B).

91.    ASB is separately entitled to a judicial declaration that Defendants' action is contrary to the federal government's power under the Spending Clause.  28 U.S.C. § 2201.

**Count IV - under the Administrative Procedure Act, the Declaratory Judgment Act, and the Spending Clause: Unconstitutional Coercion (against Defendants McMahon and the Department)**

92.    ASB repeats and realleges paragraphs 1–91 as though fully set forth herein.

93.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

94.    Pursuant to the Spending Clause of the United States Constitution, "spending-power conditions are legitimate only if the [recipient's] acceptance of them is in fact voluntary." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2232 n.4 (2025) (citing *NFIB v. Sebelius*, 567 U.S. 519, 581–82 (2012)).

95.    The Spending Clause permits the federal government to "encourage[]" compliance through funding conditions, not to punish or impose sanctions absent statutory authorization. *Sebelius*, 567 U.S. at 581.  The federal government may not wield its spending power as a "gun to the head." *Id.*

96.    Defendants' sole authority with respect to the laws of the United States is to "take care that [they] be faithfully executed." U.S. CONST. Art. II, § 3; *see also* U.S. CONST. Amend. X (reserving to the states and the people those powers not delegated to the federal government by the Constitution).  Where Congress may not impose arbitrary or unlawful conditions, the Executive similarly may not interpret acts of Congress to impose those conditions consistent with its duty to take care that the laws be faithfully executed.

97.    APS receives federal education funds under several federal statutes including Title I of the Elementary and Secondary Education Act of 1965 (20 U.S.C. §§ 6301 *et seq*.) and the Individuals With Disabilities Education Act (20 U.S.C. §§ 1400 *et seq*.).  These funds are critical to APS's ability to provide state and federally-mandated, education-related services to its students, particularly its most vulnerable students.  Loss of these funds is existential.

98.     Defendants' decision to designate APS as "high-risk," place of all federal funds on reimbursement status, and urge state entities to do the same because APS did not agree with Defendants' unilateral interpretation—directly at odds with binding legal precedent—that the District's policies violate Title IX.

99.     By designating APS as "high-risk" unless and until APS agrees with Defendants' interpretation of Title IX and rescinds J-2 PIP-2, Defendants are conditioning essential federal funding on APS's capitulation to Defendants' extralegal demands.

100.    "Appeal" of APS's "high-risk" status to Defendants is futile and does not afford it meaningful review, as Defendants have made clear that compliance with their demands is the only pathway for APS to continue to receive essential federal funding.

101.    This threat amounts to unconstitutional coercion under the Spending Clause. *Sebelius*, 567 U.S. at 581.  Placing APS on "high-risk" status and withholding all federal funding, including State-administered funds earmarked for the APS's most vulnerable students, until APS accepts Defendants' demands, leaves APS with no meaningful choice but to comply.  And this is so even when acceptance of Defendants' terms means that APS must surrender local control over its lawful policies, violate state law, eschew controlling judicial precedent, and expose itself to liability for violating the rights of students under that precedent.  This funding threat compels capitulation, not voluntary agreement.  *See Medina*, 145 S. Ct. at 2232 n.4.

102.    Because Defendants' action is contrary to Congress's constitutional power and to APS's constitutional power reserved under the Tenth Amendment, Defendants' action must be held unlawful and set aside.  5 U.S.C. § 706(2)(B).

103.    APS is separately entitled to a judicial declaration that Defendants' action is contrary to the federal government's power under the Spending Clause.  28 U.S.C. § 2201.

### Count V – *Ultra Vires*
### (against Defendants McMahon and the Department)

104.    ASB repeats and realleges paragraphs 1–103 as though fully set forth herein.

105.    An agency cannot take any action that exceeds the scope of its constitutional or statutory authority.

106.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

107.    Defendants have no authority under the Constitution or any statute to demand that APS rescind J-2 PIP-2 based on their erroneous interpretation of Title IX in order for APS to receive federal funding.

108.    Pursuant to 28 U.S.C. § 2201(a), ASB is entitled to a declaration that Defendants acted *ultra vires* by demanding that ASB rescind its policy in order for APS to receive federal funding.

### Count VI – under the Declaratory Judgment Act
### (against Defendants McMahon and the Department)

109.    ASB repeats and realleges paragraphs 1–108 as though fully set forth herein.

110.    An actual and justiciable controversy exists between the parties with respect to the enforceability of *Grimm*. Defendants have asserted, and continue to assert, that *Grimm* has been abrogated, and therefore, APS's implementation of J-2 PIP-2 is in violation of Title IX.

111.    ASB's position—and that of the Fourth Circuit*, see Doe*, 2025 WL 2375386—is that *Grimm* remains binding law in the Fourth Circuit and APS is bound to follow that law. As such, J-2 PIP-2 is not only constitutional, but compelled by federal law.

112.    Accordingly, ASB and Defendants have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment on the disputed matters raised herein.

113.    ASB is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that J-2 PIP-2 does not violate Title IX.

114.    ASB is further entitled to a judicial declaration that Defendants' action is arbitrary, capricious, an abuse of discretion, and contrary to law.

## **PRAYER FOR RELIEF**

For relief, ASB requests that the Court:

a)    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' decision to designate APS as "high-risk";

b)    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' action constructively denying funds allocated to APS and any other further actions taken by Defendants to implement their freeze on federal funds allocated to APS;

c)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' conditioning and freezing of federal funds allocated to APS is an unlawful act violative of the APA;

d)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' conditioning and freezing of federal funds allocated to APS is an unlawful act violative of the Spending Clause;

e)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that the legal principles and holdings announced in *Grimm* and reaffirmed in the Fourth

JA255

Circuit's August 15, 2025 Amended Order in *Doe*, 2025 WL 2375386, remain valid and binding legal precedent;

f)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that J-2 PIP-2 does not violate Title IX;

g)    Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that federal funds are not conditioned on compliance with Defendants' demands, including prohibiting students from accessing facilities in accordance with their gender identity;

h)    Preliminarily and permanently enjoin Defendants (including any officers, employees, and agents thereof) from taking enforcement action on the ground that J-2 PIP-2 violates Title IX;

i)    Preliminarily and permanently enjoin Defendants from conditioning, terminating, freezing, or otherwise impeding access to federal funds allocated to APS based on APS's violation of Title IX;

j)    Require that Defendants immediately pay to APS any funds that have been denied pursuant to Defendants' August 19, 2025 letter, Ex. B, and/or Defendants' belief that APS and/or J-2 PIP-2 violate or have violated Title IX;

k)    Award ASB its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

l)    Grant all other such relief as this Court deems appropriate, just, and proper.

JA256

Dated:  August 29, 2025

Respectfully submitted,

/s/ *Timothy Heaphy*

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1000
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

Joshua Mitchell (*pro hac vice* forthcoming)
Fiona L. Carroll (*pro hac vice* forthcoming)
Lindsay Hemminger (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel: (312) 728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Arlington School Board*

JA257

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | Civil Action No. _____ |
| States; the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2025, I electronically filed a true and correct copy of **PLAINTIFF'S COMPLAINT** with the Clerk of Court using the CM/ECF system. A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon

Respectfully submitted,

/s/ *Timothy Heaphy*
_____

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238

JA258

Tel: (202) 303-1000
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

Joshua Mitchell (*pro hac vice* forthcoming)
Fiona L. Carroll (*pro hac vice* forthcoming)
Lindsay Hemminger (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel: (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Arlington School Board*

JA259

# EXHIBIT A

8/20/25, 12:07 PM          U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

🇺🇸 An official website of the United States government   Here's how you know

U.S. Department of Education

PRESS RELEASE

# U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX

AUGUST 19, 2025

Today, the U.S. Department of Education (the Department) announced it is placing Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions) in Northern Virginia on high-risk status with the condition that all federal funding flowing to these districts is done by reimbursement only. This action is being taken after all five Divisions have been found in violation of Title IX of the Education Amendments of 1972 (Title IX). The Department found the Divisions in violation of Title IX last month for their policies allowing students to occupy intimate facilities based on "gender identity," not biological sex. The Divisions refused to sign the Department's proposed Resolution Agreement to voluntarily resolve their Title IX violations by last Friday's (August 15th) deadline and have instead chosen to remain in violation of Title IX.

As a result of the Divisions' rejection of the Resolution Agreement, the Department is commencing administrative proceedings seeking suspension or termination of federal financial assistance to the Divisions.

Additionally, to ensure that grantees expend federal funds consistent with federal law, the Department is placing these Divisions on reimbursement status for all Department funds including formula funding, discretionary grants, and impact aid grants, totaling over $50 million. The Divisions will now be required to pay their education expenses up front and then request reimbursement for expenditures to access funds obligated by the Department.

To indicate that the Divisions have failed to uphold the conditions of their federal grant agreements by violating federal law, the Department will classify the five Divisions as "high-

JA261

8/20/25, 12:07 PM    U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St...

Case 1:25-cv-01434    Document 1-2    Filed 08/29/25    Page 3 of 5 PageID# 34

risk" within the federal grant system.

"States and school districts cannot openly violate federal law while simultaneously receiving federal funding with no additional scrutiny. The Northern Viriginia School Divisions that are choosing to abide by woke gender ideology in place of federal law must now prove they are using every single federal dollar for a legal purpose," **said U.S. Secretary of Education Linda McMahon.** "We have given these Northern Virginia School Divisions every opportunity to rectify their policies which blatantly violate Title IX. Today's accountability measures are necessary because they have stubbornly refused to provide a safe environment for young women in their schools."

Pursuant to its regulatory authority, the Department may place grantees on high-risk status and impose High-Risk Specific Conditions on all grants for the Divisions' failure to comply with conditions of their grant agreements by violating federal law. Such restrictions are imposed to ensure that a grantee is spending federal funds consistent with the terms and conditions of the grant program and in conformity with federal law.

**Background:**

On July 25, the Department's Office for Civil Rights (OCR) concluded its investigation of the Divisions and found that they violated Title IX by allowing students to occupy intimate facilities based on "gender identity," not biological sex. OCR generously granted the Divisions' request for an extension to reach a voluntary resolution with OCR, or agree to the government's proposed Resolution Agreement, to resolve their Title IX violations, which the Divisions rejected last Friday.

The "high-risk" designation in the federal grant system alerts all federal agencies of the entity's failure to comply with the terms of their federal grant agreements.

Title IX prohibits discrimination on the basis of sex in educational programs or activities receiving federal financial assistance.

---

**CONTACT**

Press Office  |  (202) 401-1576  |  press@ed.gov

---

**Office of Communications and Outreach (OCO)**

8/20/25, 12:07 PM        U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

Page Last Reviewed: August 19, 2025

**Pay for College**

Fill out the FAFSA

529 Plans

Repay Your Loans

1098 Tax Forms

**Educational Resources**

504 Plans

FERPA

IEPs (Individualized Education Program)

**Teaching Resources**

Education Research

Professional Resources

School Safety and Security

Teaching Abroad

**File a Report**

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

**About Us**

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

JA263

8/20/25, 12:07 PM     U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment St…

Case 1:25-cv-01434     Document 1-2     Filed 08/29/25     Page 5 of 5 PageID# 36

News

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

    



www.ed.gov

**An official website of the Department of Education**

About Dept of Education     Accessibility Support     No FEAR Act data

Office of the Inspector General     Performance reports     FOIA     Privacy Policy     ED Archive

Looking for U.S. government information and services? **Visit USA.gov**

Case 1:25-cv-01434    Document 1-3    Filed 08/29/25    Page 1 of 5 PageID# 37

# EXHIBIT B

JA265

THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

August 19, 2025

Francisco Duran
Division Superintendent
Arlington Public Schools
2110 Washington Blvd
Arlington, VA 22204
Sent via email to superintendent@apsva.us

Re: High Risk Designation and Specific Conditions on Grants

Dear Superintendent Duran,

This letter is to inform you that the U.S. Department of Education (Department) has designated Arlington County Public School District as a "high-risk" entity, under all of the programs administered by the Department for which your division receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10, for the reasons discussed below. This follows the Department's July 25, 2025, Title IX noncompliance findings and proposed resolution agreement. On August 15, 2025, your division refused to sign the resolution agreement sent to you by the Office for Civil Rights (OCR) and remains in noncompliance with Title IX.

In this letter, we delineate the nature of our concerns with your division's administration of these grants; the reasons the information provided to the Department up to now by your division does not address these concerns; our determination to designate your division as a Department-wide "high-risk" entity; and the specific conditions we are imposing on all grants your division is receiving from the Department.

BACKGROUND

As you are aware, the U.S. Department of Education generously granted an extension for your school division (your division) and four other school divisions in Virginia to come into compliance with Title IX of the Educational Amendments of 1972 (Title IX), and related requirements. Unfortunately, the additional time did not result in a successful outcome in compliance with federal law.

On August 15, 2025, your division stated it does not intend to make the necessary policy changes to come into compliance with Title IX.

It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal activity. Therefore, the Department is designating your division as a Department-wide "high-risk" entity and placing specific conditions on your division's use of funds in all grants it

JA266

Page 2

receives from the Department.

The Department's prior communications with your division identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated. Thus, the Department is concerned with your division's inability to administer and/or manage Department grants properly with appropriate controls in place. These concerns are with all grants your division currently receives, administers, or manages.

In addition, the Department is identifying all the State-administered funds your division receives as a subgrantee from the Virginia Department of Education and any other State division, including under Title I of the Elementary and Secondary Education Act of 1965, as amended, and the Individuals with Disabilities Education Act. The Department expects to urge those entities to take similar actions to those being taken by the Department with regard to those funds. Representatives of the Virginia Department of Education have already agreed to take those steps.

Due to the sizable amount of Federal grant funds that are provided to your division, and concerns discussed in this letter, the Department will place all of your division's grants on reimbursement payment status until your division demonstrates to the Department's satisfaction that the following High-Risk Specific Conditions, specified below, are fully met, and that proper measures to address the problems noted in this letter are taken and are working well for a sustained period of time.

I.    YOUR DIVISION's DESIGNATION AS "HIGH-RISK"

Given these serious and deeply systemic concerns, the Department is taking immediate action to help safeguard public funds with regard to your division's activities with the Department's grants in accordance with statutory and regulatory requirements and the terms of approved grant applications, and with grants for which your division is a primary grantee or subgrantee.

The Department is designating your division as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.10. As part of this "high-risk" designation, we are imposing High-Risk Specific Conditions (noted below) on all of your division's grants. In making this determination and designation, the Department has taken into consideration several factors (some of which are mentioned above), which include, but are not limited to:

- the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;
- the improper organizational management and operations that led to the problems discussed above; and
- concerns regarding your division's lack of proper controls.

Page 3

## II.     HIGH RISK SPECIFIC CONDITIONS

Your division's grants and subgrants from the Department are being placed on a reimbursement method of payment. Under this specific condition, your division will, when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by your division with non-Federal funds.

In addition, within 30 days of the date of this letter:

1.    Your division must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps your division will take to ensure that grant funds will be spent in accordance with all appliable laws (this could include committing to implementing the resolution agreement sent to your division on July 25, 2025, with OCR's findings);

2.    Your division must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan.

The objectives of these specific conditions are to ensure that your division establishes the policies, procedures, and personnel in place to manage its grants and subgrants properly, including adherence to all pertinent federal civil rights laws that apply to your division's grants and subgrants. The Department may impose additional or modified specific conditions at any time through a subsequent letter.  If your division is unable to satisfactorily address these concerns, the Department will consider additional enforcement actions, including the possible termination of all or some of the Department's grants, and may require the recovery of funds.

## III.    REMOVAL OF REIMBURSEMENT, HIGH-RISK CONDITIONS AND HIGH-RISK DESIGNATION

The reimbursement specific condition will remain in place until the Department has (1) determined that your division has put into place adequate corrective actions, which could include actions laid out in the OCR proposed resolution agreement, and (2) concluded that the corrective actions have been working appropriately for a period of time that reasonably demonstrates assurance of effective compliance.

JA268

Case 1:25-cv-01434      Document 1-3      Filed 08/29/25      Page 5 of 5 PageID# 41

Page 4

IV.      REQUEST FOR RECONSIDERATION

Consistent with 2 C.F.R. § 200.208(d)(5), your division may request reconsideration of its designation as "high-risk", and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of this letter. Any request for reconsideration must be submitted via e-mail to Lindsey Burke of the Department, at lindsey.burke@ed.gov. In a request for a reconsideration, you should include appropriate supporting documentation.

The Department remains committed to working with your division to help with the positive resolution of these concerns. Lindsey Burke is available to answer any questions on the High-Risk Specific Conditions, as well as to help facilitate any necessary support or assistance regarding the status of your grants or subgrants from the Department.

Sincerely yours,

Linda E. McMahon

CC: Emily Anne Gullickson, Virginia State Superintendent

JA269

# EXHIBIT C

JA270

**ARLINGTON PUBLIC SCHOOLS**
**Policy Implementation Procedure J-2 PIP-2**
**Transgender Students in Schools**

It is the responsibility of each Arlington Public Schools (APS) staff member to ensure that all students, including transgender students, have safe, supportive, and inclusive school environments. School-based procedures provide APS staff with guidance to ensure compliance with the School Board Policy J-2 Student Equal Educational Opportunities-Nondiscrimination. These procedures are detailed in this document and will be disseminated to staff through administrative processes and specific guidelines.

All Arlington Public Schools staff shall be periodically trained on topics relating to transgender students. School staff members are responsible for taking prompt and effective steps to prevent and respond to harassment of any kind, including that which is based on gender identity and, as appropriate, remedy its effects.

**Definitions**
"Gender identity" is one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth (American Psychological Association, 2015).

"Transgender" is an umbrella term used to describe individuals whose gender identity, expression, or behavior does not conform with that typically associated with the sex to which they were assigned at birth (National School Boards Association, 2017).

**Bathrooms and Locker Rooms**
Access to facilities that correspond to a student's gender identity will be available to all students. Single user, gender neutral facilities will be made available to all users who seek privacy.

**Co-curricular and Extra-curricular Activities and Athletic Team Student Participation**
Students may participate in any co-curricular or extra-curricular activity consistent with their gender identity. Athletic participation regulated by the Virginia High School League (VHSL) and the Virginia Scholastic Rowing Association (VASRA), as well middle school athletics, shall be in compliance with rules outlined by that organization. Any uniform required for participation in a co-curricular or extra-curricular activity, including athletics, shall include options that are gender neutral. Awards designated by Arlington Public Schools for participation in any such activity will also be gender neutral.

**Dress Code**
All students must dress according to the constraints of the dress code as outlined within the school handbook. Information regarding appropriate attire for school day and school related activities shall be non-gender specific and enforced impartially regardless of a student's gender identity or gender expression.

**Extended Instructional Field Trips or Athletic Events**
APS is committed to providing a safe, welcoming school environment where students are engaged in learning because they feel accepted and valued. Additionally, APS respects the privacy rights of its students and parents and will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a parent or student as required by law. As part of this commitment to inclusion and equity, when

**ARLINGTON PUBLIC SCHOOLS**
**Policy Implementation Procedure J-2 PIP-2**
**Transgender Students in Schools**

an instructional or extra-curricular or athletic event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

Any student uncomfortable sharing a sleeping area, shower, bathroom, or any sex-segregated facility, shall, upon request, be provided with a designated safe, non-stigmatizing alternative. Arlington Public Schools staff shall not require a student to stay in a single-occupancy accommodation when such accommodations are not required of other students participating in the same event.

**Names, Pronouns, and Classroom Records**
Every student has the right to be addressed by names and pronouns that correspond to the student's gender identity. Regardless of whether a transgender student has legally changed their name or gender, schools will allow students to use a chosen name and gender pronouns that reflect their gender identity.

To ensure consistency, staff will update student classroom records (class rosters for substitutes, etc.) with the student's chosen name and, where applicable, appropriate gender markers.

**Privacy and Educational Records**
Information about a students' transgender status, legal name, or gender assigned at birth constitutes confidential personally identifiable and medical information. Disclosing this information to others by an Arlington Public Schools staff member may violate privacy laws, such as the Federal Family Educational Rights and Privacy Act (FERPA), as well as constitutional privacy protections and therefore, the information will not be disclosed unless in accordance with these laws.

Permanent records for students, including a student's gender, may only be changed with the submission of a legal document such as a birth certificate, passport, or court order. The process for changing any element of a student's permanent record including a student's name and gender must follow the process outlined in School Board Policy J-5.3.30 Admissions and Placement and School Board Policy J-15.30 Privacy Rights and Regulations, and state law. APS graduates may change their permanent records under the same requirements as current APS students. Appeals to a decision made regarding a change to a student's permanent record must be made in writing to the Assistant Superintendent of Teaching and Learning.

**References**
Policy J-5.3.30 Admissions and Placement
Policy J-15.30 Privacy Rights and Regulations
Policy J-6.8.1 Student Safety - Bullying Harassment Prevention
Virginia High School League Student Eligibility Requirements
Family Educational Rights and Privacy Act
Education Amendments Act of 1972, 20 U.S.C. §§1681 – 1688 (Title IX)

**Policy Implementation Procedure Adoption and Revision History**
Adopted July 1, 2019; Effective July 1, 2019

# EXHIBIT D

JA273



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

**REGION XI**
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

February 24, 2025

<u>By email only</u> to <u>superintendent@apsva.us</u>

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204

Re:    Case No. 11-25-1306
         <u>Arlington Public Schools</u>

Dear Dr. Durán:

On February 12, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), notified you that OCR was opening an investigation of Arlington Public Schools (the Division) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As explained in that letter, OCR will investigate whether the Division's "Transgender Students in Schools" policy, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

As an initial data request, please submit the items listed below to OCR **by March 17, 2025**. Please note that OCR may request supplemental data and documents relevant to the investigation.

1. The name and contact information of the individual who will serve as OCR's contact person during the investigation of this complaint.

2. The Division's narrative response to the allegation under investigation and all documents or records referenced in the narrative response.

3. The Division's Title IX grievance procedures, and where those procedures are published.

4. The name and contact information of the Division's Title IX Coordinator.

5. The Division's policies and procedures regarding student access to and use of sex-segregated restrooms, locker rooms, and/or other intimate facilities in its schools.

6. A list of any formal or informal complaints the Division has received during the 2024-2025 school year alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, and/or other intimate facilities. For each complaint, please note:

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

JA274

Page 2 of 3 – Case No. 11-25-1306

> the date of the complaint; the identity of the complainant (e.g. parent, student, teacher); any school(s) named in the complaint; a summary of the complaint; and a brief description of the Division's response to the complaint.

7. Any additional information the Division believes may be helpful in resolving this complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We look forward to your cooperation during the resolution of this complaint. If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN GREENSPAHN

Digitally signed by DAN GREENSPAHN
Date: 2025.02.24
11:21:41 -05'00'

Dan Greenspahn
Team Leader, Team 1
District of Columbia Office
Office for Civil Rights

Page 3 of 3 – Case No. 11-25-1306

### Data Request Instructions

If any item in our request is unclear, or if you experience any difficulty complying with this request, please contact the staff member(s) identified above prior to the due date. OCR requests that you submit information electronically, if feasible. Upon request, OCR may create a secure external sharing site for you to upload the submission. You may contact us for more information about this option. Please do not provide the information via an electronic cloud format such as Google Docs. If any of the requested information is available to the public on the Internet, you may provide the website address. If any responsive documents contain Social Security numbers, please redact them before producing the documents to OCR.

The Department of Education's regulation implementing Title VI of the Civil Rights Act of 1964, at 34 C.F.R. § 100.6(c), which is incorporated by reference in the Title IX regulation at 34 C.F.R. § 106.81, gives OCR the authority to request this information. In addition, in accordance with the regulation implementing the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, at 34 C.F.R. § 99.31(a)(3)(iii), and the Title VI regulation at 34 C.F.R. § 100.6(c), OCR may review personally identifiable records without regard to considerations of privacy or confidentiality. OCR will take all proper precautions to protect the identity of any individuals named in the records.

OCR may request supplemental data and documents that are relevant to the allegation under investigation. If the Division obtains any additional information or documents responsive to this data request or otherwise relevant to the allegations in this case, the Division must promptly inform OCR of its existence and supplement the data response within 15 days of its discovery. OCR reminds the Division that a failure to provide requested information may be considered a denial of access in violation of the regulations cited above. Please ensure that Division employees preserve all data and documents that are relevant to the allegation under investigation until OCR closes this case.

# **EXHIBIT E**

JA277

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

March 20, 2025

Dan Greenspahn, Esq.
U.S. Department of Education
Office for Civil Rights
District of Columbia Office
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

Re: OCR Case No. 11-25-1306 - Arlington Public Schools

Dear Mr. Greenspahn:

On February 12, 2025, Arlington Public Schools ("APS") received a letter from the District of
Columbia Office for Civil Rights ("OCR") regarding Case No. 11-25-1306 (the "Notification
Letter"). APS subsequently received a Data Request Letter from OCR on February 24, 2025 (the
"Request"). The Notification Letter indicates that a complaint was filed with OCR alleging that
APS's "Transgender Students in Schools" policy ("J-2 PIP-2") violates Title IX of the Educational
Amendments of 1972 ("Title IX") by providing greater rights to students who are transgender than
to those who are not in regards to the use of intimate, sex-segregated facilities such as restrooms
and locker rooms (collectively, "facilities"). The Notification Letter does not identify the
complainant or whether the complaint is made on behalf of any individual APS students or in
regard to any specific incident at APS.[1]

As you are aware, I represent APS in this matter. On March 17, 2025, we produced documents
and information responsive to OCR's Requests 1, 3, 4, 5, and 6 contained in the February 24
Request Letter. Those documents included:

- APS Policy J-2 PIP-2;
- a declaration from Title IX Coordinator, Sedrick Ross, certifying that APS has not received
  any Title IX complaints regarding the Policy; and

---

[1] A press release from the America First Legal Foundation claims that this investigation, as well as similar
investigations into four neighboring Virginia school divisions, was opened in response to an administrative
complaint submitted by that organization. This press release and a copy of the Request for Investigation
Letter it references does not indicate that the complaint was made on behalf of any individual APS students
or in regards to any specific incidents at APS. *See* America First Legal, *VICTORY — In Response to AFL's
Complaint, the U.S. Department of Education Office for Civil Rights Opens Investigation into Five
Northern Virginia K-12 Schools Illegal "Gender Identity" Policies*, (Feb. 14, 2025),
https://aflegal.org/victory-in-response-to-afls-complaint-the-u-s-department-of-education-office-for-civil-
rights-opens-investigation-into-five-northern-virginia-k-12-schools-illegal-gender/.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA278

121254246.1

- the APS Title IX grievance procedures and training materials provided to the Title IX Coordinator.

With this letter, we provide additional information responsive to Data Requests 2 and 7.[2]  As discussed below, APS denies that J-2 PIP-2 violates Title IX.  J-2 PIP-2 provides *all* students the option of using facilities consistent with their gender identity or access to private restroom or locker room facilities.  This regulation complies with binding state and federal law governing the use of facilities in Virginia and all other localities within the jurisdiction of the United States Court of Appeals for the Fourth Circuit and has been implemented without disruption or controversy in our schools.  Accordingly, OCR should not issue a finding of a Title IX violation or take other enforcement action in this matter.

## I.     APS Policies

J-2 PIP-2 went into effect on July 1, 2019 after it was approved by the Arlington School Board.  The provision relevant to this OCR investigation states as follows:

> **"Bathrooms and Locker Rooms**
> Access to facilities that correspond to a student's gender identity will be available to all students.  Single user, gender neutral facilities will be made available to all users who seek privacy."

Following APS implementing its policy, the Virginia General Assembly passed House Bill 145 and Senate Bill 161 during the spring 2020 session.  Those bills modified the Virginia Code to state that the "Department of Education shall develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that address common issues regarding transgender students," including students' "use of school facilities."[3]  In 2021, the Virginia Department of Education ("VDOE") issued its Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[4]

Upon the election of Governor Glenn Youngkin in 2021, the Virginia Department of Education issued new guidance on the issue of transgender student access to school facilities.  Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that "[s]tudents shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)."  As described more fully below, the Fourth Circuit in the *Grimm* case held that requiring students to use facilities that align with their biological gender violates Title IX.  The citation to *Grimm* confirms that the VDOE guidance continues to require Virginia schools to facilitate student access to facilities that correspond to their gender identity.  Accordingly, APS

---

[2] Unless otherwise noted, all documents referenced in this letter were produced on March 17, 2025.

[3] VA. CODE ANN. § 22.1-23.3.

[4] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, Virginia Department of Education (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

JA279

121254246.1

continues to adhere to both federal law and VDOE guidance in facilitating student access to facilities according to their gender identity.

## II.      Legal Analysis

The policy at issue in this inquiry is facially neutral and provides the same access to APS facilities to all students, regardless of gender identity. APS is governed by Virginia and Fourth Circuit law which requires that all individuals within the Commonwealth are safeguarded from unlawful discrimination because of gender identity in places of public accommodation, including educational institutions. Taking any steps to ban transgender students from using the facilities that align with their gender identity would violate Virginia and Fourth Circuit law.

A.    APS Policy J-2 PIP-2 provides equal access to facilities to all students.

The February 12 letter indicates that OCR has received a complaint alleging that J-2 PIP-2 "provides great rights to those students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex." *See* Notification Letter at 1. We strongly deny the allegation that the regulation affords any individual student, regardless of gender identity, greater rights than any other. J-2 PIP-2 allows *all* students the option of using a locker room or restroom consistent with their gender identity—providing no more or no less access to transgender students as that provided any others. The peers of transgender boys are other boys, and the peers of transgender girls are other girls. If a transgender girl wants to use the girls' facilities, she is allowed to do so. If any other girl wants to use those same facilities, she has the right to do so as well.

J-2 PIP-2 also provides an alternative facility option to any student to desires additional privacy, again regardless of gender identity. More specifically, that provision allows *any* student for *any* reason to request additional, reasonable privacy measures in their use of school facilities. This provision requires that, upon request, students shall be provided with an alternative private area or an alternative facility-use schedule that allows for increased privacy in a non-stigmatizing way. These accommodations are explicitly offered to all students and is not specially reserved for transgender students. This right could be invoked by a student recovering from an injury, illness or medical procedure, a student who has an implanted medical device such as a colostomy bag or insulin pump, or a student who deals with any of the myriad insecurities that present themselves to young people on their journey through their growth and development during K-12 education.

The facial neutrality of J-2 PIP-2 should end this inquiry, as it defeats any argument that some category of APS students is treated differently than another in violation of Title IX. Without some exclusion from an APS program or discriminatory impact of a policy, there is no basis on which OCR could find a violation. If APS were to change its policy and exclude access to facilities based on gender identity, that restriction would impermissibly deprive some students of a benefit and risk Title IX liability. As explained below, a change in policy would also directly contradict Virginia law and binding Fourth Circuit precedent.

JA280

121254246.1

      B.  <u>Virginia requires APS to make facilities available without regard to gender identity</u>.

In 2020, the Virginia General Assembly expanded the scope of the Virginia Human Rights Act[5] by adopting the Virginia Values Act (the "Values Act").[6]  The law "[s]safeguard[s] all individuals within the Commonwealth from unlawful discrimination because of … gender identity … in places of public accommodation, including educational institutions."[7]  The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."[8]  This legislation is the culmination of years of advocacy by the Human Rights Campaign and Equality Virginia.[9]  Prior to its passage, Virginia was one of just five states without meaningful protections in public accommodations for LGBTQ people.  When he signed the Values Act, Governor Northam stated, "This legislation sends a strong, clear message—Virginia is a place where all people are welcome to live, work, visit, and raise a family.  No longer will LGBTQ Virginias have to fear being fired, evicted, or denied service in public places because of who they are."[10]  Speaker of the House, Eileen Filler-Corn, also added, "[W]e have made discrimination against our gay, lesbian and transgender friends, family, neighbors, and co-working in employment, housing and public accommodation illegal in the Commonwealth of Virginia."[11]

Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in … education on the basis of … gender identity."[12]  This provision explicitly provides authority for J-2 PIP-2.  The Arlington School Board has enacted a valid policy that protects access to facilities for all students, regardless of gender identity.  This regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community.  In short, the APS transgender policy was both compelled by Virginia law and within the school board's authority to promulgate.[13]

      C.  <u>As determined by controlling federal authority, Title IX compels APS to make facilities available without regard to gender identity</u>.

APS's decision to implement J-2 PIP-2 is not only consistent with Virginia law, it is also required by Title IX as determined by the U.S. Court of Appeals for the Fourth Circuit.  The Fourth Circuit has explicitly held that Title IX compels local school boards to provide students with access to

---

[5] VA. CODE ANN. § 2.2-3900–3909.

[6] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).

[7] VA. CODE ANN. § 2.2-3900.

[8] *Id.* at § 2.2-3901.

[9] *See* Nick Morrow, *Virginia Values Act Signed Into Law–Extending Long-Delayed, Critical Protections to LGBTQ Virginians*, Human Rights Campaign (Apr. 11, 2020), https://www.hrc.org/news/virginia-values-act-signed-into-law-extends-protections-to-lgbtq-virginians; *Frequently Asked Questions: The Virginia Values Act*, Equality Virginia (Feb. 2021), https://equalityvirginia.org/wp-content/uploads/2021/02/FAQ_-The-Virginia-Values-Act.pdf.

[10] Tyler Thrasher, *Gov. Northam signs Virginia Values Act, providing anti-discrimination protections for LGBTQ people*, abc8NEWS (Apr. 12, 2020), https://www.wric.com/news/politics/gov-northam-signs-virginia-values-act-providing-anti-discrimination-protections-for-lgbtq-people/.

[11] *Id.*

[12] VA. CODE ANN. § 15.2-853.

[13] The Arlington County Board has also adopted the Human Rights Ordinance.  The ordinance, like J-2 PIP-2, extends protections against discrimination on the basis of gender identity to the greater Arlington community.  *See* Arlington Cnty. Code § 31.1 et seq.

JA281

121254246.1

restroom facilities that correspond to their gender identity. As explained below, the Court of
Appeals followed Supreme Court precedent in its baseline recognition of gender identity as a
protected class under Title VII, which it then applied to the analogous provision of Title IX.
Accordingly, any change in APS policy regarding transgender student access to facilities would
violate federal law, as defined by the Fourth Circuit.

The Court of Appeals considered the right of transgender students to access school facilities that
correspond with their gender identity in the case of *Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020). In that case, a local Virginia school division, in response to backlash
about a transgender male student's use of the boy's restroom, implemented a policy under which
students could only use restrooms matching their "biological gender." *Id.* at 593. The policy also
required that "students with gender identity issues shall be provided an alternative appropriate
private facility." *Id.* at 599. To effectuate this policy, a number of single-stall unisex restrooms
were made available to all students. *Id.* at 600. This is precisely the type of facility access policy
that the OCR complaint believes is required by APS and seeks to compel.

