No. 25-2087

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

FAIRFAX COUNTY SCHOOL BOARD and
ARLINGTON SCHOOL BOARD,
*Plaintiffs-Appellants*,

v.

LINDA MCMAHON, in her official capacity as Secretary of Education of the
United States, and the
UNITED STATES DEPARTMENT OF EDUCATION,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Virginia,
Nos. 1:25-cv-01432-RDA-LRV & 1:25-cv-01434-RDA-LRV,
Hon. Rossie D. Alston, Jr.

BRIEF OF *AMICI CURIAE* EQUALITY VIRGINIA, ARLINGTON
GENDER IDENTITY ALLIANCE, AND NORTHERN VIRGINIA
FAMILIES IN SUPPORT OF PLAINTIFFS-APPELLANTS

Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
joe@wardenskilaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

INTERESTS OF *AMICI CURIAE* ............................................1

SUMMARY OF ARGUMENT ....................................................2

ARGUMENT ...............................................................................4

I.    The Department of Education's Actions Threaten Lawful and
      Effective Policies that Protect and Support Transgender and
      Nonbinary Students.............................................................4

II.   Inclusive Policies Provide Significant Benefits to Transgender and
      Nonbinary Students.............................................................6

III.  The Districts' Policies Support, Respect, and Protect All Students,
      including Transgender and Nonbinary Students. ............................9

IV.   Rescinding the Districts' Inclusive Policies Would Cause Immediate
      and Irreparable Harms to Students.................................13

CONCLUSION .........................................................................18

CERTIFICATE OF COMPLIANCE ......................................19

CERTIFICATE OF SERVICE................................................20

# TABLE OF AUTHORITIES

**Cases**

*A.C. v. Metropolitan School District of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ....................................................................8

*Doe v. Boyertown Area School District*,
897 F.3d 518 (3d Cir. 2018) ....................................................................8

*Doe v. South Carolina*,
No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025), *stay denied*,
No. 25A234, 2025 WL 2610400 (U.S. Sept. 10, 2025), *appeal dismissed*
(4th Cir. Oct. 17, 2025) ....................................................................5, 9

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*,
858 F.3d 1034 (7th Cir. 2017) ....................................................................8

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706 ................................................4

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ....................4

Tucker Act, 28 U.S.C. § 1491 ....................................................................3

Va. Code. Ann. §§ 2.2-3900, 3904 ....................................................................4

**Other Authorities**

Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and
Sexual Assault Risk Among Transgender Youth,* 143 Pediatrics 8 (2019),
https://pmc.ncbi.nlm.nih.gov/articles/PMC8849575/pdf/nihms-
1774519.pdf ....................................................................7

Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The
Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022),
https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-
Report.pdf....................................................................6, 7, 9

Laura Wernick et al., *Gender Identity Disparities in Bathroom Safety and Wellbeing Among High School Students*, 46(5) J. YOUTH & ADOLESCENCE 917 (2017), https://pubmed.ncbi.nlm.nih.gov/28361196/ ....................................6

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 .......................................................................4

# INTERESTS OF *AMICI CURIAE*[1]

*Amicus curiae* Equality Virginia is the leading advocacy organization in Virginia seeking equality for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people. With over 60,000 supporters and more than 100 community-based organizational partners throughout the Commonwealth, Equality Virginia advocates and organizes across Virginia to build a future where all LGBTQ+ people thrive. Equality Virginia is committed to advocating for inclusive school environments where transgender and nonbinary youth feel safe, celebrated, and supported in their education.

*Amicus curiae* Arlington Gender Identity Alliance ("AGIA") is a community-based coalition of parents, students, and community members. AGIA's goal is to make schools a welcoming and inclusive place for all transgender, nonbinary, and gender-expansive students in Arlington Public Schools ("APS"). AGIA was formed in 2018 and has a history of advocating for, and working in collaboration with, APS to design and implement inclusive policies and nondiscrimination protections.

