No. 25-2087 (L)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FAIRFAX COUNTY SCHOOL BOARD AND ARLINGTON
SCHOOL BOARD,

*Plaintiffs–Appellants*,

v.

LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS
SECRETARY OF EDUCATION OF THE UNITED STATES,
AND THE UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia,
Nos. 1:25-cv-01432-RDA-LRV & 1:25-cv-01434-RDA-LRV

## BRIEF OF *AMICI CURIAE* NAACP LEGAL DEFENSE AND
## EDUCATIONAL FUND, INC. AND NAACP IN SUPPORT
## OF PLAINTIFFS-APPELLANTS AND REVERSAL

Katrina Feldkamp
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14 Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Kelly Gardner
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW, Suite 2300
Atlanta, GA 30303
(332) 282-6613

*Counsel for Amici Curiae*
*NAACP Legal Defense &*
*Educational Fund and NAACP*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1(b), the undersigned counsel for *amici curiae* the NAACP Legal Defense and Educational Fund, Inc. (LDF) and the National Association for the Advancement of Colored People (NAACP) submit the following disclosures:

LDF is a nonprofit 501(c)(3) corporation. It is not a publicly held corporation that issues stock, nor does it have any parent companies, subsidiaries or affiliates that have issued shares to the public.

NAACP is a nonprofit 501(c)(3) corporation. It is not a publicly held corporation that issues stock, nor does it have any parent companies, subsidiaries or affiliates that have issued shares to the public.

/s/ *Deuel Ross*
Deuel Ross
   *Counsel of Record*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.

*Attorney for Amici Curiae*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* ................................................. 1

INTRODUCTION ............................................................................ 5

ARGUMENT ................................................................................... 8

I.    Plaintiffs' Challenges to Defendants' Unlawful Agency Action Are Reviewable Under the APA. ........................................... 11

II.    The Tucker Act Does Not Apply to Requests for Equitable and Declaratory Relief in Challenges to Agency Actions. ........... 12

    A.    Plaintiffs' Claims Are Not at their Essence Contract Claims. .................................................................... 14

    B.    The Supreme Court's Recent Decision in *NIH* Confirms the District Court Erred in Declining Jurisdiction. .... 26

CONCLUSION ............................................................................... 34

CERTIFICATE OF COMPLIANCE ......................................... 36

CERTIFICATE OF SERVICE .................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
　57 F.4th 791 (11th Cir. 2022) (en banc) .................................................. 9

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
　No. 25-cv-1923 (JMC), 2025 WL 2615054 (D.D.C. Sept. 10, 2025) ..... 31

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
　479 F. Supp. 3d 511 (S.D. Tex. 2020) .................................................... 1

*Block v. Cmty. Nutrition Inst.*,
　467 U.S. 340 (1984) ............................................................................. 11

*Borel v. Sch. Bd. St. Martin Par.*,
　44 F.4th 307 (5th Cir. 2022) .................................................................. 1

*Bostock v. Clayton Cnty.*,
　590 U.S. 644 (2020) ............................................................................... 4

*Bowen v. Massachusetts*,
　487 U.S. 879 (1988) ............................................ 5, 18, 19, 20, 21, 22, 23

*Brown v. Board of Education*,
　347 U.S. 483 (1954) ............................................................................... 1

*City of Fresno v. Turner*,
　No. 25-cv-07070, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) .......... 31

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
　38 F.4th 1099 (D.C. Cir. 2022) ......................................... 11, 12, 14, 17

*Dep't of Educ. v. California*,
　604 U.S. 650 (2025) ....................................................................... 11, 21

*Doe v. South Carolina*,
   No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) .................... 14

*Fisher v. Univ. of Tex. at Austin*,
   570 U.S. 297 (2013) ................................................................. 3

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................ 11

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ................................................................ 19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) .................................... 2, 8, 14, 23

*Marks v. United States*,
   430 U.S. 188 (1977) ................................................................ 28

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   584 U.S. 617(2018) ................................................................. 2

*Me. Cmty. Health Options v. United States*,
   590 U.S. 296 (2020) ................................................... 17, 21, 22

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982)................................................. 12

*Mid-Atlantic Equity Consortium v. U.S. Dep't of Ed.*,
   No. 25-1407 (PLF), 2025 WL 2158340 (D.D.C. July 30, 2025) ............. 2

*NAACP v. U.S. Dep't of Educ.*,
   779 F. Supp. 3d 53 (D.D.C. 2025) ......................................... 2

*Nat'l Ctr. for Mfg. Scis. v. United States*,
   114 F.3d 196 (Fed. Cir. 1997)................................... 18, 22, 33

*National Institutes of Health v. American Public Health Association*,
  145 S. Ct. 2658 (2025 ................................... 11, 26, 27, 28, 29, 30, 32, 33

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ................................................................. 2

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................... 1

*Planned Parenthood of Greater N.Y. v. HHS*,
  *No.* 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ........................ 31

*Roe v. Critchfield*,
  137 F.4th 912 (9th Cir. 2025) ................................................ 9

*Roetenberg v. Sec'y of Air Force*,
  73 F. Supp. 2d 631 (E.D. Va. 1999) ........................................ 20

*Stout v. Jefferson Bd. of Educ.*,
  882 F.3d 988 (11th Cir. 2018) ............................................. 1

*Sustainability Institute v. Trump*,
  784 F. Supp. 3d 861, *appeal pending*, No. 25-1575 (4th Cir. May 22,
  2025) ............................................................................ 32

*Swanson v. Rector & Visitors of Univ. of Va.*,
  No. 30 (W.D. Va. Sept. 5, 1950) ............................................ 3