Gavin Grimm, a transgender student, sued the Gloucester School Board, arguing that the restroom
policy violated his rights under Title IX. *Grimm*, 972 F.3d at 593. Grimm prevailed on his Equal
Protection Clause and Title IX claims at the summary judgment stage. *Id.* at 603. When the School
Board appealed the Fourth Circuit created legal precedent for local public schools under its
jurisdiction. The court analogized the facts in *Grimm* to those involved in *Bostock v. Clayton
County,* 590 U.S. 644 (2020), in which the Supreme Court held that discrimination against a person
for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights
Act. *Grimm*, 972 F.3d at 616–19. The court read *Bostock* to require that Grimm's gender identity
was a similarly protected status pursuant to Title IX of that same statute. *Id.*

Having made the threshold finding that Grimm was a member of a protected class according to
*Bostock*, the Court of Appeals went on to uphold the district court's decision. *Grimm*, 972 F.3d at
619-20. First, the court held that the school board policy at issue constituted "sex-based
discrimination," violating Grimm's equal protection rights. *Id.* at 613. The court dismissed the
Board's argument that the policy was substantially related to its goal of protecting students'
privacy, noting that the Board "cite[d] to no incident, either in Gloucester County or elsewhere"
and "ignore[d] the growing number of school districts across the country who are successfully
allowing transgender students such as Grimm to use the bathroom matching their gender identity,
without incident." *Id.* at 614. Next, the Court of Appeals concluded that the policy discriminated
against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than
students with whom he was similarly situated because he alone could not use the restroom
corresponding with his gender." *Id.* at 618.[14] In affirming the district court's judgment, the Fourth
Circuit stated that it was "left without a doubt that the Board acted to protect cisgender boys from

---

[14] The Fourth Circuit also held that the School Board violated Title IX when it refused to update Grimm's
sex listed in his school records. *Grimm,* 972 F.3d at 619. The court determined that the Board "based its
decision . . . on his sex," which "harmed Grimm." *Id.* The discrimination was unlawful because "it treat[ed]
him worse than other similarly situated students, whose records reflect their correct sex." *Id.*

121254246.1

Gavin's mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life." *Id.* at 620.[15]

*Grimm* established that a policy that prohibits a transgender student from using facilities that corresponds to their gender identity and instead forces them to use the opposite sex facilities or a separate unisex facility is discriminatory under Title IX in the Fourth Circuit. *Grimm* is dispositive here and supports APS policy at issue in the instant investigation. Modification of J-2 PIP-2 in a manner requested by the complaint would constitute a violation of federal law. APS's policy protects transgender students from the type of unlawful sex discrimination found in *Grimm* by allowing them to use the facilities that correspond with their gender identity and prohibiting their assignment to a separate single-use facility. If APS decided to rescind such policy and require that transgender students use the bathroom that corresponds with their sex assigned at birth, APS would violate Virginia state and federal law.

### III.    Formal and Informal Title IX Complaints Regarding J-2 PIP-2

Consistent with the experience of numerous school districts across the country, including districts within Virginia, APS has implemented this policy without disruption or controversy. APS has not received a single formal or informal Title IX complaint about the Policy in the 2024-2025 school year or any school year since the policy was implemented. *See* Attestation of Title IX Coordinator, Sedrick Ross, ARLINGTON_OCR_1306_00000094. Nor has the Title IX office or the Office of Division Counsel received any formal or informal complaints during the 2024-2025 school year. It is highly unlikely that the Title IX office or the Office of Division Counsel would not be made aware of the existence of such a complaint, given the charged nature of the issue.

Regulation J-2 PIP-2 has enjoyed broad support among students, parents, and other stakeholders in Arlington. At the January 30, 2025 Arlington School Board meeting, a high school student thanked the Board for its continued commitment to allowing "students to be themselves at schools" and shared how J-2 PIP-2 has fostered a supportive environment for transgender students.[16] During this meeting, a litany of seven other members of the community, including APS parents and administrators, expressed appreciation for J-2 PIP-2 and urged the Board to continue its commitment to supporting transgender students.[17] Similarly, at the February 13 meeting, a parent of a transgender student that graduated from an APS school in 2024 explained how J-2 PIP-2 facilitated a positive environment for his son while he transitioned as a freshman.[18] The February 27 meeting told a similar story. Five community members spoke before the Board to share that J-2 PIP-2 reflects the values of the community, and that the policy is working well in APS schools.[19]

---

[15] As a result of the *Grimm* decision, the Gloucester County school division was required to pay $1.3 million in the plaintiff's attorneys fees and costs, in addition to what was certainly a significant amount of its own legal expenses to fight the case. On June 28, 2023, the Supreme Court denied the school board's petition for a writ of certiorari.

[16] School Board Meeting January 30, 2025, https://www.apsva.us/post/school-board-meeting-january-30-2025/, at 52:29.

[17] *Id.* at 1:12:20, 1:26:15, 1:27:32, 1:30:19, 1:34:19, 1:37:32, 1:38:41.

[18] School Board Meeting, February 13, 2025, https://www.apsva.us/arlington-school-board/school-board-meetings/watch-school-board-meetings/, at 2:00:21.

[19] School Board Meeting, February 27, 2025, https://www.apsva.us/arlington-school-board/school-board-meetings/watch-school-board-meetings/, at 50:07, 59:59, 1:11:26, 1:40:14, and 1:46:02.

JA283

121254246.1

## IV.    Conclusion

The policy at issue in this complaint is working well and will not be modified by the Arlington School Board.  The policy is compelled by Virginia law and consistent with binding Fourth Circuit precedent.  Moreover, it has been implemented without disruption and generated minimal opposition within the APS division.  Changing the policy would fly in the face of these practical benefits and legal requirements.  A policy requiring students to use the bathroom facility that correspond to their gender at birth would create an undue danger of harm to certain APS students and expose APS to substantial litigation risk.  Accordingly, the policy will remain in place unless some additional authority requires that it be changed.

If you have questions or need additional verification of the matters set forth in this letter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

JA284

# EXHIBIT F

JA285



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

July 25, 2025

By email only to: robert.falconi@acps.k12.va.us; jcafferky@bklawva.com;
jstalnaker@bklawva.com; christine.smith@apsva.us; THeaphy@willkie.com; jefoster@fcps.edu;
edkennedy@fcps.edu; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com;
HSiegmund@mcguirewoods.com

Dr. Melanie Kay-Wyatt
Superintendent of Schools
Alexandria City Public Schools
1340 Braddock Place
Alexandria, VA 22314
c/o   Robert M. Falconi, Division Counsel (robert.falconi@acps.k12.va.us)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204
c/o   Chrissy Smith, Division Counsel (christine.smith@apsva.us)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
c/o   John Foster, Division Counsel (jefoster@fcps.edu)
      Ellen Kennedy, Deputy Division Counsel (edkennedy@fcps.edu)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Aaron Spence
Superintendent
Loudoun County Public Schools
21000 Education Court
Ashburn, VA 20148
c/o   Wesley Allen, Division Counsel (Wesley.Allen@lcps.org)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

*Page 2 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Dr. LaTanya D. McDade
Superintendent of Schools
Prince William County Public Schools
14715 Bristow Road
Manassas, VA 20112
c/o   Laura Colombell Marshall (LMarshall@mcguirewoods.com)
       Heidi Siegmund (HSiegmund@mcguirewoods.com)

Re:     Case No. 11-25-1305 – Alexandria City Public Schools
        Case No. 11-25-1306 – Arlington Public Schools
        Case No. 11-25-1307 – Fairfax County Public Schools
        Case No. 11-25-1308 – Loudoun County Public Schools
        Case No. 11-25-1309 – Prince William County Public Schools

Dear Dr. Kay-Wyatt, Dr. Durán, Dr. Reid, Dr. Spence, and Dr. McDade:

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its investigation of the complaints filed against Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions).  The complaint alleges that the Divisions' anti-discrimination policies pertaining to "trans-identifying" students "provide greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."  Specifically, the complaint alleges that the Divisions' policies related to the use of intimate, sex-segregated facilities, including restrooms and locker rooms, violate Title IX.[1]

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106,[2] which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As recipients of federal financial assistance from the Department of Education, the Divisions must comply with this law and its implementing regulations.

In reaching a determination, OCR reviewed publicly available information, information provided by the Complainant, and documents provided by the Divisions. After carefully considering all of the information obtained during the investigation, OCR finds that the Divisions are in violation of Title IX and its implementing regulations. OCR's findings, analysis, and conclusions are discussed below.

## I.   Factual Background

The Divisions currently maintain the following policies, each of which include similarities with respect to access to intimate facilities for students whose "gender identity" does not correspond to his/her sex.

---

[1] The terms bathrooms and restrooms throughout this letter are used interchangeably.

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

*Page 3 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

- <u>Alexandria City Public Schools: "Policy JB: Nondiscrimination in Education"</u>
  This policy states, in part, that the Division must "[p]rovide[] access for all students to facilities, such as restrooms and locker rooms, that correspond to a student's gender identity." The policy defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary" and adds that it "is an innate part of a person's identity and can be the same or different from society's expectations with the sex they were assigned at birth." The policy notes that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

- <u>Arlington County Public Schools: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools"</u>
  This policy states that "[a]ccess to facilities that correspond to a student's gender identity will be available to all students." It defines "gender identity" as "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." The policy also requires single-use, gender-neutral facilities for individuals seeking privacy.

- <u>Fairfax County Public Schools: "Regulation 2603.2 – Gender-expansive and Transgender Students"</u>
  This regulation states, in part, that "[g]ender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity." The regulation adds that these students "may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth." A corresponding document, entitled "Regulation 2603-Gender-Expansive and Transgender Students Guidance Document," defines gender-expansive (among other terms) as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "an individual whose gender identity is different from that associated with the individual's sex assigned at birth." The regulation states that any student who wishes for privacy must be provided with "a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-us/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to a student's gender identity before or after other students)." These alternatives are intended to minimize the impact on lost instructional time.

- <u>Loudoun County Public Schools: "Policy 8040 – Rights of Transgender and Gender-expansive Students"</u>
  This policy states, in part, that "[s]tudents should be allowed to use the facility that corresponds to their consistently asserted gender identity. While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-use restrooms commensurate with the size of the school." A corresponding regulation, "Regulation 8040-REG," defines gender-expansive (among

*Page 4 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other terms) as "convey[ing] a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "[a] self-identifying term that describes a person whose gender identity is different from their sex assigned at birth." The policy states that the Division will modernize its restrooms and locker rooms to improve privacy and that it will have single-user restrooms.

- Prince William County Public Schools: "Regulation 738-5 – Treatment of Transgender and Gender Nonconforming Students"
  This regulation states that "[a]ll students shall have access to facilities (e.g., restrooms and locker rooms) that correspond to their gender identity." It defines gender identity as "[a]n internal sense of one's own identity as a boy/man, girl/woman, something in between, or something outside the male/female binary," adding that it is "an innate part of a person's identity and can be the same as, or different from, the sex assigned at birth." The regulation states that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

These policies are an outgrowth of model policies issued by the Virginia Department of Education on July 18, 2023, entitled "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools." These model policies state, in part, that "[s]tudents shall use bathrooms that correspond to his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir 2020)."[3]

---

[3] In *Grimm*, the Fourth Circuit held that a School Board could not prohibit a female student who "consistently and persistently" identified as male from using a high school's sex-separated male bathroom under both the Equal Protection Clause and Title IX. 972 F.3d at 619-20. The court found "that transgender persons constitute a quasi-suspect class" and applied heightened scrutiny to reach its equal-protection holding. *Id.* at 613.

In a recent seminal decision, however, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibits providing controversial medical interventions to minors to address "gender dysphoria." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). While acknowledging that trans-identification does not (indeed, cannot) change one's sex, *id.* at 1830 n.2, the Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status," *id.* at 1829-37. The law, the Court explained, easily passed the rational-basis standard because of the "'medical and scientific uncertainty'" surrounding interventions for "gender dysphoria." *Id.* at 1836-37. Further, several justices of the Supreme Court signaled that "transgender status" or "gender identity" is not a category or characteristic warranting heightened scrutiny under the Equal Protection Clause due to the mutability of the concept of "transgender" or "gender identity." *See id.* at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status

*Page 5 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Since on or about the start of the 2024-2025 school year, two Divisions (Alexandria and Arlington) reported to OCR not having received any complaints alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, or other intimate facilities. Fairfax County Public Schools informed OCR that one student filed a lawsuit just before the start of the 2024-2025 school year, which was subsequently joined by three additional students, alleging that Regulation 2603.2 violated their free speech, free exercise, due process, and equal protection rights because it required students to share a restroom with someone who is trans-identifying or, alternatively, use single-use restrooms. According to an Amended Petition for Declaratory, Injunctive, and Additional Relief submitted by the Petitioners to the court and reviewed by OCR, as a result of the Division's regulation, one of the students "avoided using school restrooms and only did so when absolutely necessary." Loudoun County Public Schools asserted that it received two informal complaints about a male student's presence in a female locker room making female students uncomfortable; one complaint from a female student of bullying and harassment in the male locker room; and three complaints related to the female student's presence in the male locker room, making the three complaining male students feel "discomfort, embarrassment, and vulnerability." As to the two informal complaints about a male student in the female locker room, the complaint stated that the male student made sexual jokes, momentarily touched other students, and watched female students changing in the locker room. Lastly, Prince William County Public Schools reported to OCR that it received one complaint of a female student's presence in a male locker room, and a second anonymous complaint that a boy dressed as a girl was in a female locker room, making the complaining student feel uncomfortable.

## II.    Legal Standard

### A.    Title IX prohibits discrimination on the basis of sex.

Title IX of the Education Amendments of 1972 (Title IX) states a general prohibition on sex discrimination in education programs or activities that receive federal funding:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Maintaining sex-separated facilities would thus need only pass rational-basis review under constitutional scrutiny, and schools have a legitimate interest in separating males from females in intimate spaces.

Moreover, *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions. Indeed, the Supreme Court has granted, vacated, and remanded numerous cases, including a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

*Page 6 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

20 U.S.C. § 1681(a).[4] After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX also empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The relevant department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletics, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).

One Title IX regulation states the general prohibition on sex discrimination under Title IX:

(a) General. Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

(b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or

---

[4] Title IX defines "Education institution" as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). And Title IX's implementing regulation defines "program or activity" to include: "[a] department, agency, special purpose district, or other instrumentality of a State or local government"; "[t]he entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"; and "[a] college, university, or other postsecondary institution, or a public system of higher education." 34 C.F.R. § 106.2.

*Page 7 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other treatment;

    .       .       .

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31.

Another Title IX regulation provides that recipients of federal funding may have sex-separated bathrooms and locker rooms as long as those facilities are comparable:

> Comparable facilities. A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33.

**B.    Under Title IX, "sex" means biological sex and does not include "gender identity."**

Title IX and its implementing regulation use the term "sex." The term "sex" is an objective factor. Title IX and its implementing regulations use the term "sex" to mean biological sex. "Sex" does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex).

What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations … reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and does not include "gender identity." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

*Page 8 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."
>
> (b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.
>
> (c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.
>
> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell….

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female" "male" "girl" "woman" "boy" "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[5]

Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. The term "gender identity" is, at best, a subjective factor, "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 145 S. Ct. 1816 (2025). According to some, "gender identity" is "a three-dimensional 'galaxy.'" *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020); *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring). And according to a once blindly followed but now discredited partisan organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *see, e.g.*, Executive Order 14187, *Protecting Children From Chemical and Surgical*

---

[5] https://womenshealth.gov/article/sex-based-definitions (U.S. Department of Health and Human Services).

*Page 9 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

*Mutilation*, 90 Fed. Reg. 8,771, (Jan. 28, 2025) (noting that WPATH "lacks scientific integrity"); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring) ("But recent revelations indicate that WPATH's lodestar is ideology, not science. For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, 'our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" (alteration omitted)); *Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 1849 (WPATH and other "prominent medical professionals … have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). The ACLU even contends that trans-identifying individuals include anyone not matching their sex-stereotype. *See* ACLU, *Transgender People and the Law*, at 19-20 ("transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender").[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth" or really at any period of time. *L.W.*, 83 F.4th at 487; *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Or as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] … but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7]

In short, Title IX is not a statute about "gender identity," but sex discrimination. As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams*, 57 F.4th at 814-15; *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

## C.    Title IX's prohibition against sex discrimination does not include discrimination based on "gender identity."

*Bostock v. Clayton County*'s interpretation of Title VII does not defeat this straightforward reading of Title IX's text, context, and history. 590 U.S. 644 (2020). *Bostock* itself made clear that

---

[6]https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services (May 1, 2025), https://opa.hhs.gov/gender-dysphoria-report, at p. 34.

*Page 10 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

it did not "prejudge" the interpretation of other statutes like Title IX and did not "purport to address bathrooms, locker rooms, or anything else of the kind" under the statute it did interpret. 590 U.S. at 681. And for good reason: *Bostock*'s "text-driven reasoning applies only to Title VII," as "many subsequent cases make clear." *L.W.*, 83 F.4th at 484; *accord Tennessee*, 2024 WL 3453880, at *2 ("*Bostock* is a Title VII case."). "As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination" like Title IX. *Id.* (collecting cases). *Bostock* "bears minimal relevance to cases involving a different law and a different factual context," as is the case with Title IX. *Alabama*, 2024 WL 3981994, at *5 (cleaned up). While *Bostock* "involved employment discrimination under Title VII," Title IX "is about schools and children—and the school is not the workplace." *Id.* (cleaned up); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII … is a vastly different statute from Title IX."). And "'Title IX, unlike Title VII, includes express statutory and regulatory carveouts for differentiating between the sexes,'" so "if *Bostock* applied, it 'would swallow the carve-outs,'" "'render them meaningless,'" and absurdly provide more protection for "gender-identity discrimination" than sex discrimination. *Alabama*, 2024 WL 3981994, at *5 (quoting *Adams*, 57 F.4th at 811 & 814 n.7). Thus, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see, e.g.*, *Alabama*, 2024 WL 3981994, at *4-5 (collecting cases concluding the same); *cf. Dep't of Ed. v. Louisiana*, 603 U.S. 866, 867 (2024) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Department of Education's predecessor to create regulations "implementing … [T]itle IX." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including bathrooms and athletics. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

*Page 11 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on bathrooms and athletics. That "highly counterintuitive result" cannot be right. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address "gender-identity discrimination" as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and "gender identity." *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).

Even if *Bostock* were relevant to Title IX's scope, it would not change the Department's reading of Title IX and its implementing regulations here. Under *Bostock*, Title IX permits sex separation in bathrooms and locker rooms. Indeed, *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. That is not true here. Unlike in *Bostock*, males and females are not similarly situated when it comes to bathrooms or locker rooms; given their real biological differences, sex is relevant to such decisions. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *Adams*, 57 F.4th at 814-17; *Bostock*, 590 U.S. at 725-28 (Alito, J., dissenting). And as explained below, Title IX not only allows sex-separate bathrooms but requires them.

Page 12 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

## III.    Analysis

### A.    The Divisions have violated and are still violating Title IX and its implementing regulations.

As explained, Title IX is not a statute about "gender identity" or "gender-identity discrimination" but one about sex discrimination. "Sex" does not mean, and has never meant, "gender identity." Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. By allowing males to invade sensitive female-only spaces like bathrooms (and vice versa), the Divisions intentionally, or with deliberate indifference, endanger students' safety, privacy, and dignity; create a hostile environment for students; and deny them access to educational activities or programs. *See, e.g.*, *Tennessee*, 737 F. Supp. 3d at 561 ("ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities"). The Divisions are thus violating Title IX.

Title IX is consistent with longstanding tradition of sex-separated sensitive facilities like bathrooms. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05; *see, e.g.*, WOMEN'S SPORTS POL'Y WORKING GRP., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes (Jan. 28, 2023), https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

In line with this tradition, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Further recognizing that sex separation is necessary to adhere to Title IX's requirements, one of Title IX's implementation regulation—which has existed since Title IX's enactment—expressly permits a recipient to provide separate toilet, locker room, and shower facilities based on sex. 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignitary interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room. Eliminating sex-separate bathrooms and locker rooms, as the Divisions have here, "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559. And it creates a hostile educational environment that denies students educational opportunities.

Although self-evident, a recently released report finds requiring girls to undress or use the bathroom in the presence of boys, causes distress in girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities. *See* Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N.

Page 13 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id.*; *see Tennessee*, 737 F. Supp. 3d at 562 ("the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened too"). Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Id.* at 561.

This harm is not hypothetical. The Divisions' policies affect real students. For example, OCR learned that since the start of the 2024-2025 school year, Fairfax County Public Schools was subject to a lawsuit filed on behalf of a student—and later joined by three additional students—alleging that sharing a restroom with students of the opposite sex violated, among other things, the students' equal-protection rights. In that filing, the petitioners alleged that one of the students avoided using school restrooms whenever possible because of the Division's regulation. Loudoun County Public Schools also received five reports from both male and female students about a student of the opposite sex's presence in the locker rooms, resulting in, as one complaint put it, "discomfort, embarrassment, and vulnerability." In two of those complaints, female students alleged that a male student made sexual jokes, momentarily touched other students in an inappropriate manner, and watched female students changing in the locker room. And Prince William County Public Schools reported two complaints about the presence of individuals of the opposite sex in the locker rooms, resulting in students' discomfort.

Students at school have enough to worry about; worrying about whether it is safe to use the bathroom or change in a locker room cannot be one of them. The Divisions' bathroom, locker room, and sex-segregated intimate facilities policies or regulations violate Title IX and its implementing regulations because they permit access to intimate facilities that correspond with a student's "gender identity," which, in turn, requires students to use these intimate facilities in the presence of members of the opposite sex. In so doing, the Divisions are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent. Put differently, the Divisions are creating a hostile education environment that denies students the benefits of an education program or activity based on sex, in violation of Title IX and its implementing regulations.

## B.    The Divisions' reliance on *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), does not shield it from liability under Title IX.

*Grimm* does not change the Department's conclusion that the Divisions have violated and are violating Title IX. The Supreme Court in *Skrmetti* abrogated *Grimm* and other Fourth Circuit precedents in key respects, showing that a sex-separated bathroom policy is permissible under Title IX and the Equal Protection Clause. Regardless, *Grimm*'s conclusions hinged on certain factual findings that, as the record shows, are debunked. Moreover, many of the Divisions' policies do not limit bathroom access to consistent or persistent assertions of a certain "gender identity" and thus are overbroad.

### 1.    *Skrmetti* abrogated *Grimm* in key respects.

Key aspects of *Grimm* are no longer binding in light of *Skrmetti*. The Supreme Court granted, vacated, and remanded the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which heavily relied on *Grimm*, showing that *Grimm* is out of step with Supreme

Page 14 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

Court precedent. *See Folwell v. Kadel*, No. 24-99, 2025 WL 1787687, at *1 (U.S. June 30, 2025) ("The petition for writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025)."). And *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions, especially given that the Supreme Court granted, vacated, and remanded cases outside the medical-intervention context, including in a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

    ***First***, *Grimm*'s Title IX ruling hinged on the correctness of its equal-protection analysis, specifically the conclusion that a sex-separated bathroom policy classifies based on sex. *See Grimm*, 972 F.3d at 618 ("*In light of our equal protection discussion above*, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." (emphasis added)). But that analysis has been abrogated by the Supreme Court in *Skrmetti*. *Skrmetti* made clear that the key question is whether the policy "prohibit[s] conduct for one sex that it permits for the other." 145 S. Ct. at 1831. And that is not true for sex-separated bathrooms. Neither sex may use the bathroom of their choosing; both sexes must use the bathroom consistent with his or her sex.

    ***Second***, in *Grimm*, the Fourth Circuit relied heavily on *Bostock*, which it imported to Title IX with little analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." *Grimm,* 972 F.3d at 616 (cleaned up). But *Bostock* does not apply to Title IX. Even if it did*, Bostock* does not establish that a sex-separated bathroom policy discriminates based on sex in violation of Title IX.

    To begin with, the Supreme Court has recently made clear that it has not "considered whether *Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. In so doing, however, the Supreme Court also made clear that *Bostock*'s "'because of' test" derived from Title VII's "because of" language, which "incorporates the traditional but-for causation standard." *Id.* As explained above, *Bostock* simply does not apply outside Title VII and does not apply to Title IX. *See, e.g., Tennessee*, 2024 WL 3453880, at *2; *Alabama*, 2024 WL 3981994, at *4-5; *cf. Louisiana*, 603 U.S. at 867 (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

    In any event, the Supreme Court has clarified *Bostock*'s analysis in *Skrmetti*, abrogating *Grimm*. According to *Skrmetti*, *Bostock* concluded that sex is a but-for cause when for similarly situated individuals, the entity "penalize[s] a member of one sex for a trait or action that it tolerates in members of the other." *Skrmetti*, 145 S. Ct. at 1834. That is not true for sex-separated bathrooms because "changing the [applicant's] sex … does not automatically change the operation of" the sex-separated bathroom policy. *See id.* at 1834-35. For example, if a female seeks to choose her own bathroom, a sex-separate bathroom policy prohibits her from doing so—and requires that her bathroom choice reflect biological reality, regardless of whether that reality matches the person's

*Page 15 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

asserted "gender identity." Change that person's sex from "female to male," *id.* at 1834, and the bathroom policy would still prohibit him from choosing his own bathroom—and would still require that his bathroom reflect biological reality, regardless of whether that reality matches the person's "gender identity." Thus, under such a policy, sex is not "the but-for cause" of one's inability to self-select a bathroom based on one's "gender identity." *Id.* A sex-separated bathroom policy does not "intentionally penalize[]" a male "for a trait" that the policy "tolerates" in a female, *id.*, so it does not discriminate based on sex under *Bostock*'s reasoning, as clarified by *Skrmetti*.

**Third,** the Fourth Circuit in *Grimm* alternatively concluded that a sex-separated bathroom policy triggered intermediate scrutiny under the Equal Protection Clause because it thought "transgender status" was a "quasi-suspect class" and that such a policy classifies based on "transgender status." *Grimm*, 972 F.3d at 613. Even if *Skrmetti* has not abrogated this analysis, *see* 145 S. Ct. at 1832-34 (state child-protection law did not classify based on trans-identification), it does not mean that the Divisions' overbroad policies follow Title IX, as explained below. In any event, the Fourth Circuit's conclusion that "trans-identification" is a quasi-suspect class is inconsistent with subsequent Supreme Court dicta. The Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class." *Skrmetti*, 145 S. Ct. at 1832. And rightly so. As three Justices explained in *Skrmetti*, "transgender status" or "gender identity" is not a class that warrants heightened scrutiny. *See id.* at 1855 (Barrett, J., concurring, joined by Thomas, J.) ("The Equal Protection Clause does not demand heightened judicial scrutiny of laws that classify based on transgender status," and, thus, "[r]ational-basis review applies."); *id.* at 1860 (Alito, J., concurring in part and in the judgment) ("[T]ransgender status does not qualify under our precedents as a suspect or 'quasi-suspect' class.").

To start, "transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." *Id.* at 1851 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class."). It is not "definitively ascertainable," let alone "at the moment of birth," as "detransition[ers]" show. *Id.* at 1851 (Barrett, J., concurring) (cleaned up). It is not a "discrete group" because the category of trans-identifying individuals "is large, diverse, and amorphous" and "not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Id.* at 1851-52 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."). And trans-identification, "unlike race and sex, is often not accompanied by visibly identifiable characteristics" because an individual's "'gender identity' is an 'internal sense,'" which does not "necessarily tend to 'carry an obvious badge' of their membership in the class that might serve to exacerbate discrimination." *Id.* at 1866-67. This alone "is enough to demonstrate that transgender status does not define a suspect class." *Id.* at 1853 (Barrett, J., concurring).

But there is more. The group has not, "as a historical matter, been subjected to discrimination." *Id.* (cleaned up). That is because this group has not "suffered a history of *de jure* discrimination." *Id.*; *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("[T]ransgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or 'quasi-suspect.'"). Indeed, "there is no evidence that transgender individuals, like racial minorities and

*Page 16 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

women, have been excluded from participation in the political process." *Id.* at 1866. To the contrary, "despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems." *Id.* This too separately shows "transgender status" does not warrant heightened scrutiny.

Thus, the Divisions' reliance on the Fourth Circuit's opinion in *Grimm* that "transgender status" or "gender identity" is a quasi-suspect class that is subject to heightened scrutiny, is wrong. Indeed, Justice Barrett specifically cited *Grimm* as an example of a lower court erroneously employing "sociological intuitions about a group's relative political power" while failing to rely upon "objective, legally grounded standard[s] that courts can apply consistently." *Id.* at 1855 (Barrett, J., concurring).

**Fourth,** even if heightened scrutiny applied,[9] a sex-separate bathroom policy would easily satisfy that standard. In *Skrmetti*, the Supreme Court explained that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on *impermissible* stereotypes." 145 S. Ct. at 1832 (emphasis added). Because sex-separate bathrooms are necessary to preserve students' privacy, safety, and dignity, they "do not themselves evince sex-based stereotyping." *Id.*; *see Skrmetti*, 83 F.4th at 486 ("Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping.").

## 2.    *Grimm* hinged on certain factual findings that are refuted based on the record in this investigation.

More fundamentally, *Grimm* is premised on factual findings and conclusions that are clearly distinguished from the facts in this investigation. *Grimm* does not apply to this investigation because the Department has developed a different record than the limited record in *Grimm*, and the "question [in *Grimm* was] limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *See Grimm*, 972 F.3d at 596.

**First,** per *Grimm*, a female who identifies as a boy is "similarly situated" to a male because a trans-identifying female is somehow a boy. *See Grimm*, 972 F.3d at 610 n.10 ("To avoid a conclusion that Grimm was similarly situated to other boys, the dissent fails to meaningfully reckon with what it means for [Grimm] to be a transgender boy. We have been presented with a strong record documenting the modern medical understanding of what it means to be transgender, and considering that evidence is definitively the role of this Court." (cleaned up)). Indeed, *Grimm*

---

[9] To the extent that *Grimm* is still binding, the Department preserves the right to challenge this precedent. At any rate, the writing on the wall is clear: The Supreme Court recently granted certiorari in two cases that clearly signals that whatever is left of *Grimm*, it will no longer be good law or, at the very least, shows that *Grimm* should be seriously reconsidered. *See W. Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025); *Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S. July 3, 2025). These cases will address whether Title IX or the Equal Protection Clause prevents a State from having sex-separated sports teams. The Supreme Court will also consider, among other things, whether *Bostock* extends to Title IX and whether classification based on "transgender status" is subject to heightened scrutiny.

*Page 17 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

claimed that a sex-separate bathroom policy defining "sex" to mean objective biological facts is based on nothing more than an "invented classification" and "discriminatory notion." *See, e.g.*, *id.* at 618-19.

But *Grimm*'s conclusions are refuted by the facts found in this investigation, which shows Grimm's conclusions are contrary to science and biological reality. *See, e.g.*, *supra* n.3. The Supreme Court in *Skrmetti* recognized that trans-identification does not (indeed, cannot) change one's sex. *See* 145 S. Ct. at 1830 n.2; *see also, e.g.*, *Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (cleaned up)). And as noted above, the President and the Department of Health and Human Services have also recognized that a trans-identifying male is not similarly situated to a female and that biological sex is not invented but based on scientific truth.

In claiming otherwise, the Fourth Circuit heavily relied on WPATH. *See, e.g.*, *Grimm*, 972 F.3d at 595-96 (claiming WPATH "represent[s] the consensus approach of the medical and mental health community" and relying on WPATH). But as explained, WPATH is a discredited, partisan advocacy group. *See, e.g.*, Amicus Brief of Alabama in *United States v. Skrmetti*, No. 23-477 (filed Oct. 15, 2024)[10]; The Cass Review: Independent Review of Gender Identity Services for Children and Young People (Apr. 2024).[11] WPATH's opinions are not based on appropriate evidence but rather the biased motivation to help "social justice lawyers." *Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring) (cleaned up).

*Grimm*'s conclusion also ignores the physical reality of how humans use restrooms. Simply making male and female restrooms available to both sexes based on "gender identity" does not provide the same services to male and female students. As one court noted, "[i]f defendant provided 'identical' men's and women's restrooms … each containing two toilet stalls and seventeen urinals, few would argue that the facilities were functionally comparable notwithstanding their physical similarity. The benefits and services derived by one group would be substantially less than the benefits and services derived by the other*." Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 733 (D. Or. 1997), *supplemented*, 1 F. Supp. 2d 1159 (D. Or. 1998). Or as another court has explained, "[n]ot to be unduly technical, but transgender girls would use individual stalls because female restrooms do not contain urinals. And transgender boys cannot physically use urinals and would, therefore, also use individual stalls." *Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315-DCN, 2023 WL 6690596, at *9 (D. Idaho Oct. 12, 2023), *aff'd*, 131 F.4th 975 (9th Cir. 2025). By ignoring objective biological facts, and instead basing bathroom policies on a subjective factor like "gender identity," the school divisions of Alexandria, Arlington, Fairfax, Loudoun, or Prince William engage in the different treatment of male and female students, in violation of Title IX.

---

[10] https://www.supremecourt.gov/DocketPDF/23/23477/328275/20241015131826340_20 24.10.15%20-%20Ala.%20Amicus%20Br.%20iso%20TN%20FINAL.pdf.

[11] https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.indepe ndent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf.

*Page 18 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

In short, common sense and overwhelming evidence establishes that a boy is a boy, and a girl is a girl, regardless if the boy or girl has undergone medical interventions, and that a boy and a girl are not similarly situated when it comes to bathrooms and other intimate facilities.

**Second**, contrary to *Grimm*, the privacy and security concerns of students are not "sheer conjecture and abstraction" but real and serious. *Grimm*, 972 F.3d at 614. There is evidence that "trans-identifying" individuals using bathrooms not in line with their sex has led to privacy, security, and dignitary harms. *Contra Grimm*, 972 F.3d at 614 ("The Board does not present any evidence that a transgender student, let alone Grimm, is likely to be a peeping tom, rather than minding their own business like any other student. Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys' restrooms did not increase when Grimm was banned from those restrooms."). As noted above, students have filed lawsuits or complaints with some of the Divisions, alleging that students have suffered privacy and safety harms from these Divisions' bathroom policies.

The Virginia Attorney General recently released findings in an investigation conducted in March 2025, involving a female student who identified as a male student and was recording male students inside the boys' locker room and restroom in the Loudoun County Public Schools. The report indicates that when the boys expressed their concerns about sharing a locker room with a female student, the school division investigated the boys for voicing those concerns.