*Amici curiae* also include parents and former students in Northern Virginia who have personal experience with the Districts' policies—experience that is not

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting this brief.

captured in the parties' briefs. They offer important perspectives on how inclusive policies make APS and Fairfax County Public Schools ("FCPS") (together, the "Districts") safer and more effective learning environments for all students and help their children thrive, and why removing those protections would cause immediate, measurable, and lasting harm.

The experiences of students and their families, described below, show that the harms at issue can neither be fixed by money nor remedied in the Court of Federal Claims. Therefore, this Court should reverse the District Court's erroneous dismissal of the case and remand for consideration on the merits.

## SUMMARY OF ARGUMENT

> *Having access to the correct bathrooms made me feel like I belonged in the physical space of my school . . . . APS's inclusive policies for transgender students allowed me to feel safe and thrive while in school. I was a really happy high school student and I'm a really happy adult. This is fundamentally because of the support I received from every community in my life: my family, my friends, and my school.*
>
> - *Former student in Arlington Public Schools*

> *[I]f our district's inclusive policies are rescinded [then] my child will be more frequently absent from school, her mental health will suffer, and she will be less likely to fulfill her academic potential.*
>
> - *Parent of student enrolled in Prince William County Schools*

This case is not about money. Instead, as demonstrated by these experiences and others described below, this case centers on the grave nonmonetary harms that will result from the federal government's unlawful command that the Districts

rescind their inclusive policies that respect transgender and nonbinary students, which have been in effect for years.

In *Amici*'s experience, the Districts' inclusive policies for students' use of single-sex facilities enable *all* students to fully participate in academics and extracurricular activities, protect *all* students from discrimination, and allow *all* students to attend school without fear. In contrast, the federal government's demand that the Districts rescind inclusive facilities policies, which are consistent with and abide by this Court's binding precedent in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), would eliminate these protections and profoundly harm students' daily safety, dignity, health, and access to education across Northern Virginia. *Amici* offer a narrative of the experiences of Northern Virginia families that illustrate the benefits currently flowing from these inclusive policies, and the specific harms that would result their rescission.

*Amici* submit this brief to support Appellants' argument that this case is properly before an Article III court. The Tucker Act, 28 U.S.C. § 1491, channels claims seeking money from the United States to the Court of Federal Claims, but this controversy is not about seeking money; it is about stopping an unlawful directive before it inflicts widespread, irreparable harm on *all* students' ability to flourish in school. This is relief that only an Article III court can provide.

3

**ARGUMENT**

**I.    The Department of Education's Actions Threaten Lawful and Effective Policies that Protect and Support Transgender and Nonbinary Students.**

The Districts seek judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, of unlawful actions taken against them by the U.S. Department of Education (the "Department") and Education Secretary Linda McMahon. JA012–JA119 (Fairfax County School Board's Complaint Against Linda McMahon and the U.S. Department of Education); JA230–JA328 (Arlington School Board's Complaint Against Linda McMahon and the U.S. Department of Education). The Districts' claims are based on an undeniable truth: the Department is attempting to coerce the Districts to rescind inclusive policies for transgender and nonbinary students that are fully consistent with applicable federal and state laws, as interpreted by this Court. *See Grimm*, 972 F.3d at 586 (interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and the Equal Protection Clause of the Fourteenth Amendment); Virginia Human Rights Act, VA. CODE. ANN. §§ 2.2-3900, 3904 (prohibiting discrimination based on sex and gender identity in places of public accommodation, including schools).

There is no question as to the binding federal law protecting students in the Fourth Circuit. Even in the order dismissing this case, the district court "unconditionally recognize[d] that *Grimm* 'remains the law of this Circuit' and thus binds both this Court and parties within the Fourth Circuit." JA216. In *Grimm*, this

4

Court held that a school district violates Title IX and the Equal Protection Clause when it excludes a transgender boy from the boys' restroom. 972 F.3d at 616, 619. And just months ago, a unanimous panel of this Court reaffirmed that "*Grimm* remains the law of this Circuit," in granting an injunction pending appeal allowing him to use boys' bathrooms at school. *Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8 (4th Cir. Aug. 15, 2025), *stay denied*, No. 25A234, 2025 WL 2610400 (U.S. Sept. 10, 2025), *appeal dismissed* (4th Cir. Oct. 17, 2025). In *Doe*, the plaintiff student had been prevented from using the boys' student restroom based on a South Carolina state budget proviso that requires public schools to exclude transgender boys from boys' restrooms and transgender girls from girls' restrooms, under threat of revocation of state education funding. *Id.* at *1-2, *8.