*United States v. J & E Salvage Co.*,
  55 F.3d 985 (4th Cir. 1995) ................................................ 12

*United States v. Windsor*,
  570 U.S. 744 (2013) ......................................................... 2

**Statutes**

28 U.S.C. § 1491(a)(1) ........................................................... 12

5 U.S.C. § 702 ...................................................................................11

5 U.S.C. §§ 703, 704, 706...................................................................5

**Other Authorities**

Arlington Pub. Schs., *About Title I*, https://www.apsva.us/titlei/about-title-i/ (last visited Oct. 27, 2025) ........................................................25

Arlington Pub. Schs., *Student Demographics*, https://analytics.apsva.us/public/equity/aps_membership.html (last visited Oct. 27, 2025)........................................................................25

Arthur Morse, *When Negroes Entered a Texas School*, Harper's (Sept. 1, 1954), http://web.archive.org/web/20150406160442/ <https://southtexasrabblerousers.files.wordpress.com/2 014/04/dmc-harpers-1.pd.............................................................................................3

Fairfax Cnty. Pub. Schs., *Title I Program*, Fairfax Cnty. Sch. Bd., https://www.fcps.edu/about-fcps/leadership/district-performance-transparency/title-i-program (last visited Oct. 27, 202 ......................25

Nathaniel Frank et al., What We Know Project, *Research Brief Documents the Shockingly Disproportionate Harms Discrimination Inflicts on LGBTQ People of Color* 2, Ctr. for Study of Inequality at Cornell Univ. (June 16, 2021), https://www.nclrights.org/wp-content/uploads/2021/06/LGBTQ_Discrimination_PR.p ....................24

R. Nath et al., *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People* 16, Trevor Project (2024), https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.p................................25

U.S. Dep't of Educ., *Formula Grants*, https://www.ed.gov/grants-and-programs/formula-grants (last visited Oct. 25, 2025)..........................16

Va. Dep't of Educ., *Fall Membership*,
  https://p1pe.doe.virginia.gov/apex_captcha/home.do?apexTypeId=304
  (last visited Oct. 27, 2025)......................................................................25

## INTEREST OF *AMICI CURIAE*

The NAACP Legal Defense and Educational Fund, Inc.[1] ("LDF") is the nation's first civil rights legal organization. Founded in 1940 under the leadership of Justice Thurgood Marshall, LDF's mission is to achieve racial justice and ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. LDF won the landmark school desegregation case *Brown v. Board of Education*, 347 U.S. 483 (1954), and has litigated numerous other educational equity cases since. *See, e.g., Borel v. Sch. Bd. St. Martin Par.*, 44 F.4th 307 (5th Cir. 2022); *Stout v. Jefferson Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018); *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022); *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511 (S.D. Tex. 2020).

LDF has also participated as *amicus curiae* in several cases addressing the rights of lesbian, gay, bisexual, transgender, and queer

---

[1] LDF and NAACP ("Amici") submit this brief with the consent of all Parties pursuant to Fed. R. App. Proc. 29(a)(2). Amici affirm that no party or counsel for any party authored this brief in whole or in part and that no one other than Amici or their counsel contributed any money that was intended to fund the preparation or submission of this brief.

individuals in and outside of the education context, including in the case that governs the Title IX issue central to this litigation. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); *see also, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617(2018); *Obergefell v. Hodges*, 576 U.S. 644 (2015); *United States v. Windsor*, 570 U.S. 744 (2013).

Moreover, LDF has successfully challenged the federal government's imposition of unlawful restrictions on school districts and other regulated entities that receive funds to advance educational equity. *See, e.g., NAACP v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025); *Mid-Atlantic Equity Consortium v. U.S. Dep't of Ed.*, No. 25-1407 (PLF), 2025 WL 2158340 (D.D.C. July 30, 2025). The correct application of the law, including Title IX and the Tucker Act, is of paramount significance to LDF's educational equity work and the Black students, families, and educators that LDF serves.

The National Association for the Advancement of Colored People ("NAACP") was founded in 1909 and has more than 2,200 local units across the country, including in Fairfax and Arlington counties. Its principal objectives are to ensure the political, educational, social, and

economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued adverse effects of racial discrimination while working toward its elimination.

The NAACP has worked for over a century to address issues of racial discrimination and inequality in public education and has been at the forefront of every major advancement in ensuring equal educational opportunities at all levels of the nation's public schools. *See, e.g.*, Br. of Resp't as Amicus Curiae, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013); Arthur Morse, *When Negroes Entered a Texas School*, Harper's (Sept. 1, 1954), http://web.archive.org/web/20150406160442/ https://southtexasrabblerousers.files.wordpress.com/2      014/04/dmc-harpers-1.pdf; *Swanson v. Rector & Visitors of Univ. of Va.*, No. 30 (W.D. Va. Sept. 5, 1950). Throughout its history, the NAACP has used the legal process to champion equality and justice for all persons, including

lesbian, gay, bisexual, transgender, and queer individuals. *See, e.g.*, Br. for Pet'r as Amicus Curiae, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

## INTRODUCTION

Congress enacted the Administrative Procedure Act ("APA") to allow those parties adversely affected by Government decisions to seek judicial review in federal district courts and, where appropriate, for those courts to employ the power of equity. *See* 5 U.S.C. §§ 703, 704, 706. The APA's specific purpose is "to remove obstacles to judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988) (citation omitted). Unfortunately, in wrongly and prematurely dismissing Plaintiffs Fairfax County and Arlington Public Schools' challenges to the unlawful actions of the U.S. Department of Education, the court below failed to acknowledge the separate purposes of the APA and the Tucker Act.