In 2021, public reports indicate a male student, who had conveyed to a classmate that he told his mother he was "pansexual," wore his hair in a bun, and would sometimes dress in a skirt and wear fishnet gloves, sexually assaulted a 15-year-old female classmate in a girls' restroom at Stone Bridge High School in Loudoun County Public Schools. That male was later adjudicated guilty of the assault in court. The same male student was then transferred to another school in the same division and sexually assaulted another female student less than six weeks after the first assault. He was adjudicated guilty of that assault as well.[12]

What has been seen in the Divisions has also been seen throughout the country. For example, on April 15, 2025, a high school track student athlete spoke during public comment at the Lucia Mar School District Board of Education in Arroyo Grande, California about the impact the Board's policy of allowing boys who identify as girls to use locker rooms and restrooms designated for girls, had on her. The student recounted how she had recently gone into the women's locker room at school to change for track practice. While she was changing her clothes, a male student was sitting in the locker room watching her and the other female students undress. The young lady stated the experience was traumatizing. She stated the male student had already dressed for track practice at the beginning of the day. The male student had no reason to be in a locker room other than to watch girls undress.

In June 2024, a 16-year-old female student at Stewartville High School in Minnesota expressed her experience having to share restroom and locker room facilities with boys at school,

---

[12] Report Regarding Investigation into Misconduct at Stone Bridge High School and Broad Run High School, December 31. 2021.

*Page 19 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

and the impact it had on her educational opportunities.[13] The young lady reported that she was in the locker room after gym class getting ready to change clothes and she heard a male's voice inside the women's locker room and when she turned to look, she saw a boy in the locker room. She indicated that she talked to her school principal about feeling uncomfortable about changing in the locker room in the presence of a boy, but he told her that students can "be whoever they want to be." She also indicated she is scared about boys pretending to be girls, then touching them or taking cellphone photos of girls in restrooms or locker rooms, and that other girls she knows share her concerns. The mother of two other female students spoke up raising similar concerns. Parents have also spoken out about school district policies allowing teen-age boys to share locker rooms and restrooms with teen-age girls at Rochester Public Schools in Minnesota. One parent indicated she had to move her daughters to another school district because of restroom and locker room policies allowing boys into restrooms and locker rooms designated for girls.[14]

Public reports indicate in March 2023, four 14-year-old freshman girls in the Sun Prairie Area School District in Wisconsin were showering in the girls' locker room when they were exposed to the genitalia of an 18-year-old senior male student who told the girls he was "trans."

There are unfortunately more examples. *See, e.g.*, Declaration of A.C. in *Sexuality and Gender Alliance v. Critchfield*, No. 1:23-cv-00315, Doc. 90-1 ¶¶ 4-7 (D. Idaho July 21, 2025) (girl student detailing how, at her school that allows boys into the girls' bathroom, a male was "masturbating in the adjacent stall" to hers in the girls' bathroom).

**Third,** in *Grimm*, the Court stated "the heart of [the] appeal is whether equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender." 972 F.3d at 593. What is at the heart of this investigation, however, is an issue not considered by the Court in *Grimm*. This investigation is evaluating whether the Divisions are taking action that denies students who are not "transgender" equal access to education benefits and opportunities in programs and activities offered by the Divisions. In *Grimm*, the Court was concerned that Grimm practiced bathroom avoidance resulting in urinary tract infections and felt "unsafe, anxious, and disrespected" because of the Board's policy requiring students to use the restroom that corresponds to their sex. *Id.* at 600. Those same concerns are present for students who are not "transgender" and who are forced to share a restroom or locker room with a member of the opposite sex. The Divisions have an obligation under Title IX to all students in the provision of restrooms and locker rooms, not just students who identify as "transgender."

3.    **Regardless, many of the Divisions' policies are overbroad, showing that even applying *Grimm*, they violate Title IX.**

Even if *Grimm* were still binding, four of the five school divisions at issue in this investigation (Alexandria, Arlington, Fairfax, and Prince Williams) violate Title IX by not limiting their intimate-facilities policies to students that "consistently and persistently" assert a "gender

---

[13] https://www.dailysignal.com/2024/06/13/really-uncomfortable-16-year-old-girl-speaks-sharing-school-bathrooms-locker-rooms-males/.

[14] https://www.dailysignal.com/2024/06/11/concerned-daughters-safety-13-minnesota-school-districts-issue-transgender-guidelines-allowing-boys-girls-spaces/;
https://alphanews.org/infuriating-minnesota-mom-slams-school-districts-radical-transgender-restroom-guidelines/.

*Page 20 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

identity."[15] *Grimm* was crystal clear that its decision was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a binary gender." 972 F.3d at 596 (emphasis added); *accord id.* at 610 ("Grimm, however, did not question his gender identity at all; he knew he was a boy."); *id.* at 619 ("Grimm *consistently and persistently* identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys' restrooms as part of the appropriate treatment." (emphasis added)). In other words, these school divisions allow individuals that do not assert a consistent and persistent "gender identity" to use facilities of the opposite sex. Because Grimm is premised on this limitation, policies without that limitation cannot rely on *Grimm*. Thus, these four school divisions have overbroad policies that are not justified by *Grimm* and violate Title IX.

For these reasons, OCR concludes that *Grimm* does not apply and that, even assuming it does apply, would not change the outcome of this investigation. The Divisions' policies that allow teenage boys to share intimate facilities with teenage girls violate common sense, create unnecessary distress and risk of harm, and deny students the availability of sex-separated locker rooms and bathrooms. These policies result in hostile environments and a denial of the overall benefits of an education program or activity based on sex. The Divisions are thus violating Title IX and its implementing regulations.

## IV.    Conclusion

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the Divisions' compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

---

[15]  *See,* https://go.boarddocs.com/va/acps/Board.nsf/files/DE62ZL049E89/$file/JB%20-%20Nondiscrimination%20in%20Education.pdf;https://go.boarddocs.com/vsba/arlington/Board.nsf/files/BDNQEE68DE84/$file/J-2%20PIP-2%20Transgender%20Students%20in%20Schools.pdf;https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/CDPTV8792B2E/$file/R2603.pdf;https://go.boarddocs.com/vsba/pwcs/Board.nsf/goto?open&id=C3VP7R61926D.

*Page 21 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

This letter is accompanied by a draft resolution agreement that specifies the actions that, when taken by the Division, will remedy the violation of Title IX. Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter.

If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse.

Sincerely,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2025.07.25 10:21:48 -05'00'

Bradley R. Burke
Regional Director

Enclosure

JA306

# EXHIBIT G

JA307

## RESOLUTION AGREEMENT
### Arlington Public Schools
### OCR Case Numbers 11-25-1306

Arlington Public Schools (hereinafter referred to as "the Division") agrees to fully implement this Resolution Agreement to resolve the allegations investigated in Office for Civil Rights (OCR) Case Number 11-25-1306.  This Agreement does not constitute an admission by the Division of a violation of Title IX of the Education Amendments Act of 1972 (Title IX), or any other law enforced by OCR.

## Action Item 1 – Rescission of Policies, Regulations, and Corresponding Guidance

The Division will rescind any components of the following policy pertaining to access to intimate facilities: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools."  The Division will also rescind any corresponding guidance documents, trainings, or other related documents pertaining to the components of the aforementioned policy that apply to intimate facilities.

### Reporting Requirements:

a.  By_____2025, the Division will provide OCR with documentation demonstrating that Action Item 1 has been fully implemented.

## Action Item 2 – Issue Memorandum to Schools

The Division will issue a memorandum to each Division school regarding the rescission of the policies and/or regulations outlined in Action Item 1.  The memorandum will inform the schools that any future policies related to access to intimate facilities must be consistent with Title IX. The memorandum shall:

a.  Specify that Title IX compliance means a school must not – on the basis of *sex* – exclude *female* students from participation in, deny female students the benefits of, or subject female students to discrimination under, any education program or activity including but not limited to the use of intimate facilities including locker rooms and bathrooms.

b.  Specify that schools must provide intimate facilities such as locker rooms and bathrooms accessible to students strictly separated on the basis of sex and comparably provided to each sex.

The memorandum will further state that the words *sex, female, male, girls, women, boys, men* as used in the memorandum and as applicable in all practices, policies, and procedures adopted and implemented by the Division pursuant to or consistent with Title IX, mean the following:

*Sex* is a person's immutable biological classification as either male or female.
*Female* is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova).
*Male* is a person of the sex characterized by a reproductive system with the biological function of producing sperm.
*Woman* is an adult human female.

JA308

*Page 2 – Resolution Agreement, Arlington Public Schools - 11251306*

        **Girl** is a minor human female.
        **Man** is an adult human male.
        **Boy** is a minor human male.

The memorandum will further state that the above meanings of words are to be understood in the context of the facts that *there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm); and the sex of a human – female or male – is determined genetically at conception (fertilization), observable before birth, and unchangeable.*

The Division will post this memorandum in a prominent location on its website.

**<u>Reporting Requirements:</u>**

a. By _____2025, the Division will submit a copy of the draft memorandum to OCR for OCR's review and approval.

b. Within _____days of receiving OCR's approval, the Division will disseminate the memorandum to the Division schools and provide verification to OCR.

By signing this Agreement, the Division agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement.  During the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms and obligations of this Agreement.

Upon OCR's acknowledgment of the Division's satisfaction of the commitments made under this Agreement, OCR will close the case.

The Division understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the Division written notice of the alleged breach and 60 calendar days to cure the alleged breach.

The Agreement will become effective immediately upon the signature of the Division's authorized official below.


By: _____    Date:  _____
      Name and Title
      Recipient Name

# EXHIBIT H

Confidential Treatment Requested

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

July 29, 2025

Bradley Burke
Regional Director
United States Department of Education
Office for Civil Rights

Re:    Case No. 11-25-1305 – Alexandria City Public Schools
       Case No. 11-25-1306 – Arlington Public Schools
       Case No. 11-25-1307 – Fairfax County Public Schools
       Case No. 11-25-1308 – Loudoun County Public Schools
       Case No. 11-25-1309 – Prince William County Public Schools

Dear Mr. Burke,

We are in receipt of the Letter of Findings ("LOF") and accompanying draft resolution agreements that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the "Divisions") on July 25, 2025. As explained below, the Divisions respectfully request the opportunity to negotiate with OCR for up to 90 calendar days, as guaranteed by Section 303(f) of the OCR Case Processing Manual ("OCR Manual").

In February, 2025, OCR issued a Notification Letter and a Data Request Letter to the Divisions indicating that a complaint was filed with OCR alleging that the Divisions' policies violated Title IX by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restroom and locker rooms. The Divisions timely responded to the Data Request Letter and provided both documents and narrative responses in March 2025.

On July 25, OCR issued its LOF and accompanying draft resolution agreements. The LOF specifically provides: "Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter. If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse."

Pursuant to Section 303(f) of the OCR Manual: "From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within which to reach final agreement." Section 303(h) of the OCR Manual further provides that "when it is clear that agreement will not be reached . . . OCR shall issue an Impasse Letter that informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period."

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HAMBURG   HOUSTON   LONDON   LOS ANGELES
MILAN   MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA311

Confidential Treatment Requested

Your letter and the 10-day deadline it imposes for a response suggests that OCR believes the parties have reached an impasse, triggering the 10-day notice provision of Section 303(h). The Divisions disagree with that characterization of the status of negotiations, as we have only received OCR's LOF and draft resolution agreements less than two business days ago. The LOF contains a complex legal analysis of recent Supreme Court precedent. The draft resolution agreement demands substantial changes to school division policies and regulations and the redefinition of fundamental terms therein. It is premature to declare negotiations at an "impasse" when we have only just received OCR's LOF and demand for substantial changes to policies and/or regulations. The Divisions have not yet had an opportunity to evaluate, much less respond to those assertions. Accordingly, we believe that the 90-day period provided by Section 303(f) of the Manual applies, as the Divisions intend to engage in their respective good-faith discussions with OCR and attempt to negotiate a resolution agreement.

The Divisions will use the additional time to engage in an evaluation process, including by involving their respective elected school boards as appropriate, in order to respond to OCR's proposed resolution agreement. The policies at issue impact a wide array of stakeholders. Matters of policy as well as resolution of federal investigations often require the involvement of the elected school boards of each Division. As a practical constraint, given the summer recess, some of the Divisions' school boards will not reconvene for several weeks from now and must comply with Virginia public meetings law when scheduling meetings. It is not possible for the school boards to meet, evaluate the OCR LOF and draft resolution agreement, consider stakeholder feedback as appropriate, and make consequential decisions within 10 days.

Moreover, compliance with the proposed resolution agreement is more complex than simply rescinding the policies at issue, as some of the specific Division policies involved in this matter contain components that are not subject to the resolution agreement and will be impacted by the proposed changes. Just as these policies were not enacted within ten days, but rather over the course of an appreciable timeframe that allowed for thoughtful deliberation and consideration, reframing the policies to comply with the proposed resolution agreement cannot be done on the highly abbreviated timeframe provided by the OCR LOF. Ninety days will allow time for the Divisions to discuss and evaluate the LOF and proposed resolution agreements, solicit feedback from relevant invested parties as appropriate, and engage in negotiations with OCR in a good faith effort to resolve the matter.

For these reasons, the Divisions respectfully request that OCR honor the terms of the OCR Manual by providing the Divisions with a minimum of 90 days to negotiate with OCR.

Respectfully,

*/s/* Timothy J. Heaphy
Timothy J. Heaphy
*On behalf of Fairfax County Public Schools and Arlington Public Schools*
Willkie Farr & Gallagher LLP
THeaphy@willkie.com
PH: 202-303-1069

cc:
Michelle C. Reid, Ed.D., Division Superintendent, FCPS
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

JA312

Confidential Treatment Requested

Francisco Duran, Ed.D., Superintendent, APS
Chrissy Smith, Division Counsel, APS


John F. Cafferky
*On behalf of Alexandria City Public Schools and Loudoun County Public Schools*
Blankingship & Keith PC
jcafferky@bklawva.com
jstalnaker@bklawva.com
PH: 703-279-7201
PH: 703-691-1235


cc:
Melanie Kay-Wyatt, Ed.D., Division Superintendent, ACPS
Robert M. Falconi, Division Counsel, ACPS
Aaron Spence, Ed.D., Division Superintendent, LCPS
Wesley Allen, Division Counsel, LCPS

*/s/* Laura Colombell Marshall
Laura Colombell Marshall
Heidi Siegmund
*On behalf of Prince William County Public Schools*
McGuireWoods LLP
LMarshall@mcguirewoods.com
HSiegmund@mcguirewoods.com
PH: 202-857-1700
PH: 804-775-1049


cc:
Dr. LaTanya D. McDade, Superintendent
Wade T. Anderson, Division Counsel

JA313

Case 1:25-cv-01434     Document 1-10     Filed 08/29/25     Page 1 of 5 PageID# 86

# EXHIBIT I

**Hemminger, Lindsay**

| | |
|---|---|
| **From:** | Burke, Bradley <Bradley.Burke@ed.gov> |
| **Sent:** | Thursday, July 31, 2025 2:25 PM |
| **To:** | Heaphy, Timothy; jcafferky@bklawva.com; jstalnaker@bklawva.com; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com |
| **Cc:** | Hemminger, Lindsay; Carroll, Fiona |
| **Subject:** | RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**\*\*\* EXTERNAL EMAIL \*\*\***

Counsel,

I received your letter, dated July 29, 2025.

First, your letter incorrectly asserts that "OCR believes the parties have reached an impasse." We have not reached an impasse because your clients have contacted OCR within 10 days of our Letter of Finding and indicated a willingness to negotiate a resolution agreement in these cases. If your clients are, in fact, serious about coming into compliance with Title IX, we are all ears. But we expect to engage in discussions with dispatch. Every day that goes by without a satisfactory resolution agreement is a day that children in the five Northern Virginian school divisions are at risk of grave harm.

Second, your letter incorrectly asserts that OCR's Case Processing Manual (CPM) requires a 90-day period to engage in a resolution agreement negotiation. As a threshold matter, the CPM neither creates rights, nor is it governed by the Administrative Procedure Act. Relevant here, we refer you to CPM Section 303(g), which states that OCR "may end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached," including "the recipient's refusal to agree to a key resolution term." Given that your clients have indicated a willingness to negotiate in good faith about coming into compliance with Title IX, we have neither ended negotiations, nor reached an impasse.

Nevertheless, OCR's proposed resolution agreement was intentional and specific about its key resolution terms. And we do not intend to allow recipients who are not serious about coming into compliance with Title IX—including acknowledging that Title IX is a statute only about sex discrimination and that the term "sex" in Title IX refers only to biological sex and not gender identity—to drag out discussions unnecessarily. We are, therefore, asking counsel for each recipient to indicate whether or not your client is willing to consider agreeing to the terms in the draft resolution agreement. We are, of course, open to additional terms, but OCR is firm on these key terms. As a result, we expect a response to this specific inquiry no later than August 15, 2025.

Respectfully,
Brad Burke

Bradley R. Burke

JA315

U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Wednesday, July 30, 2025 9:24 AM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** Re: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thanks Brad.

_
On July 30, 2025 at 9:56:28 AM EDT, Burke, Bradley <Bradley.Burke@ed.gov> wrote:

> **\*\*\* EXTERNAL EMAIL \*\*\***

Good morning Mr. Heaphy, and all.

Thank you for reaching out.  I'll review your letter and respond shortly.

Respectfully,

Brad Burke

Bradley R. Burke
U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov


**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Tuesday, July 29, 2025 5:28 PM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and
11251309

JA316

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Mr. Burke,

On behalf of the 5 northern Virginia school districts referenced in the above-referenced OCR investigations, please see the attached letter. We request confidential treatment of this and other communications as the matter proceeds.

Thank you,

Tim Heaphy


**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

**From:** Burke, Bradley <Bradley.Burke@ed.gov>
**Sent:** Friday, July 25, 2025 11:31 AM
**To:** robert.falconi@acps.k12.va.us; jcafferky@bklawva.com; jstalnaker@bklawva.com; christine.smith@apsva.us; Heaphy, Timothy <THeaphy@willkie.com>; jefoster@fcps.edu; Kennedy, Ellen D <edkennedy@fcps.edu>; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Subject:** Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

**\*\*\* EXTERNAL EMAIL \*\*\***

Good morning,

Please see the attached Letter of Findings and draft Resolution Agreements in the above referenced cases.

Respectfully,

Brad Burke

Bradley R. Burke
Regional Director
U.S. Department of Education
Office for Civil Rights

Email: Bradley.Burke@ed.gov



JA317

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

JA318

# EXHIBIT J

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

August 15, 2025

Bradley Burke
Regional Director
U.S. Department of Education
Office for Civil Rights
Via email:  Bradley.Burke@ed.gov

Re: <u>OCR Case No. 11-25-1306 - Arlington Public Schools</u>

Dear Mr. Burke,

We write in response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Arlington Public Schools ("APS") on July 25, 2025.[1]

As explained below, APS cannot agree to the terms of the Resolution Agreement because rescission of Policy Implementation Procedure J-2 PIP-2 "Transgender Students in Schools" (the "Policy") would violate Fourth Circuit and Virginia state law.  The Supreme Court's 2025 decision in *United States v. Skrmetti* did not "abrogate" the 4th Circuit authority of *Grimm v. Gloucester County School Board* that requires the current APS policy, as it involved both facts and law materially different from those involved in *Grimm*.  The Supreme Court has accepted certiorari in *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025), a case raising the precise legal issue at stake in the instant investigation.  Given the looming guidance from the Court as to whether Title IX restricts or protects access to facilities based on gender identity, APS proposes that OCR stay this matter until the *B.P.J.* case is resolved.

## I.      Procedural History

In February 2025, OCR issued a Notification Letter and a Data Request Letter to APS indicating that a complaint was filed with OCR alleging that APS's policies violated Title IX by providing greater rights to students who are transgender than to those who are not with regard to the use of intimate, sex-segregated facilities such as restrooms and locker rooms.  APS responded timely to the Data Request Letter and provided both documents and narrative responses in March 2025.  On July 25, 2025, OCR issued its LOF and accompanying Resolution Agreement.  On July 29, 2025, APS responded to OCR with a letter requesting additional time to evaluate the LOF and Resolution Agreement and engage in negotiations with OCR.  On July 31, 2025, OCR clarified that the parties have not yet reached an impasse given APS's willingness to negotiate in good faith about the Resolution Agreement and provided APS with a deadline of August 15, 2025 to indicate whether APS is willing to consider agreeing to the Resolution Agreement's terms.

---

[1]  This letter is submitted on behalf of Arlington Public Schools only and does not bind or represent the position of the other four public school divisions in Northern Virginia listed in the LOF.  While our firm represents both APS and Fairfax County Public Schools in this matter, this letter is submitted solely on behalf of APS.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

## II.    APS Policies Are Required by Virginia Law and Binding Authority in the Fourth Circuit

On March 24, 2025, we submitted a letter to Dan Greenspahn of OCR that addressed the issues raised in the Notification Letter. In that letter, we explained that both Virginia law and binding federal precedent require APS to provide access to facilities to students based on their gender identity. More specifically, we cited the Virginia Values Act (the "Values Act"),[2] which "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity . . . in places of public accommodation, including educational institutions."[3] Consistent with the Values Act, the Code of Virginia provides that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."[4] The Policy is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. It also reflects the important value that guides all APS polices—ensuring all students are able to learn in an inclusive environment free from all forms of discrimination.

The Policy is not only consistent with Virginia law, it is required by binding federal precedent that recognizes gender identity as a protected class pursuant to Title IX. As thoroughly described in our March 24, 2025 letter to Mr. Greenspahn, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit explicitly held that Title IX requires local school boards to provide students with access to restroom facilities that correspond to their gender identity. We will not restate the facts involved in *Grimm* or explain its holding here, beyond noting that it continues to not only support but require the Policy at issue in the instant investigation. Any change in APS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

## III.    The Supreme Court Has Not Yet but Will Soon Resolve the Central Issue Raised by This Investigation -- Whether Title IX Requires Public Schools to Provide Students with Access to Facilities Based on Their Gender Identity

Contrary to OCR's position, the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) does not abrogate the Fourth Circuit's decision in *Grimm*. The *Skrmetti* case involves materially distinct facts and does not involve a Title IX claim, distinguishing it from the issues resolved by the Fourth Circuit in *Grimm*. *Skrmetti's* lack of relevance to the issues involved here is emphatically demonstrated by the Supreme Court's decision to accept cert in *W. Virginia State Bd. of Educ. v. B.P.J.*, a case that will decide whether Title IX and the Equal Protection Clause of the Fourteenth Amendment prevent a state from designating schools sports teams based on biological sex. Until the Supreme Court issues its ruling in *B.P.J.*, *Grimm* remains binding law in the Fourth Circuit. Should APS agree to the Resolution Agreement's terms, APS would be in jeopardy of violating federal law.

---

[2] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[3] VA. CODE ANN. § 2.2-3900.
[4] VA. CODE ANN. § 15.2-853.

A. The Supreme Court's decision in *Skrmetti* does not abrogate *Grimm*, which is binding authority in the Fourth Circuit.

The LOF states that *Grimm* is no longer good law because it was abrogated by the Supreme Court's June 2025 decision in *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). The Court in *Skrmetti* considered whether a Tennessee law that prohibits certain medical interventions and procedures for minors with "gender dysphoria" is constitutional under the Equal Protection Clause. In holding that the law is constitutional, the Supreme Court rejected the plaintiff's argument that heightened scrutiny of the Tennessee statute is warranted given that the law relies on sex-based classifications. *Id*. at 1828–29. The Court stated that the law *does not* classify on the basis of sex or transgender status because it prohibits healthcare providers from administering puberty blockers or hormones to minors for certain medical uses, regardless of the minor's sex or transgender status. *Id*. at 1837. Accordingly, the Court applied rational basis review and found that the Tennessee law is supported by the legislature's policy goal of protecting public health. *Id*. at 1835–37.

*Skrmetti* differs from *Grimm* in several significant ways. It resolved the constitutionality of a specific Tennessee law prohibiting the use of certain treatments to children absent limited circumstances. The Court cited authority for the harms potentially done by the treatments prohibited by the Tennessee statute—a much different policy rationale than the facility access issues involved in *Grimm* and the instant investigation. The Court's consideration of the Tennessee law at issue in *Skrmetti* involved a Constitutional challenge rather than a Title IX claim as that involved in *Grimm*. The Court's discussion of the standard of review was commensurate with the legal basis for the challenge to the Tennessee law—the Equal Protection Clause. Title IX contains no such standard of review and flatly precludes classification based on sex absent certain limited circumstances defined by statute or regulation. While several Justices went beyond the Court's holding to observe that "gender identity" should not be viewed as a suspect class, the dicta in those concurrences is potentially inconsistent with the Court's holding in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in which the Supreme Court held that employment actions based on sexual preference and gender identity constitute discrimination "on the basis of sex" under Title VII of the Civil Rights Act. In sum, *Skrmetti* is both factually and legally distinguishable from *Grimm* and does not overrule the Fourth Circuit's dispositive holding in that case.[5]

B. *Grimm* applies because the Supreme Court has not decided whether gender identity is protected by Title IX.

OCR's assertion that *Grimm* has been "abrogated" by *Skrmetti* is flatly inconsistent with the fact that the Supreme Court has accepted cert in a case that squarely raises the issue at stake in this matter—whether "gender identity" is protected by Title IX. As indicated above, the Supreme Court recently granted cert in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth. 98

---

[5] The continued viability of *Grimm* has been recognized by the Fourth Circuit in a recent Order granting a preliminary injunction in the case of *John Doe et al v. State of South Carolina*, 2:24-cv-06420-RMG. The plaintiffs in the *Doe* case moved to enjoin the enforcement of a South Carolina statute which requires schools to restrict restroom use to a student's gender assigned at birth. In asking the Court of Appeals to grant an injunction, the plaintiffs asserted that *Skrmetti* does not abrogate *Grimm*, given the different factual context and legal bases for that decision. On August 12, 2025, the Court of Appeals agreed, granting the preliminary injunction motion and indicating that "an opinion explaining the Court's action will follow."

JA322

F.4th 542, 550 (4th Cir.).  Had the extent of legal protection based on "gender identity" been resolved by *Skrmetti* as the LOF suggests, the Court would not have been forced to resolve those issues in *B.P.J.*  Contrary to OCR's position, the Court's decision to accept review in *B.P.J.* demonstrates that the circuit split on the important issues of transgender access under Title IX remains, necessitating Court resolution.  If OCR's expansive view of *Skrmetti* were correct, *B.P.J.* would not be docketed for this next Supreme Court term.

When it hears the *B.P.J.* case next term, the Court will decide whether Title IX and the Equal Protection Clause prevent a state from designating school sports teams based on biological sex.  *B.P.J.* raises the precise issues involved in the Policy at issue in the current investigation.  Until this dispositive issue is conclusively resolved by the Supreme Court, *Grimm* remains controlling in the Fourth Circuit and mandates the Policy at issue.

**IV.    The Instant Investigation Should Be Paused Until the Court Resolves the Central Legal Issue that Controls the Policy at Stake**

When the Supreme Court decides *B.P.J.*, it will answer the critical question of whether Title IX requires educational institutions to separate student resources by biological sex.  Unless and until the Supreme Court places further restrictions on the reach of Title IX to exclude transgender students, *Grimm* is the governing law in the Fourth Circuit.

Should APS comply with the actions outlined in the LOF and draft Resolution Agreement, the district risks litigation based on a failure to follow governing Fourth Circuit law.  Transgender students and their families would have a cognizable claim that a policy limiting their access to facilities that correspond to their gender at birth violates Title IX.

APS is committed to strict compliance with Title IX and other provisions of law.  All APS policies also reflect the paramount value of equality and the protection of all students against discrimination of any kind.  The specific contours of compliance with law and adherence to core values with respect to transgender student access to facilities will soon be made clear when the Supreme Court decides *B.P.J.*  That case will be argued in the fall of 2025 and likely result in an opinion sometime in the first half of 2026.  While that case is pending, *Grimm* remains good law and binds APS and its policies.

To resolve this dilemma, APS proposes that OCR stay this case until the Supreme Court issues its decision in *B.P.J.*  Should the Court in that case find that gender identity is not protected by Title IX, *Grimm* will indeed be abrogated, necessitating a change in policy.  If, however, the Court follows *Bostock* and extends to Title IX the protection for gender identity it recognized under Title VII, *Grimm* (and the Policy) will be upheld.  APS will follow that clear precedent and make any necessary policy changes once *B.P.J.* is decided.  A pause in the instant investigation is the only way for APS to resolve this matter without violating current binding authority in the Fourth Circuit.  Accordingly, we respectfully request that OCR not refer this matter for enforcement action until the Court issues definitive guidance in *B.P.J.*

Thank you in advance for your consideration.  If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

- 4 -

JA323

Sincerely,

/s/ Timothy J. Heaphy
Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Francisco Durán, Ed.D., Division Superintendent,
APS Chrissy Smith, Division Counsel, APS

JA324

# EXHIBIT K

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC
20006-1238

August 18, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via e-mail: Bradley.Burke@ed.gov

Dear Mr. Burke,

On August 15, 2025, we submitted a letter setting forth our response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Arlington Public Schools ("APS") on July 25, 2025. We write today to provide additional authority for our position– an opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, No. 25-1787, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit.

The *Doe* case cited above involves a challenge to a South Carolina statute that seeks to enforce a rule identical to that contained in the Resolution Agreement you have demanded our client enter with OCR – a restriction on restroom access to students according to their gender assigned at birth. Doe, a 9th grader in Berkeley County, South Carolina public school, challenges that law and moved for a preliminary injunction against its enforcement. On August 12, 2025, the day before Doe began his 9th grade year, the Court of Appeals granted that preliminary injunction. The practical effect of that injunction is to invalidate the South Carolina statute at issue in the litigation, allowing Doe to access restrooms in his public school consistent with his gender identity.

On Friday, August 15, 2025, the Court of Appeals issued a lengthy Amended Order ("Order") explaining its rationale for granting Doe's motion for a preliminary injunction. The Order, which we have attached to this letter as an Exhibit, flatly states "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." Order at 17. Applying the legal standard for a preliminary injunction, the Court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the Court's ruling in *Grimm*, invalidating an identical restriction on restroom access. Order at 16-17. The Court also found that Doe had demonstrated irreparable harm, observing that "state action infringing on constitutional rights generally constitutes irreparable harm." Order at 17. The Court finally found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm* – a prior binding decision of this Court" was clearly in the public interest. Order at 18.

Two concurrences in the Order reinforce the Court's holding. Judge Diaz specifically rebutted the state's argument that you have made in the instant case – that *Skrmetti* abrogated *Grimm*. Judge Diaz observed that "[t]he Court's decision in United States v. *Skrmetti* . . . has little to say about the issues Grimm addressed." Order at 21. He noted that the ban on gender affirming care upheld

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA326

127227086.1

in *Skrmetti* differs significantly from the restroom access policy at issue in *Grimm* and did not involve a Title IX claim. Order at 21-22. Accordingly, Judge Diaz concluded that "*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of Grimm's Title IX holding." Order at 22.

Perhaps more significant is Judge Agee's concurrence in *Doe*. Judge Agee dissented in *Grimm* and continues to assert that the decision was wrongly decided. Nonetheless, he concurred in the Court's Order granting the injunction because he recognizes that *Grimm* remains binding authority in the Fourth Circuit. He rejected South Carolina's arguments that the law is "unsettled" and that *Grimm* is factually distinguishable from Doe, writing:

> none of this matters for purposes of deciding the issue presented by Doe's motion for an injunction pending appeal. *Grimm* binds all judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. **The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal**.

Order at 29 (emphasis added).

*Doe* reinforces our position that *Grimm* remains viable post-*Skrmetti* and requires APS to continue to facilitate restroom access for students consistent with their gender identity. The South Carolina statute at issue in *Doe* attempts to do exactly what the proposed Resolution Agreement in the instant matter would require – limit restroom access to students' gender assigned at birth. The Fourth Circuit has invalidated that South Carolina law and rejected the position taken by OCR in the instant investigation. Even Judge Agee, who shares your position on the scope of Title IX and its application to the issue of facility access, agrees that *Grimm* controls, entitling Doe to injunctive relief and access to restrooms that correspond to his gender identity. If APS agreed to the terms in the Resolution Agreement, we would be acting in direct contradiction to *Doe* and *Grimm*, which we simply cannot agree to do.

Any attempt to enforce OCR's demand that the current policy be changed will result in litigation in which APS, like Doe, will ask the Court to enjoin any enforcement activity. In such litigation, we will cite the clear authority that compels the current restroom access policy. The Department of Justice will be limited to the same arguments rejected first in *Grimm* and reaffirmed last week in *Doe* – essentially asking the Court to disregard binding precedent recognized even by the dissenting judge in *Grimm*. While we expect that any litigation in which we seek to enforce these rights will be readily successful given the authority presented herein and in prior correspondence, it would be costly, disruptive, and create great uncertainty among thousands of APS students and families. Accordingly, we ask again that OCR not refer this matter for enforcement action and rather pause this investigation as the Supreme Court considers these important issues in its upcoming term.

Thank you in advance for your consideration. If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

JA327

127227086.1

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Francisco Durán, Ed.D., Division Superintendent
Chrissy Smith, Division Counsel, APS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | Civil Action No. _____ |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**ARLINGTON SCHOOL BOARD'S**
**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY**
**RESTRAINING ORDER**

Plaintiff Arlington School Board ("ASB")[1] respectfully moves this Court for a preliminary

injunction and/or temporary restraining order as set out below and for the reasons provided in the

accompanying Memorandum of Law in Support of ASB's Emergency Motion for Preliminary

Injunction and/or Temporary Restraining Order ("Memorandum").[2]  Fed. R. Civ. P. 65(a).  ASB

moves to preliminarily enjoin and/or temporarily restrain Defendants, including their officers,

employees, agents, attorneys, and any person working in concert or participation with any

Defendant or under any Defendant's supervision, direction or control, from designating APS as

---

[1] Plaintiff Arlington School Board operates, maintains, and supervises Arlington Public Schools
("APS").

[2] Fairfax County School Board ("FCSB") has filed against Defendants the Department of
Education and Secretary Linda McMahon ("Defendants") a similar action and motion for
immediate issuance of a temporary restraining order and preliminary injunction.  Given the similar
nature of the action and motions, ASB and FCSB request that the two actions and motions be
consolidated.

"high-risk" and requiring that APS receive federal funds by reimbursement.  ASB also seeks that this Court enter an order waiving the requirement for bond or security.