Now, through similar coercive tactics, the Department is threatening to revoke the Districts' federal funding simply for following the law and respecting the civil rights of transgender and nonbinary students. The Department's unlawful directives put the Districts in an impossible position: lose federal funding and comply with Fourth Circuit precedent, or keep federal funding and defy Fourth Circuit precedent.

The Districts do not seek monetary relief. Rather, they seek equitable relief to prevent the Department from imposing—through executive fiat and in defiance of established precedent—unlawful mandates that would harm students and undermine state and local authority. Article III courts are the correct forum for this dispute.

## II.    Inclusive Policies Provide Significant Benefits to Transgender and Nonbinary Students.

Feeling safe in the restroom is critical to every student's school experience. This is true—like for every other student—for transgender and nonbinary students, who do not live in accord with their birth sex. Requiring a transgender girl to use a boys' bathroom, or requiring a transgender boy to use a girls' bathroom, is directly related to feelings of experiencing less school safety, as well as lower self-esteem and grades than their peers.[2] As one study found, "ensuring safe access to bathrooms and other school facilities among trans students is a vital component to addressing educational inequality."[3] The authors went on to explain:

> [S]afety using bathroom facilities mediates the inequalities in overall school safety experienced by trans students. In order to support the wellbeing and healthy development of all students, especially trans students, educational policies and practices can explicitly support the right of students to use a bathroom that matches their identity, including the provision of gender-neutral bathrooms.[4]

Students who feel unsafe at school may avoid certain areas or activities where they feel unwelcome, which may also lead them to avoid school altogether.[5] A

---

[2] Laura Wernick et al., *Gender Identity Disparities in Bathroom Safety and Wellbeing Among High School Students*, 46(5) J. YOUTH & ADOLESCENCE 917, 924–25 (2017), https://pubmed.ncbi.nlm.nih.gov/28361196/.

[3] *Id.* at 928.

[4] *Id.* at 929.

[5] Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools,* at 10 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf.

national survey conducted by GLSEN, a national organization focused on ensuring safe schools for LGBTQ+ students, shows that "LGBTQ+ students most commonly avoided school bathrooms, locker rooms, and physical education or gym classes[.]"[6] Approximately 45.1% of LGBTQ+ students surveyed avoided school bathrooms.[7] One study found that "[t]ransgender and non-binary middle and high school youth in our sample experienced sexual assault at troubling rates well above those for non-transgender adolescents," advising schools to "avoid[ ] restrictive policies."[8] The study found that "[y]outh whose restroom/locker room use was restricted were more likely to experience sexual assault compared to those without restrictions[.]"[9]

This Court has underscored the adverse impacts experienced by transgender youth when they are excluded from restrooms. In *Grimm*, the Court noted that "[w]hen being forced to use a special restroom or one that does not align with their gender, more than 40% of transgender students fast, dehydrate, or find ways not to use the restroom." 972 F.3d at 597 (citations omitted).

---

[6] *Id.* at 10–11.

[7] *Id.* at 11.

[8] Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth,* 143 PEDIATRICS 25, 33 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC8849575/pdf/nihms-1774519.pdf.

[9] *Id.* at 26.