This case arises out of the unlawful August 2025 decision of Defendants U.S. Department of Education and its Secretary Linda McMahon to designate Fairfax County Public Schools and Arlington Public Schools (together, the "Districts" or "Plaintiffs") as "high-risk." JA012-013 ¶¶ 1–2; JA230-231 ¶¶ 1–2. According to Defendants, the "high-risk" designation signifies that the Districts have "failed to uphold the conditions of their federal grant agreements by violating federal law"

5

and "choosing to abide by woke gender ideology." JA044-045. Defendants'
internal agency determination rests on a policy that fundamentally
misinterprets Title IX of the Education Amendments of 1972 ("Title IX").
This legally unsound policy determination has punitive, forward-looking
implications for Defendants' ongoing relationships with Plaintiffs.
Defendants seek to dictate certain of the Districts' policies and
procedures; modify the method for disbursing the Districts' formula
funding, discretionary grants, and impact aid grants; and direct changes
to the Virginia Department of Education's process for providing the
Districts with federal pass-through funding. JA012-013; JA230-231.

Presented with Plaintiffs' challenges to Defendants' administrative
decision to wrongly label the Districts "high-risk," the district court
concluded that it lacks jurisdiction to reach the merits of the case. But
the district court misapprehended Plaintiffs' claims and misconstrued
the scope of the Tucker Act. Plaintiffs' claims, which challenge the legal
basis for Defendants' newly applied "high-risk" designation, are not
contract claims and, thus, are not redressable in the Court of Federal
Claims. Rather than contract law, Plaintiffs' claims turn on the proper
interpretation of Title IX, and Plaintiffs seek prospective injunctive

relief, not money damages. For these reasons, the Tucker Act does not apply.

Left undisturbed, the district court's decision threatens to broaden the Tucker Act's reach in contravention of the APA's clear purpose and controlling precedent, leaving the Districts without any forum for relief. The decision would also leave unchecked the government's decision to put local education agencies in the impossible position that the Districts now find themselves: discriminate against students by acceding to Defendants' incorrect interpretations of civil rights laws or follow binding law and suffer illegal government retribution obstructing the implementation of educational programs designed to serve vulnerable students.

For the Districts, the absence of an adequate forum for relief portends devastating consequences. By designating Plaintiffs as "high-risk," Defendants now seek to subject Plaintiffs to onerous new burdens based solely on Defendants' unlawful misinterpretation of Title IX. JA025-027 ¶¶ 49, 51–53; JA242-244 ¶¶ 49, 51–53. Hanging in the balance are the educational opportunities and outcomes of the more than 200,000 students in the Districts. The burdens Defendants are prepared

to impose on Plaintiffs as a result of their "high-risk" designation will impede the Districts' efficient and effective implementation of educational programs that are especially critical for students of color. Further, if Defendants are successful in forcing the Districts to remove vital anti-discrimination protections, many of the Districts' most vulnerable students—particularly Black students who identify as Lesbian, Gay, Bisexual, Transgender, or Queer ("LGBTQ")—will suffer.

To ensure a proper reading of the APA, preserve the Districts' rights to challenge arbitrary or unlawful administrative actions not founded upon contract, and protect vulnerable students who will otherwise be adversely affected, this Court should reverse.

## ARGUMENT

In *Grimm v. Gloucester County School Board*, this Court held that a public school board's policy requiring transgender students to use restrooms that match their assigned sex at birth violates Title IX and the Equal Protection Clause. 972 F.3d 586, 593–94 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). Yet, despite this Court's controlling interpretation of federal law, Defendants have lodged a pressure campaign to compel the Districts to prohibit transgender students from

using school facilities consistent with their gender identity. According to Defendants, Title IX *requires* schools to limit students' access to sex-segregated facilities to those that correspond with the students' assigned sex at birth. But no court has adopted this interpretation,[2] which directly contravenes *Grimm* and puts Plaintiffs in an untenable bind: either they comply with this Circuit's interpretation of federal civil rights protections for transgender students and lose essential federal programs and funding or they violate federal law and the rights of transgender students to avoid such losses. To resolve this conflict, Plaintiffs brought an APA challenge seeking judicial review of Defendants' incorrect interpretation of Title IX and subsequent decision to designate them as "high-risk."

Although the district court rightfully "recognize[d] that *Grimm* remains the law of this Circuit" and thus binds parties within the Circuit,

---

[2] Some courts have concluded that Title IX does not require school districts to allow students to use facilities consistent with their gender identity. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc); *see also Roe v. Critchfield*, 137 F.4th 912, 926–28 (9th Cir. 2025) (declining to reach the question whether Title IX permits districts to limit students' access to sex-separated facilities on the basis of their assigned sex at birth, but concluding that because "Title IX does not 'so clearly' prohibit" such limitations, the district court did not abuse its discretion in denying plaintiff's request to preliminarily enjoin a policy adopting those limitations (citation omitted)). None, however, have held that Title IX *prevents* districts from permitting students to do so.