As set forth in detail in the accompanying Memorandum, and supported by the filed Complaint, Defendants are in violation of the Administrative Procedure Act and the Spending Clause set forth in the United States Constitution, and ASB is entitled to a declaratory judgment stating that Defendants violated the APA by designating APS as "high risk" and requiring that APS receive federal funds by reimbursement.  ASB thus seeks a preliminary injunction and/or restraining order enjoining and restraining Defendants and their officers, employees, agents, attorneys, and any person working in concert or participation with any Defendant or under any Defendant's supervision, direction or control, from designating APS as "high-risk" and requiring that APS receive federal funds by reimbursement.

Dated:  August 29, 2025                    Respectfully submitted,

                                           /s/ *Timothy Heaphy*
                                           _____

                                           Timothy Heaphy
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street Northwest
                                           Washington, District of Columbia 20006-1238
                                           Tel:  (202) 303-1000
                                           theaphy@willkie.com
                                           Virginia State Bar I.D. Number:  68912

                                           Joshua Mitchell (*pro hac vice* forthcoming)
                                           Fiona L. Carroll (*pro hac vice* forthcoming)
                                           Lindsay Hemminger (*pro hac vice* forthcoming)
                                           WILLKIE FARR & GALLAGHER LLP
                                           1875 K Street Northwest
                                           Washington, District of Columbia 20006-1238
                                           Tel:  (202) 303-1000
                                           jmitchell@willkie.com
                                           fcarroll@willkie.com
                                           lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312) 728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Arlington School Board*

3

**IN THE**
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | Civil Action No. _____ |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants*. | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 29th day of August, 2025, I electronically filed a true and correct copy of **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER** and accompanying documents with the Clerk of Court using the CM/ECF system.  A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon

/s/ *Timothy Heaphy*
_____

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

JA332

Joshua Mitchell (*pro hac vice* forthcoming)
Fiona L. Carroll (*pro hac vice* forthcoming)
Lindsay Hemminger (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1000
jmitchell@willkie.com
fcarroll@willkie.com
lhemminger@willkie.com

Breanna Smith-Bonsu (*pro hac vice* forthcoming)
Chloe Smeltzer (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel: (312)728-9000
bsmith-bonsu@willkie.com
csmeltzer@willkie.com

*Attorneys for Arlington School Board*

# EXHIBIT A

JA334

**ARLINGTON PUBLIC SCHOOLS**
**Policy Implementation Procedure J-2 PIP-2**
**Transgender Students in Schools**

It is the responsibility of each Arlington Public Schools (APS) staff member to ensure that all students, including transgender students, have safe, supportive, and inclusive school environments. School-based procedures provide APS staff with guidance to ensure compliance with the School Board Policy J-2 Student Equal Educational Opportunities-Nondiscrimination. These procedures are detailed in this document and will be disseminated to staff through administrative processes and specific guidelines.

All Arlington Public Schools staff shall be periodically trained on topics relating to transgender students.  School staff members are responsible for taking prompt and effective steps to prevent and respond to harassment of any kind, including that which is based on gender identity and, as appropriate, remedy its effects.

**Definitions**
"Gender identity" is one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth (American Psychological Association, 2015).

"Transgender" is an umbrella term used to describe individuals whose gender identity, expression, or behavior does not conform with that typically associated with the sex to which they were assigned at birth (National School Boards Association, 2017).

**Bathrooms and Locker Rooms**
Access to facilities that correspond to a student's gender identity will be available to all students. Single user, gender neutral facilities will be made available to all users who seek privacy.

**Co-curricular and Extra-curricular Activities and Athletic Team Student Participation**
Students may participate in any co-curricular or extra-curricular activity consistent with their gender identity.  Athletic participation regulated by the Virginia High School League (VHSL) and the Virginia Scholastic Rowing Association (VASRA), as well middle school athletics, shall be in compliance with rules outlined by that organization.  Any uniform required for participation in a co-curricular or extra-curricular activity, including athletics, shall include options that are gender neutral.  Awards designated by Arlington Public Schools for participation in any such activity will also be gender neutral.

**Dress Code**
All students must dress according to the constraints of the dress code as outlined within the school handbook.  Information regarding appropriate attire for school day and school related activities shall be non-gender specific and enforced impartially regardless of a student's gender identity or gender expression.

**Extended Instructional Field Trips or Athletic Events**
APS is committed to providing a safe, welcoming school environment where students are engaged in learning because they feel accepted and valued. Additionally, APS respects the privacy rights of its students and parents and will maintain confidentiality of nonpublic information about students, releasing this information to third parties only when authorized by a parent or student as required by law.  As part of this commitment to inclusion and equity, when

**ARLINGTON PUBLIC SCHOOLS**
**Policy Implementation Procedure J-2 PIP-2**
**Transgender Students in Schools**

an instructional or extra-curricular or athletic event requires students to be accommodated overnight, students may be assigned to a room consistent with the student's gender identity.

Any student uncomfortable sharing a sleeping area, shower, bathroom, or any sex-segregated facility, shall, upon request, be provided with a designated safe, non-stigmatizing alternative. Arlington Public Schools staff shall not require a student to stay in a single-occupancy accommodation when such accommodations are not required of other students participating in the same event.

### Names, Pronouns, and Classroom Records
Every student has the right to be addressed by names and pronouns that correspond to the student's gender identity. Regardless of whether a transgender student has legally changed their name or gender, schools will allow students to use a chosen name and gender pronouns that reflect their gender identity.

To ensure consistency, staff will update student classroom records (class rosters for substitutes, etc.) with the student's chosen name and, where applicable, appropriate gender markers.

### Privacy and Educational Records
Information about a students' transgender status, legal name, or gender assigned at birth constitutes confidential personally identifiable and medical information. Disclosing this information to others by an Arlington Public Schools staff member may violate privacy laws, such as the Federal Family Educational Rights and Privacy Act (FERPA), as well as constitutional privacy protections and therefore, the information will not be disclosed unless in accordance with these laws.

Permanent records for students, including a student's gender, may only be changed with the submission of a legal document such as a birth certificate, passport, or court order. The process for changing any element of a student's permanent record including a student's name and gender must follow the process outlined in School Board Policy J-5.3.30 Admissions and Placement and School Board Policy J-15.30 Privacy Rights and Regulations, and state law. APS graduates may change their permanent records under the same requirements as current APS students. Appeals to a decision made regarding a change to a student's permanent record must be made in writing to the Assistant Superintendent of Teaching and Learning.

### References
Policy J-5.3.30 Admissions and Placement
Policy J-15.30 Privacy Rights and Regulations
Policy J-6.8.1 Student Safety - Bullying Harassment Prevention
Virginia High School League Student Eligibility Requirements
Family Educational Rights and Privacy Act
Education Amendments Act of 1972, 20 U.S.C. §§1681 – 1688 (Title IX)

### Policy Implementation Procedure Adoption and Revision History
Adopted July 1, 2019; Effective July 1, 2019

# EXHIBIT B

JA337



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

**REGION XI**
**NORTH CAROLINA**
**SOUTH CAROLINA**
**VIRGINIA**
**WASHINGTON, DC**

February 24, 2025

By email only to superintendent@apsva.us

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204

Re:    Case No. 11-25-1306
       Arlington Public Schools

Dear Dr. Durán:

On February 12, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), notified you that OCR was opening an investigation of Arlington Public Schools (the Division) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As explained in that letter, OCR will investigate whether the Division's "Transgender Students in Schools" policy, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX.

As an initial data request, please submit the items listed below to OCR **by March 17, 2025**. Please note that OCR may request supplemental data and documents relevant to the investigation.

1.  The name and contact information of the individual who will serve as OCR's contact person during the investigation of this complaint.

2.  The Division's narrative response to the allegation under investigation and all documents or records referenced in the narrative response.

3.  The Division's Title IX grievance procedures, and where those procedures are published.

4.  The name and contact information of the Division's Title IX Coordinator.

5.  The Division's policies and procedures regarding student access to and use of sex-segregated restrooms, locker rooms, and/or other intimate facilities in its schools.

6.  A list of any formal or informal complaints the Division has received during the 2024-2025 school year alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, and/or other intimate facilities. For each complaint, please note:

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

JA338

Page 2 of 3 – Case No. 11-25-1306

the date of the complaint; the identity of the complainant (e.g. parent, student, teacher); any school(s) named in the complaint; a summary of the complaint; and a brief description of the Division's response to the complaint.

7. Any additional information the Division believes may be helpful in resolving this complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We look forward to your cooperation during the resolution of this complaint. If you have any questions, please contact me at 202-245-8014 or Dan.Greenspahn@ed.gov.

Sincerely,

DAN GREENSPAHN
Digitally signed by DAN GREENSPAHN
Date: 2025.02.24 11:21:41 -05'00'

Dan Greenspahn
Team Leader, Team 1
District of Columbia Office
Office for Civil Rights

JA339

Page 3 of 3 – Case No. 11-25-1306

## Data Request Instructions

If any item in our request is unclear, or if you experience any difficulty complying with this request, please contact the staff member(s) identified above prior to the due date. OCR requests that you submit information electronically, if feasible. Upon request, OCR may create a secure external sharing site for you to upload the submission. You may contact us for more information about this option. Please do not provide the information via an electronic cloud format such as Google Docs. If any of the requested information is available to the public on the Internet, you may provide the website address. If any responsive documents contain Social Security numbers, please redact them before producing the documents to OCR.

The Department of Education's regulation implementing Title VI of the Civil Rights Act of 1964, at 34 C.F.R. § 100.6(c), which is incorporated by reference in the Title IX regulation at 34 C.F.R. § 106.81, gives OCR the authority to request this information. In addition, in accordance with the regulation implementing the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, at 34 C.F.R. § 99.31(a)(3)(iii), and the Title VI regulation at 34 C.F.R. § 100.6(c), OCR may review personally identifiable records without regard to considerations of privacy or confidentiality. OCR will take all proper precautions to protect the identity of any individuals named in the records.

OCR may request supplemental data and documents that are relevant to the allegation under investigation. If the Division obtains any additional information or documents responsive to this data request or otherwise relevant to the allegations in this case, the Division must promptly inform OCR of its existence and supplement the data response within 15 days of its discovery. OCR reminds the Division that a failure to provide requested information may be considered a denial of access in violation of the regulations cited above. Please ensure that Division employees preserve all data and documents that are relevant to the allegation under investigation until OCR closes this case.

JA340

# EXHIBIT C

JA341

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

March 20, 2025

Dan Greenspahn, Esq.
U.S. Department of Education
Office for Civil Rights
District of Columbia Office
400 Maryland Avenue, SW
Washington, D.C. 20202-1475

Re: OCR Case No. 11-25-1306 - Arlington Public Schools

Dear Mr. Greenspahn:

On February 12, 2025, Arlington Public Schools ("APS") received a letter from the District of Columbia Office for Civil Rights ("OCR") regarding Case No. 11-25-1306 (the "Notification Letter"). APS subsequently received a Data Request Letter from OCR on February 24, 2025 (the "Request"). The Notification Letter indicates that a complaint was filed with OCR alleging that APS's "Transgender Students in Schools" policy ("J-2 PIP-2") violates Title IX of the Educational Amendments of 1972 ("Title IX") by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restrooms and locker rooms (collectively, "facilities"). The Notification Letter does not identify the complainant or whether the complaint is made on behalf of any individual APS students or in regard to any specific incident at APS.[1]

As you are aware, I represent APS in this matter. On March 17, 2025, we produced documents and information responsive to OCR's Requests 1, 3, 4, 5, and 6 contained in the February 24 Request Letter. Those documents included:

- APS Policy J-2 PIP-2;
- a declaration from Title IX Coordinator, Sedrick Ross, certifying that APS has not received any Title IX complaints regarding the Policy; and

---

[1] A press release from the America First Legal Foundation claims that this investigation, as well as similar investigations into four neighboring Virginia school divisions, was opened in response to an administrative complaint submitted by that organization. This press release and a copy of the Request for Investigation Letter it references does not indicate that the complaint was made on behalf of any individual APS students or in regards to any specific incidents at APS. *See* America First Legal, *VICTORY — In Response to AFL's Complaint, the U.S. Department of Education Office for Civil Rights Opens Investigation into Five Northern Virginia K-12 Schools Illegal "Gender Identity" Policies*, (Feb. 14, 2025), https://aflegal.org/victory-in-response-to-afls-complaint-the-u-s-department-of-education-office-for-civil-rights-opens-investigation-into-five-northern-virginia-k-12-schools-illegal-gender/.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

121254246.1

- the APS Title IX grievance procedures and training materials provided to the Title IX Coordinator.

With this letter, we provide additional information responsive to Data Requests 2 and 7.[2]  As discussed below, APS denies that J-2 PIP-2 violates Title IX.  J-2 PIP-2 provides *all* students the option of using facilities consistent with their gender identity or access to private restroom or locker room facilities.  This regulation complies with binding state and federal law governing the use of facilities in Virginia and all other localities within the jurisdiction of the United States Court of Appeals for the Fourth Circuit and has been implemented without disruption or controversy in our schools.  Accordingly, OCR should not issue a finding of a Title IX violation or take other enforcement action in this matter.

## I.    APS Policies

J-2 PIP-2 went into effect on July 1, 2019 after it was approved by the Arlington School Board. The provision relevant to this OCR investigation states as follows:

> **"Bathrooms and Locker Rooms**
> Access to facilities that correspond to a student's gender identity will be available to all students.  Single user, gender neutral facilities will be made available to all users who seek privacy."

Following APS implementing its policy, the Virginia General Assembly passed House Bill 145 and Senate Bill 161 during the spring 2020 session.  Those bills modified the Virginia Code to state that the "Department of Education shall develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that address common issues regarding transgender students," including students' "use of school facilities."[3]  In 2021, the Virginia Department of Education ("VDOE") issued its Model Policies for the Treatment of Transgender Students in Virginia Public Schools, which provided that "[s]tudents should be allowed to use the facility that corresponds to their gender identity" and advised that schools should provide all students access to single-user restrooms and private changing areas for those who would like more privacy.[4]

Upon the election of Governor Glenn Youngkin in 2021, the Virginia Department of Education issued new guidance on the issue of transgender student access to school facilities.  Despite the fact that there has been no change to the Virginia Code, VDOE issued the 2023 Model Policies to Ensure Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, which state that "[s]tudents shall use bathrooms that correspond with his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020)."  As described more fully below, the Fourth Circuit in the *Grimm* case held that requiring students to use facilities that align with their biological gender violates Title IX.  The citation to *Grimm* confirms that the VDOE guidance continues to require Virginia schools to facilitate student access to facilities that correspond to their gender identity.  Accordingly, APS

---

[2] Unless otherwise noted, all documents referenced in this letter were produced on March 17, 2025.
[3] VA. CODE ANN. § 22.1-23.3.
[4] *Model Policies for the Treatment of Transgender Students in Virginia's Public Schools*, Virginia Department of Education (Mar. 2021), https://equalityvirginia.org/wp-content/uploads/2021/03/Transgender-Student-Model-Policies-March-2021-final.pdf.

JA343

121254246.1

continues to adhere to both federal law and VDOE guidance in facilitating student access to facilities according to their gender identity.

## II.      Legal Analysis

The policy at issue in this inquiry is facially neutral and provides the same access to APS facilities to all students, regardless of gender identity.  APS is governed by Virginia and Fourth Circuit law which requires that all individuals within the Commonwealth are safeguarded from unlawful discrimination because of gender identity in places of public accommodation, including educational institutions.  Taking any steps to ban transgender students from using the facilities that align with their gender identity would violate Virginia and Fourth Circuit law.

A.   APS Policy J-2 PIP-2 provides equal access to facilities to all students.

The February 12 letter indicates that OCR has received a complaint alleging that J-2 PIP-2 "provides great rights to those students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."  *See* Notification Letter at 1.  We strongly deny the allegation that the regulation affords any individual student, regardless of gender identity, greater rights than any other.  J-2 PIP-2 allows *all* students the option of using a locker room or restroom consistent with their gender identity—providing no more or no less access to transgender students as that provided any others.  The peers of transgender boys are other boys, and the peers of transgender girls are other girls.  If a transgender girl wants to use the girls' facilities, she is allowed to do so.  If any other girl wants to use those same facilities, she has the right to do so as well.

J-2 PIP-2 also provides an alternative facility option to any student to desires additional privacy, again regardless of gender identity.  More specifically, that provision allows *any* student for *any* reason to request additional, reasonable privacy measures in their use of school facilities.  This provision requires that, upon request, students shall be provided with an alternative private area or an alternative facility-use schedule that allows for increased privacy in a non-stigmatizing way.  These accommodations are explicitly offered to all students and is not specially reserved for transgender students.  This right could be invoked by a student recovering from an injury, illness or medical procedure, a student who has an implanted medical device such as a colostomy bag or insulin pump, or a student who deals with any of the myriad insecurities that present themselves to young people on their journey through their growth and development during K-12 education.

The facial neutrality of J-2 PIP-2 should end this inquiry, as it defeats any argument that some category of APS students is treated differently than another in violation of Title IX.  Without some exclusion from an APS program or discriminatory impact of a policy, there is no basis on which OCR could find a violation.  If APS were to change its policy and exclude access to facilities based on gender identity, that restriction would impermissibly deprive some students of a benefit and risk Title IX liability.  As explained below, a change in policy would also directly contradict Virginia law and binding Fourth Circuit precedent.

- 3 -

JA344

121254246.1

    B.   Virginia requires APS to make facilities available without regard to gender identity.

In 2020, the Virginia General Assembly expanded the scope of the Virginia Human Rights Act[5] by adopting the Virginia Values Act (the "Values Act").[6] The law "[s]safeguard[s] all individuals within the Commonwealth from unlawful discrimination because of … gender identity … in places of public accommodation, including educational institutions."[7] The Values Act defines "gender identity" as "the gender-related identity, appearance, or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth."[8] This legislation is the culmination of years of advocacy by the Human Rights Campaign and Equality Virginia.[9] Prior to its passage, Virginia was one of just five states without meaningful protections in public accommodations for LGBTQ people. When he signed the Values Act, Governor Northam stated, "This legislation sends a strong, clear message—Virginia is a place where all people are welcome to live, work, visit, and raise a family. No longer will LGBTQ Virginias have to fear being fired, evicted, or denied service in public places because of who they are."[10] Speaker of the House, Eileen Filler-Corn, also added, "[W]e have made discrimination against our gay, lesbian and transgender friends, family, neighbors, and co-working in employment, housing and public accommodation illegal in the Commonwealth of Virginia."[11]

Virginia law also states that "[a] county may enact an ordinance prohibiting discrimination in … education on the basis of … gender identity."[12] This provision explicitly provides authority for J-2 PIP-2. The Arlington School Board has enacted a valid policy that protects access to facilities for all students, regardless of gender identity. This regulation is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. In short, the APS transgender policy was both compelled by Virginia law and within the school board's authority to promulgate.[13]

    C.   As determined by controlling federal authority, Title IX compels APS to make facilities available without regard to gender identity.

APS's decision to implement J-2 PIP-2 is not only consistent with Virginia law, it is also required by Title IX as determined by the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit has explicitly held that Title IX compels local school boards to provide students with access to

---

[5] VA. CODE ANN. § 2.2-3900–3909.

[6] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).

[7] VA. CODE ANN. § 2.2-3900.

[8] Id. at § 2.2-3901.

[9] See Nick Morrow, Virginia Values Act Signed Into Law–Extending Long-Delayed, Critical Protections to LGBTQ Virginians, Human Rights Campaign (Apr. 11, 2020), https://www.hrc.org/news/virginia-values-act-signed-into-law-extends-protections-to-lgbtq-virginians; Frequently Asked Questions: The Virginia Values Act, Equality Virginia (Feb. 2021), https://equalityvirginia.org/wp-content/uploads/2021/02/FAQ_-The-Virginia-Values-Act.pdf.

[10] Tyler Thrasher, Gov. Northam signs Virginia Values Act, providing anti-discrimination protections for LGBTQ people, abc8NEWS (Apr. 12, 2020), https://www.wric.com/news/politics/gov-northam-signs-virginia-values-act-providing-anti-discrimination-protections-for-lgbtq-people/.

[11] Id.

[12] VA. CODE ANN. § 15.2-853.

[13] The Arlington County Board has also adopted the Human Rights Ordinance. The ordinance, like J-2 PIP-2, extends protections against discrimination on the basis of gender identity to the greater Arlington community. See Arlington Cnty. Code § 31.1 et seq.

JA345

121254246.1

restroom facilities that correspond to their gender identity. As explained below, the Court of Appeals followed Supreme Court precedent in its baseline recognition of gender identity as a protected class under Title VII, which it then applied to the analogous provision of Title IX. Accordingly, any change in APS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

The Court of Appeals considered the right of transgender students to access school facilities that correspond with their gender identity in the case of *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). In that case, a local Virginia school division, in response to backlash about a transgender male student's use of the boy's restroom, implemented a policy under which students could only use restrooms matching their "biological gender." *Id.* at 593. The policy also required that "students with gender identity issues shall be provided an alternative appropriate private facility." *Id.* at 599. To effectuate this policy, a number of single-stall unisex restrooms were made available to all students. *Id.* at 600. This is precisely the type of facility access policy that the OCR complaint believes is required by APS and seeks to compel.

Gavin Grimm, a transgender student, sued the Gloucester School Board, arguing that the restroom policy violated his rights under Title IX. *Grimm*, 972 F.3d at 593. Grimm prevailed on his Equal Protection Clause and Title IX claims at the summary judgment stage. *Id.* at 603. When the School Board appealed the Fourth Circuit created legal precedent for local public schools under its jurisdiction. The court analogized the facts in *Grimm* to those involved in *Bostock v. Clayton County,* 590 U.S. 644 (2020), in which the Supreme Court held that discrimination against a person for being transgender is discrimination "on the basis of sex," under Title VII of the Civil Rights Act. *Grimm*, 972 F.3d at 616–19. The court read *Bostock* to require that Grimm's gender identity was a similarly protected status pursuant to Title IX of that same statute. *Id.*

Having made the threshold finding that Grimm was a member of a protected class according to *Bostock*, the Court of Appeals went on to uphold the district court's decision. *Grimm*, 972 F.3d at 619-20. First, the court held that the school board policy at issue constituted "sex-based discrimination," violating Grimm's equal protection rights. *Id.* at 613. The court dismissed the Board's argument that the policy was substantially related to its goal of protecting students' privacy, noting that the Board "cite[d] to no incident, either in Gloucester County or elsewhere" and "ignore[d] the growing number of school districts across the country who are successfully allowing transgender students such as Grimm to use the bathroom matching their gender identity, without incident." *Id.* at 614. Next, the Court of Appeals concluded that the policy discriminated against Grimm "on the basis of sex" under Title IX, reasoning that "Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* at 618.[14] In affirming the district court's judgment, the Fourth Circuit stated that it was "left without a doubt that the Board acted to protect cisgender boys from

---

[14] The Fourth Circuit also held that the School Board violated Title IX when it refused to update Grimm's sex listed in his school records. *Grimm,* 972 F.3d at 619. The court determined that the Board "based its decision . . . on his sex," which "harmed Grimm." *Id.* The discrimination was unlawful because "it treat[ed] him worse than other similarly situated students, whose records reflect their correct sex." *Id.*

121254246.1

Gavin's mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life." *Id.* at 620.[15]

*Grimm* established that a policy that prohibits a transgender student from using facilities that corresponds to their gender identity and instead forces them to use the opposite sex facilities or a separate unisex facility is discriminatory under Title IX in the Fourth Circuit. *Grimm* is dispositive here and supports APS policy at issue in the instant investigation. Modification of J-2 PIP-2 in a manner requested by the complaint would constitute a violation of federal law. APS's policy protects transgender students from the type of unlawful sex discrimination found in *Grimm* by allowing them to use the facilities that correspond with their gender identity and prohibiting their assignment to a separate single-use facility. If APS decided to rescind such policy and require that transgender students use the bathroom that corresponds with their sex assigned at birth, APS would violate Virginia state and federal law.

## III.    Formal and Informal Title IX Complaints Regarding J-2 PIP-2

Consistent with the experience of numerous school districts across the country, including districts within Virginia, APS has implemented this policy without disruption or controversy. APS has not received a single formal or informal Title IX complaint about the Policy in the 2024-2025 school year or any school year since the policy was implemented. *See* Attestation of Title IX Coordinator, Sedrick Ross, ARLINGTON_OCR_1306_00000094. Nor has the Title IX office or the Office of Division Counsel received any formal or informal complaints during the 2024-2025 school year. It is highly unlikely that the Title IX office or the Office of Division Counsel would not be made aware of the existence of such a complaint, given the charged nature of the issue.

Regulation J-2 PIP-2 has enjoyed broad support among students, parents, and other stakeholders in Arlington. At the January 30, 2025 Arlington School Board meeting, a high school student thanked the Board for its continued commitment to allowing "students to be themselves at schools" and shared how J-2 PIP-2 has fostered a supportive environment for transgender students.[16] During this meeting, a litany of seven other members of the community, including APS parents and administrators, expressed appreciation for J-2 PIP-2 and urged the Board to continue its commitment to supporting transgender students.[17] Similarly, at the February 13 meeting, a parent of a transgender student that graduated from an APS school in 2024 explained how J-2 PIP-2 facilitated a positive environment for his son while he transitioned as a freshman.[18] The February 27 meeting told a similar story. Five community members spoke before the Board to share that J-2 PIP-2 reflects the values of the community, and that the policy is working well in APS schools.[19]

---

[15] As a result of the *Grimm* decision, the Gloucester County school division was required to pay $1.3 million in the plaintiff's attorneys fees and costs, in addition to what was certainly a significant amount of its own legal expenses to fight the case. On June 28, 2023, the Supreme Court denied the school board's petition for a writ of certiorari.

[16] School Board Meeting January 30, 2025, https://www.apsva.us/post/school-board-meeting-january-30-2025/, at 52:29.

[17] *Id.* at 1:12:20, 1:26:15, 1:27:32, 1:30:19, 1:34:19, 1:37:32, 1:38:41.

[18] School Board Meeting, February 13, 2025, https://www.apsva.us/arlington-school-board/school-board-meetings/watch-school-board-meetings/, at 2:00:21.

[19] School Board Meeting, February 27, 2025, https://www.apsva.us/arlington-school-board/school-board-meetings/watch-school-board-meetings/, at 50:07, 59:59, 1:11:26, 1:40:14, and 1:46:02.

121254246.1

## IV.    Conclusion

The policy at issue in this complaint is working well and will not be modified by the Arlington School Board.  The policy is compelled by Virginia law and consistent with binding Fourth Circuit precedent.    Moreover, it has been implemented without disruption and generated minimal opposition within the APS division.  Changing the policy would fly in the face of these practical benefits and legal requirements.  A policy requiring students to use the bathroom facility that correspond to their gender at birth would create an undue danger of harm to certain APS students and expose APS to substantial litigation risk.  Accordingly, the policy will remain in place unless some additional authority requires that it be changed.

If you have questions or need additional verification of the matters set forth in this letter, please feel free to reach me at the number below.


Sincerely,

/s/ Timothy J. Heaphy

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

JA348

# EXHIBIT D

JA349



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

July 25, 2025

By email only to: robert.falconi@acps.k12.va.us; jcafferky@bklawva.com;
jstalnaker@bklawva.com; christine.smith@apsva.us; THeaphy@willkie.com; jefoster@fcps.edu;
edkennedy@fcps.edu; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com;
HSiegmund@mcguirewoods.com

Dr. Melanie Kay-Wyatt
Superintendent of Schools
Alexandria City Public Schools
1340 Braddock Place
Alexandria, VA 22314
c/o   Robert M. Falconi, Division Counsel (robert.falconi@acps.k12.va.us)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

Dr. Francisco Durán
Superintendent
Arlington Public Schools
2110 Washington Boulevard
Arlington, VA 22204
c/o   Chrissy Smith, Division Counsel (christine.smith@apsva.us)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Michelle C. Reid
Division Superintendent
Fairfax County Public Schools
8115 Gatehouse Road
Falls Church, VA 22042
c/o   John Foster, Division Counsel (jefoster@fcps.edu)
      Ellen Kennedy, Deputy Division Counsel (edkennedy@fcps.edu)
      Timothy J. Heaphy (THeaphy@willkie.com)

Dr. Aaron Spence
Superintendent
Loudoun County Public Schools
21000 Education Court
Ashburn, VA 20148
c/o   Wesley Allen, Division Counsel (Wesley.Allen@lcps.org)
      John F. Cafferky (jcafferky@bklawva.com)
      Jakob T. Stalnaker (jstalnaker@bklawva.com)

*Page 2 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Dr. LaTanya D. McDade
Superintendent of Schools
Prince William County Public Schools
14715 Bristow Road
Manassas, VA 20112
c/o   Laura Colombell Marshall (LMarshall@mcguirewoods.com)
      Heidi Siegmund (HSiegmund@mcguirewoods.com)

Re:     Case No. 11-25-1305 – Alexandria City Public Schools
        Case No. 11-25-1306 – Arlington Public Schools
        Case No. 11-25-1307 – Fairfax County Public Schools
        Case No. 11-25-1308 – Loudoun County Public Schools
        Case No. 11-25-1309 – Prince William County Public Schools

Dear Dr. Kay-Wyatt, Dr. Durán, Dr. Reid, Dr. Spence, and Dr. McDade:

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its investigation of the complaints filed against Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the Divisions).   The complaint alleges that the Divisions' anti-discrimination policies pertaining to "trans-identifying" students "provide greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex."   Specifically, the complaint alleges that the Divisions' policies related to the use of intimate, sex-segregated facilities, including restrooms and locker rooms, violate Title IX.[1]

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106,[2] which prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. As recipients of federal financial assistance from the Department of Education, the Divisions must comply with this law and its implementing regulations.

In reaching a determination, OCR reviewed publicly available information, information provided by the Complainant, and documents provided by the Divisions. After carefully considering all of the information obtained during the investigation, OCR finds that the Divisions are in violation of Title IX and its implementing regulations. OCR's findings, analysis, and conclusions are discussed below.

## I.   Factual Background

The Divisions currently maintain the following policies, each of which include similarities with respect to access to intimate facilities for students whose "gender identity" does not correspond to his/her sex.

---

[1] The terms bathrooms and restrooms throughout this letter are used interchangeably.

[2] This matter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020 (85 Fed. Reg. 30,026-30,579 (May 19, 2020). *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 626-28 (E.D. Ky. 2025).

*Page 3 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

- Alexandria City Public Schools: "Policy JB: Nondiscrimination in Education"
  This policy states, in part, that the Division must "[p]rovide[] access for all students to facilities, such as restrooms and locker rooms, that correspond to a student's gender identity." The policy defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary" and adds that it "is an innate part of a person's identity and can be the same or different from society's expectations with the sex they were assigned at birth." The policy notes that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

- Arlington County Public Schools: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools"
  This policy states that "[a]ccess to facilities that correspond to a student's gender identity will be available to all students." It defines "gender identity" as "one's sense of self as male, female, or an alternative gender that may or may not correspond to a person's sex assigned at birth." The policy also requires single-use, gender-neutral facilities for individuals seeking privacy.

- Fairfax County Public Schools: "Regulation 2603.2 – Gender-expansive and Transgender Students"
  This regulation states, in part, that "[g]ender-expansive and transgender students shall be provided with the option of using a locker room or restroom consistent with the student's gender identity." The regulation adds that these students "may also be provided with the option of using the facilities that correspond to the student's sex assigned at birth." A corresponding document, entitled "Regulation 2603-Gender-Expansive and Transgender Students Guidance Document," defines gender-expansive (among other terms) as "convey[ing] a wider, more flexible range of gender identity and expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "an individual whose gender identity is different from that associated with the individual's sex assigned at birth." The regulation states that any student who wishes for privacy must be provided with "a reasonable, non-stigmatizing alternative such as the use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, or a nearby health or single-us/unisex bathroom), or with a separate changing schedule (e.g., using the locker room that corresponds to a student's gender identity before or after other students)." These alternatives are intended to minimize the impact on lost instructional time.

- Loudoun County Public Schools: "Policy 8040 – Rights of Transgender and Gender-expansive Students"
  This policy states, in part, that "[s]tudents should be allowed to use the facility that corresponds to their consistently asserted gender identity. While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-use restrooms commensurate with the size of the school." A corresponding regulation, "Regulation 8040-REG," defines gender-expansive (among

*Page 4 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other terms) as "convey[ing] a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of binary (two discreet and opposite categories of male and female) gender system." It further defines "transgender" as "[a] self-identifying term that describes a person whose gender identity is different from their sex assigned at birth." The policy states that the Division will modernize its restrooms and locker rooms to improve privacy and that it will have single-user restrooms.

- Prince William County Public Schools: "Regulation 738-5 – Treatment of Transgender and Gender Nonconforming Students"
  This regulation states that "[a]ll students shall have access to facilities (e.g., restrooms and locker rooms) that correspond to their gender identity." It defines gender identity as "[a]n internal sense of one's own identity as a boy/man, girl/woman, something in between, or something outside the male/female binary," adding that it is "an innate part of a person's identity and can be the same as, or different from, the sex assigned at birth." The regulation states that the Division must make single-user or gender-inclusive facilities or other reasonable alternatives available upon request to any student who seeks privacy that will be non-stigmatizing and will minimize lost instruction.

These policies are an outgrowth of model policies issued by the Virginia Department of Education on July 18, 2023, entitled "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools." These model policies state, in part, that "[s]tudents shall use bathrooms that correspond to his or her sex, except to the extent that federal law otherwise requires. *See Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir 2020)."[3]

---

[3] In *Grimm*, the Fourth Circuit held that a School Board could not prohibit a female student who "consistently and persistently" identified as male from using a high school's sex-separated male bathroom under both the Equal Protection Clause and Title IX. 972 F.3d at 619-20. The court found "that transgender persons constitute a quasi-suspect class" and applied heightened scrutiny to reach its equal-protection holding. *Id.* at 613.