Other federal appellate courts have also found that "[p]olicies that exclude transgender individuals from privacy facilities that are consistent with their gender identities 'have detrimental effects on the physical and mental health, safety, and well-being of transgender individuals.'" *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 523 (3d Cir. 2018) (quotation marks omitted). For example, the Third Circuit found that "exclusionary policies exacerbate the risk of 'anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness, and eating disorders among other adverse outcomes." *Id.* The Seventh Circuit has made similar findings. In *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, a transgender boy was required to use the girls' restrooms or a gender-neutral restroom in the main office. 858 F.3d 1034, 1040–41 (7th Cir. 2017). As a result, he restricted his water intake to avoid using the restroom at school, which risked exacerbating his susceptibility to fainting and seizures when dehydrated. *Id.* at 1041. The court noted that "[h]e also suffered from stress-related migraines, depression, and anxiety because of the policy's impact on his transition and what he perceived to be the impossible choice between living as a boy or using the restroom. He even began to contemplate suicide." *Id.*; *see also A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 766 (7th Cir. 2023) (noting transgender twin boys were "profoundly upset[ ]" by the district's policy requiring them to use girls' bathrooms or the unisex bathroom because using the girls' facilities would reveal

8

their transgender status and the unisex bathroom was far from their classrooms and sometimes locked, resulting in both boys avoiding the using the bathroom while at school, which was "painful, distracting, and medically dangerous," and led to depression and humiliation).[10]

In addition, 78.8% of "LGBTQ+ students reported avoiding school functions and activities outside of school to some extent," and "nearly a third avoided them often or frequently."[11] In fact, some students even choose to seek enrollment in other schools. For example, the plaintiff in *Doe v. South Carolina* explained that the state's budget proviso requiring him, as a transgender boy, to use the girls' multi-stall restrooms at school, "led not only to formal punishment from school administrators, but also led [him] to withdraw and seek alternative schooling options despite a desire to re-enroll in in-person public schools without being subject to the Proviso." No. 25-1787, 2025 WL 2375386, *6 (4th Cir. Aug. 15, 2025).

## III. The Districts' Policies Support, Respect, and Protect All Students, including Transgender and Nonbinary Students.

Each of the Districts has a policy that allows transgender boys to use boys' restrooms and transgender girls to use girls' restrooms. JA054–JA059 (FCPS

---

[10] The subsequent appeal of an order granting summary judgment to the plaintiff students is "being held without oral argument until the Supreme Court has issued its opinion in *West Virginia v. B.P.J.*, No. 24-43 (cert. granted July 3, 2025)." Order, *A.C. v. Metro. Sch. Dist. of Martinsville*, No. 25-1094 (7th Cir. Sept. 19, 2025).

[11] Kosciw, *supra* note 5, at 12.

Policy); JA270–JA272 (APS Policy). The positive effects of these inclusive policies are not limited to transgender and nonbinary students; instead, they help *all* students succeed.

As one parent of a student who is not transgender or nonbinary observed, "All kids thrive in a supportive, inclusive environment." Current students and recent graduates of the Districts who are not transgender consistently reported that attending a school where every student is accepted and welcomed improves their own outlook on school, increases their willingness to attend, and strengthens their sense of safety. One current student explained: "I personally feel safer going to a school where I know my friends and peers are accepted and respected for who they are." Families further emphasized that these policies have impacted their children in a positive way by helping their non-transgender children internalize that every person deserves to be treated with respect. As one parent noted, "As a parent of two cis-gender kids . . . I can sincerely say that their experiences at school have only been enhanced by this policy, in that they know they and their friends are able to show up as their authentic selves and will be welcomed at school and supported for who they are."

Inclusive policies are particularly important in Virginia, where GLSEN concluded "schools were not safe for most LGBTQ+ secondary school students."[12] The experiences of *amici* across multiple Northern Virginia school districts— including in APS and FCPS—confirm that their inclusive facilities policies improve attendance, reduce anxiety and bullying, increase participation in extracurriculars, and support academic performance and engagement. In short, the policies allow all students to learn, participate and thrive in a supportive school environment.

A Northern Virginia student succinctly captured the impact of a supportive environment, stating: "If you are comfortable, you will do better. Literally the stress will impact your ability to perform on tasks and [at] school." One parent of a FCPS student shared that their transgender child experienced depression and difficulty attending school when the environment was not inclusive. However, the district's policies helped their child feel integrated into the school community, remain engaged, and achieve success. Another family credited their district's inclusive policy with empowering their transgender child to feel comfortable being themselves at school, resulting in positive impacts in her academic, social, and extracurricular achievements.