JA216 (cleaned up), it erred in concluding that it lacks jurisdiction to review Plaintiffs' claims. Those claims assert an APA challenge to Defendants' erroneous interpretation of Title IX and subsequent reliance on that interpretation to alter various aspects of the complex and ongoing relationship that Plaintiffs—like all local educational agencies—share with Defendants. JA025 ¶ 49; JA027 ¶ 53; JA029 ¶ 66; JA030 ¶¶ 69–70; JA230-234 ¶¶ 1–2, 5, 13, 18–25; JA242-244 ¶¶ 49, 51, 53. The contours of Plaintiffs' claims demonstrate that they fall comfortably within the scope and purpose of the APA, which facilitates judicial review of administrative decisions, including those establishing criteria that the government relies upon in making and executing funding determinations. Plaintiffs' claims are, by contrast, ill-suited to resolution under the Tucker Act, which directs claims against the government sounding in contract to a specialized court authorized only to award money damages.

Here, Plaintiffs do not challenge the termination of particular grants or seek damages for past contractual harm. Nor do Plaintiffs ask the court to interpret the terms of particular grants or any other contractual obligations. Their claims are thus neither founded upon

10

contract nor barred by the Tucker Act. Contrary to the district court's conclusion, *National Institutes of Health v. American Public Health Association ("NIH")* does not provide otherwise. 145 S. Ct. 2658 (2025). Rather, *NIH* affirmed district court jurisdiction over internal guidance with forward-looking implications for grant-related policies. *See id.* at 2551 (Barrett, J., concurring). For these reasons, this Court should reverse and remand for Plaintiffs' claims to proceed on the merits.

## I.   Plaintiffs' Challenges to Defendants' Unlawful Agency Action Are Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Section 702 of the APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702); *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley")*, 38 F.4th 1099, 1105–06 (D.C. Cir. 2022). Claimants "seeking relief other than money damages," 5 U.S.C. § 702, may pursue this cause of action so long as no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Dep't of Educ. v.*

11

*California*, 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702). Despite the district court's decision to the contrary, nothing in the Tucker Act forbids relief where—as here—Plaintiffs challenge unlawful agency action and seek only declaratory and injunctive relief.

## II. The Tucker Act Does Not Apply to Requests for Equitable and Declaratory Relief in Challenges to Agency Actions.

The district court concluded that the Tucker Act deprives it of subject matter jurisdiction over Plaintiffs' claims "[b]ecause the relief that Plaintiffs seek ultimately requires this Court 'to order the payment of money.'" JA219 (citation omitted). This conclusion—which misunderstands Plaintiff's core legal challenge—is reversible error.

The Tucker Act waives the government's sovereign immunity from actions "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). It grants the Court of Federal Claims exclusive jurisdiction over contract actions seeking more than $10,000 in damages. *See Crowley*, 38 F.4th at 1106; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). But the Tucker Act should not be construed "so broad[ly] as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968; *see also United States*

12

*v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) (citing *Megapulse* approvingly for the proposition that "courts should attempt 'to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds'") (quoting *Megapulse*, 672 F.2d at 969–70). Plaintiffs here present such a claim.

Properly understood, Plaintiffs' chief complaint is not that Defendants have failed to pay sums owed under previously-awarded grants. It is instead that Defendants' decision to designate Plaintiffs "high-risk" and the related decision to place them on reimbursement status rests on a faulty interpretation of Title IX and is thus contrary to law. JA025 ¶ 49; JA026 ¶ 51; JA027 ¶ 53; JA029 ¶ 66; JA030 ¶¶ 69–70; JA230-234 ¶¶ 1–2, 13–25; JA242-244 ¶¶ 49, 51, 53. Put differently, Plaintiffs do not challenge *whether* Defendants have properly paid sums owed but rather Defendants' decisions about *how* funds will be administered and disbursed moving forward. Controlling precedent establishes that jurisdiction over such a claim—which neither sounds in contract nor seeks money damages—properly lies with the district court.

13

### A. Plaintiffs' Claims Are Not at Their Essence Contract Claims.

To determine whether the Tucker Act deprives it of jurisdiction, a court must assess whether the plaintiff's claims are "at [their] essence" contract claims. *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967–68) (internal quotation marks omitted). Courts conduct this assessment using a two-pronged inquiry that considers (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968) (internal quotation marks omitted). Neither of these prongs supports the conclusion that Plaintiffs' claims are at their essence contract claims.

### 1. Plaintiffs' Rights Arise from Statute, Not Contract.

Here, the source of Plaintiffs' rights is statutory, not contractual. Plaintiffs seek to clarify their rights and obligations—and, by extension, the scope of Defendants' enforcement authority—under Title IX, its implementing regulations, and this Court's decisions in *Grimm* and *Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025). JA014-015 ¶¶ 13–14; JA018-019 ¶¶ 29–30; JA025 ¶ 49; JA026 ¶ 51; JA027 ¶ 53; JA030 ¶¶ 69–70; JA038 ¶¶ (a)–(c), (e)–(f), (h); JA231-233

14

¶¶ 6, 13–14; JA236-237 ¶ 29–30; JA242-244 ¶¶ 49, 51, 53; JA247 ¶¶ 69–70; JA254-255 ¶¶ 111–113; JA255-256 ¶ (a)–(c), (e)–(f), (h).