In a recent seminal decision, however, the Supreme Court rejected an equal-protection challenge to a State's child-protection law that prohibits providing controversial medical interventions to minors to address "gender dysphoria." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). While acknowledging that trans-identification does not (indeed, cannot) change one's sex, *id.* at 1830 n.2, the Court concluded that the challenged law was subject to rational-basis review because it did not classify based on sex or "transgender status," *id.* at 1829-37. The law, the Court explained, easily passed the rational-basis standard because of the "'medical and scientific uncertainty'" surrounding interventions for "gender dysphoria." *Id.* at 1836-37. Further, several justices of the Supreme Court signaled that "transgender status" or "gender identity" is not a category or characteristic warranting heightened scrutiny under the Equal Protection Clause due to the mutability of the concept of "transgender" or "gender identity." *See id.* at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries … are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status

*Page 5 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Since on or about the start of the 2024-2025 school year, two Divisions (Alexandria and Arlington) reported to OCR not having received any complaints alleging sex discrimination with regard to students' access to, or use of, school restrooms, locker rooms, or other intimate facilities. Fairfax County Public Schools informed OCR that one student filed a lawsuit just before the start of the 2024-2025 school year, which was subsequently joined by three additional students, alleging that Regulation 2603.2 violated their free speech, free exercise, due process, and equal protection rights because it required students to share a restroom with someone who is trans-identifying or, alternatively, use single-use restrooms. According to an Amended Petition for Declaratory, Injunctive, and Additional Relief submitted by the Petitioners to the court and reviewed by OCR, as a result of the Division's regulation, one of the students "avoided using school restrooms and only did so when absolutely necessary." Loudoun County Public Schools asserted that it received two informal complaints about a male student's presence in a female locker room making female students uncomfortable; one complaint from a female student of bullying and harassment in the male locker room; and three complaints related to the female student's presence in the male locker room, making the three complaining male students feel "discomfort, embarrassment, and vulnerability." As to the two informal complaints about a male student in the female locker room, the complaint stated that the male student made sexual jokes, momentarily touched other students, and watched female students changing in the locker room. Lastly, Prince William County Public Schools reported to OCR that it received one complaint of a female student's presence in a male locker room, and a second anonymous complaint that a boy dressed as a girl was in a female locker room, making the complaining student feel uncomfortable.

## II.    Legal Standard

### A.    Title IX prohibits discrimination on the basis of sex.

Title IX of the Education Amendments of 1972 (Title IX) states a general prohibition on sex discrimination in education programs or activities that receive federal funding:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

---

is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Maintaining sex-separated facilities would thus need only pass rational-basis review under constitutional scrutiny, and schools have a legitimate interest in separating males from females in intimate spaces.

Moreover, *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions. Indeed, the Supreme Court has granted, vacated, and remanded numerous cases, including a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

*Page 6 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

20 U.S.C. § 1681(a).[4] After that general ban on sex discrimination, Title IX lists various sex-based practices that the statute does not forbid. Recipients of federal funding, for example, may have traditionally sex-separated schools (*id.* § 1681(a)(5)), fraternities and sororities (*id.* § 1681(a)(6)), Boys and Girls State conferences (*id.* § 1681(a)(7)), and scholarships for "beauty" pageants (*id.* § 1681(a)(9)). Schools may also have father-daughter dances if they provide "reasonably comparable activities" for "the other sex." *Id.* § 1681(a)(8). And Title IX's ban on sex discrimination cannot be "construed" to prohibit "separate living facilities for the different sexes." *Id.* § 1686.

Title IX also empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX. *See id.* § 1682. The relevant department has exercised this authority from the beginning, issuing regulations making clear that schools may have sex-separate bathrooms, athletics, among other things. *See* 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).

One Title IX regulation states the general prohibition on sex discrimination under Title IX:

(a) General. Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

(b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or

---

[4] Title IX defines "Education institution" as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). And Title IX's implementing regulation defines "program or activity" to include: "[a] department, agency, special purpose district, or other instrumentality of a State or local government"; "[t]he entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"; and "[a] college, university, or other postsecondary institution, or a public system of higher education." 34 C.F.R. § 106.2.

*Page 7 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

other treatment;

.        .        .

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31.

Another Title IX regulation provides that recipients of federal funding may have sex-separated bathrooms and locker rooms as long as those facilities are comparable:

Comparable facilities. A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33.

**B.    Under Title IX, "sex" means biological sex and does not include "gender identity."**

Title IX and its implementing regulation use the term "sex." The term "sex" is an objective factor. Title IX and its implementing regulations use the term "sex" to mean biological sex. "Sex" does not mean, and has never meant, "gender identity."

When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F. 4th 791, 812-13 (11th Cir. 2022) (en banc) (consulting nine contemporary dictionaries for definitions); *see id.* at 812-15 (finding Title IX refers to biological sex).

What dictionaries establish, Title IX's context confirms. "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current [and longstanding] regulations … reflect this presupposition." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020). Section 1681(a)(2), for example, distinguishes between "institution[s] which admi[t] only students of one sex" and "institution[s] which admi[t] students of *both sexes*." 20 U.S.C. §1681(a)(2) (emphasis added). Section 1681(a)(8) similarly refers to sex in binary terms: If father-son or mother-daughter activities are provided for "one sex," then "reasonably comparable activities" must be provided for "the other sex." *Id.* § 1681(a)(8). And Title IX's implementing regulation on bathrooms, like other regulations, use the term "sex" in binary and biological terms. *See, e.g.*, 34 C.F.R. § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex" and making clear that "such facilities provided for students of one sex shall be comparable to such facilities provided to students of the other sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."). Thus, all indicators of ordinary meaning show that "sex" in Title IX means biological sex and does not include "gender identity." *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("the term 'sex' in Title IX 'unambiguously' referred to 'biological sex' and not 'gender identity'").

*Page 8 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued two Executive Orders that reaffirm the meaning of the term "sex" in Title IX:

> (a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

> (b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

> (c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

> (d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

> (e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell….

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8,615-16 (Jan. 30, 2025); *see* Executive Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9,279 (Feb. 11, 2025) (incorporating Executive Order 14168's definitions). And following the Executive Order 14168, the U.S. Department of Health and Human Services published definitions of "sex" and related words (such as "female" "male" "girl" "woman" "boy" "man"), stating that "sex" means "a person's immutable biological classification as either male or female."[5]

Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. The term "gender identity" is, at best, a subjective factor, "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Executive Order 14168, 90 Fed. Reg. at 8,616. Indeed, as some courts have explained, "gender identity" is not a "'discrete'" category but "can describe 'a huge variety of gender identities and expressions.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *aff'd sub nom.*, 145 S. Ct. 1816 (2025). According to some, "gender identity" is "a three-dimensional 'galaxy.'" *United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020); *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring). And according to a once blindly followed but now discredited partisan organization, World Professional Association for Transgender Health (WPATH), someone can be "more than one gender identity simultaneously or at different times (*e.g.*, bigender)," "not have a gender identity or have a neutral gender identity (*e.g.*, agender or neutrois)," "have gender identities that encompass or blend elements of other genders (*e.g.*, polygender, demiboy, demigirl)," or "have a gender that changes over time (*e.g.*, genderfluid)." *Standards of Care for the Health of Transgender and Gender Diverse People*, World Prof. Ass'n Transgender Health, S80 (8th ed. 2022); *see, e.g.*, Executive Order 14187, *Protecting Children From Chemical and Surgical*

---

[5] https://womenshealth.gov/article/sex-based-definitions (U.S. Department of Health and Human Services).

*Page 9 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

*Mutilation*, 90 Fed. Reg. 8,771, (Jan. 28, 2025) (noting that WPATH "lacks scientific integrity"); *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring) ("But recent revelations indicate that WPATH's lodestar is ideology, not science. For example, in one communication, a contributor to WPATH's most recent Standards of Care frankly stated, 'our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" (alteration omitted)); *Skrmetti*, 145 S. Ct. at 1848 (Thomas, J., concurring) ("WPATH appears to rest [its conclusions] on self-referencing consensus rather than evidence-based research."); *id.* at 1849 (WPATH and other "prominent medical professionals ... have built their medical determinations on concededly weak evidence" and "have surreptitiously compromised their medical recommendations to achieve political ends."). The ACLU even contends that trans-identifying individuals include anyone not matching their sex-stereotype. *See* ACLU, *Transgender People and the Law*, at 19-20 ("transgender" means "a broad range of identities and experiences that fall outside of the traditional understanding of gender").[6]

Simply put, "gender identity" is not "ascertainable at the moment of birth" or really at any period of time. *L.W.*, 83 F.4th at 487; *see Skrmetti*, 145 S. Ct. at 1851-52 (Barrett, J., concurring) (explaining that trans-identification is not "definitively ascertainable at the moment of birth," that "transgender status does not turn on an immutable characteristic," that "the transgender population [is not] a discrete group," and that the group's "boundaries ... are not defined by an easily ascertainable characteristic that is fixed and consistent across the group" (cleaned up)); *id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."); *id.* at 1866-67 (similar). Or as the Department of Health and Human Services has explained, "[i]t may be true that a person's gender identity is subjective[,] ... but the more critical point is that no tolerably clear definition of 'gender identity' has been offered in the first place."[7]

In short, Title IX is not a statute about "gender identity," but sex discrimination. As many courts have rightly concluded, "the term 'sex' in Title IX 'unambiguously' refer[s] to 'biological sex' and not 'gender identity.'" *Alabama*, 2024 WL 3981994, at *4; *accord, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024); *Adams*, 57 F.4th at 814-15; *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 920 (D. Kan. 2024); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530-36 (E.D. Ky. 2024); *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 399-400 & nn.48-49 (W.D. La. 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 520-25 (N.D. Tex. 2024).

## C.    Title IX's prohibition against sex discrimination does not include discrimination based on "gender identity."

*Bostock v. Clayton County*'s interpretation of Title VII does not defeat this straightforward reading of Title IX's text, context, and history. 590 U.S. 644 (2020). *Bostock* itself made clear that

---

[6] https://www.aclu.org/sites/default/files/field_pdf_file/lgbttransbrochurelaw2015electronic.pdf.

[7] *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Department of Health and Human Services (May 1, 2025), https://opa.hhs.gov/gender-dysphoria-report, at p. 34.

*Page 10 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

it did not "prejudge" the interpretation of other statutes like Title IX and did not "purport to address bathrooms, locker rooms, or anything else of the kind" under the statute it did interpret. 590 U.S. at 681. And for good reason: *Bostock*'s "text-driven reasoning applies only to Title VII," as "many subsequent cases make clear." *L.W.*, 83 F.4th at 484; *accord Tennessee*, 2024 WL 3453880, at *2 ("*Bostock* is a Title VII case."). "As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination" like Title IX. *Id.* (collecting cases). *Bostock* "bears minimal relevance to cases involving a different law and a different factual context," as is the case with Title IX. *Alabama*, 2024 WL 3981994, at *5 (cleaned up). While *Bostock* "involved employment discrimination under Title VII," Title IX "is about schools and children—and the school is not the workplace." *Id.* (cleaned up); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title VII … is a vastly different statute from Title IX."). And "'Title IX, unlike Title VII, includes express statutory and regulatory carveouts for differentiating between the sexes,'" so "if *Bostock* applied, it 'would swallow the carve-outs,'" "'render them meaningless,'" and absurdly provide more protection for "gender-identity discrimination" than sex discrimination. *Alabama*, 2024 WL 3981994, at *5 (quoting *Adams*, 57 F.4th at 811 & 814 n.7). Thus, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Tennessee*, 2024 WL 3453880, at *2; *see, e.g.*, *Alabama*, 2024 WL 3981994, at *4-5 (collecting cases concluding the same); *cf. Dep't of Ed. v. Louisiana*, 603 U.S. 866, 867 (2024) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

Contemporaneous post-enactment history confirms Title IX does not include discrimination based on "gender identity." Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Department of Education's predecessor to create regulations "implementing … [T]itle IX." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including bathrooms and athletics. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[8] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment

---

[8] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.)); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.")).

*Page 11 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

of the statute and remained consistent over time."). In fact, that evidence is even stronger here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982). Reading Title IX's bar on sex discrimination to wholesale include "gender-identity discrimination," as some wrongly claim, would eviscerate these accurate regulatory interpretations of Title IX, including the regulation on bathrooms and athletics. That "highly counterintuitive result" cannot be right. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021).

Congress's actions more than 50 years following Title IX's enactment further confirm that Title IX's bar on sex discrimination does not include "gender-identity discrimination." In other statutory contexts, Congress has acted affirmatively to address "gender-identity discrimination" as a distinct category separate from sex discrimination. For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender*, sexual orientation, *gender identity*, or disability of the victim poses a serious national problem." 34 U.S.C. § 30501(1) (emphases added). Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and "gender identity." *See* 34 U.S.C. § 12291(b)(13)(A) (2013), as amended by Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), sexual orientation, or disability" (emphasis added)). These post-Title IX enactments show that Congress knows how to prohibit discrimination based on "gender identity" when it wants to but did not do so in Title IX. *DHS v. MacLean*, 574 U.S. 383, 394 (2015).

Even if *Bostock* were relevant to Title IX's scope, it would not change the Department's reading of Title IX and its implementing regulations here. Under *Bostock*, Title IX permits sex separation in bathrooms and locker rooms. Indeed, *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. That is not true here. Unlike in *Bostock*, males and females are not similarly situated when it comes to bathrooms or locker rooms; given their real biological differences, sex is relevant to such decisions. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468-69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part); *Adams*, 57 F.4th at 814-17; *Bostock*, 590 U.S. at 725-28 (Alito, J., dissenting). And as explained below, Title IX not only allows sex-separate bathrooms but requires them.

368 of 461

*Page 12 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

## III.  Analysis

### A.  The Divisions have violated and are still violating Title IX and its implementing regulations.

As explained, Title IX is not a statute about "gender identity" or "gender-identity discrimination" but one about sex discrimination. "Sex" does not mean, and has never meant, "gender identity." Title IX and its implementing regulations never use the term "gender identity," let alone define this seemingly undefinable term. By allowing males to invade sensitive female-only spaces like bathrooms (and vice versa), the Divisions intentionally, or with deliberate indifference, endanger students' safety, privacy, and dignity; create a hostile environment for students; and deny them access to educational activities or programs. *See, e.g.*, *Tennessee*, 737 F. Supp. 3d at 561 ("ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities"). The Divisions are thus violating Title IX.

Title IX is consistent with longstanding tradition of sex-separated sensitive facilities like bathrooms. "[T]he privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence. In fact, 'sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding.'" *Adams*, 57 F.4th at 805. Unsurprisingly, "courts have long found a privacy interest in shielding one's body from the opposite sex in a variety of legal contexts," which is why "[t]he protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective." *Id.* at 804-05; *see, e.g.*, Women's Sports Pol'y Working Grp., Access to Female Athletes' Locker Rooms Should Be Restricted to Female Athletes (Jan. 28, 2023), https://womenssportspolicy.org/access-to-female-athletes-locker-rooms-should-be-restricted-to-female-athletes-january-28-2023/ ("Women's locker rooms are designed to provide female athletes with a separate, safe, private place to shower, change clothes, and use the toilet.").

In line with this tradition, Title IX itself clarifies that its general sex-discrimination bar does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Further recognizing that sex separation is necessary to adhere to Title IX's requirements, one of Title IX's implementation regulation—which has existed since Title IX's enactment—expressly permits a recipient to provide separate toilet, locker room, and shower facilities based on sex. 34 C.F.R. § 106.33. The separate-living-facilities clarification (20 U.S.C. § 1686) and the separate-sensitive-facilities regulation (34 C.F.R. § 106.33) are grounded in students' privacy, safety, and dignitary interest in using the bathroom away from students of the opposite sex and in shielding their bodies from students of the opposite sex while changing in the locker room. Eliminating sex-separate bathrooms and locker rooms, as the Divisions have here, "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect by permitting sex-based segregation in sensitive areas where separation has been traditional." *Tennessee*, 737 F. Supp. 3d at 559. And it creates a hostile educational environment that denies students educational opportunities.

Although self-evident, a recently released report finds requiring girls to undress or use the bathroom in the presence of boys, causes distress in girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities. *See* Reem Alsalem, *Special Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N.

Page 13 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325. The report indicates that policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets. *Id.*; *see Tennessee*, 737 F. Supp. 3d at 562 ("the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened too"). Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Id.* at 561.

This harm is not hypothetical. The Divisions' policies affect real students. For example, OCR learned that since the start of the 2024-2025 school year, Fairfax County Public Schools was subject to a lawsuit filed on behalf of a student—and later joined by three additional students—alleging that sharing a restroom with students of the opposite sex violated, among other things, the students' equal-protection rights. In that filing, the petitioners alleged that one of the students avoided using school restrooms whenever possible because of the Division's regulation. Loudoun County Public Schools also received five reports from both male and female students about a student of the opposite sex's presence in the locker rooms, resulting in, as one complaint put it, "discomfort, embarrassment, and vulnerability." In two of those complaints, female students alleged that a male student made sexual jokes, momentarily touched other students in an inappropriate manner, and watched female students changing in the locker room. And Prince William County Public Schools reported two complaints about the presence of individuals of the opposite sex in the locker rooms, resulting in students' discomfort.

Students at school have enough to worry about; worrying about whether it is safe to use the bathroom or change in a locker room cannot be one of them. The Divisions' bathroom, locker room, and sex-segregated intimate facilities policies or regulations violate Title IX and its implementing regulations because they permit access to intimate facilities that correspond with a student's "gender identity," which, in turn, requires students to use these intimate facilities in the presence of members of the opposite sex. In so doing, the Divisions are facilitating the significant deleterious effects—including discomfort, embarrassment, psychological harm, and potential physical injury—that Title IX seeks to prevent. Put differently, the Divisions are creating a hostile education environment that denies students the benefits of an education program or activity based on sex, in violation of Title IX and its implementing regulations.

## B.   The Divisions' reliance on *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), does not shield it from liability under Title IX.

*Grimm* does not change the Department's conclusion that the Divisions have violated and are violating Title IX. The Supreme Court in *Skrmetti* abrogated *Grimm* and other Fourth Circuit precedents in key respects, showing that a sex-separated bathroom policy is permissible under Title IX and the Equal Protection Clause. Regardless, *Grimm*'s conclusions hinged on certain factual findings that, as the record shows, are debunked. Moreover, many of the Divisions' policies do not limit bathroom access to consistent or persistent assertions of a certain "gender identity" and thus are overbroad.

### 1.   *Skrmetti* abrogated *Grimm* in key respects.

Key aspects of *Grimm* are no longer binding in light of *Skrmetti*. The Supreme Court granted, vacated, and remanded the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024), which heavily relied on *Grimm*, showing that *Grimm* is out of step with Supreme

*Page 14 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

Court precedent. *See Folwell v. Kadel*, No. 24-99, 2025 WL 1787687, at *1 (U.S. June 30, 2025) ("The petition for writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025)."). And *Skrmetti*'s relevance is clearly beyond laws or policies involving medical interventions, especially given that the Supreme Court granted, vacated, and remanded cases outside the medical-intervention context, including in a case involving birth certificates. *See, e.g.*, *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025) ("The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Tenth Circuit for further consideration in light of *United States v. Skrmetti*, 605 U. S. —— (2025).").

 *First*, *Grimm*'s Title IX ruling hinged on the correctness of its equal-protection analysis, specifically the conclusion that a sex-separated bathroom policy classifies based on sex. *See Grimm*, 972 F.3d at 618 ("*In light of our equal protection discussion above*, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students." (emphasis added)). But that analysis has been abrogated by the Supreme Court in *Skrmetti*. *Skrmetti* made clear that the key question is whether the policy "prohibit[s] conduct for one sex that it permits for the other." 145 S. Ct. at 1831. And that is not true for sex-separated bathrooms. Neither sex may use the bathroom of their choosing; both sexes must use the bathroom consistent with his or her sex.

 *Second*, in *Grimm*, the Fourth Circuit relied heavily on *Bostock*, which it imported to Title IX with little analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." *Grimm,* 972 F.3d at 616 (cleaned up). But *Bostock* does not apply to Title IX. Even if it did*, Bostock* does not establish that a sex-separated bathroom policy discriminates based on sex in violation of Title IX.

To begin with, the Supreme Court has recently made clear that it has not "considered whether *Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. In so doing, however, the Supreme Court also made clear that *Bostock*'s "'because of' test" derived from Title VII's "because of" language, which "incorporates the traditional but-for causation standard." *Id.* As explained above, *Bostock* simply does not apply outside Title VII and does not apply to Title IX. *See, e.g.*, *Tennessee*, 2024 WL 3453880, at *2; *Alabama*, 2024 WL 3981994, at *4-5; *cf. Louisiana*, 603 U.S. at 867 (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).

In any event, the Supreme Court has clarified *Bostock*'s analysis in *Skrmetti*, abrogating *Grimm*. According to *Skrmetti*, *Bostock* concluded that sex is a but-for cause when for similarly situated individuals, the entity "penalize[s] a member of one sex for a trait or action that it tolerates in members of the other." *Skrmetti*, 145 S. Ct. at 1834. That is not true for sex-separated bathrooms because "changing the [applicant's] sex … does not automatically change the operation of" the sex-separated bathroom policy. *See id.* at 1834-35. For example, if a female seeks to choose her own bathroom, a sex-separate bathroom policy prohibits her from doing so—and requires that her bathroom choice reflect biological reality, regardless of whether that reality matches the person's

Page 15 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

asserted "gender identity." Change that person's sex from "female to male," *id.* at 1834, and the bathroom policy would still prohibit him from choosing his own bathroom—and would still require that his bathroom reflect biological reality, regardless of whether that reality matches the person's "gender identity." Thus, under such a policy, sex is not "the but-for cause" of one's inability to self-select a bathroom based on one's "gender identity." *Id.* A sex-separated bathroom policy does not "intentionally penalize[]" a male "for a trait" that the policy "tolerates" in a female, *id.*, so it does not discriminate based on sex under *Bostock*'s reasoning, as clarified by *Skrmetti*.

**Third,** the Fourth Circuit in *Grimm* alternatively concluded that a sex-separated bathroom policy triggered intermediate scrutiny under the Equal Protection Clause because it thought "transgender status" was a "quasi-suspect class" and that such a policy classifies based on "transgender status." *Grimm*, 972 F.3d at 613. Even if *Skrmetti* has not abrogated this analysis, *see* 145 S. Ct. at 1832-34 (state child-protection law did not classify based on trans-identification), it does not mean that the Divisions' overbroad policies follow Title IX, as explained below. In any event, the Fourth Circuit's conclusion that "trans-identification" is a quasi-suspect class is inconsistent with subsequent Supreme Court dicta. The Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class." *Skrmetti*, 145 S. Ct. at 1832. And rightly so. As three Justices explained in *Skrmetti*, "transgender status" or "gender identity" is not a class that warrants heightened scrutiny. *See id.* at 1855 (Barrett, J., concurring, joined by Thomas, J.) ("The Equal Protection Clause does not demand heightened judicial scrutiny of laws that classify based on transgender status," and, thus, "[r]ational-basis review applies."); *id.* at 1860 (Alito, J., concurring in part and in the judgment) ("[T]ransgender status does not qualify under our precedents as a suspect or 'quasi-suspect' class.").

To start, "transgender status is not marked by the same sort of obvious, immutable, or distinguishing characteristics as race or sex." *Id.* at 1851 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Transgender status is not 'immutable,' and as a result, persons can and do move into and out of the class."). It is not "definitively ascertainable," let alone "at the moment of birth," as "detransition[ers]" show. *Id.* at 1851 (Barrett, J., concurring) (cleaned up). It is not a "discrete group" because the category of trans-identifying individuals "is large, diverse, and amorphous" and "not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Id.* at 1851-52 (Barrett, J., concurring) (cleaned up); *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class."). And trans-identification, "unlike race and sex, is often not accompanied by visibly identifiable characteristics" because an individual's "'gender identity' is an 'internal sense,'" which does not "necessarily tend to 'carry an obvious badge' of their membership in the class that might serve to exacerbate discrimination." *Id.* at 1866-67. This alone "is enough to demonstrate that transgender status does not define a suspect class." *Id.* at 1853 (Barrett, J., concurring).

But there is more. The group has not, "as a historical matter, been subjected to discrimination." *Id.* (cleaned up). That is because this group has not "suffered a history of *de jure* discrimination." *Id.*; *see id.* at 1861 (Alito, J., concurring in part and in the judgment) ("[T]ransgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or 'quasi-suspect.'"). Indeed, "there is no evidence that transgender individuals, like racial minorities and

women, have been excluded from participation in the political process." *Id.* at 1866. To the contrary, "despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems." *Id.* This too separately shows "transgender status" does not warrant heightened scrutiny.

Thus, the Divisions' reliance on the Fourth Circuit's opinion in *Grimm* that "transgender status" or "gender identity" is a quasi-suspect class that is subject to heightened scrutiny, is wrong. Indeed, Justice Barrett specifically cited *Grimm* as an example of a lower court erroneously employing "sociological intuitions about a group's relative political power" while failing to rely upon "objective, legally grounded standard[s] that courts can apply consistently." *Id.* at 1855 (Barrett, J., concurring).

***Fourth,*** even if heightened scrutiny applied,[9] a sex-separate bathroom policy would easily satisfy that standard. In *Skrmetti*, the Supreme Court explained that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on *impermissible* stereotypes." 145 S. Ct. at 1832 (emphasis added). Because sex-separate bathrooms are necessary to preserve students' privacy, safety, and dignity, they "do not themselves evince sex-based stereotyping." *Id.*; *see Skrmetti*, 83 F.4th at 486 ("Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States v. Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping.").

## 2. *Grimm* hinged on certain factual findings that are refuted based on the record in this investigation.

More fundamentally, *Grimm* is premised on factual findings and conclusions that are clearly distinguished from the facts in this investigation. *Grimm* does not apply to this investigation because the Department has developed a different record than the limited record in *Grimm*, and the "question [in *Grimm* was] limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *See Grimm*, 972 F.3d at 596.

***First,*** per *Grimm*, a female who identifies as a boy is "similarly situated" to a male because a trans-identifying female is somehow a boy. *See Grimm*, 972 F.3d at 610 n.10 ("To avoid a conclusion that Grimm was similarly situated to other boys, the dissent fails to meaningfully reckon with what it means for [Grimm] to be a transgender boy. We have been presented with a strong record documenting the modern medical understanding of what it means to be transgender, and considering that evidence is definitively the role of this Court." (cleaned up)). Indeed, *Grimm*

---

[9] To the extent that *Grimm* is still binding, the Department preserves the right to challenge this precedent. At any rate, the writing on the wall is clear: The Supreme Court recently granted certiorari in two cases that clearly signals that whatever is left of *Grimm*, it will no longer be good law or, at the very least, shows that *Grimm* should be seriously reconsidered. *See W. Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164, at *1 (U.S. July 3, 2025); *Little v. Hecox*, No. 24-38, 2025 WL 1829165, at *1 (U.S. July 3, 2025). These cases will address whether Title IX or the Equal Protection Clause prevents a State from having sex-separated sports teams. The Supreme Court will also consider, among other things, whether *Bostock* extends to Title IX and whether classification based on "transgender status" is subject to heightened scrutiny.

*Page 17 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

claimed that a sex-separate bathroom policy defining "sex" to mean objective biological facts is based on nothing more than an "invented classification" and "discriminatory notion." *See, e.g.*, *id.* at 618-19.

But *Grimm*'s conclusions are refuted by the facts found in this investigation, which shows Grimm's conclusions are contrary to science and biological reality. *See, e.g.*, *supra* n.3. The Supreme Court in *Skrmetti* recognized that trans-identification does not (indeed, cannot) change one's sex. *See* 145 S. Ct. at 1830 n.2; *see also, e.g.*, *Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring: The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (cleaned up)). And as noted above, the President and the Department of Health and Human Services have also recognized that a trans-identifying male is not similarly situated to a female and that biological sex is not invented but based on scientific truth.

In claiming otherwise, the Fourth Circuit heavily relied on WPATH. *See, e.g.*, *Grimm*, 972 F.3d at 595-96 (claiming WPATH "represent[s] the consensus approach of the medical and mental health community" and relying on WPATH). But as explained, WPATH is a discredited, partisan advocacy group. *See, e.g.*, Amicus Brief of Alabama in *United States v. Skrmetti*, No. 23-477 (filed Oct. 15, 2024)[10]; The Cass Review: Independent Review of Gender Identity Services for Children and Young People (Apr. 2024).[11] WPATH's opinions are not based on appropriate evidence but rather the biased motivation to help "social justice lawyers." *Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring) (cleaned up).

*Grimm*'s conclusion also ignores the physical reality of how humans use restrooms. Simply making male and female restrooms available to both sexes based on "gender identity" does not provide the same services to male and female students. As one court noted, "[i]f defendant provided 'identical' men's and women's restrooms … each containing two toilet stalls and seventeen urinals, few would argue that the facilities were functionally comparable notwithstanding their physical similarity. The benefits and services derived by one group would be substantially less than the benefits and services derived by the other*." Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 733 (D. Or. 1997), *supplemented*, 1 F. Supp. 2d 1159 (D. Or. 1998). Or as another court has explained, "[n]ot to be unduly technical, but transgender girls would use individual stalls because female restrooms do not contain urinals. And transgender boys cannot physically use urinals and would, therefore, also use individual stalls." *Roe ex rel. Roe v. Critchfield*, No. 1:23-CV-00315-DCN, 2023 WL 6690596, at *9 (D. Idaho Oct. 12, 2023), *aff'd*, 131 F.4th 975 (9th Cir. 2025). By ignoring objective biological facts, and instead basing bathroom policies on a subjective factor like "gender identity," the school divisions of Alexandria, Arlington, Fairfax, Loudoun, or Prince William engage in the different treatment of male and female students, in violation of Title IX.

---

[10] https://www.supremecourt.gov/DocketPDF/23/23477/328275/20241015131826340_2024.10.15%20-%20Ala.%20Amicus%20Br.%20iso%20TN%20FINAL.pdf.

[11] https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.independent-review.uk/wp-content/uploads/2024/04/CassReview_Final.pdf.

*Page 18 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

In short, common sense and overwhelming evidence establishes that a boy is a boy, and a girl is a girl, regardless if the boy or girl has undergone medical interventions, and that a boy and a girl are not similarly situated when it comes to bathrooms and other intimate facilities.

**Second**, contrary to *Grimm*, the privacy and security concerns of students are not "sheer conjecture and abstraction" but real and serious. *Grimm*, 972 F.3d at 614. There is evidence that "trans-identifying" individuals using bathrooms not in line with their sex has led to privacy, security, and dignitary harms. *Contra Grimm*, 972 F.3d at 614 ("The Board does not present any evidence that a transgender student, let alone Grimm, is likely to be a peeping tom, rather than minding their own business like any other student. Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys' restrooms did not increase when Grimm was banned from those restrooms."). As noted above, students have filed lawsuits or complaints with some of the Divisions, alleging that students have suffered privacy and safety harms from these Divisions' bathroom policies.

The Virginia Attorney General recently released findings in an investigation conducted in March 2025, involving a female student who identified as a male student and was recording male students inside the boys' locker room and restroom in the Loudoun County Public Schools. The report indicates that when the boys expressed their concerns about sharing a locker room with a female student, the school division investigated the boys for voicing those concerns.

In 2021, public reports indicate a male student, who had conveyed to a classmate that he told his mother he was "pansexual," wore his hair in a bun, and would sometimes dress in a skirt and wear fishnet gloves, sexually assaulted a 15-year-old female classmate in a girls' restroom at Stone Bridge High School in Loudoun County Public Schools. That male was later adjudicated guilty of the assault in court. The same male student was then transferred to another school in the same division and sexually assaulted another female student less than six weeks after the first assault. He was adjudicated guilty of that assault as well.[12]

What has been seen in the Divisions has also been seen throughout the country. For example, on April 15, 2025, a high school track student athlete spoke during public comment at the Lucia Mar School District Board of Education in Arroyo Grande, California about the impact the Board's policy of allowing boys who identify as girls to use locker rooms and restrooms designated for girls, had on her. The student recounted how she had recently gone into the women's locker room at school to change for track practice. While she was changing her clothes, a male student was sitting in the locker room watching her and the other female students undress. The young lady stated the experience was traumatizing. She stated the male student had already dressed for track practice at the beginning of the day. The male student had no reason to be in a locker room other than to watch girls undress.

In June 2024, a 16-year-old female student at Stewartville High School in Minnesota expressed her experience having to share restroom and locker room facilities with boys at school,

---

[12] Report Regarding Investigation into Misconduct at Stone Bridge High School and Broad Run High School, December 31. 2021.

*Page 19 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

and the impact it had on her educational opportunities.[13] The young lady reported that she was in the locker room after gym class getting ready to change clothes and she heard a male's voice inside the women's locker room and when she turned to look, she saw a boy in the locker room. She indicated that she talked to her school principal about feeling uncomfortable about changing in the locker room in the presence of a boy, but he told her that students can "be whoever they want to be." She also indicated she is scared about boys pretending to be girls, then touching them or taking cellphone photos of girls in restrooms or locker rooms, and that other girls she knows share her concerns. The mother of two other female students spoke up raising similar concerns. Parents have also spoken out about school district policies allowing teen-age boys to share locker rooms and restrooms with teen-age girls at Rochester Public Schools in Minnesota. One parent indicated she had to move her daughters to another school district because of restroom and locker room policies allowing boys into restrooms and locker rooms designated for girls.[14]

Public reports indicate in March 2023, four 14-year-old freshman girls in the Sun Prairie Area School District in Wisconsin were showering in the girls' locker room when they were exposed to the genitalia of an 18-year-old senior male student who told the girls he was "trans."

There are unfortunately more examples. *See, e.g.*, Declaration of A.C. in *Sexuality and Gender Alliance v. Critchfield*, No. 1:23-cv-00315, Doc. 90-1 ¶¶ 4-7 (D. Idaho July 21, 2025) (girl student detailing how, at her school that allows boys into the girls' bathroom, a male was "masturbating in the adjacent stall" to hers in the girls' bathroom).

**Third**, in *Grimm*, the Court stated "the heart of [the] appeal is whether equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender." 972 F.3d at 593. What is at the heart of this investigation, however, is an issue not considered by the Court in *Grimm*. This investigation is evaluating whether the Divisions are taking action that denies students who are not "transgender" equal access to education benefits and opportunities in programs and activities offered by the Divisions. In *Grimm*, the Court was concerned that Grimm practiced bathroom avoidance resulting in urinary tract infections and felt "unsafe, anxious, and disrespected" because of the Board's policy requiring students to use the restroom that corresponds to their sex. *Id.* at 600. Those same concerns are present for students who are not "transgender" and who are forced to share a restroom or locker room with a member of the opposite sex. The Divisions have an obligation under Title IX to all students in the provision of restrooms and locker rooms, not just students who identify as "transgender."

   3.   **Regardless, many of the Divisions' policies are overbroad, showing that even applying *Grimm*, they violate Title IX.**

Even if *Grimm* were still binding, four of the five school divisions at issue in this investigation (Alexandria, Arlington, Fairfax, and Prince Williams) violate Title IX by not limiting their intimate-facilities policies to students that "consistently and persistently" assert a "gender

---

[13] https://www.dailysignal.com/2024/06/13/really-uncomfortable-16-year-old-girl-speaks-sharing-school-bathrooms-locker-rooms-males/.