---

[12] GLSEN, *2021 National School Climate Survey State Snapshot: Virginia* 1 (2023), https://maps.glsen.org/wp-content/uploads/2024/08/GLSEN_2021_NSCS_State_Snapshots_VA.pdf.

*Amici* families consistently reported that knowing that their children can be who they are at school fosters a sense of comfort and belonging, which is essential for academic success. For example, one parent noted that, because the policies are in place, their transgender daughter can focus on fundamental aspects of her education—learning to read and write, drawing pictures, and developing friendships. Similarly, a parent of an APS graduate described how their transgender child is now thriving in college, stating that their district's inclusive policies were instrumental in supporting their son's safety and mental well-being because he "felt comfortable being himself and using spaces matching his gender at school," which in turn led to reduced absenteeism and alleviated social anxiety. The parent attributed the "foundation of institutional support" in their district with "ground[ing] his [son's] entire school experience. School was a safe place[.]"

The advantages of these policies also extend beyond the classroom. Several families explained that inclusive facilities policies enable their children to participate in after-school activities without the need to return home simply to use the restroom.

Other parents highlighted that inclusive policies also benefit the siblings of transgender and nonbinary students. Knowing that their siblings are treated with acceptance and respect allows these students to concentrate on their own studies, free from worry about their family members' well-being, and reassured that their school is a welcoming place for everyone.

12

*Amici* families agree that when their transgender and nonbinary children can be themselves at school, it fosters a sense of comfort and belonging that enables them to thrive. No amount of money from the Court of Federal Claims can ensure that students who have relied on the Districts' policies to support their well-being, academic performance, and engagement will continue to thrive in school if the Districts are forced to rescind their policies. The relief here is equitable and preventative, which is why review on the merits by the District Court is necessary.

## IV. Rescinding the Districts' Inclusive Policies Would Cause Immediate and Irreparable Harms to Students.

As one parent described it, if the Districts are forced to rescind their inclusive policies, their child "would have to hide herself and the focus would shift from education to paranoia, from joy to fear." This dispute is not about a contract; it is about the federal government intruding on local nondiscrimination policies and compelling unlawful changes in how schools treat students. The harms flow from the immediate impact of the federal government's coercion on students' daily lives, which only the district court can redress through equitable relief.

To require transgender boys to use girls' restrooms and transgender girls to use boys' restroom, or to navigate single-user alternatives, subjects those students to stigma. But that is not all. The experiences of *amici* confirm that rescinding these policies would produce other immediate harms: forced avoidance of bathrooms and hydration, exacerbated health conditions, increased absenteeism, social isolation,

13

and educational disengagement. The *amici* parents point to bullying and harms to their children's mental and physical health, as well as school avoidance behaviors directly tied to bathroom access.

For example, families reported that their children try not to drink water during the school day to avoid using bathrooms in the absence of inclusive policies. Their efforts to refrain from drinking water result in dehydration, leading to dizziness, headaches, exacerbated gastrointestinal issues, and increased risk of urinary tract infections. One parent described bracing for exactly those outcomes if their child's restroom access is taken away. Another parent described their child's history of severe anxiety and stomach pain that went away only when the student could live openly in a sex different than their birth sex, supported by school policy.

Moreover, numerous *amici* families indicated that the removal of inclusive policies would negatively affect their children's mental health, leading to increased absenteeism and declining academic performance. One parent explained how, early in transition, their child "had a hard time getting out of bed and going to school and had increased absences," and emphasized that feeling accepted at school later "helped him stay engaged in school and be successful." Another parent warned that without inclusive policies, their child "would have to go a lot more stealth" and that constant worry "will not [let a child] perform well in school." Parents repeatedly linked the loss of inclusive policies to heightened anxiety and reduced attendance.

14

One mother whose child has struggled with anxiety stated that if their District withdrew its policies, her child "would [not] be willing to attend school at all," and she feared "we would end up with a high school drop out."