Nowhere do Plaintiffs challenge Defendants' actions on the basis of particular grant terms. Nor could they. The various federal funds collaterally affected by Defendants' interpretation of Title IX and the related decision to place Plaintiffs on "high-risk" and reimbursement status range in amount, type, and authorizing source. JA028 ¶¶ 57–58; JA245 ¶¶ 57–58. Included among them are hundreds of millions of dollars in federal formula funds, which "provide low-income students with free and reduced price meals," support Plaintiffs' provision of services to students with disabilities, and help Plaintiffs meet the academic needs of low-income students and English learners, among other things. JA028 ¶¶ 57–58; *see also* JA245 ¶¶ 57–58. In their August 2025 press release announcing the change in Plaintiffs' status, Defendants emphasized that the change to reimbursement status would apply to "all Department funds including formula funding, discretionary grants, and impact aid grants" provided to Plaintiffs for education programs. JA044. Unlike discretionary grants, however, "[f]ormula grant programs are noncompetitive awards based on a predetermined formula

15

determined by Congress."[3] Claims related to Plaintiffs' formula funds can hardly be said to arise from contract, as it is Congress—not the terms of any particular agreement—that establishes the parameters for such funds. In any event, regardless of funding type, the implications of Plaintiffs' "high-risk" designation for their receipt of federal funding are collateral to Plaintiffs' primary challenge—the validity of Defendants' Title IX interpretation that prompted the designation in the first place. Under these circumstances, Plaintiffs' rights arise from statute, and the Tucker Act does not apply.

> 2.    <u>Plaintiffs Do Not Seek Money Damages—the Only Type of Relief Available in the Court of Federal Claims.</u>

The type of relief Plaintiffs seek reinforces the Tucker Act's inapplicability. Plaintiffs do not claim money damages—the "specific sums already calculated, past due, and designed to compensate for completed labors" that are appropriate for resolution under the Tucker

---

[3] U.S. Dep't of Educ., *Formula Grants*, https://www.ed.gov/grants-and-programs/formula-grants (last visited Oct. 25, 2025). These formula grants, which the U.S. Department of Education administers, include a range of school improvement grants, grants for special populations (e.g., Title I grants, Title III English Language Acquisition grants, IDEA Part B grants, and grants for students experiencing homelessness), and impact aid grants. *See id.*

16

Act. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020); *see also Crowley*, 38 F.4th at 1107 (observing that the crux of the inquiry into the type of relief sought "boils down to whether the plaintiff effectively seeks to attain monetary damages"). Instead, they seek "prospective, nonmonetary relief to clarify future obligations"[4]—namely whether Defendants may assign "high-risk" status when the decision to do so depends upon an incorrect interpretation of law. Plaintiffs' complaint specifically requests that the court issue judicial declarations that "the legal principles and holdings announced in *Grimm* . . . remain valid and binding legal precedent" and that their existing policies permitting students to access school facilities in accordance with their gender identity "do[] not violate Title IX." JA038 ¶¶ (e)–(f); JA255-256 ¶¶ (e)–(f). Plaintiffs further request that the court "vacate and set aside Defendants' decision to designate [them] as 'high-risk'" and "[p]reliminarily and permanently enjoin Defendants . . . from taking enforcement action on the ground that [Plaintiffs' facility access policies] violate[] Title IX." JA038-039 ¶¶ (a), (h); JA255-256 ¶¶ (a), (h); *see also* JA221 (quoting Plaintiffs' proposed order accompanying their motion for

---

[4] *Me. Cmty. Health Options*, 590 U.S. at 327.

17

preliminary injunction as "enjoin[ing] Defendants 'from designating [Plaintiffs] as 'high-risk' and requiring that [Plaintiffs] receive federal funds by reimbursement'"). In short, the true focus of Plaintiffs' requests for declaratory and injunctive relief is Defendants' interpretation of Title IX and subsequent reliance on that interpretation to designate Plaintiffs "high-risk" and place them on reimbursement status. *See Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997) ("[W]e . . . look to the true nature of the action in determining the existence or not of jurisdiction.") (cleaned up).

Courts have upheld district courts' jurisdiction to review this type of prospective claim under the APA, even where the challenged method affects the amount of future payments by the government. *See, e.g.*, *Bowen*, 487 U.S. at 879. In *National Center for Manufacturing Sciences*, the Federal Circuit concluded that an action was improperly transferred from the district court to the Court of Federal Claims where the parties had an ongoing relationship and plaintiff's complaint "anticipate[d] the need for injunctive relief" related to the future "disposition of appropriated funds." 114 F.3d at 201–02. In *Katz v. Cisneros*, the Federal Circuit affirmed a district court's jurisdiction to review an agency's

18

"interpretation of law which controls payment to [an aggrieved party]" where the party "unmistakably asks for prospective relief" and "[a]n adjudication of the lawfulness of [the agency's] regulatory interpretation will have future impact on the ongoing relationship between the parties." 16 F.3d 1204, 1208–09 (Fed. Cir. 1994).

*Bowen v. Massachusetts* is particularly instructive. There, the Supreme Court held that although the APA bars a district court from reviewing actions seeking money damages, that prohibition does not prevent a state from seeking to enjoin an agency that refuses to reimburse it for certain expenditures under the Medicaid Act. *See Bowen*, 487 U.S. at 893, 900, 910. The Supreme Court explained that "[t]he State's suit . . . is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900. It later characterized *Bowen* as a suit "not merely for past due sums, but for an injunction to correct the *method* of calculating payments going forward." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (emphasis added).

19

The same is true of this suit. Plaintiffs seek prospective relief to correct the *method* Defendants use to administer and execute federal educational programs, including those that provide Plaintiffs with federal funds awarded on the basis of a statutory formula. Although a court's conclusion that Defendants misinterpreted Title IX and unlawfully placed Plaintiffs on "high-risk" and reimbursement status may lead Defendants to administer these programs and disburse Plaintiffs' federal funding using an alternative method, that result would not—as the district court described—be an order for the payment of money. It would be "a mere by-product of th[e] court's primary function of reviewing the Secretary's interpretation of federal law." *Bowen*, 487 U.S. at 910; *see also Roetenberg v. Sec'y of Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999) ("It is settled that where, as here, the essence of a claim is the equitable relief sought, and any financial ramifications of a favorable decision are subordinate to the equitable relief, the Court of Federal Claims does *not* have exclusive jurisdiction over that claim"). The Supreme Court has recently reaffirmed *Bowen* and made clear that jurisdiction under the APA is proper where, as here, a plaintiff challenges an administrative action that is distinct from, albeit related to, a

20

disbursement outcome. *See California*, 604 U.S. 650, 145 S. Ct. 966, 968 (2025) (recognizing that, under *Bowen*, "a district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds") (cleaned up).