[14] https://www.dailysignal.com/2024/06/11/concerned-daughters-safety-13-minnesota-school-districts-issue-transgender-guidelines-allowing-boys-girls-spaces/; https://alphanews.org/infuriating-minnesota-mom-slams-school-districts-radical-transgender-restroom-guidelines/.

*Page 20 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

identity."[15] *Grimm* was crystal clear that its decision was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a binary gender." 972 F.3d at 596 (emphasis added); *accord id.* at 610 ("Grimm, however, did not question his gender identity at all; he knew he was a boy."); *id.* at 619 ("Grimm *consistently and persistently* identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys' restrooms as part of the appropriate treatment." (emphasis added)). In other words, these school divisions allow individuals that do not assert a consistent and persistent "gender identity" to use facilities of the opposite sex. Because Grimm is premised on this limitation, policies without that limitation cannot rely on *Grimm*. Thus, these four school divisions have overbroad policies that are not justified by *Grimm* and violate Title IX.

For these reasons, OCR concludes that *Grimm* does not apply and that, even assuming it does apply, would not change the outcome of this investigation. The Divisions' policies that allow teenage boys to share intimate facilities with teenage girls violate common sense, create unnecessary distress and risk of harm, and deny students the availability of sex-separated locker rooms and bathrooms. These policies result in hostile environments and a denial of the overall benefits of an education program or activity based on sex. The Divisions are thus violating Title IX and its implementing regulations.

## IV.    Conclusion

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the Divisions' compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied on, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the Division must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law or regulation enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law or regulation enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

---

[15]    *See,* https://go.boarddocs.com/va/acps/Board.nsf/files/DE62ZL049E89/$file/JB%20-%20Nondiscrimination%20in%20Education.pdf;https://go.boarddocs.com/vsba/arlington/Board.nsf/files/BDNQEE68DE84/$file/J-2%20PIP-2%20Transgender%20Students%20in%20Schools.pdf;https://go.boarddocs.com/vsba/fairfax/Board.nsf/files/CDPTV8792B2E/$file/R2603.pdf;https://go.boarddocs.com/vsba/pwcs/Board.nsf/goto?open&id=C3VP7R61926D.

*Page 21 Letter of Findings – OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309*

      This letter is accompanied by a draft resolution agreement that specifies the actions that, when taken by the Division, will remedy the violation of Title IX. Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter.

      If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse.

                      Sincerely,

BRADLEY BURKE

Digitally signed by BRADLEY BURKE
Date: 2025.07.25 10:21:48 -05'00'

Bradley R. Burke
Regional Director

Enclosure

# EXHIBIT E

JA371

## RESOLUTION AGREEMENT
### Arlington Public Schools
### OCR Case Numbers 11-25-1306

Arlington Public Schools (hereinafter referred to as "the Division") agrees to fully implement this Resolution Agreement to resolve the allegations investigated in Office for Civil Rights (OCR) Case Number 11-25-1306. This Agreement does not constitute an admission by the Division of a violation of Title IX of the Education Amendments Act of 1972 (Title IX), or any other law enforced by OCR.

### Action Item 1 – Rescission of Policies, Regulations, and Corresponding Guidance

The Division will rescind any components of the following policy pertaining to access to intimate facilities: "Policy Implementation Procedure J-2 PIP-2: Transgender Students in Schools." The Division will also rescind any corresponding guidance documents, trainings, or other related documents pertaining to the components of the aforementioned policy that apply to intimate facilities.

#### Reporting Requirements:

a.   By_____2025, the Division will provide OCR with documentation demonstrating that Action Item 1 has been fully implemented.

### Action Item 2 – Issue Memorandum to Schools

The Division will issue a memorandum to each Division school regarding the rescission of the policies and/or regulations outlined in Action Item 1. The memorandum will inform the schools that any future policies related to access to intimate facilities must be consistent with Title IX. The memorandum shall:

a.   Specify that Title IX compliance means a school must not – on the basis of *sex* – exclude *female* students from participation in, deny female students the benefits of, or subject female students to discrimination under, any education program or activity including but not limited to the use of intimate facilities including locker rooms and bathrooms.

b.   Specify that schools must provide intimate facilities such as locker rooms and bathrooms accessible to students strictly separated on the basis of sex and comparably provided to each sex.

The memorandum will further state that the words *sex, female, male, girls, women, boys, men* as used in the memorandum and as applicable in all practices, policies, and procedures adopted and implemented by the Division pursuant to or consistent with Title IX, mean the following:

*Sex* is a person's immutable biological classification as either male or female.
*Female* is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova).
*Male* is a person of the sex characterized by a reproductive system with the biological function of producing sperm.
*Woman* is an adult human female.

JA372

*Page 2 – Resolution Agreement, Arlington Public Schools - 11251306*

      **Girl** is a minor human female.
      **Man** is an adult human male.
      **Boy** is a minor human male.

The memorandum will further state that the above meanings of words are to be understood in the context of the facts that *there are only two sexes (female and male) because there are only two types of gametes (eggs and sperm); and the sex of a human – female or male – is determined genetically at conception (fertilization), observable before birth, and unchangeable.*

The Division will post this memorandum in a prominent location on its website.

**Reporting Requirements:**

a.  By _____2025, the Division will submit a copy of the draft memorandum to OCR for OCR's review and approval.

b.  Within _____days of receiving OCR's approval, the Division will disseminate the memorandum to the Division schools and provide verification to OCR.

By signing this Agreement, the Division agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. During the monitoring of this Agreement, if necessary, OCR may visit the Division, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the Division has fulfilled the terms and obligations of this Agreement.

Upon OCR's acknowledgment of the Division's satisfaction of the commitments made under this Agreement, OCR will close the case.

The Division understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the Division written notice of the alleged breach and 60 calendar days to cure the alleged breach.

The Agreement will become effective immediately upon the signature of the Division's authorized official below.

By: _____    Date: _____
      Name and Title
      Recipient Name

JA373

# EXHIBIT F

JA374

Confidential Treatment Requested

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

July 29, 2025

Bradley Burke
Regional Director
United States Department of Education
Office for Civil Rights

Re:     Case No. 11-25-1305 – Alexandria City Public Schools
        Case No. 11-25-1306 – Arlington Public Schools
        Case No. 11-25-1307 – Fairfax County Public Schools
        Case No. 11-25-1308 – Loudoun County Public Schools
        Case No. 11-25-1309 – Prince William County Public Schools

Dear Mr. Burke,

We are in receipt of the Letter of Findings ("LOF") and accompanying draft resolution agreements that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, Loudoun County Public Schools, and Prince William County Public Schools (the "Divisions") on July 25, 2025. As explained below, the Divisions respectfully request the opportunity to negotiate with OCR for up to 90 calendar days, as guaranteed by Section 303(f) of the OCR Case Processing Manual ("OCR Manual").

In February, 2025, OCR issued a Notification Letter and a Data Request Letter to the Divisions indicating that a complaint was filed with OCR alleging that the Divisions' policies violated Title IX by providing greater rights to students who are transgender than to those who are not in regards to the use of intimate, sex-segregated facilities such as restroom and locker rooms. The Divisions timely responded to the Data Request Letter and provided both documents and narrative responses in March 2025.

On July 25, OCR issued its LOF and accompanying draft resolution agreements. The LOF specifically provides: "Given the serious violation of Title IX, OCR will conclude that attempts to secure the Division's voluntary compliance are at an impasse unless the Division indicates a willingness to execute a resolution agreement within 10 days of the date of this letter. If the Divisions have not indicated a willingness to execute an agreement by that date, OCR will issue a letter of impasse that confirms the Divisions' refusal to voluntarily come into compliance with Title IX and informs the Division that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse."

Pursuant to Section 303(f) of the OCR Manual: "From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within which to reach final agreement." Section 303(h) of the OCR Manual further provides that "when it is clear that agreement will not be reached . . . OCR shall issue an Impasse Letter that informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period."

JA375

Confidential Treatment Requested

Your letter and the 10-day deadline it imposes for a response suggests that OCR believes the parties have reached an impasse, triggering the 10-day notice provision of Section 303(h). The Divisions disagree with that characterization of the status of negotiations, as we have only received OCR's LOF and draft resolution agreements less than two business days ago. The LOF contains a complex legal analysis of recent Supreme Court precedent. The draft resolution agreement demands substantial changes to school division policies and regulations and the redefinition of fundamental terms therein. It is premature to declare negotiations at an "impasse" when we have only just received OCR's LOF and demand for substantial changes to policies and/or regulations. The Divisions have not yet had an opportunity to evaluate, much less respond to those assertions. Accordingly, we believe that the 90-day period provided by Section 303(f) of the Manual applies, as the Divisions intend to engage in their respective good-faith discussions with OCR and attempt to negotiate a resolution agreement.

The Divisions will use the additional time to engage in an evaluation process, including by involving their respective elected school boards as appropriate, in order to respond to OCR's proposed resolution agreement. The policies at issue impact a wide array of stakeholders. Matters of policy as well as resolution of federal investigations often require the involvement of the elected school boards of each Division. As a practical constraint, given the summer recess, some of the Divisions' school boards will not reconvene for several weeks from now and must comply with Virginia public meetings law when scheduling meetings. It is not possible for the school boards to meet, evaluate the OCR LOF and draft resolution agreement, consider stakeholder feedback as appropriate, and make consequential decisions within 10 days.

Moreover, compliance with the proposed resolution agreement is more complex than simply rescinding the policies at issue, as some of the specific Division policies involved in this matter contain components that are not subject to the resolution agreement and will be impacted by the proposed changes. Just as these policies were not enacted within ten days, but rather over the course of an appreciable timeframe that allowed for thoughtful deliberation and consideration, reframing the policies to comply with the proposed resolution agreement cannot be done on the highly abbreviated timeframe provided by the OCR LOF. Ninety days will allow time for the Divisions to discuss and evaluate the LOF and proposed resolution agreements, solicit feedback from relevant invested parties as appropriate, and engage in negotiations with OCR in a good faith effort to resolve the matter.

For these reasons, the Divisions respectfully request that OCR honor the terms of the OCR Manual by providing the Divisions with a minimum of 90 days to negotiate with OCR.

Respectfully,

*/s/ Timothy J. Heaphy*
Timothy J. Heaphy
*On behalf of Fairfax County Public Schools and Arlington Public Schools*
Willkie Farr & Gallagher LLP
THeaphy@willkie.com
PH: 202-303-1069

cc:
Michelle C. Reid, Ed.D., Division Superintendent, FCPS
John Foster, Division Counsel, FCPS
Ellen Kennedy, Deputy Division Counsel, FCPS
Michael McMillin, Staff Attorney, FCPS

JA376

Confidential Treatment Requested

Francisco Duran, Ed.D., Superintendent, APS
Chrissy Smith, Division Counsel, APS


John F. Cafferky
*On behalf of Alexandria City Public Schools and Loudoun County Public Schools*
Blankingship & Keith PC
jcafferky@bklawva.com
jstalnaker@bklawva.com
PH: 703-279-7201
PH: 703-691-1235


cc:
Melanie Kay-Wyatt, Ed.D., Division Superintendent, ACPS
Robert M. Falconi, Division Counsel, ACPS
Aaron Spence, Ed.D., Division Superintendent, LCPS
Wesley Allen, Division Counsel, LCPS

*/s/* Laura Colombell Marshall
Laura Colombell Marshall
Heidi Siegmund
*On behalf of Prince William County Public Schools*
McGuireWoods LLP
LMarshall@mcguirewoods.com
HSiegmund@mcguirewoods.com
PH: 202-857-1700
PH: 804-775-1049


cc:
Dr. LaTanya D. McDade, Superintendent
Wade T. Anderson, Division Counsel

JA377

# EXHIBIT G

JA378

**Hemminger, Lindsay**

| | |
|---|---|
| **From:** | Burke, Bradley <Bradley.Burke@ed.gov> |
| **Sent:** | Thursday, July 31, 2025 2:25 PM |
| **To:** | Heaphy, Timothy; jcafferky@bklawva.com; jstalnaker@bklawva.com; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com |
| **Cc:** | Hemminger, Lindsay; Carroll, Fiona |
| **Subject:** | RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**\*\*\* EXTERNAL EMAIL \*\*\***

Counsel,

I received your letter, dated July 29, 2025.

First, your letter incorrectly asserts that "OCR believes the parties have reached an impasse." We have not reached an impasse because your clients have contacted OCR within 10 days of our Letter of Finding and indicated a willingness to negotiate a resolution agreement in these cases. If your clients are, in fact, serious about coming into compliance with Title IX, we are all ears. But we expect to engage in discussions with dispatch. Every day that goes by without a satisfactory resolution agreement is a day that children in the five Northern Virginian school divisions are at risk of grave harm.

Second, your letter incorrectly asserts that OCR's Case Processing Manual (CPM) requires a 90-day period to engage in a resolution agreement negotiation. As a threshold matter, the CPM neither creates rights, nor is it governed by the Administrative Procedure Act. Relevant here, we refer you to CPM Section 303(g), which states that OCR "may end the negotiations period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached," including "the recipient's refusal to agree to a key resolution term." Given that your clients have indicated a willingness to negotiate in good faith about coming into compliance with Title IX, we have neither ended negotiations, nor reached an impasse.

Nevertheless, OCR's proposed resolution agreement was intentional and specific about its key resolution terms. And we do not intend to allow recipients who are not serious about coming into compliance with Title IX—including acknowledging that Title IX is a statute only about sex discrimination and that the term "sex" in Title IX refers only to biological sex and not gender identity—to drag out discussions unnecessarily. We are, therefore, asking counsel for each recipient to indicate whether or not your client is willing to consider agreeing to the terms in the draft resolution agreement. We are, of course, open to additional terms, but OCR is firm on these key terms. As a result, we expect a response to this specific inquiry no later than August 15, 2025.

Respectfully,
Brad Burke

Bradley R. Burke

1

JA379

U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Wednesday, July 30, 2025 9:24 AM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** Re: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thanks Brad.

_
On July 30, 2025 at 9:56:28 AM EDT, Burke, Bradley <Bradley.Burke@ed.gov> wrote:

**\*\*\* EXTERNAL EMAIL \*\*\***

Good morning Mr. Heaphy, and all.

Thank you for reaching out.  I'll review your letter and respond shortly.

Respectfully,

Brad Burke

Bradley R. Burke
U.S. Department of Education
Office for Civil Rights
Bradley.Burke@ed.gov

**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

---

**From:** Heaphy, Timothy <THeaphy@willkie.com>
**Sent:** Tuesday, July 29, 2025 5:28 PM
**To:** Burke, Bradley <Bradley.Burke@ed.gov>; jcafferky@bklawva.com; jstalnaker@bklawva.com;
LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Cc:** Hemminger, Lindsay <LHemminger@willkie.com>; Carroll, Fiona <FCarroll@willkie.com>
**Subject:** RE: Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and
11251309

JA380

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Mr. Burke,

On behalf of the 5 northern Virginia school districts referenced in the above-referenced OCR investigations, please see the attached letter.  We request confidential treatment of this and other communications as the matter proceeds.

Thank you,

Tim Heaphy


**Timothy J. Heaphy**
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. | Washington, DC 20006-1238
Direct: +1 202 303 1068 | Mobile: +1 804 291 7369
theaphy@willkie.com | vCard | www.willkie.com bio

**From:** Burke, Bradley <Bradley.Burke@ed.gov>
**Sent:** Friday, July 25, 2025 11:31 AM
**To:** robert.falconi@acps.k12.va.us; jcafferky@bklawva.com; jstalnaker@bklawva.com; christine.smith@apsva.us; Heaphy, Timothy <THeaphy@willkie.com>; jefoster@fcps.edu; Kennedy, Ellen D <edkennedy@fcps.edu>; Wesley.Allen@lcps.org; LMarshall@mcguirewoods.com; HSiegmund@mcguirewoods.com
**Subject:** Letter of Findings - OCR case nos. 11251305; 11251306; 11251307; 11251308; and 11251309

*** EXTERNAL EMAIL ***

Good morning,

Please see the attached Letter of Findings and draft Resolution Agreements in the above referenced cases.

Respectfully,

Brad Burke

Bradley R. Burke
Regional Director
U.S. Department of Education
Office for Civil Rights

Email: Bradley.Burke@ed.gov



JA381

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

JA382

# EXHIBIT H

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC 20006-1238

Tel: 202 303 1000
Fax: 202 303 2000

August 15, 2025

Bradley Burke
Regional Director
U.S. Department of Education
Office for Civil Rights
Via email: Bradley.Burke@ed.gov

Re: <u>OCR Case No. 11-25-1306 - Arlington Public Schools</u>

Dear Mr. Burke,

We write in response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Arlington Public Schools ("APS") on July 25, 2025.[1]

As explained below, APS cannot agree to the terms of the Resolution Agreement because rescission of Policy Implementation Procedure J-2 PIP-2 "Transgender Students in Schools" (the "Policy") would violate Fourth Circuit and Virginia state law. The Supreme Court's 2025 decision in *United States v. Skrmetti* did not "abrogate" the 4th Circuit authority of *Grimm v. Gloucester County School Board* that requires the current APS policy, as it involved both facts and law materially different from those involved in *Grimm*. The Supreme Court has accepted certiorari in *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom. W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025), a case raising the precise legal issue at stake in the instant investigation. Given the looming guidance from the Court as to whether Title IX restricts or protects access to facilities based on gender identity, APS proposes that OCR stay this matter until the *B.P.J.* case is resolved.

## I.    Procedural History

In February 2025, OCR issued a Notification Letter and a Data Request Letter to APS indicating that a complaint was filed with OCR alleging that APS's policies violated Title IX by providing greater rights to students who are transgender than to those who are not with regard to the use of intimate, sex-segregated facilities such as restrooms and locker rooms. APS responded timely to the Data Request Letter and provided both documents and narrative responses in March 2025. On July 25, 2025, OCR issued its LOF and accompanying Resolution Agreement. On July 29, 2025, APS responded to OCR with a letter requesting additional time to evaluate the LOF and Resolution Agreement and engage in negotiations with OCR. On July 31, 2025, OCR clarified that the parties have not yet reached an impasse given APS's willingness to negotiate in good faith about the Resolution Agreement and provided APS with a deadline of August 15, 2025 to indicate whether APS is willing to consider agreeing to the Resolution Agreement's terms.

---

[1]  This letter is submitted on behalf of Arlington Public Schools only and does not bind or represent the position of the other four public school divisions in Northern Virginia listed in the LOF. While our firm represents both APS and Fairfax County Public Schools in this matter, this letter is submitted solely on behalf of APS.

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

## II.     APS Policies Are Required by Virginia Law and Binding Authority in the Fourth Circuit

On March 24, 2025, we submitted a letter to Dan Greenspahn of OCR that addressed the issues raised in the Notification Letter. In that letter, we explained that both Virginia law and binding federal precedent require APS to provide access to facilities to students based on their gender identity. More specifically, we cited the Virginia Values Act (the "Values Act"),[2] which "[s]afeguard[s] all individuals within the Commonwealth from unlawful discrimination because of . . . gender identity . . . in places of public accommodation, including educational institutions."[3] Consistent with the Values Act, the Code of Virginia provides that "[a] county may enact an ordinance prohibiting discrimination in . . . education on the basis of . . . gender identity."[4] The Policy is consistent with the Virginia Values Act and within the power of a local school board to enact policies that reflect the interests of their community. It also reflects the important value that guides all APS polices—ensuring all students are able to learn in an inclusive environment free from all forms of discrimination.

The Policy is not only consistent with Virginia law, it is required by binding federal precedent that recognizes gender identity as a protected class pursuant to Title IX. As thoroughly described in our March 24, 2025 letter to Mr. Greenspahn, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit explicitly held that Title IX requires local school boards to provide students with access to restroom facilities that correspond to their gender identity. We will not restate the facts involved in *Grimm* or explain its holding here, beyond noting that it continues to not only support but require the Policy at issue in the instant investigation. Any change in APS policy regarding transgender student access to facilities would violate federal law, as defined by the Fourth Circuit.

## III.     The Supreme Court Has Not Yet but Will Soon Resolve the Central Issue Raised by This Investigation -- Whether Title IX Requires Public Schools to Provide Students with Access to Facilities Based on Their Gender Identity

Contrary to OCR's position, the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) does not abrogate the Fourth Circuit's decision in *Grimm*. The *Skrmetti* case involves materially distinct facts and does not involve a Title IX claim, distinguishing it from the issues resolved by the Fourth Circuit in *Grimm*. *Skrmetti's* lack of relevance to the issues involved here is emphatically demonstrated by the Supreme Court's decision to accept cert in *W. Virginia State Bd. of Educ. v. B.P.J.*, a case that will decide whether Title IX and the Equal Protection Clause of the Fourteenth Amendment prevent a state from designating schools sports teams based on biological sex. Until the Supreme Court issues its ruling in *B.P.J.*, *Grimm* remains binding law in the Fourth Circuit. Should APS agree to the Resolution Agreement's terms, APS would be in jeopardy of violating federal law.

---

[2] S.B. 868, 161st Gen. Assemb. Reg. Sess. (Va. 2020).
[3] Va. Code Ann. § 2.2-3900.
[4] Va. Code Ann. § 15.2-853.

JA385

A. The Supreme Court's decision in *Skrmetti* does not abrogate *Grimm,* which is binding authority in the Fourth Circuit.

The LOF states that *Grimm* is no longer good law because it was abrogated by the Supreme Court's June 2025 decision in *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). The Court in *Skrmetti* considered whether a Tennessee law that prohibits certain medical interventions and procedures for minors with "gender dysphoria" is constitutional under the Equal Protection Clause. In holding that the law is constitutional, the Supreme Court rejected the plaintiff's argument that heightened scrutiny of the Tennessee statute is warranted given that the law relies on sex-based classifications. *Id*. at 1828–29. The Court stated that the law *does not* classify on the basis of sex or transgender status because it prohibits healthcare providers from administering puberty blockers or hormones to minors for certain medical uses, regardless of the minor's sex or transgender status. *Id*. at 1837. Accordingly, the Court applied rational basis review and found that the Tennessee law is supported by the legislature's policy goal of protecting public health. *Id*. at 1835–37.

*Skrmetti* differs from *Grimm* in several significant ways. It resolved the constitutionality of a specific Tennessee law prohibiting the use of certain treatments to children absent limited circumstances. The Court cited authority for the harms potentially done by the treatments prohibited by the Tennessee statute—a much different policy rationale than the facility access issues involved in *Grimm* and the instant investigation. The Court's consideration of the Tennessee law at issue in *Skrmetti* involved a Constitutional challenge rather than a Title IX claim as that involved in *Grimm*. The Court's discussion of the standard of review was commensurate with the legal basis for the challenge to the Tennessee law—the Equal Protection Clause. Title IX contains no such standard of review and flatly precludes classification based on sex absent certain limited circumstances defined by statute or regulation. While several Justices went beyond the Court's holding to observe that "gender identity" should not be viewed as a suspect class, the dicta in those concurrences is potentially inconsistent with the Court's holding in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in which the Supreme Court held that employment actions based on sexual preference and gender identity constitute discrimination "on the basis of sex" under Title VII of the Civil Rights Act. In sum, *Skrmetti* is both factually and legally distinguishable from *Grimm* and does not overrule the Fourth Circuit's dispositive holding in that case.[5]

B. *Grimm* applies because the Supreme Court has not decided whether gender identity is protected by Title IX.

OCR's assertion that *Grimm* has been "abrogated" by *Skrmetti* is flatly inconsistent with the fact that the Supreme Court has accepted cert in a case that squarely raises the issue at stake in this matter—whether "gender identity" is protected by Title IX. As indicated above, the Supreme Court recently granted cert in *West Virginia v. B.P.J.*, a case involving a West Virginia law which limits participation in women's sports programs to students whose gender was female at birth. 98

---

[5] The continued viability of *Grimm* has been recognized by the Fourth Circuit in a recent Order granting a preliminary injunction in the case of *John Doe et al v. State of South Carolina*, 2:24-cv-06420-RMG. The plaintiffs in the *Doe* case moved to enjoin the enforcement of a South Carolina statute which requires schools to restrict restroom use to a student's gender assigned at birth. In asking the Court of Appeals to grant an injunction, the plaintiffs asserted that *Skrmetti* does not abrogate *Grimm*, given the different factual context and legal bases for that decision. On August 12, 2025, the Court of Appeals agreed, granting the preliminary injunction motion and indicating that "an opinion explaining the Court's action will follow."

JA386

F.4th 542, 550 (4th Cir.). Had the extent of legal protection based on "gender identity" been resolved by *Skrmetti* as the LOF suggests, the Court would not have been forced to resolve those issues in *B.P.J.* Contrary to OCR's position, the Court's decision to accept review in *B.P.J.* demonstrates that the circuit split on the important issues of transgender access under Title IX remains, necessitating Court resolution. If OCR's expansive view of *Skrmetti* were correct, *B.P.J.* would not be docketed for this next Supreme Court term.

When it hears the *B.P.J.* case next term, the Court will decide whether Title IX and the Equal Protection Clause prevent a state from designating school sports teams based on biological sex. *B.P.J.* raises the precise issues involved in the Policy at issue in the current investigation. Until this dispositive issue is conclusively resolved by the Supreme Court, *Grimm* remains controlling in the Fourth Circuit and mandates the Policy at issue.

**IV.    The Instant Investigation Should Be Paused Until the Court Resolves the Central Legal Issue that Controls the Policy at Stake**

When the Supreme Court decides *B.P.J.*, it will answer the critical question of whether Title IX requires educational institutions to separate student resources by biological sex. Unless and until the Supreme Court places further restrictions on the reach of Title IX to exclude transgender students, *Grimm* is the governing law in the Fourth Circuit.

Should APS comply with the actions outlined in the LOF and draft Resolution Agreement, the district risks litigation based on a failure to follow governing Fourth Circuit law. Transgender students and their families would have a cognizable claim that a policy limiting their access to facilities that correspond to their gender at birth violates Title IX.

APS is committed to strict compliance with Title IX and other provisions of law. All APS policies also reflect the paramount value of equality and the protection of all students against discrimination of any kind. The specific contours of compliance with law and adherence to core values with respect to transgender student access to facilities will soon be made clear when the Supreme Court decides *B.P.J.* That case will be argued in the fall of 2025 and likely result in an opinion sometime in the first half of 2026. While that case is pending, *Grimm* remains good law and binds APS and its policies.

To resolve this dilemma, APS proposes that OCR stay this case until the Supreme Court issues its decision in *B.P.J.* Should the Court in that case find that gender identity is not protected by Title IX, *Grimm* will indeed be abrogated, necessitating a change in policy. If, however, the Court follows *Bostock* and extends to Title IX the protection for gender identity it recognized under Title VII, *Grimm* (and the Policy) will be upheld. APS will follow that clear precedent and make any necessary policy changes once *B.P.J.* is decided. A pause in the instant investigation is the only way for APS to resolve this matter without violating current binding authority in the Fourth Circuit. Accordingly, we respectfully request that OCR not refer this matter for enforcement action until the Court issues definitive guidance in *B.P.J.*

Thank you in advance for your consideration. If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

JA387

Sincerely,

/s/ Timothy J. Heaphy
Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Francisco Durán, Ed.D., Division Superintendent,
APS Chrissy Smith, Division Counsel, APS

JA388

# EXHIBIT I

JA389

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, N.W.
Washington, DC
20006-1238

August 18, 2025

Bradley R. Burke
Regional Director
United States Department of Education
Office for Civil Rights
Via e-mail: Bradley.Burke@ed.gov

Dear Mr. Burke,

On August 15, 2025, we submitted a letter setting forth our response to the Letter of Findings ("LOF") and accompanying draft resolution agreement (the "Resolution Agreement") that the U.S. Department of Education, Office for Civil Rights ("OCR") issued to Arlington Public Schools ("APS") on July 25, 2025. We write today to provide additional authority for our position– an opinion issued on Friday, August 15 by the United States Court of Appeals in *John Doe v. State of South Carolina*, No. 25-1787, which makes clear that *Grimm* remains good law and controls the issue of student restroom access in the Fourth Circuit.

The *Doe* case cited above involves a challenge to a South Carolina statute that seeks to enforce a rule identical to that contained in the Resolution Agreement you have demanded our client enter with OCR – a restriction on restroom access to students according to their gender assigned at birth. Doe, a 9th grader in Berkeley County, South Carolina public school, challenges that law and moved for a preliminary injunction against its enforcement. On August 12, 2025, the day before Doe began his 9th grade year, the Court of Appeals granted that preliminary injunction. The practical effect of that injunction is to invalidate the South Carolina statute at issue in the litigation, allowing Doe to access restrooms in his public school consistent with his gender identity.

On Friday, August 15, 2025, the Court of Appeals issued a lengthy Amended Order ("Order") explaining its rationale for granting Doe's motion for a preliminary injunction. The Order, which we have attached to this letter as an Exhibit, flatly states "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." Order at 17. Applying the legal standard for a preliminary injunction, the Court found that Doe had demonstrated a likelihood of success on the merits, as the South Carolina statute at issue was in direct conflict with the Court's ruling in *Grimm*, invalidating an identical restriction on restroom access. Order at 16-17. The Court also found that Doe had demonstrated irreparable harm, observing that "state action infringing on constitutional rights generally constitutes irreparable harm." Order at 17. The Court finally found that the balance of equities supports the injunction, noting that "preventing the State from enforcing a policy that directly contradicts *Grimm* – a prior binding decision of this Court" was clearly in the public interest. Order at 18.

Two concurrences in the Order reinforce the Court's holding. Judge Diaz specifically rebutted the state's argument that you have made in the instant case – that *Skrmetti* abrogated *Grimm*. Judge Diaz observed that "[t]he Court's decision in United States v. *Skrmetti* . . . has little to say about the issues Grimm addressed." Order at 21. He noted that the ban on gender affirming care upheld

BRUSSELS   CHICAGO   DALLAS   FRANKFURT   HOUSTON   LONDON   LOS ANGELES   MILAN
MUNICH   NEW YORK   PALO ALTO   PARIS   ROME   SAN FRANCISCO   WASHINGTON

JA390

127227086.1

in *Skrmetti* differs significantly from the restroom access policy at issue in *Grimm* and did not involve a Title IX claim. Order at 21-22. Accordingly, Judge Diaz concluded that "*Skrmetti* said nothing whatsoever to cause doubt as to the vitality of Grimm's Title IX holding." Order at 22.

Perhaps more significant is Judge Agee's concurrence in *Doe*. Judge Agee dissented in *Grimm* and continues to assert that the decision was wrongly decided. Nonetheless, he concurred in the Court's Order granting the injunction because he recognizes that *Grimm* remains binding authority in the Fourth Circuit. He rejected South Carolina's arguments that the law is "unsettled" and that *Grimm* is factually distinguishable from Doe, writing:

> none of this matters for purposes of deciding the issue presented by Doe's motion for an injunction pending appeal. *Grimm* binds all judges of this Circuit, notwithstanding any expectation that the Supreme Court will adjust, if not overrule, the foundations of *Grimm* in a way that is likely to determine whether Doe will ultimately prevail in this action. **The current law of this Circuit answers the question of whether Doe has satisfied the requirements for obtaining an injunction pending the appeal**.

Order at 29 (emphasis added).

*Doe* reinforces our position that *Grimm* remains viable post-*Skrmetti* and requires APS to continue to facilitate restroom access for students consistent with their gender identity. The South Carolina statute at issue in *Doe* attempts to do exactly what the proposed Resolution Agreement in the instant matter would require – limit restroom access to students' gender assigned at birth. The Fourth Circuit has invalidated that South Carolina law and rejected the position taken by OCR in the instant investigation. Even Judge Agee, who shares your position on the scope of Title IX and its application to the issue of facility access, agrees that *Grimm* controls, entitling Doe to injunctive relief and access to restrooms that correspond to his gender identity. If APS agreed to the terms in the Resolution Agreement, we would be acting in direct contradiction to *Doe* and *Grimm*, which we simply cannot agree to do.

Any attempt to enforce OCR's demand that the current policy be changed will result in litigation in which APS, like Doe, will ask the Court to enjoin any enforcement activity. In such litigation, we will cite the clear authority that compels the current restroom access policy. The Department of Justice will be limited to the same arguments rejected first in *Grimm* and reaffirmed last week in *Doe* – essentially asking the Court to disregard binding precedent recognized even by the dissenting judge in *Grimm*. While we expect that any litigation in which we seek to enforce these rights will be readily successful given the authority presented herein and in prior correspondence, it would be costly, disruptive, and create great uncertainty among thousands of APS students and families. Accordingly, we ask again that OCR not refer this matter for enforcement action and rather pause this investigation as the Supreme Court considers these important issues in its upcoming term.

Thank you in advance for your consideration. If you have questions or want to schedule time to discuss the matter, please feel free to reach me at the number below.

Sincerely,

/s/ Timothy J. Heaphy

JA391

127227086.1

Timothy J. Heaphy
Willkie Farr & Gallagher
THeaphy@willkie.com
PH: 202-303-1068

cc:
Francisco Durán, Ed.D., Division Superintendent
Chrissy Smith, Division Counsel, APS

JA392

# EXHIBIT J

THE SECRETARY OF EDUCATION

WASHINGTON, DC 20202

August 19, 2025

Francisco Duran
Division Superintendent
Arlington Public Schools
2110 Washington Blvd
Arlington, VA 22204
Sent via email to superintendent@apsva.us

Re: High Risk Designation and Specific Conditions on Grants

Dear Superintendent Duran,

This letter is to inform you that the U.S. Department of Education (Department) has designated Arlington County Public School District as a "high-risk" entity, under all of the programs administered by the Department for which your division receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10, for the reasons discussed below. This follows the Department's July 25, 2025, Title IX noncompliance findings and proposed resolution agreement. On August 15, 2025, your division refused to sign the resolution agreement sent to you by the Office for Civil Rights (OCR) and remains in noncompliance with Title IX.

In this letter, we delineate the nature of our concerns with your division's administration of these grants; the reasons the information provided to the Department up to now by your division does not address these concerns; our determination to designate your division as a Department-wide "high-risk" entity; and the specific conditions we are imposing on all grants your division is receiving from the Department.

BACKGROUND

As you are aware, the U.S. Department of Education generously granted an extension for your school division (your division) and four other school divisions in Virginia to come into compliance with Title IX of the Educational Amendments of 1972 (Title IX), and related requirements. Unfortunately, the additional time did not result in a successful outcome in compliance with federal law.