Students who do not feel safe using school facilities may avoid attending school, classes, or extracurricular activities altogether. For instance, one parent recounted that single-user bathrooms are frequently unavailable during after school or weekend activities, and that their child would be unable to participate in extracurricular activities if he was required to use a girls' bathroom. As one family observed, "[r]escinding the policy could impact any and every aspect of [their child's] school experience, from her academic achievement, to her friendships and safety among her peers, [to] her ability to use the appropriate bathroom when she needs to[.]"

*Amici* families also expressed deep concern that rescinding these policies would lead to an increase in bullying. Several students have already suffered severe bullying, and based on those experiences, these families understandably anticipate that the federal government's directive would recreate those harmful conditions in the Districts. As one parent explained, when schools adopt policies that "erase [transgender students'] dignity," it "enables students to do the same." *Amici* parents who do not have transgender or nonbinary children have conveyed parallel concerns for their children's classmates and the overall school climate, emphasizing that

"[r]escinding a policy that aims to foster inclusivity reinforces a paradigm in which bullying is allowed to thrive."

Other parents expressed concerns that their children will be involuntarily outed if the policies are withdrawn. One parent, whose daughter "has only ever been seen as a girl" in her school district, explained that a change in the policy would be traumatic for her daughter because "[i]t is important for her social and emotional health not to be excluded from the girls restroom and not to have to explain to her friends why she might be treated differently. . . . [she] would be afraid to talk to her friends if they found out she was trans. . . . she would be absolutely isolated."

The risk of privacy violations compounds these harms. Without inclusive policies, enforcing restroom use based on birth sex could invite invasive practices. Families ask, with urgency, how schools are to determine "birth sex"? Paperwork checks that out students to peers? Invasive physical examinations? The prospect alone chills participation and undermines trust in the school environment, especially as these practices would necessarily apply to all students—not just to transgender and nonbinary students. One parent expressed "worry that teachers and administrators could or would police [my daughter's] gender in order to determine the appropriate rest room." They added, "I cannot imagine a way to do this that would leave her safety and dignity intact."

These severity of the harms from the federal government's coercion is such that they are already having a tangible impact on *amici* families. Some families have already begun to contemplate withdrawing their children from public school, pursuing homebound instruction, enrolling in private school, or relocating—all of which would impose significant additional hardships on their entire families. One parent described the uncertainty created by the federal government's threats as causing ongoing stress for transgender and nonbinary students and their families, who now live with the constant worry of what the future may hold. Another parent emphasized that their child "needs to focus on her academics, not whether or not her rights are going to be taken away."

These harms—the loss of access to appropriate facilities, forced outing, privacy violations, health risks from dehydration, increased absenteeism, loss of academic focus, and chilled participation in extracurriculars—are ones that money cannot fix. One parent summed up the effect of the government's action with painful clarity: "Eliminating these policies is only practical if you intend to eliminate the young people themselves. That's what is so heartbreaking about this entire debate: It seems to seek to erase our kids entirely." These are the harms that are at stake in this lawsuit: harms that the Court of Federal Claims has no jurisdiction to consider.

17

## CONCLUSION

The Districts' requested remedy—an order setting aside or enjoining the federal government's coercive and unlawful directive that the Districts violate transgender students' civil rights or lose federal funding—is relief that the Court of Federal Claims cannot provide under the Tucker Act. Therefore, *amici* urge this Court to reverse and remand to the District Court for adjudication on the merits, ensuring that the substantive issues at the heart of this case—issues with immediate consequences for students' health, safety, dignity, and learning—receive the thorough judicial consideration they warrant.

Dated: October 27, 2025

/s/ Joseph J. Wardenski
Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
joe@wardenskilaw.com

*Counsel for Amici Curiae*

18

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits in Fed. R. App. P. 29(a)(5) because it contains 4,042 words, calculated using the word count function of Microsoft Word for Mac, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared using Times New Roman, a serif, proportionally spaced typeface, in 14-point type-size.

/s/ Joseph J. Wardenski
Joseph J. Wardenski

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joseph J. Wardenski
Joseph J. Wardenski