3.   The District Court's Decision Deprives Plaintiffs of an Adequate Forum and Impedes Their Ability to Serve Vulnerable Students Who Depend on Federal Funds.

Because the Court of Federal Claims does not have authority to order equitable relief, accepting the district court's conclusion that it lacks jurisdiction would deprive Plaintiffs of an adequate forum. The consequences of such an outcome are significant. Left untouched, Plaintiffs' "high-risk" designation threatens serious repercussions for the hundreds of thousands of students they serve, particularly the vulnerable students whose educational experiences and outcomes depend heavily on federal programs burdened as a result of Defendants' demand for compliance with an unlawful interpretation of Title IX. Nothing in the law requires this result.

Like the parties in *Bowen*, Plaintiffs and Defendants have a "complex ongoing relationship, which ma[kes] it important that a district court adjudicate future disputes." *Me. Cmty. Health Options*, 590 U.S. at

21

327 (cleaned up). This complex ongoing relationship includes, among other things, Defendants' enforcement of civil rights statutes and other federal laws that bind the Districts and Defendants' annual administration of a wide range of congressionally authorized federal funding. The APA is more appropriately "tailored" to "managing . . . relationship[s] between States and the Federal Government that occur over time and that involve constantly shifting balance sheets." *Id.* at 327.[5] Moreover, Plaintiffs cannot obtain the relief they request in the Court of Federal Claims. *See Nat'l Ctr. for Mfg. Scis.*, 114 F.3d at 201–02 (observing that plaintiff could not obtain prospective injunctive relief related to the future "disposition of appropriated funds" in the Court of Federal Claims).

As the Supreme Court noted in *Bowen*, "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief" and courts should not "assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of [a] rather

---

[5] By contrast, "the Tucker Act is suited to remedying particular categories of past injuries or labors for which various federal statutes provide compensation." *Me. Cmty. Health Options*, 590 U.S. at 327 (cleaned up).

22

complex ongoing relationship between the parties." 487 U.S. at 905.
Accordingly, although the district court "recognize[d] that *Grimm*
remains the law of this Circuit" and thus binds parties within the Circuit,
JA216 at 4 (citation omitted), the Court of Federal Claims has no power
to grant the equitable relief required to ensure that the parties' ongoing
relationship aligns with this Circuit's interpretation of Title IX. *See Katz*,
16 F.3d at 1209 ("[N]o relief is available in the Court of Federal Claims
here because the case challenges the interpretation of law which controls
payment to [the aggrieved party].").

Even if Plaintiffs could seek *some* relief in the Court of Federal
Claims, they may do so only after Defendants disallow reimbursement
under the procedures that apply on account of Plaintiff's "high-risk"
designation. This jurisdictional limitation, which does not bind the
district court, undermines the important interests that Plaintiffs—like
all public school systems—have in planning future programs for the
hundreds of thousands of students they serve, especially the vulnerable
students whom federal programs are intended to support. *See Bowen*, 487
U.S. at 905–06 (explaining that unlike the district court, "the jurisdiction
of the Claims Court to entertain the action . . . would be at least doubtful"

under some circumstances, effectively undermining the state's "interest in planning future programs for groups [served by the Medicaid program]").

Without an appropriate forum in which to obtain a clear understanding and declaration of their rights regarding the methods Defendants may use to administer federal programs and disburse related funds, the Districts must make an impossible choice: violate the law of this Circuit to secure critical funding, including to support Title I schools and vulnerable students, or protect LGBTQ students from harmful discrimination and harassment, as required by Title IX. LGBTQ students, particularly Black LGBTQ students, already experience high rates of discrimination, victimization, and related depression and anxiety.[6] If the Districts are unable to enforce policies that shield

---

[6] LGBTQ students experience a high risk of depression and anxiety, suicide, and suicide attempts. Nathaniel Frank et al., What We Know Project, *Research Brief Documents the Shockingly Disproportionate Harms Discrimination Inflicts on LGBTQ People of Color* 2, Ctr. for Study of Inequality at Cornell Univ. (June 16, 2021), https://www.nclrights.org/wp-content/uploads/2021/06/LGBTQ_Discrimination_PR.pdf. Black LGBTQ youth in particular experience higher levels of victimization. *Id.* at 1. For example, 46% of Black LGBTQ youth report experiencing discrimination because of their gender identity. R. Nath et al., *2024 U.S. National*

students from discrimination on the basis of sex—policies that are consistent with the law of this Circuit—those harms will proliferate.

The lack of a forum for clarifying the rights at issue will also make it difficult for the Districts to plan the educational programs and policies that serve the students for whom federal education support is intended. Plaintiffs operate 58 Title I schools, the vast majority of which have student populations that are majority-minority.[7] Uncertainty surrounding the continuation of federal education programs and support designed to "provide low-income students with free and reduced price meals" and "boost the academic performance of low-income students and English learners," JA028 ¶ 57–58; *see also* JA245 ¶¶ 57–58, undoubtedly

---

*Survey on the Mental Health of LGBTQ+ Young People* 16, Trevor Project (2024), https://www.thetrevorproject.org/survey-2024/assets/static/TTP_2024_National_Survey.pdf.