On August 15, 2025, your division stated it does not intend to make the necessary policy changes to come into compliance with Title IX.

It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal activity. Therefore, the Department is designating your division as a Department-wide "high-risk" entity and placing specific conditions on your division's use of funds in all grants it

JA394

Page 2

receives from the Department.

The Department's prior communications with your division identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated. Thus, the Department is concerned with your division's inability to administer and/or manage Department grants properly with appropriate controls in place. These concerns are with all grants your division currently receives, administers, or manages.

In addition, the Department is identifying all the State-administered funds your division receives as a subgrantee from the Virginia Department of Education and any other State division, including under Title I of the Elementary and Secondary Education Act of 1965, as amended, and the Individuals with Disabilities Education Act. The Department expects to urge those entities to take similar actions to those being taken by the Department with regard to those funds. Representatives of the Virginia Department of Education have already agreed to take those steps.

Due to the sizable amount of Federal grant funds that are provided to your division, and concerns discussed in this letter, the Department will place all of your division's grants on reimbursement payment status until your division demonstrates to the Department's satisfaction that the following High-Risk Specific Conditions, specified below, are fully met, and that proper measures to address the problems noted in this letter are taken and are working well for a sustained period of time.

I.     YOUR DIVISION's DESIGNATION AS "HIGH-RISK"

Given these serious and deeply systemic concerns, the Department is taking immediate action to help safeguard public funds with regard to your division's activities with the Department's grants in accordance with statutory and regulatory requirements and the terms of approved grant applications, and with grants for which your division is a primary grantee or subgrantee.

The Department is designating your division as a "high-risk" entity in accordance with 2 C.F.R. §§ 200.208 and 3474.10. As part of this "high-risk" designation, we are imposing High-Risk Specific Conditions (noted below) on all of your division's grants. In making this determination and designation, the Department has taken into consideration several factors (some of which are mentioned above), which include, but are not limited to:

- the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;
- the improper organizational management and operations that led to the problems discussed above; and
- concerns regarding your division's lack of proper controls.

JA395

Page 3

II.     HIGH RISK SPECIFIC CONDITIONS

Your division's grants and subgrants from the Department are being placed on a reimbursement method of payment. Under this specific condition, your division will, when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by your division with non-Federal funds.

In addition, within 30 days of the date of this letter:

1.    Your division must submit plans for compliance with all federal laws, and provide detailed information that identifies and discusses the steps your division will take to ensure that grant funds will be spent in accordance with all appliable laws (this could include committing to implementing the resolution agreement sent to your division on July 25, 2025, with OCR's findings);

2.    Your division must submit a corrective action plan (as noted above, this could include committing to implement the OCR resolution agreement) that shows all steps taken to be in compliance with the applicable laws and assurances, that compliance will be properly maintained, that includes a proposed schedule to monitor the implementation of the corrective actions, and, if appropriate, a schedule of when the corrective actions will be completed and by whom (the responsible division representative).  If deemed necessary, the Department may require additional actions to be included in the plan.

The objectives of these specific conditions are to ensure that your division establishes the policies, procedures, and personnel in place to manage its grants and subgrants properly, including adherence to all pertinent federal civil rights laws that apply to your division's grants and subgrants. The Department may impose additional or modified specific conditions at any time through a subsequent letter.  If your division is unable to satisfactorily address these concerns, the Department will consider additional enforcement actions, including the possible termination of all or some of the Department's grants, and may require the recovery of funds.

III.    REMOVAL OF REIMBURSEMENT, HIGH-RISK CONDITIONS AND HIGH-RISK DESIGNATION

The reimbursement specific condition will remain in place until the Department has (1) determined that your division has put into place adequate corrective actions, which could include actions laid out in the OCR proposed resolution agreement, and (2) concluded that the corrective actions have been working appropriately for a period of time that reasonably demonstrates assurance of effective compliance.

JA396

Page 4

IV.      REQUEST FOR RECONSIDERATION

Consistent with 2 C.F.R. § 200.208(d)(5), your division may request reconsideration of its designation as "high-risk", and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of this letter.  Any request for reconsideration must be submitted via e-mail to Lindsey Burke of the Department, at lindsey.burke@ed.gov. In a request for a reconsideration, you should include appropriate supporting documentation.

The Department remains committed to working with your division to help with the positive resolution of these concerns. Lindsey Burke is available to answer any questions on the High-Risk Specific Conditions, as well as to help facilitate any necessary support or assistance regarding the status of your grants or subgrants from the Department.

Sincerely yours,

Linda E. McMahon

CC: Emily Anne Gullickson, Virginia State Superintendent

JA397

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | Civil Action No. 25-cv-01434 |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | | |

## DECLARATION OF ANDY HAWKINS

I, Andy Hawkins, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

    1. My name is Andy Hawkins, and I am the Business Officer of Arlington Public Schools ("APS"). Unless otherwise indicated, I have personal knowledge of the matters set forth herein and would be competent to testify to those matters if called upon to do so.

    2. For fiscal year 2026, APS expects to receive approximately $23 million in federal funding from various government agencies, including the Department of Education ("DOE").

    3. APS receives federal aid by submitting grant applications to the relevant government agencies. Once the agency reviews and approves the application, the money becomes available and may be accounted for in APS's annual budget. None of the grant applications APS submitted for fiscal year 2026 required APS to adopt DOE's interpretation of Title IX in order to receive the funds.

JA398

4. All of the funds that APS receives from federal agencies are provided on a reimbursement basis. Once APS's grant application is approved, APS submits for reimbursement on a yearly, monthly, bi-monthly basis or pursuant to a particular schedule.

5. In fiscal year 2026, APS expects to receive the following in federal funds from DOE:

    a.  $6,000,000 in Individuals with Disabilities Education Act ("IDEA") grant funding, which funds special education and related services as APS is required to provide by law. These federal dollars are primarily used for staff salaries to provide services to special education students, including (1) thirty-two one-to-one special education instructional assistants for APS students needing the most support; (2) twenty student support coordinators who schedule and conduct individualized education plan ("IEP") meetings between school personnel and parents/guardians of students with special needs; and (3) three transition coordinators that assist students with IEPs, who are fourteen years old and older, through varied programs to meet their IEP needs through age twenty-two. This funding is passed through the Virginia Department of Education ("VDOE") to APS. APS is reimbursed on a monthly basis.

    b.  $3,713,605.67 in Title I Part A aid, which provides supplementary financial resources to districts and schools with high concentrations of children from low-income families to help ensure that all children meet challenging state academic standards and close persistent opportunity and performance gaps. This funding supports 3,543 students (25% of APS's total elementary school

- 2 -

JA399

student population), 258 of whom are unhoused, 57 of whom are in foster care, and 28 of whom are unaccompanied youth. This funding is passed through VDOE to APS. APS is typically reimbursed on a twice-yearly basis, in part on July 1, and in full on October 1.

c.  $611,443.16 in Title II Part A aid, which aims to support student achievement by increasing the number of qualified teachers in classrooms, increasing the number of qualified principals and assistant principals in schools, and increasing the effectiveness of teachers and principals. Without Title II funding, key structures that sustain instructional quality will be dismantled as APS will lose its only specialists in this critical area of teacher talent development. APS will also lose important division-wide pedagogical infrastructure used for data collection and implementation of strategies focused on high-quality instruction. This funding is passed through VDOE to APS. APS is typically reimbursed on a twice-yearly basis, in part on July 1, and in full on October 1.

d.  $703,231.05 in Title III Part A aid, which is used to support English-language ("EL") learners to become proficient in English and meet state academic standards. This impacts 7,760 students in APS schools. Cutting this funding would eliminate positions for two EL teacher specialists who provide professional learning support for teachers throughout APS, and one EL data coordinator who provides data analysis and teacher coaching. As a part of its Title III allocation, APS receives $55,395.06 in Immigrant Children and Youth Funds to help APS respond to significant increases in the immigrant

- 3 -

student population by providing targeted support. APS has a comprehensive support system in place for EL and immigrant students—without this funding, the support system will be dismantled. This funding is passed through VDOE to APS. APS is typically reimbursed on a twice-yearly basis, in part on July 1, and in full on October 1.

e.  $298,312.10 in aid from the DOE Office of Career, Technical, and Adult Education. This funding allows APS to serve 1,500 adult students annually through its Arlington Education & Employment Program ("REEP"), which provides opportunities for adults who are not fluent in English to become literate and obtain skills necessary for employment and economic self-sufficiency. REEP also teaches civics programming so adults may fully participate in American society. This funding is passed through VDOE to APS. APS is typically reimbursed on a twice-yearly basis, in part on July 1, and in full on October 1.

6. In fiscal year 2026, APS expects to receive the following funding from other government agencies, which are passed through VDOE:

a.  $8,595,000 in funding for the Food and Nutrition Services program from the U.S. Department of Agriculture ("USDA"). This funding provides 19,800 meals to APS students *every day*. It also supports APS's ten Community Eligibility Program ("CEP") schools, which serve free meals to all students without consideration of a student's ability to pay. There are 6,800 APS students attending these CEP schools. APS is reimbursed on a monthly basis.

- 4 -

> b. $2,500,000 in Medicaid funding from the Department of Medical Assistance
> Services through the U.S. Department of Health and Human Services
> ("HHS"), which reimburses APS for partial costs associated with providing
> physical, occupational, and speech therapy to APS students. APS is
> reimbursed on a monthly basis.

7. APS has never been notified by the federal government or VDOE that the results of any of
   its financial audits were irregular, such that it should be on notice that a federal agency may
   designate APS as a "high-risk" entity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and
correct.

Dated: September 2, 2025

Andy Hawkins

- 5 -

JA402

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ARLINGTON SCHOOL BOARD, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| LINDA McMAHON, in her official capacity | ) |
| as Secretary of Education of the United | )    Civil Action No. 25-cv-01434 |
| States, and the UNITED STATES | ) |
| DEPARTMENT OF EDUCATION, | ) |
| | ) |
| *Defendants.* | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September, 2025, I electronically filed a true and correct copy of **DECLARATION OF ANDY HAWKINS** and accompanying documents with the Clerk of Court using the CM/ECF system. A copy of the foregoing will be sent to the following parties:

U.S. Department of Education

Secretary Of Education Linda McMahon


/s/ *Timothy Heaphy*
_____

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel: (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number: 68912

*Attorney for Arlington School Board*

JA403

# DEX 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| ARLINGTON SCHOOL BOARD,<br><br>   Plaintiff,<br><br> v.<br><br>LINDA McMAHON, in her official capacity as Secretary of Education of the United States, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>   Defendants. | Civil Action No. 1:25-cv-01434-MSN-WBP |

## DECLARATION OF MURRAY BESSETTE

1. My name is Murray Bessette. I make this Declaration based on my own personal knowledge, on information contained in the records of the U.S. Department of Education ("Department"), and/or on information provided to me by Department employees. I make this declaration in opposition to the temporary restraining order and preliminary injunction sought by the Plaintiff in this matter.

2. I am currently employed as Acting Assistant Secretary for the Department's Office of Planning, Evaluation, and Policy Development ("OPEPD") headquartered in Washington, D.C. I began my service at the Department on February 24, 2025. OPEPD advises the Secretary of Education ("Secretary") on policy development, implementation, and review, including grant policies.

3. Under the General Education Provisions Act (GEPA), section 423 (20 U.S.C. § 1226a-1) the Secretary may determine the method of payment, including reimbursement, under a grant program. Under the Uniform Guidance applicable to federal agencies including the Department, the Department may adjust specific conditions imposed on grant recipients, and specific conditions may include requiring payments as reimbursements rather than advance payments (2 C.F.R. § 200.208). Under regulation applicable to the Department, 2 C.F.R. § 3474.10, the Secretary may designate specific conditions as "high-risk conditions" and may designate a non-Federal entity subject to specific conditions as "high-risk."

4. Plaintiff incorrectly asserts that by designating Plaintiff as "high-risk" and imposing the specific condition of a reimbursement method of payment, the Department has "effectively blocked access" to Plaintiff's federal funding. High-risk designation and a reimbursement method of payment do not freeze or cut off an entity's access to federal funds. Rather, those

JA405

designations allow the Department to account for identified risks and potential risks and appropriately monitor the grantee to mitigate those risks.

5. Prior to terminating federal financial assistance should the Department find a violation of Title IX, the Department would follow the administrative process set forth in 2 C.F.R. § 200.339 or 34 C.F.R. § 100.8; with respect to Plaintiff, the process to which OCR is bound for enforcement of its findings of violation of federal civil rights law is still on-going, and termination of federal financial assistance would not occur until that process had concluded.

6. Discretionary grants made directly to the Plaintiff by the Department are now, as a result of the challenged designations, placed on reimbursement method of payment. However, as to Department formula funds, each State may choose the method of payment for distributing those funds to their local educational agencies (LEAs) (e.g., school districts or divisions). Virginia had chosen as a matter of policy (prior to the challenged designations by the Department) a reimbursement method of payment for all of its LEAs; thus, Plaintiff already receives its federal formula grant funds under a reimbursement method of payment.

7. The "High-Risk Letter" (ECF No. 3, Exh. J) from the Secretary to the Plaintiff, does not effectuate or indicate any imminent freeze, "block," or termination of Plaintiff's federal funds. That letter described to Plaintiff how Plaintiff might seek reconsideration of the high-risk status and specific condition determinations; however, Plaintiff has not submitted any such request for reconsideration to the Department. As to districts that have submitted requests for reconsideration, the Department is undertaking individualized reconsideration based on each district's submission.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 2nd day of September, 2025.

_____
Murray Bessette

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1434 (RDA/LRV) |
| | ) | |
| LINDA McMAHON, Secretary of the | ) | |
| Department of Education, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' NOTICE REGARDING FACTUAL BACKGROUND

Defendants respectfully submit this notice to correct a factual representation in their Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 19) and address a matter discussed on the record during today's hearing on Plaintiff's motion for emergency relief.

Defendants previously asserted that Plaintiff had not requested reconsideration in response to the Department of Education's ("ED") August 19, 2025 letter notifying Plaintiff of its high-risk designation and of the specific conditions ED was imposing on grants Plaintiff received from ED. *See* ECF No. 19 at 8. At the time its brief was filed, ED did not have knowledge that reconsideration had been filed. After Plaintiff's representations during argument today, ED conducted further investigation of the matter and discovered that on August 26, 2025, Plaintiff submitted a request for reconsideration via e-mail. It appears ED did not have knowledge that such request was submitted because the e-mail was caught by a spam filter. Plaintiff did not attach the request for reconsideration to their Complaint or Motion, and Defendants likewise do not believe it is necessary to put in the record now beyond clarifying its existence.

JA407

Notwithstanding this factual clarification, Plaintiff's request for reconsideration does not change the thrust of Defendants' arguments, including specifically that Plaintiff failed to exhaust administrative remedies.  Plaintiff filed suit and requested a temporary restraining order only three days after submitting its reconsideration request and represented at the hearing that it did not believe it needed to wait for a response before filing suit.  Defendants remain willing to consider the reconsideration request, but believe that if Plaintiff seeks for this to be resolved at the agency level – as its request for reconsideration suggests – that this action should be dismissed or stayed until such time as such reconsideration process concludes.

[*Signature page follows.*]

Dated: September 3, 2025                    Respectfully submitted,

                                            ERIK S. SIEBERT
                                            United States Attorney

                              By:      _____/s/_____
                                            MATTHEW J. MEZGER
                                            Assistant United States Attorney
                                            Office of the United States Attorney
                                            2100 Jamieson Avenue
                                            Alexandria, Virginia 22314
                                            Tel:    (703) 299-3741
                                            Fax:    (703) 299-3983
                                            Email: matthew.mezger@usdoj.gov

                                            CHAD MIZELLE
                                            Acting Associate Attorney General

                                            ABHISHEK KAMBLI
                                            Deputy Associate Attorney General

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            DIANE KELLEHER
                                            Director
                                            Civil Division, Federal Programs Branch

                                            GARRY D. HARTLIEB
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Tel: (202) 305-0568
                                            E-mail:  Garry.Hartlieb2@usdoj.gov

                                            *Counsel for Defendants*

JA409

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 1:25-cv-01434 (RDA/LRV) |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF ARLINGTON SCHOOL BOARD'S NOTICE OF APPEAL**

Plaintiff Arlington School Board appeals to the United States Court of Appeals for the Fourth Circuit from the Court's order (Dkt. No. 28) denying Plaintiff's Emergency Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. No. 2) and dismissing Plaintiff's Complaint (Dkt. No. 1) issued on September 5, 2025.

JA410

Dated:  September 10, 2025   Respectfully submitted,


     /s/ *Timothy Heaphy*
     _____

     Timothy Heaphy
     WILLKIE FARR & GALLAGHER LLP
     1875 K Street Northwest
     Washington, District of Columbia 20006-1238
     Tel:  (202) 303-1000
     theaphy@willkie.com
     Virginia State Bar I.D. Number:  68912

     Joshua Mitchell (admitted *pro hac vice*)
     WILLKIE FARR & GALLAGHER LLP
     1875 K Street Northwest
     Washington, District of Columbia 20006-1238
     Tel:  (202) 303-1000
     jmitchell@willkie.com
     District of Columbia Bar I.D. Number:  1012854

     Breanna Smith-Bonsu (admitted *pro hac vice*)
     WILLKIE FARR & GALLAGHER LLP
     300 North LaSalle Drive
     Chicago, Illinois 60654-3406
     Tel:  (312) 728-9000
     bsmith-bonsu@willkie.com
     Illinois State Bar I.D. Number:  6330468

     *Attorneys for Arlington School Board*

JA411

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No. 1:25-cv-01434 |
| v. | ) | |
| | ) | |
| LINDA McMAHON, in her official capacity | ) | |
| as Secretary of Education of the United | ) | |
| States, and the UNITED STATES | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2025, I electronically filed a true and

correct copy of the foregoing memorandum and accompanying documents with the Clerk of Court

using the CM/ECF system.  A copy of the foregoing will be sent to the following parties:


Matthew J. Mezger
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
Matthew.mezger@usdoj.gov

Abhishek Kambli
United States Department of Justice
950 Pennsylvania Avenue Northwest
Washington, D.C. 20530-0001
(202) 445-5496
Abhishek.kambli@usdoj.gov

Garry D. Hartlieb
United States Attorney's Office – Norfolk
101 West Main Street
Suite 8000
Norfolk, Virginia 23510
(757) 441-6331 Garry.hartlieb@usdoj.gov

*Counsel for the U.S. Department of*
*Education and Secretary Of Education*
*Linda McMahon*

JA412

/s/ *Timothy Heaphy*

Timothy Heaphy
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1068
theaphy@willkie.com
Virginia State Bar I.D. Number:  68912

Joshua Mitchell (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street Northwest
Washington, District of Columbia 20006-1238
Tel:  (202) 303-1000
jmitchell@willkie.com
District of Columbia Bar I.D. Number:  1012854

Breanna Smith-Bonsu (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, Illinois 60654-3406
Tel:  (312) 728-9000
bsmith-bonsu@willkie.com
Illinois State Bar I.D. Number:  6330468

*Attorneys for Arlington School Board*

JA413

```
                                                              1
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   -------------------------------------x
                                         :
 4   FAIRFAX COUNTY SCHOOL BOARD         : Civil Action No.:
         and                             :
 5   ARLINGTON COUNTY SCHOOL BOARD       : 1:25-cv-1432
                                         : 1:25-cv-1434
 6                      Plaintiffs,      :
            v.                           :
 7                                       :
     LINDA MCMAHON, et al.               : September 3, 2025
 8                                       :
                       Defendants.       :
 9   -------------------------------------x

10              TRANSCRIPT OF TRO HEARING
          BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
11            UNITED STATES DISTRICT COURT JUDGE

12               A P P E A R A N C E S

13    FOR THE PLAINTIFFS:    TIM HEAPHY, ESQ.
      (FCSB and ACSB)        LINDSAY HEMMINGER, ESQ.
14                           FIONA CARROLL, ESQ.
                             Willkie Farr & Gallagher
15                           1875 K. Street, N.W.
                             Washington, DC 20006
16    FOR THE DEFENDANTS:    MATTHEW MEZGER, AUSA
                             United States Attorney's Office,
17                           Eastern District of Virginia
                             2100 Jamieson Avenue
18                           Alexandria, Virginia 22314

19                           ABHISHEK KAMBLI, ESQ.
                             Acting Associate Attorney General
20                           ANNA EDWARDS, ESQ.
                             U.S. Department of Justice
21                           950 Pennsylvania Avenue NW
                             Washington, DC 20530
22
                             GARRY HARTLIEB, ESQ.
23                           101 W. Main Street
                             Suite 8000
24                           Norfolk, VA

25
```

2

```
1   OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                     United States District Court
2                                    401 Courthouse Square
                                     Tenth Floor
3                                    Alexandria, VA 22314
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA415

—————FCSB v. McMahon—————

3

**P R O C E E D I N G S**

1

2    (Court proceedings commenced at 9:08 a.m.)

3

4              THE COURTROOM CLERK:  Case No. 2025-cv-1432.

5    Fairfax County School Board v. Linda McMahon, et al.  And Case

6    No. 2025-cv-1434.  Arlington County School Board versus Linda

7    McMahon, et al.

8              Counsel, please note your appearances for the

9    record, please.

10             MR. HEAPHY:  Your Honor, good morning.  I'm Tim

11   Heaphy from the law firm, Willkie Farr & Gallagher, here for

12   both the plaintiffs, Arlington Public Schools and the Fairfax

13   County Public Schools.

14             THE COURT:  Good morning, sir.

15             MS. HEMMINGER:  Good morning, Your Honor.  Lindsay

16   Hemminger for the plaintiffs.

17             MS. CARROLL:  Good morning, Your Honor.  Fiona

18   Carroll on behalf of plaintiffs.

19             THE COURT:  Good morning.

20             MR. MEZGER:  Good morning, Your Honor.  Assistant

21   United States Attorney, Matthew Mezger.  I'm joined today by a

22   couple of folks.  From the associate attorney generals office,

23   I have Deputy Associate Attorney General, Abhishek Kambli.  I

24   have counsel, Anna Edwards, and then I also have trial

25   attorney, Garry Hartlieb from the federal programs branch.

———FCSB v. McMahon———

4

```
 1            THE COURT:  Very good.  We could have a Bar meeting

 2    here.  We have everybody in the Bar present so we can go ahead

 3    and begin our business.

 4            There is a couple of things that we need to take

 5    care of.  I've been informed that Breanna Smith-Bonsu is part

 6    of the team representing the Fairfax County School Board.  As

 7    some of you may know, Ms. Smith-Bonsu clerked for me from 2019

 8    to 2021.  My long-standing policy has been to recuse myself

 9    from cases involving a former law clerk for the first one to

10    two years after their clerkship.  It has been four years since

11    the end of Ms. Smith-Bonsu's clerkship.  Accordingly, I find

12    no conflict warranting recusal in this case.  So I just want

13    to make everyone aware of that.