[7] Together, these schools serve nearly 40,000 students. *See* Fairfax Cnty. Pub. Schs., *Title I Program*, Fairfax Cnty. Sch. Bd., https://www.fcps.edu/about-fcps/leadership/district-performance-transparency/title-i-program (last visited Oct. 27, 2025); Arlington Pub. Schs., *Student Demographics*, https://analytics.apsva.us/public/equity/aps_membership.html (last visited Oct. 27, 2025); Arlington Pub. Schs., *About Title I*, https://www.apsva.us/titlei/about-title-i/ (last visited Oct. 27, 2025); Va. Dep't of Educ., *Fall Membership*, https://p1pe.doe.virginia.gov/apex_captcha/home.do?apexTypeId=304 (last visited Oct. 27, 2025).

presents particular planning difficulties for these schools. The Districts likewise face difficulties in planning educational programs and policies for students with disabilities also supported by federal education programs.

Given the important role that judicial review will play in the parties' ongoing relationship and the Court of Federal Claims' inability to provide Plaintiffs with adequate relief, jurisdiction in the district court is proper.

**B.      The Supreme Court's Recent Decision in *NIH* Confirms the District Court Erred in Declining Jurisdiction.**

The Supreme Court's recent decision in *NIH* supports the propriety of the district court's jurisdiction over claims challenging Defendants' "high-risk" designation. The district court's contrary conclusion relies on an overly broad reading of the Tucker Act that was rejected by the majority in *NIH*. 145 S. Ct. at 2661. (Barrett, J., concurring) (holding that the lower court "was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the [agency] guidance").

1.  <u>The Supreme Court Held that Agency Action Not
    Grounded in Contract, Including Internal Guidance, Is
    Subject to Judicial Review in District Courts.</u>

The Court's decision in *NIH* confirms longstanding precedent that
"the District Court is the right forum [to] challenge [internal] guidance,"
including "agency guidance discuss[ing] internal policies related to
grants." 145 S. Ct. at 2660–61 (Barrett, J., concurring in the partial grant
of the application for stay) (collecting examples of plaintiffs seeking
vacatur under the APA of internal agency guidance as arbitrary and
capricious). In her concurrence, Justice Barrett declined to stay the lower
court's order to the extent it vacated the guidance at issue. *Id.* She
concluded that a challenge to internal agency guidance defining what
research the agency will and will not fund does not constitute "a claim
'founded . . . upon' contract" simply because that guidance "discusses
internal policies related to grants." 145 S. Ct. at 2661 (citation omitted).
Her opinion also rejected the idea that a challenge to internal guidance
is inseparable from a challenge to the grant terminations that may result

from that guidance. *Id.* (concluding that the two "claims are legally distinct").

The Chief Justice, Justice Sotomayor, Justice Kagan, and Justice Jackson similarly declined to stay the lower court's order to vacate the guidance but would also have denied the stay as to the grant terminations. 145 S. Ct. at 2658. When, as here, the majority does not endorse a single rationale for its decision, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (cleaned up). Because Justice Barrett provides the narrowest opinion denying the stay as to the internal guidance, her opinion controls.

> 2. Defendants' Designation of the Districts as "High-Risk" Is, like the Guidance in *NIH*, an Internal Agency Determination Not Founded upon Contract.

The Districts seek to "vacate and set aside Defendants' decision to designate [them] as 'high-risk.'" JA038 ¶ (a); JA255 ¶ (a). Like the internal agency guidance at issue in *NIH*, Defendants' designation of the Districts as "high-risk" is not an action founded upon contract, 145 S. Ct.

28

at 2661, but instead an upstream, statutory[8] agency determination with forward-looking implications for the method by which state and local educational agencies disburse and receive funding. *NIH* therefore compels a reversal of the lower court's decision that it lacks jurisdiction to vacate the "high-risk" designation.

In concluding that the guidance at issue in *NIH* was not founded upon contract and that the district court was the right forum to challenge that guidance, Justice Barrett's opinion considered "both logic and law." 145 S. Ct. at 2661. First, as to logic, Justice Barrett concluded that "[v]acating the guidance does not reinstate terminated grants" because if that were the case, "the District Court would have needed only to vacate the guidance itself." *Id*. Here, too, vacating the "high-risk" designation does not reinstate any particular funds.

The facts surrounding the "high-risk" designation prove as much. Following the designation, agency staff altered the method by which they administer and disburse formula funding, discretionary grants, and impact aid grants and advised the Virginia Department of Education to administer pass-through funding to the Districts differently. JA012-013;

---

[8] *See supra* Section II.A.1.

JA230-231. That the "high-risk" designation affects how agency staff implement grant-related policies "does not transform a challenge to that [designation] into a claim 'founded . . . upon' contract that only the CFC can hear." *NIH*, 145 S. Ct. at 2661. Vacatur of that designation "has prospective and generally applicable implications beyond the reinstatement of specific grants" and therefore "falls well within" the district court's jurisdiction under the APA. *Id.* at 2662–63 (Roberts, C.J., concurring in part and dissenting in part).

This reading is further reinforced by Justice Barrett's second consideration in *NIH*: the legal difference between the agency guidance and the grant terminations that flowed from that guidance. Her opinion affirmed that the district court was the correct forum for claims challenging the guidance because that guidance is legally distinct from grant terminations or other adjudications made under it. 145 S. Ct. at 2661 (citing *Am. Pub. Health Ass'n v. Nat'l Insts. of Health,* 145 F.4th 39, 50 (1st Cir. 2025); *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415 (D.D.C. 2020)). So too here. Because the "high-risk" designation is legally distinct from any future decisions to withhold funds under that designation, the district court can properly exercise jurisdiction over the Districts'

30

challenges to the designation and the unlawful Title IX interpretation upon which it relies.