14            Secondly, we need to take care of some pro hac vice

15    motions.  Some are, essentially, not contested.  Other ones we

16    have a little bit of a problem.  First, let's deal with the

17    ones that are not problematic.  Regarding Mr. Joshua Nathaniel

18    Mitchell, that motion is granted.

19            With regard to Breanna Smith-Bonsu, that motion is

20    granted.  With regard to Ms. Hemminger, it says on your

21    application that you have not been admitted to any bar --

22    other federal bar associations, federal bars.  Is

23    Ms. Hemminger present?

24            MS. HEMMINGER:  I think that's correct, yes.

25            THE COURT:  Okay.  There's a rule that to be
```

FCSB v. McMahon

5

1  considered pro hac vice in the Eastern District of Virginia,

2  you have to be admitted in another district.

3          So are you admitted in another district federal

4  court?

5          MS. HEMMINGER:  No.

6          THE COURT:  Okay.  We'll just set that aside.  And

7  with regard to Chloe Smeltzer.

8          THE PETITIONER:  Yes, Your Honor.

9          THE COURT:  It's the same situation.  We'll just set

10 those aside.

11         MR. HEAPHY:  I appreciate that.

12         THE COURT:  So those motions have been set aside.

13 Obviously, Counsel, if you want to join our federal court in

14 the future, we'll be more than happy to have you.

15         I don't have any problem, Counsel.  Do you have any

16 problem with them remaining at counsel table.

17         MR. MEZGER:  No, Your Honor.

18         THE COURT:  Very good.  I appreciated getting the

19 government's position at 11:34 last night.  We did take time

20 to read it, but we do sleep.  So we haven't read it as

21 exhaustively as we otherwise would have.  But we are aware

22 some of the additional arguments being made on behalf of the

23 government in this case.  And obviously, we will consider all

24 arguments that have been presented to the Court.

25         The Court is suggesting a way that we handle the

FCSB v. McMahon

6

1   hearing here this morning.  I would suggest we do this:  Allow

2   plaintiffs 15 minutes, allow the government 15 minutes, allow

3   plaintiff ten minutes in rebuttal since it is your case.

4   Obviously, with the depth of information and argument that we

5   have here, we're not going to issue any opinions from the

6   bench today.  We're going to take our time.

7        We're very efficient, but we'll probably try to get

8   something to you maybe by the end of this week.  We have a lot

9   of things that we need to work through.  So we'll work with

10  you on that.  Being an old appellate judge, the way that I

11  typically handle arguments like this, I will ask questions

12  during the time of your presentation.  Please do not interpret

13  that as me trying to take any time from your presentation.

14  I've always been of the view that it's important for the

15  litigants, in particular the lawyers, to understand and know

16  what is important to the Court.  So it can help you to shape

17  your arguments.

18        All right.  Plaintiff, you're up.

19        MR. HEAPHY:  Your Honor, thank you very much.  May

20  it please the Court.  We're here today because the defendants

21  have placed our clients in the impossible position of a choice

22  between either violating federal law or losing critically

23  needed federal funds that support tens of thousands of public

24  school students in Northern Virginia.  The only way out of

25  that impossible dilemma, Your Honor, is court intervention in

———FCSB v. McMahon———

7

1  the form of a preliminary junction.  We are here today to ask

2  the Court to issue a preliminary injunction because we can

3  demonstrate a likelihood of success on both our Administrative

4  Procedures Act and declaratory judgment claims based on the

5  controlling authority in the Fourth Circuit in

6  *Grimm v. Gloucester County* and *Doe v. South Carolina*.  The

7  clear irreparable harm we can demonstrate that would result

8  from the deprivation of these federal funds.

9          THE COURT:  Does the fact that *Grimm* was not a

10  preliminary injunction case impact the analysis at all?

11          MR. HEAPHY:  It does not, Your Honor, at all.  *Grimm*

12  was a case that involved a policy, exactly akin to that at

13  stake in this case.  It was a case in which a transgender boy,

14  Gavin Grimm in Gloucester County, Virginia, was deprived of

15  access to a restroom according to his gender identity.  The

16  Fourth Circuit found that that was a violation of the equal

17  protection clause and Title IX.  And therefore, required

18  Gloucester County to allow Mr. *Grimm* to access the facility

19  consistent with his gender identity.  Our policies are

20  consistent with *Grimm*.  *Grimm* has been affirmed, Your Honor,

21  just recently, a couple of weeks ago.

22          THE COURT:  Is that up on cert now?

23          MR. HEAPHY:  The plaintiffs -- excuse me, the South

24  Carolina state has applied for cert, Your Honor, but the Court

25  has not ruled.

FCSB v. McMahon

8

1          So the law as of today is that the Fourth Circuit

2   just reaffirmed *Grimm* in the *Doe v. South Carolina* case.

3   Again, exactly on point.  That was a case, the *Doe* case in

4   which South Carolina passed a statute that prevented Mr. *Doe*

5   or Ms. *Doe*, excuse me, a transgender girl, from accessing the

6   facilities, the girl's restrooms.  And the Fourth Circuit

7   enjoined the enforcement of that statute relying upon *Grimm*,

8   and explicitly *Grimm* remains good law in the Fourth Circuit.

9          So as of today, Your Honor, unless and until the

10  Supreme Court acts, *Grimm* and *Doe* essentially control this

11  case.  That is our position, and that's what informs our

12  argument that we have a likelihood of success on the merits.

13         THE COURT:  I understand your point on *Grimm*, and it

14  does impact, at least indirectly, the situation and

15  circumstances that we have, but I would like to focus my

16  interest on a little bit of the potential sovereign immunity

17  jurisdictional issue.  Neither party really discussed that

18  very much.  What are your views on that?

19         MR. HEAPHY:  Yes, Your Honor.  So the government's

20  brief last night indicates that this is a case that should

21  have been brought in the Court of Federal Claims as opposed to

22  the district court.  I would start with the proposition of the

23  Administrative Procedures Act, Section 702, gives this Court

24  jurisdiction, and I'm quoting from the statute, "of an action

25  in court of the United States seeking relief other than money

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA421

———FCSB v. McMahon———
9
1  damages and stating a claim that an agency or an officer or an

2  employee thereof has failed to act under color of legal

3  authority."

4        When there is a claim, Your Honor, of the government

5  acting in excess of statutory authority, that case is

6  appropriately before the United States District Court, not the

7  Court of Federal Claims.  We are seeking in this case

8  injunctive relief, not a check, not money damages.  We are

9  seeking to prevent the deprivation of funds.  That is an

10  equitable remedy unavailable in the Court of Federal Claims.

11        THE COURT:  I think we can all agree that the case

12  law is somewhat convoluted because we have a lot of opinions

13  that are going different ways, and we have some of our own

14  justices on the Supreme Court of the United States carving out

15  exceptions and it sort of leaves the court with a real tough

16  situation to figure out where the Blue Plains are.  Justice

17  Gorsuch has actually sent out somewhat of an admonishment to

18  judges in the District Courts as to how these cases should be

19  resolved.

20        How can I satisfy the suggestion, at this point,

21  because it doesn't necessarily become precedent of Justice

22  Gorsuch with some of the other opinions and directives that

23  have been provided by other members of the Supreme Court of

24  the United States.

25        MR. HEAPHY:  Your Honor, fair question.  There's a

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———
EASTERN DISTRICT OF VIRGINIA

JA422

FCSB v. McMahon

10

1  difference between a claim of money damages where a plaintiff

2  is seeking that the government must write a check, must

3  provide payment, that is a case that, based on a recent

4  authority, the *California v. Department of Education* case and

5  the *American Federation of Teachers* case held should go to the

6  Court of Federal Claims.  When, however, there is an

7  underlying policy dispute beyond money damages.  But a dispute

8  as to the interpretation of law, that is a matter much more

9  appropriately adjudicated by Your Honor in a district court.

10        And in the *Bowen v. Massachusetts* case is precisely

11  on point.  The District Court has jurisdiction to review

12  claims for injunctive relief involving federal contribution to

13  the state's Medicaid program in the form of advances.  The

14  Court in *Bowen* said neither a disallowance decision, nor the

15  reversal of a disallowance decision is properly characterized

16  as an award for damages.  Either decision is an adjustment,

17  indeed, a relatively minor one, in the size of the federal

18  grant to the state that is payable in huge quarterly

19  installments.

20        That is precisely what we have here.  It's a

21  question of how much the school boards will be able to access

22  from a congressionally appropriated funds.  And

23  that allocation depends upon an interpretation of law, of

24  Title IX, whether or not we are in violation of Title IX or

25  not.  The exclusive reason that we have been given, Your

—FCSB v. McMahon—

11

1   Honor, for the high-risk status for the access to federal

2   funds is that we are in violation of Title IX.  We strongly

3   disagree with that because of *Grimm* and *Doe*.  So this really

4   is, at bottom, Your Honor, a policy dispute as to the coverage

5   of Title IX.  It's, therefore, very different from an

6   administrative proceeding over whether or not certain moneys

7   are owed.  It is a policy dispute that under *Bowen v.*

8   *Massachusetts* we suggest is appropriately adjudicated by this

9   Court in an Administrative Procedures Act case.

10          Even, Your Honor, in the California case, the shadow

11  docket case from earlier this year, the Court ruled that the

12  general rule is that APA actions go to district courts even

13  when a remedial order may result in the disbursement of funds

14  citing the *Bowen* case.  The shadow docket case, the California

15  case, was a case involving a claim for money damages.  The

16  argument there was that monies had been withheld.  We are

17  seeking an equitable remedy that Title IX protects Arlington

18  and Fairfax County's policies and therefore the conditions

19  placed upon reimbursement, are unlawful.

20          THE COURT:  Does it really come down to what kind of

21  case the Court decides that it is?

22          MR. HEAPHY:  Your Honor can decide the case either

23  on APA grounds or declaratory judgment grounds.  We make our

24  argument in the complaint that this case is also ripe for

25  declaratory judgment.  There's a dispute as to the appropriate

—————FCSB v. McMahon—————

12

1    coverage of Title IX.  And if the Court finds likelihood of

2    success on the declaratory judgment count or the

3    Administrative Procedures Act count, then we're entitled to

4    that equitable relief, given the irreparable harm, which we

5    have identified in our pleadings and in our declarations.

6              THE COURT:  Yes, sir.

7              MR. HEAPHY:  So clearly, Your Honor, in our view,

8    and, again, we haven't had a chance to brief this because we

9    just understandably received the defendants' motion last

10   night.  We believe this case is appropriately here, Your

11   Honor, because, again, at bottom it is a policy dispute.

12             THE COURT:  Let me ask you this, would it be fair to

13   say that most of the plaintiffs' claims expressly referred to

14   the disbursement of federal funds owed or to grants which

15   would appear to place them under the California sustainability

16   line of cases such that the Court may lack subject matter

17   jurisdiction.

18             MR. HEAPHY:  Again, Your Honor, no.  The difference

19   is in the California line of cases there was -- it was,

20   essentially, a contract claim.  The government was withholding

21   money and then California was seeking to recoup that money.

22   What we are asking the Court to do here is to provide a

23   declaratory judgment that Title IX protects the policies at

24   issue.

25             Again, separate the strict argument over how much

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————
EASTERN DISTRICT OF VIRGINIA

JA425

FCSB v. McMahon

13

1    money is owed from an underlying policy dispute.  The entire

2    basis, Your Honor, it's important to understand, of the

3    high-risk designation is that Fairfax and Arlington, in the

4    view of the Department of Education, are in violation of law.

5    There is no allegation of mismanagement of funds, there's no

6    allegation that the funds are being misapplied to some area

7    beyond the terms of the grant.  The only dispute between the

8    parties is whether or not the restroom access policy does or

9    does not violate equal protection or Title IX.  That is the

10   sole reason why this high-risk designation, the reimbursement

11   process, and the condition on reimbursement applies.

12            So given that this, again, is a policy dispute, it

13   separates this case from the California authority to which you

14   refer.  It is ripe, Your Honor, for adjudication because of

15   that underlying policy dispute.  And there is nothing in the

16   government's brief that abrogates *Grimm* or *Doe*.

17            Again, Your Honor, unless and until the Supreme

18   Court or an en banc panel of the Fourth Circuit, diminishes

19   that authority that binds this Court, that binds the

20   Department of Education, that binds our clients, and, frankly,

21   compels the policies at issue, *Grimm* and *Doe*, just two weeks

22   ago, Your Honor, the Fourth Circuit said explicitly, and I'll

23   quote from the opinion:  *Grimm* remains the law of this circuit

24   and is thus binding on all courts within it.  In the *Doe* case,

25   the Court said -- it says, *Skrmetti*, the transgender

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

JA426

FCSB v. McMahon

14

1  healthcare case from the Supreme Court, says nothing about the

2  issues in this case.  And even Judge Agee, a judge who,

3  admittedly, disagrees with *Grimm*, affirmed the preliminary

4  injunction in the *Doe* case by saying, *Grimm* binds all judges

5  of this circuit, notwithstanding any expectation that the

6  Supreme Court will adjust, if not overruled, the foundations

7  of *Grimm* in a way that is likely to determine whether *Doe* will

8  ultimately prevail in this action.  The current law of this

9  circuit answers the question of whether *Doe* has satisfied the

10  requirements for obtaining an injunction pending appeal.

11        We're in precisely the same situation, Your Honor.

12  There may come a time when the Supreme Court in this or some

13  other case revisits the underlying Title IX or equal

14  protection rulings of *Grimm* reaffirmed in *Doe*, but unless and

15  until that day, our clients in this court are bound by that

16  interpretation.  And that is really the hub of this dispute

17  and why the funds have been withheld and why we have been

18  forced to come to this Court for relief.

19        THE COURT:  Talk to me a little bit about, if you

20  can, about the failure to exhaust suggestion that has been

21  made by the government.

22        MR. HEAPHY:  Yes, Your Honor, I appreciate that.

23        So the defendants argue that we have not exhausted

24  administrative remedies.  I want to stress that there's

25  absolutely no process that's contemplated in the regulations

—FCSB v. McMahon—

15

1  that are cited in the high-risk letter.  The high-risk letter

2  indicates -- it's C.F.R. Section 200.208 is the basis for the

3  action.  First of all, Your Honor, that is a section that

4  applies to pre-award conditions on grants.  Arguably, doesn't

5  even apply to grants that have already been allocated.  It has

6  no timeframe, it has no process for reconsideration.

7          What the letter says is we have an opportunity to

8  ask for reconsideration by writing a letter to a political

9  appointee in the Secretary of Education Office, which we had

10 done.  The declaration incorrectly says we have not filed such

11 a letter.  We have asked for reconsideration.  But

12 importantly, Your Honor, the high-risk designation has been

13 imposed.  It did not wait until the conclusion of the

14 reconsideration process.  It took immediate effect.  And the

15 conditions on reimbursement applied today, right, as of now,

16 Fairfax County and Arlington will not be able to get

17 reimbursed federal funds unless they change their policy in a

18 way that, in our view, would violate Title IX.

19         THE COURT:  How would you say that the resolution of

20 the issue that we have in sort of the broad aspect of the case

21 as a, essentially, a confrontation between what a district

22 court can or cannot do based upon the Fourth Circuit analysis

23 and what the executive branch can and cannot do based upon

24 another analytical framework.

25         MR. HEAPHY:  Your Honor, again, the executive branch

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

JA428

FCSB v. McMahon

16

1  has to act within its statutory authority under the

2  Administrative Procedures Act.  It cannot impose action that

3  are arbitrary and capricious.  When they do, as we suggest

4  that they have done here, it is appropriate and frankly

5  necessary for district courts to intervene.  So --

6          THE COURT:  Taking it a step further, and again I'm

7  not necessarily convinced that *Grimm* absolutely applies across

8  the board.  But let me give you a hypothetical that I came up

9  with last night as I was thinking about this case.

10          Suppose the federal government said to the state of

11  Kentucky, it's the Sixth Circuit, take it out of the Fourth

12  Circuit, that the amount of money that you're using to address

13  the needs of special needs children.  So I am taking it out of

14  the context of this emotional passionate thing about the

15  transgender issue, making it real simple for something that

16  everyone can be sympathetic to.  And they say, Well, you're

17  not spending enough money to assess and address the issues

18  that special needs children have, and so, therefore, unless

19  you commit more money to the special needs programs in your

20  state, your federal funding is questioned.  And let's assume

21  for the sake of discussion that Kentucky appellate courts had

22  said, Oh, no, you don't have to do that.  And so, we have that

23  tension.  Where does the sweet spot come?

24          MR. HEAPHY:  Your Honor, again, that's a very, very

25  different hypothetical than what we have here.  If the

FCSB v. McMahon

17

1  Department of Education is, essentially, seeking to set

2  certain priorities for local school districts, if that is

3  consistent with the will of Congress, that would be

4  permissible.  Here, the Department of Education is not -- is

5  not seeking to influence how money is spent.  They are taking

6  the money away because of an allegation that we are in

7  violation of Title IX, which is just, frankly, incorrect and

8  unlawful.

9       THE COURT:  So, essentially, your argument could

10 actually come down to a ripeness issue because we haven't

11 gotten to the point that you just described.

12      MR. HEAPHY:  Yes, Your Honor.  And again, on the

13 ripeness point, it is ripe now, because, again, back to the

14 exhaustion argument, if the Department of Education had waited

15 until reconsideration had been exhausted, rather than impose

16 this designation, then perhaps we would not -- this case would

17 not be ripe.  But since the action has been taken, and since

18 there is no timeframe for adjudication, we submitted this

19 letter for reconsideration, it could sit on the desk of this

20 political appointee for months, because, again, it's not bound

21 by any regulation, then it's ripe, Your Honor.  Again, we will

22 not get the money unless this Court steps in, validates *Doe*

23 and *Grimm*, and our interpretation of Title IX.  That's why it

24 is ripe, and that's why it's appropriately before this Court

25 as opposed to the Court of Federal Claims.

---
FCSB v. McMahon
---

18

 1          THE COURT:  All right.  Let me hear from your

 2   opponent colleague and then we will come back to you.

 3          MR. HEAPHY:  Thank you.

 4          MR. KAMBLI:  Good morning, Your Honor.

 5          THE COURT:  Good morning, sir.

 6          MR. KAMBLI:  Abhishek Kambli for the United States.

 7   So the big picture theme of our opening brief is that the

 8   plaintiffs rushed into court asking for an extraordinary

 9   relief based on an incorrect premise that they were about to

10   lose federal funding, but then failed to establish basic

11   jurisdiction along the way.  And it's especially problematic,

12   as Your Honor was alluding to when my friend on the other side

13   was speaking, about the recent SCOTUS precedent on the issue.

14   As you're well aware, Justice Gorsuch admonished district

15   court judges that --

16          THE COURT:  That was just one person, so I guess the

17   other people who are protecting me the admonishment isn't as

18   strong.

19          MR. KAMBLI:  Yes, Your Honor.  But the big picture

20   point is that when the case was talking about is that the

21   reason for the admonishment is because of the artificial way

22   the Fourth Circuit was going about trying to distinguish the

23   *Department of Education v. California* case and ignored the

24   fact that the Supreme Court's ruling in *Department of*

25   *Education v. California* was very broad when the heart of the

JA431

FCSB v. McMahon

19

1   dispute is a money matter, which I'll get to in a moment.

2          But before we get there, there's actually another

3   jurisdictional bar outside of the Tucker Act, which is that

4   the APA does not provide a cause of action when something is

5   committed to agency discretion.  So I'll start with that point

6   and then get into the Tucker Act and some of the other

7   jurisdictional bars.

8          So we start with the premise that the Court does not

9   have jurisdiction and it's the plaintiffs' burden to

10  demonstrate to the Court that it does.  And when you talk

11  about likelihood of success on the merits, that also includes

12  whether the Court can hear the case at all.  And with the

13  agency discretion, the plaintiffs cited 20 U.S.C. 1683, which

14  is the Title IX statute that talks about if you terminate

15  funding then the APA can be an available cause of action and

16  it would not be considered committed to agency discretion.

17         What we have here is a separate statute at play and

18  that's 20 U.S.C. 1226(a)(1), which is pretty on point, because

19  what we're talking about here is not whether they get the

20  funding, but how it's disbursed to them.  And what it states

21  in that statute is that payments pursuant to grants or a

22  contract under any applicable program may be made and it says,

23  later by way of reimbursement as the secretary may determine.

24  So what we have here is the high-risk status means that they

25  can only receive funds through reimbursement and that the

FCSB v. McMahon

20

1  Department of Education will just commit extra scrutiny before

2  disbursing those funds.  As the declaration by the Department

3  of Education says, if there are any loss of federal funds, it

4  will go through the Title IX process, which requires an

5  attempt to make a voluntary resolution and then judicial

6  action before stripping funding.

7         THE COURT:  Assuming that this Court makes the

8  determination that the *Grimm* approach is the way to go and

9  it's binding precedent on this Court that the Court must

10 follow, and the approach that you are suggesting is not the

11 most viable one, how would you address the situation and the

12 circumstances of the stare decisis effect of *Grimm*?

13        MR. KAMBLI:  So, Your Honor, again, this is assuming

14 that the Court goes past jurisdiction and gets to that point.

15        THE COURT:  Yes.

16        MR. KAMBLI:  So there is a few points that I would

17 make on that.  So the heart of plaintiffs' claim is that the

18 action was arbitrary and capricious, that's the first claim.

19 And that is a deferential standard that just requires that

20 everything be reasonably explained, and there is plenty of

21 correspondence with the Department of Education and the

22 plaintiffs that the action that the department took and the

23 reasons why it took it, was pretty thoroughly explained.  And

24 to the extent that plaintiffs question why they were placed in

25 this designation while other schools weren't, the declination

—FCSB v. McMahon—

21

1  of enforcement against another entity is, presumptively,

2  nonreviewable under the APA and outside the case of *Heckler v.*

3  *Chaney*, 470 U.S. 821, 835 for that.  But the *Grimm* issue

4  has --

5          THE COURT:  And it's been suggested that Virginia

6  has been singled out for this sort of procedure or process or

7  punishment, for lack of a better way of putting it, and that

8  other states in the Fourth Circuit have not, such as North

9  Carolina.

10         Why wouldn't that be subject to at least an inquiry

11 as to whether or not things were arbitrary and capricious?

12         MR. KAMBLI:  So the inquiry is based on whether the

13 agency adequately explained why it was investigating and it

14 was in response to an OCR complaint and that's when the

15 investigation was launched, and it was through the OCR process

16 that they had addressed it.  So someone else launched a

17 complaint to the Department of Education and they were

18 investigating.  And maybe there are other instances in other

19 schools, but they haven't reached the point that the Virginia

20 schools have at this stage.

21         So that alone passes the deferential threshold of

22 arbitrary and capricious.  But in terms of the declination of

23 enforcement actions, since there's a wide amount of variables,

24 and that's such as whether someone launched a complaint, which

25 happened in this case.  Maybe they haven't in those other

FCSB v. McMahon

22

1   circuits just yet, and, obviously, the agency does not have

2   unlimited resources to investigate everyone, which is why

3   those types of declinations are presumptively nonreviewable to

4   begin with.

5          In terms of adequately explaining why Virginia --

6   these Virginia school districts were investigated, the fact

7   that there was an OCR complaint and an investigation

8   opened does --

9          THE COURT:  So, in other words, there was a prima

10  facie basis for the investigation to occur and once the

11  investigation occurred, the government took whatever action it

12  deemed appropriate?

13         MR. KAMBLI:  Yes, Your Honor.  And yeah, there was

14  some serious claims.  There was one student that said that

15  because of his -- of their discomfort, that they would not be

16  able to use the bathroom throughout the day.  So those kinds

17  of allegations warrant serious investigations.

18         And in terms of the *Grimm* issue, there are two

19  issues.  So one, the background of the *Doe v. South Carolina*

20  case warrants some discussion here, because what happened in

21  that case is South Carolina passed a bathroom bill and the

22  plaintiff immediately challenged.  The district court judge

23  decided to exercise caution and state let's wait to see how

24  everything plays out before deciding this issue and *Skrmetti*

25  may have had some impact and they were hearing another Fourth

FCSB v. McMahon

23

1  Circuit case, *B.P.J.,* that would do that.

2          What plaintiffs did in that case is sought an

3  injunction pending appeal, which is an extraordinary remedy in

4  an emergency posture that the Fourth Circuit granted.  And

5  that's what's up before the Supreme Court right now, and the

6  Supreme Court directed a response from the plaintiff in that

7  case by Friday.  So we'll probably know within the next couple

8  of weeks what they decide to do with that.  But it is -- it is

9  safe to say that it is in flux and might be decided in

10  relatively short order.

11          But there are also manners in which we can

12  distinguish this case from *Grimm*.  For instance, *Grimm* was

13  talking about bathrooms.  This Virginia policy includes locker

14  rooms, which, although, you could theoretically apply the same

15  principles, it does present a different issue because locker

16  rooms tend to be areas where students undress around one

17  another and present separate issues.  And one of the aspects

18  that was pointed out in the Department's correspondence with

19  the plaintiffs was that there was lack of proper controls.

20          And that's kind of one of the other reasons why the

21  exhaustion of remedies is an important issue.  Maybe there was

22  a way to settle with plaintiffs that allow them to follow

23  *Grimm* but address some of the concerns that the Department of

24  Education had, but because they went to court first there was

25  no opportunity to work that out with the agency.  And multiple

FCSB v. McMahon

24

 1  school districts have utilized that administrative remedy

 2  option, and I don't want to prejudge what that would look like

 3  because that is still undertaking the process.

 4          THE COURT:  Do you view the case law as a preference

 5  for exhaustion of remedies?

 6          MR. KAMBLI:  So, Your Honor, my understanding of the

 7  case law is that there are certain instances where it's not

 8  required, but for something run of the mill, especially when

 9  it's something fully committed to agency discretion, such as

10  this, we do believe that that's the only avenue that

11  plaintiffs have since there is no cause of action under the

12  APA to challenge it in Federal District Court.  So in that

13  scenario, where it's at best questionable whether they have a

14  cause of action at all, it should at least be a step in the

15  process before they go to the federal district court.  And

16  there is an avenue in docket No. 310, in the letter that was

17  sent, there was a request for reconsideration.  It states

18  consistent with 2 CFR 200.208(d)(5), your division may request

19  reconsideration of its designation as high risk.  So there

20  is --

21          THE COURT:  I'll ask your opponent colleague a

22  similar question and then I'm going to maybe give you a shot

23  at it to see if we can sort of come up with something.  With

24  all of the cases, and I appreciate you saying that things are

25  in a bit of a state of flux, because we're just sort of trying

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA437

FCSB v. McMahon

25

1   to find our way, and we've got nonmajority opinions from the

2   Supreme Court, we've got concurring opinions that are telling

3   us that we need to do certain things and be aware, we've got

4   some very well-written dissents, we've got some Fourth Circuit

5   law that says in one context you should do one thing, but if

6   you look at it from the context of subject matter

7   jurisdiction, we should look at it another way.

8            Where do you believe the sweet spot is here?

9            MR. KAMBLI:  So I think the sweet spot is actually

10   in the committed-to-agency discretion argument, because the

11   Tucker Act only comes up to the extent that any court can hear

12   it at all, which court does.  But if it's committed to agency

13   discretion, that ends the inquiry because no Court can hear

14   that.

15           So the statute that the defendants -- or excuse me,

16   the plaintiffs cite to get into court is 20 U.S.C. 1683, but

17   that's only triggered when there's actual funding

18   terminations.  Here there is no funding termination.  It's

19   just a change in the method of reimbursement.  And that's

20   something that the statute itself commits fully to agency

21   discretion.  And what's more telling about how the statute

22   confers agency discretion is what it does not say.

23           THE COURT:  When you say there's not a termination

24   but a funding reimbursement, don't they essentially come out

25   to be the same thing?

—————FCSB v. McMahon—————

26

1          MR. KAMBLI:  No, Your Honor, not at all.  The

2    declaration from the Department of Education says there are no

3    funding cuts on the way.  And if there are, they would follow

4    the Title IX procedure, which is significantly more lengthy.

5          What this does is it requires the school district to

6    pay their expenses upfront and then the -- all it requires

7    that the Department of Education to do is conduct extra

8    scrutiny before reimbursing them on the back end.  And this is

9    already a status they are under for most of their grants.  So

10   there's two kinds of grants.  There's the formula funding,

11   which goes directly to the State of Virginia, but then

12   disburses it to its -- to its educational institutes like the

13   ones that are plaintiffs here.  And those are already on

14   reimbursement status.  So those are not affected at all.

15         But there are some that go directly to the entity,

16   and I -- we don't have a breakdown at this time of exactly

17   which fall into which bucket, but it's just basically saying

18   that instead of those going directly to the entity, because of

19   the high-risk status, the entity has to pay the cost upfront,

20   and then ask the Department of Education for reimbursement

21   later.  And all that means is that the Department of Education

22   takes a closer look before giving the funding.  There is no

23   indication that any of the grants will be terminated from any

24   of the school districts in question.

25         THE COURT:  All right.  Go ahead and close your

FCSB v. McMahon

27

1   argument, Counsel.

2           MR. KAMBLI:  So that's why something like this is

3   committed to agency discretion because we're not cutting off

4   federal funds.  So if federal funds were cut, then there's

5   potentially a trigger with 20 U.S.C. 1683, which brings it

6   under the APA.  But what the statute does say is that for this

7   particular type of action that the agency took, which is

8   placing an entity on "reimbursement only" status, it says that

9   bets can be made as the secretary may determine.  That "may

10  determine" is a language that indicates that it's only at the

11  secretary's discretion to put someone at that status.  And at

12  a minimum, if the agency later cut funding, then maybe there's

13  an argument that 20 U.S.C. 1683 is triggered, and that they

14  could potentially have an action under the APA.

15          All that's happened at this point is that the agency

16  is just saying you put the expenses upfront, we'll review it,

17  and provide you the funding on the back end.

18          THE COURT:  One more question.  How do plaintiffs'

19  allegations in Count 2 fall under the Tucker Act; and if they

20  do fall under the Tucker Act, how does that affect the Court's

21  analysis here?

22          MR. KAMBLI:  Yes, Your Honor.  May I have one moment

23  to look?

24          THE COURT:  Sure.

25          MR. KAMBLI:  Yes, Your Honor.  So I think that the

---FCSB v. McMahon---

28

1  big picture that the Supreme Court, both in *Department of*
2  *Education v. California* and *APHA v. NIH* was trying to hammer
3  home, and the Court says, it really doesn't matter how you
4  plead whatever your injury is, it matters at its essence what
5  you're seeking.  And it would be highly unlikely that the
6  plaintiffs would be here if it wasn't for this high-risk
7  designation that basically makes it so that they have to pay
8  upfront, and get the money on the back end.
9         So this case is ultimately all about money.  In
10 fact, one of the requests was from the plaintiffs was let's
11 put all of this on hold before any action is taken against us
12 until *B.P.J.* is decided, and it was the high-risk designation
13 that delayed funding, at least in the immediate sense that
14 triggered here.
15        So that's at its heart a breach of contract claim
16 saying we're not giving them the money on time.  So that's
17 what it looks for.  And there's been plenty of Circuit case
18 law that says a plaintiff can't reframe their claim as one for
19 declaratory or injunctive relief as a way to plead around
20 the --
21        THE COURT:  But you do agree that if the Court were
22 to say that its focus, in this analysis, and I'm not
23 necessarily saying this is what's going to happen as a Tucker
24 Act situation, your subject matter jurisdiction arguments
25 would not carry as much weight.

FCSB v. McMahon

29

1          MR. KAMBLI:  No, Your Honor, because it matters what

2    relief they are seeking.  Because if they are ultimately

3    asking turn the money back on, that goes to the Court of

4    Federal Claims.  And it doesn't matter if there's statutory or

5    constitutional claims because attached to getting the money

6    back because the Court of Federal Claims can hear that one of

7    the points in the sustainability institute case of the Fourth

8    Circuit highlighted is that there was also an ultra vires

9    constitutional claim, and it stated that just adding that

10   alone doesn't change the calculus on whether the Court of

11   Federal Claims can hear it.

12          So if the reason for your money loss was a statutory

13   violation or a constitutional violation, the Court of Federal

14   Claims can hear that, it's just that if the relief that you're

15   seeking is ultimately to get your money from the federal

16   government, that's the heart of the issue.  And that's what --

17   that's the reason the Supreme Court had to reiterate the

18   second time in the *NIH* case because the First Circuit tried to

19   differentiate using *Bowen* the same way the plaintiff has in

20   this case, and then the Supreme Court had to reiterate that

21   what matters is at the heart of what you're seeking.  If it's

22   an order to pay up, then that belongs in the Court of Federal

23   Claims.

24          THE COURT:  Okay.

25          MR. KAMBLI:  And, to the extent that it's a close

———FCSB v. McMahon———

30

1    call, it's plaintiffs' burden to demonstrate that there is a

2    clear showing that the Court has jurisdiction.  So the tie

3    would go to the runner if that was the Court's concern.

4          THE COURT:  And how can you say that in Washington,

5    D.C., we never win, so --

6          MR. KAMBLI:  Yeah, so the other thing that I would

7    add is that the dec action, which is the plaintiffs' alternate

8    cause of action to the APA, does not relief -- does not, as

9    it, on its own, create a cause of action because the federal

10   circuit, the Sixth Circuit, the Tenth Circuit, and others

11   circuits have said you can't plead a dec action to get around

12   the Tucker Act.  And that makes sense on some level, because

13   if there's not an independent cause of action beyond just the

14   Declaratory Judgment Act, at that point the Declaratory

15   Judgment Act opens the door to advisory opinions, which would

16   run afoul.

17         THE COURT:  And basically what you're saying is just

18   because they are alleging a potential Tucker Act, that

19   conclusory statements in a complaint don't necessarily carry

20   the day as far as ability of the Court to actually act on the

21   relief that's requested?

22         MR. KAMBLI:  Yes, Your Honor.  And basically it

23   boils down to this, so the APA is -- the issue is the APA

24   waived sovereign immunity in a limited sense and waivers of

25   sovereign immunity have to be read narrowly.  And the statute

—FCSB v. McMahon—

31

```
 1   of the APA states the APA is available when there's no other
 2   adequate remedy of law.  There is another adequate remedy of
 3   law in the Court of Federal Claims.  So the conclusion, that's
 4   consistent with the Supreme Court's precedent on the issue is,
 5   if the Court of Federal Claims can hear the issue, then it
 6   must.  So if it can hear plaintiffs' claim, then it has to go
 7   there.
 8            THE COURT:  Two minutes.
 9            MR. KAMBLI:  Yes, Your Honor.  So I will also -- I
10   also wanted to touch upon irreparable harm because without
11   irreparable harm there is never a need for emergency relief.
12   And what plaintiffs -- the plaintiffs kind of go back and
13   forth between the terminology of, you know, the high-risk
14   status and reimbursement only versus termination of federal
15   funds.  We have a sworn declaration that says they are not
16   cutting federal funds, they are just putting them on a
17   reimbursement status.
18            So the irreparable harm in the immediate term would
19   be if, for instance, the plaintiff had to shut down a program
20   because they can't cover the funds on their own right away and
21   would be harmed by waiting.  But that's not what their
22   declarations say.  The declarations just point to where they
23   get federal funding.  And if they lose it then, yes, it would
24   be irreparable harm, but they're not at any risk of losing it
25   at this moment.  All that's happening is that they are getting
```

─────FCSB v. McMahon─────

32

1   it through reimbursement, and the immediacy of that is absent,

2   and that alone can be a reason why this Court --

3          THE COURT:  Tell me, if you know, and I appreciate

4   you might not know, typically how long in the context of these

5   situations does reimbursement occur?

6          MR. KAMBLI:  So it varies, but it's also not an

7   unusual status, so, you know, as I mentioned earlier, the

8   formula grants are already given to the school district

9   through reimbursement.  So we don't know the portion of the

10  funds that are given through directly to the school, which

11  would be subject to this high-risk determination that aren't

12  already in reimbursement status.  But my understanding is that

13  it's not a long time.  All that happens is that it just

14  scrutinizes the funding, and then they get the money, but I

15  don't have a precise calculation as to how much.

16         THE COURT:  I appreciate that.

17         MR. KAMBLI:  But at the same time, we don't have any

18  evidence that any programs are imminently in danger of being

19  shut down.  And we don't also know how much, for the rest of

20  the fiscal year, that is not already given out by the

21  Department of Education.  So we don't know, for instance, how

22  much of the funding, until at least until October, is affected

23  by this, because most of that might have already been given to

24  the plaintiffs.  But again, that's also their burden to

25  demonstrate what the irreparable harm is, and the declarations

———FCSB v. McMahon———

33

1    and the evidence they presented do not do that.  So that alone

2    is another reason to deny the TRO even despite the merits on

3    *Grimm*.

4           And so, the conclusion, I'll just add, is that in

5    *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court

6    stated that some things are just best left to the democratic

7    and political process.  Justice Kavanaugh went as far as

8    saying the framers of the constitution did not set up

9    something in the nature of Athenian democracy or a New England

10   town meeting to oversee the conduct of the national government

11   by means of lawsuits in federal court.

12          Basically the jurisdiction is not just a step that

13   the plaintiffs have to overcome to get into court, but it's

14   the constitutional minimal design to limit the Court's power.

15   And that's one of the big picture admonishments that's coming

16   out of the Supreme Court is -- the court is not -- is skipping

17   over that step and not taking that part seriously.

18          So we ask that the Court deny it without even

19   reaching the merits because there are multiple jurisdictional

20   bars in this case.  But even if so, they haven't met things

21   like irreparable harm and things of that sort that would

22   require emergency relief.  Thank you, Your Honor.

23          THE COURT:  Thank you, Counsel.  Rebuttal?

24          MR. HEAPHY:  Yes, Your Honor.  Thank you.  So what's

25   at issue here, Your Honor, is not reimbursement.  It's

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

———————————FCSB v. McMahon———————————
34

1    conditions upon reimbursement.  Let me just read from the

2    high-risk designation letter, the enforcement action that

3    we're seeking for Your Honor to enjoin.

4            In order to get reimbursed, the division must submit

5    plans for compliance with all federal laws, must submit a

6    corrective action plan, that could include implementation of

7    the OCR resolution agreement.  What the administrative action

8    has already done, and this is effective today, is require a

9    change in policy.  That, Your Honor, is precisely why this is

10   appropriate under the Administrative Procedures Act because

11   that's in violation of law.  The condition on reimbursement.

12   It's not reimbursement.  It's the condition for reimbursement.

13   It would require my clients to violate Title IX and equal

14   protection as defined by the Fourth Circuit.  And that is why

15   it is ripe, Your Honor, for this Court's review.

16           Another factual clarification about negotiations,

17   persistently, and I would invite the Court to look at the

18   correspondence between our clients and the Department of

19   Education, all of which are exhibits in our pleadings.

20   Consistently the department insisted, as an inviolate,

21   absolutely essential condition for resolution is change the

22   policy.  There was never any receptivity to anything other

23   than a gender at birth exclusive restroom access policy,

24   which, again, was a nonstarter for our clients because of the

25   clear authority.

———————Tonia M. Harris OCR-USDC/EDVA 703-646-1438———————
EASTERN DISTRICT OF VIRGINIA

JA447

FCSB v. McMahon

35

1          So we are at an impasse.  There is no possibility,

2    Your Honor, of a negotiated resolution given that is the

3    condition that in the high-risk letter and in negotiations has

4    been imposed.

5          Your Honor, speaking to the jurisdictional question

6    of the Administrative Procedure Act, just quoting from the

7    Administrative Procedure Act.  Congress declared that any

8    action by a department or agency terminating or refusing to

9    grant or to continue financial assistance is subject to

10   judicial review under the Administrative Procedure Act.  And

11   that federal agency's action shall not be deemed committed to

12   unreviewable agency discretion.

13         THE COURT:  And I understand that point.  The

14   government is suggesting, however, that this is not a

15   termination, this is a reimbursement, which takes it out of

16   the ambit of the APA.

17         MR. HEAPHY:  And, Your Honor, again, our response to

18   that is it is not simply a reimbursement.  It is an effective

19   denial of funds because of that condition that is on the face

20   of the administrative action.

21         THE COURT:  Essentially, what you're saying is

22   because they have taken a position that is -- using my own

23   term -- so extreme, which essentially says that you cannot do

24   this, that there is really no mechanism or remedy for you to

25   come up with some sort of negotiated regulation?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

JA448

—————FCSB v. McMahon—————

36

1          MR. HEAPHY:  Precisely, Your Honor.  That is exactly

2    what we are saying.  We cannot satisfy the condition that has

3    been articulated consistently as recently as the August 19th

4    high-risk designation letter without violating federal law.

5    That is the horns of this dilemma that requires us to come to

6    the Court for relief.  The Court really is the only place it

7    can provide such relief.

8          I want to speak to the *NIH* case.  This recent case.

9    Judge Barrett, Justice Barrett, made a distinction in that

10   case between guidance, in terms of articulation of policy, and

11   that case involved DEI programs and claim for money damages.

12   And she bound in her concurrence in this shadow docket,

13   *National Institutes of Health v. American Public Health*

14   *Association*, that the guidance is appropriately reviewable by

15   a district court because, again, it speaks to terms and

16   conditions and policy.  Whereas, the claim for money damages

17   must be bifurcated and go to the Court of Federal Claims.

18          So even under the authority the defendants cite,

19   they explicitly say that policy disputes in the form, in that

20   case of the DEI guidance, here the underlying question about

21   the applicability of Title IX, are appropriately before a

22   district court pursuant to the Administrative Procedures Act.

23          THE COURT:  And while Justice Barrett's concurrence

24   is compelling, and it's academic, and it's easy to read and

25   understand, she doesn't seem to have support from the rest of

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

JA449

FCSB v. McMahon

37

1   the justices to create a majority.

2          MR. HEAPHY:  Your Honor, I understand and that's why

3   you are precisely right when you say you're navigating a lot

4   of conflicting opinions, some of which are binding and some of

5   which are, essentially, dicta.  So you must return, Your

6   Honor, simply to the plain terms of the Administrative

7   Procedure Act, which we submit, once again, makes claim that

8   this is an arbitrary and capricious action by an

9   administrative agency that must be adjudicated by a federal

10  court.

11         I want to also, Your Honor, if I can, respond to the

12  selective enforcement claim.  It's absolutely certain that

13  this is an enforcement action that has been taken against some

14  but not all school districts that have the very same policy.

15  I can read to Your Honor from the Fourth Circuit case of

16  *Kirk v. Commissioner of Social Security,* where an agency

17  applies different standards to similarly situated entities,

18  fails to support this disparate treatment with a reasoned

19  explanation and substantial evidence on the record.  Its

20  action is arbitrary and capricious and cannot --

21         THE COURT:  That's the question that I had for your

22  opponent colleague as to why is this happening in Virginia in

23  certain counties and it's not happening in other counties.

24  It's not happening in North Carolina.  And so, the suggestion

25  is that this is selective enforcement.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

JA450

FCSB v. McMahon

38

1          MR. HEAPHY:  Yes, exactly, Your Honor.  You're

2   precisely right.  It is a selective enforcement action.

3          Your Honor, then the last thing I wanted to respond

4   to is the limits of *Grimm*.  Counsel spent time talking about

5   how *Grimm* is somehow limited on its facts.  Let me just read

6   the very first sentence of *Grimm*.  At the heart of this appeal

7   is whether equal protection and Title IX can protect

8   transgender students from school bathroom policies that

9   prohibit them from affirming their gender.  We join a growing

10  consensus of courts in holding that the answer is

11  resoundingly, yes.

12          *Grimm* is not limited to its fact.  It establishes

13  the precedent, Your Honor, that in the Fourth Circuit it is an

14  equal protection violation to prevent a transgender boy from

15  accessing facilities corresponding with his gender.  And it

16  violates Title IX.  That is a binding of law that is binding,

17  Your Honor, and the fact that *Grimm* himself in that case

18  persistently presented as a transgender boy, while true, does

19  not diminish the underlying force of the Court's holding.

20          THE COURT:  Very good.

21          I want to say to both sides very well argued.  I

22  appreciate your argument.  I appreciate the hard work that

23  you're putting in to make your case.  What the Court is going

24  to do is take the matter under advisement.  The Court has

25  already made its determination on the various pro hac vice

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

JA451

———FCSB v. McMahon———

39

1    motions.  And counsel, if you are in the position down the

2    road to actually become a member in another district, we'll be

3    more than happy to welcome you to this district.

4        MR. HEAPHY:  Your Honor, just one other thing, if I

5    may.  My understanding is that there are at least two other

6    districts in Northern Virginia that may very well be filing

7    similar complaints with this Court.  I believe their school

8    boards have yet to meet and decide.  But just for purposes of

9    timing, I do expect that Alexandria and Loudon County may very

10   well join Arlington and Fairfax in this action.

11       THE COURT:  Very good.  I probably think that you

12   know this.  A group filed a request for filing an amicus.  The

13   Court is not going to get into that right now.  It's best that

14   the parties who have done a very good job articulating their

15   perspectives and opinions in the case, basically control the

16   perspective, and so the Court is not going to necessarily rely

17   on anything that's coming from any amicus.

18       All right.  Very good, Counsel.  What we're going to

19   do is, there are other people here for other things, I assume,

20   and so what we're going to do is --

21       (Off the record discussion.)

22       THE COURT:  All right.  My chief of staff has

23   informed me that the next matter is under seal.  So what we're

24   going to do is we're going to need to clear the courtroom.

25       Mr. Hood, if you can come back to chambers, I would

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

—FCSB v. McMahon—

40

1   appreciate it so Ms. Tinsley can take care of her due

2   diligence.

3

4            **(Proceedings adjourned at 9:58 a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

JA453

1                    CERTIFICATE OF REPORTER

2

3              I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the TRO Hearing

7    in the case of the **FAIRFAX COUNTY SCHOOL BOARD and**

8    **ARLINGTON COUNTY SCHOOL BOARD versus LINDA MCMAHON, et al.,**

9    Civil Action No.: 1:25-cv-1432 and 1:25-cv-1434, in said

10   court on the 3rd day of September, 2025.

11             I further certify that the foregoing 41 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16             In witness whereof, I have hereto subscribed my

17   name, this September 9, 2025.

18

19

20
                         _____
21                       Tonia M. Harris, RPR
22                       Official Court Reporter

23

24

25

                                                              41

JA454