Courts in sister circuits have read *NIH* to affirm district court jurisdiction to review internal agency guidance, including policies that discuss internal grant procedures or impose unlawful grant conditions. *See, e.g. Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, No. 25-cv-1923 (JMC), 2025 WL 2615054 at *11 (D.D.C. Sept. 10, 2025) (finding that *NIH* does not bar plaintiffs' APA challenge to agency guidance); *City of Fresno v. Turner*, No. 25-cv-07070, 2025 WL 2721390 at *6 (N.D. Cal. Sept. 23, 2025) (relying on *NIH* to find jurisdiction to review policies and guidance conditioning funding on allegedly unlawful requirements); *Planned Parenthood of Greater N.Y. v. HHS, No.* 25-2453, 2025 WL 2840318, at *13 (D.D.C. Oct. 7, 2025) (same). A finding that the lower court has jurisdiction to review the "high-risk" designation is consistent with that application.

3.   The Lower Court's Decision Relies on Logic Rejected by the Supreme Court that Would Improperly Broaden Tucker Act Jurisdiction.

The district court relies on logic rejected by the Supreme Court in *NIH* to conclude that it lacks jurisdiction to review Defendants'

designation of the Districts as "high-risk." Affirming that logic would contradict the Court's ruling in *NIH* and improperly broaden the reach of the Tucker Act.

The district court insisted that it lacked jurisdiction over the Districts' claims, including their challenge to the "high-risk" determinations, "[b]ecause the relief that Plaintiffs seek ultimately requires this Court 'to order the payment of money.'" JA219[9] This reasoning follows the same logic employed by dissenting opinions in *NIH*: that the challenge to guidance is not "separable from the[] challenge to the grant terminations." 145 S. Ct. at 2665 (Kavanaugh, J., concurring in part and dissenting in part); *see also* 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part) ("all claims on which the district court rendered judgment were 'based on' respondents' contracts

---

[9] The lower court also relied upon this Court's decision in *Sustainability Institute v. Trump*, 784 F. Supp. 3d 861, *appeal pending*, No. 25-1575 (4th Cir. May 22, 2025), to justify its logic. But that decision concerned claims seeking to restore immediate access to grant funds that had been terminated. *Id.* at 868–69. It is inapposite here, where Plaintiffs instead seek to vacate an agency determination with a range of forward-looking implications, including changes in the method by which a variety of funds are administered and disbursed.

with the government and . . . were thus entered without jurisdiction" (citation omitted)).

But the majority in *NIH* rejected this logic. In her controlling opinion, Justice Barrett concluded not only that claims challenging guidance and grant terminations are "legally distinct" but that "[b]oth logic and law . . . support channeling challenges to the grant terminations and guidance to different forums." *Id.* at 2661. Upholding the lower court's decision would, therefore, improperly broaden the Tucker Act to bar district court jurisdiction over challenges to internal agency guidance and policies. For this reason, this Court should conclude that the district court has jurisdiction to review the Districts' separate and distinct pleas to "vacate and set aside Defendants' decision to designate [them] as 'high-risk.'" JA038 ¶ (a); JA255 ¶ (a).[10]

---

[10] To the extent the Districts' pleadings conflate the distinct agency actions at issue, this Court must "look to the true nature of the action in determining the existence or not of jurisdiction." *Nat'l Ctr. for Mfg. Sciences*, 114 F.3d at 199 (cleaned up). The distinction between the "high-risk" designation and any actions taken as a result of that designation support the district court's jurisdiction over challenges to the designation. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

## CONCLUSION

In declining jurisdiction over Plaintiffs' challenge to the unlawful interpretation of Title IX that triggered Defendants' designation of Plaintiffs as "high-risk," the district court misunderstood Plaintiffs' core complaints and failed to give proper effect to the purpose and scope of the APA. The district court's decision leaves Plaintiffs without an adequate forum for their claims and lays the devastating consequences of Defendants' unlawful policy interpretation at the feet of thousands of vulnerable students who depend on federal education support. This outcome does not accord with controlling authority construing jurisdiction under the APA and Tucker Act. Nor is this outcome required by *NIH*. For these reasons, this Court should reverse.

34

Dated: October 27, 2025

Respectfully submitted,

/s/ *Deuel Ross*

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14 Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Katrina Feldkamp
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200

Kelly Gardner
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
260 Peachtree Street NW, Suite 2300
Atlanta, GA 30303
(332) 282-6613

*Counsel for Amici Curiae NAACP
Legal Defense & Educational Fund
and NAACP*

## CERTIFICATE OF COMPLIANCE

I, Deuel Ross, counsel for *amici curiae* NAACP Legal Defense and Educational Fund, Inc. and the NAACP, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is proportionately spaced, has a typeface of 14 points or more, and contains 6,467 words.

October 27, 2025

/s/ *Deuel Ross*
Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.

Counsel for *Amici Curiae*

36

**CERTIFICATE OF SERVICE**

I, Deuel Ross, counsel for *amici curiae* NAACP Legal Defense and Educational Fund, Inc. and the NAACP and a member of the Bar of this Court, certify that, on October 27, 2025, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

October 27, 2025

/s/ *Deuel Ross*
Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.

Counsel for *Amici Curiae*

37